# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
MICHAEL SIMONS, M.D.

**(b)** County of Residence of First Listed Plaintiff  NEW HAVEN
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Norman A. Pattis, PATTIS & SMITH, LLC
383 Orange Street, New Haven, CT 06511
203-393-3017; npattis@pattisandsmith.com

## DEFENDANTS
YALE UNIVERSITY, PETER SALOVEY, ROBERT ALPERN, M.D., UNKNOWN PERSONS

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title IX of the Education Amendments of 1972(US Code 1681); 42 USC Section1981
Brief description of cause:
Violation of the plaintiff's rights, breach of his right to privacy, breach of contract and wrongful dischard

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 09/30/2019
SIGNATURE OF ATTORNEY OF RECORD *[signature]*

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

 (b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

 (c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL SIMONS, M.D., <br> Plaintiff, | : <br> : <br> : | :cv_____ |
| YALE UNIVERSITY, <br> PETER SALOVEY, <br> ROBERT ALPERN, M.D., <br> UNKNOWN PERSONS, <br> Defendants. | : <br> : <br> : <br> : <br> : | SEPTEMBER 30, 2019 |

## COMPLAINT

1.  This is an action for violation of the plaintiff's rights arising under Title IX of the Education Amendments of 1972 (20 United States Code Section 1681) and 42 United States Code Section 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., and for breach of his right to privacy under Connecticut law, for breach of contract and the implied warranty of fair dealing arising under Connecticut law, wrongful discharge and his right to be free from negligent infliction of emotional distress arising under Connecticut law.

### Jurisdiction

2.  Jurisdiction and venue are evoked pursuant to 28 U.S.C. Sections 1331 and 1332 and 28 U.S.C. Section 1391b).

### Parties

3.  The plaintiff, Dr. Michael Simons, is an adult resident of the State of Connecticut. He also maintains a resident in London, England. He is a physician,

1

medical researcher and faculty member of the Yale School of Medicine and is employed by Yale University.

4. Yale University, herein after "the university," is a private educational institution organized and operating in the State of Connecticut. The university maintains undergraduate, graduate and professional courses of studies, including a medical school, serving approximately 7,500 students. The university employs thousands of persons. It receives federal funds within the meaning of 20 U.S.C. Section 1681 et seq. ("Title IX").

5. Peter Salovey was at all time relevant to this Complaint, and he remains, president of the university. He is also the Chris Argyris Professor of Psychology at the university.

6. Dr. Robert Alpern was at all times relevant to this Complaint the Dean of the Yale School of Medicine.

7. Unknown persons employed by the university are named herein as conduits of private information transmitted to news media, including The New York Times and The Washington Post.

## Facts

8. In 2008, the university offered the plaintiff, a cardiologist with an international reputation as a scholar, a tenured professorship and a position as the Chief of Cardiology in the School of Medicine. At the same time, the plaintiff was offered an endowed chair, the Robert W. Berliner Professorship of Medicine,

2

a position named for the former Dean of the Yale School of Medicine. Part of the offer also included an appointment of the plaintiff to the role of Chief of Cardiovascular Medicine at the Yale-New Haven Hospital. Dr. Simons accepted the offer and began employment in these various roles in 2008. Dr. Simons relinquished the A.G. Huber Endowed professorship at Dartmouth College on the basis of the offer of the Berliner professorship at Yale.

9. An integral part of Dr. Simons' written contract was appointment to the Robert W. Berliner Professorship of Medicine. The possession of an endowed chair reduces a faculty member's dependence on grants thereby increasing their financial security. It further facilitates the success of grant applications, as the prestige of having an endowed chair reflects the applicant's standing in the scientific community and positively affects grant funding bodies' view of the applicant. Endowed chairs are a rare commodity and are offered only to the very best and select members of the faculty. In Dr. Simons' case, the endowed chair was the pinnacle of a 25-plus year academic career.

10. In 2009, the university appointed Dr. Simons to the position of Director of the Yale Cardiovascular Research Center.

11. The university has in recent years been subjected to regulatory and public relations scrutiny over how it handles claims of sexual misconduct by male students and male employees against female students and female employees.

12. In April 2011, the university received a letter from the Office of Civil Rights of the federal Department of Education (DOE), the so-called "Dear Colleague" letter. This letter advised recipients that universities needed to "take immediate action to eliminate [sexual] harassment, prevent its recurrence, and address its effects, or face potential loss of federal funding under Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681, et seq. and its attendant regulations.

13. In the wake of the 'Dear Colleague" letter, the DOE began a highly publicized series of investigations of colleges and universities to determine whether those institutions took a strong enough stand against claims of alleged sexual harassment.

14. In late 2010 and early 2011, the Office of Civil Rights concluded, in response to a complaint from a Yale student, that the university was deficient in the manner in which it responded to allegations of sexual misconduct on campus. The federal agency concluded that these deficiencies tended to create and foster a sexually hostile environment toward women.

15. As a result of this criticism, the university created a University-Wide Committee on Sexual Misconduct, "UWC," to provide formal and informal means of resolving claims of alleged sexual misconduct. The UWC is charged with enforcing Yale's Sexual Misconduct Policy. The plaintiff was subject to the policies and jurisdiction of the UWC as a faculty member.

4

16. The university adopted Procedures Governing the University-Wide Committee on Sexual Misconduct. These procedures set out the rights and responsibilities of an accuser, the accused and the university in a complaint about sexual misconduct.

17. In 2013, the university was subject to hostile criticism and complaints by activists that it tolerated sexual misconduct by student and alumni groups, including a group calling itself "Students Against Sexual Violence at Yale," and a group of alumni who wrote an open letter to Defendant Salovey urging a more forceful response to allegations of sexual misconduct. The activities of the student and alumni groups were widely reported upon in the press.

18. Just before the university created the UWC, in February 2010, the plaintiff sent a letter to a junior colleague, Dr. Jane Doe, whose name and identity are known to the defendants. The letter was a declaration of love and romantic interest of the sort men have sent to women from time immemorial. The recipient was not a subordinate of the plaintiff's and was in no way dependent upon him for her position. Dr. Doe made clear to the plaintiff that the plaintiff's romantic interest was unrequited, and, after an exchange of several emails, the communications between two ceased, ending finally in 2011.

19. Dr. Doe subsequently developed a romantic relationship with another physician/colleague, Dr. Robert Roe. When Dr. Roe experienced professional difficulties at the Yale Medical School, Drs. Roe and Doe decided

that the plaintiff was to blame, and that the plaintiff had acted to undermine Dr. Roe in an effort to retaliate against Dr. Doe.

20.  In 2013, Dr. Doe filed a complaint with the UWC alleging that she had been sexually harassed within the meaning of Yale's Sexual Misconduct Policy. The university retained retired Connecticut Superior Court Judge Beverly Hodgson to conduct an independent investigation of the allegations and claims raised in Dr. Doe's complaint.

21.  After Judge Hobson's lengthy fact-finding, the UWC concluded that Dr. Simons had, in fact, sexually harassed Dr. Doe. It recommended that Dr. Simons be suspended as chief of cardiology for a period of five years. After an appeal to the university's provost, the suspension was reduced to 18 months. This sanction was confirmed by Defendant Salovey and imposed.

22.  An express term and condition of the UWC Procedures is that "[t]he UWC and all members of the Yale community who are involved in a matter before the UWC are expected to maintain the confidentiality of its proceedings and the information obtained for those proceedings. Disciplinary action may be taken against any member of the Yale community who discloses a UWC Document in violation of these procedures or who is responsible for the improper disclosure of such documents by others."

23.  Despite the confidential nature of the UWC proceedings, the discipline imposed on Dr. Simons was leaked by one or unknown persons to the media, including The New York Times. As a result of the public reaction to those

stories, the university, in 2013, forced Dr. Simons to resign as Chief of Cardiology. After a second series of stories in The New York Times, the university then demanded that Dr. Simons resign as Director of the Cardiovascular Research Center. When Dr. Simons refused to do so, the university took the position away from him.

24. Neither the plaintiff nor anyone associated with him disclosed to the media that discipline imposed or the results of the UWC investigation. When Dr. Simons complained about the disclosure of private information to the press, the university refused to act or to investigate.

25. Dr. Simons remained a member in good standing of the university's faculty and successfully completed the suspension imposed as a penalty for violation of the sexual harassment policy. Throughout this period, Dr. Simons retained the Robert W. Berliner Professorship of Medicine, a position that maintained the plaintiff's ability to attract grants, and, therefore, compensation.

26. On or about 2017, general media reports about men alleged to have engaged in sexual misconduct with women became a rallying point for activists galvanized by the slogan and social media hashtag #MeToo. Said activists generated an implacable intolerance to any perceived instance of sexual harassment, inculcating an ethos requiring that victims be believed uncritically, and fostering a general climate of hysteria in which activists were unable to distinguish genuine acts of sexual misconduct from the sort of normal courting

7

behavior customary between men and women, such as the love letter sent by Dr. Simons to Dr. Doe in 2010.

27. Upon information and belief, in early 2018, one or more persons unknown sympathetic to the #MeToo movement with knowledge of the confidential UWC proceedings against Dr. Simons sought to inflict further punishment on Dr. Simons for the love letter he sent in 2010. According to Dean Alpern, these persons contacted the Berliner family, which endowed the Robert W. Berliner Professorship of Medicine, encouraging the family to demand that the university remove Dr. Simons from the professorship.

28. According to Dr. Alpern, members of the Berliner family contacted Yale administrators, including Defendant Salovey, to express their desire to remove Dr. Simons from the Robert W. Berliner Professorship of Medicine. Fearing a backlash from #MeToo actitvists and hoping to placate them, Defendant Salovey and the administration began exploring how to remove Dr. Simons from the chair.

29. In the Spring of 2018, Defendant Alpern, who was then Dean of the Medical School, approached Dr. Simons and asked him to relinquish the Robert W. Berliner Professorship in exchange for a different endowed chair. the Waldemar Von Zedwitz Professor of Cardiology. Dr. Alpern explained that the exchange was an unfortunate necessity given the political climate on campus.

30. Dr. Simons reluctantly agreed to the exchange.

31.  On June 22, 2018, Defendant Salovey sent Dr. Simons a letter confirming Dr. Simons' appointment as the Waldemar Von Zedwitz Professor of Cardiology, noting that "endowed chairs are awarded to those whose scholarship has brought distinction to the university." Defendant Salovey also noted, "I am delighted to convey our pleasure in your accomplishments," noting that the university's newspaper would "soon publish a story announcing the appointment."

32.  #MeToo activists and sympathizers immediately complained that the university had conferred a new honor on Dr. Simons.

33.  On September 6, 2018, the university released a statement through the university's newspaper that Dr. Simons was transferred from the Berliner Professorship to the Waldemar Von Zedtwitz Professorship in part due to concerns raised by the Berliner family, who had previously endowed the chair, and in part to make the Berliner Professorship available to a new employee. The announcement contended, despite what Defendant Salovey had written in June, that "the University had no intention to confer a new honor on Dr. Simons."

34.  #MeToo activists and sympathizers were unsatisfied by the transfer of chairs, contending that it signaled a tolerance and acceptance of sexual misconduct. Ignoring the fact that Dr. Simons had already been punished for sending a quotidian love letter, the activists wrote an open letter condemning the university and Defendant Salovey for honoring Dr. Simons with a new appointment. "We are submitting this letter to voice our disgust and

9

disappointment with this decision. We hope this letter sends that message in support of those targeted by his harassment at Yale and around the country who will see this action and be discouraged from speaking up," the activists wrote.

35. The university responded immediately, saying through a spokesman that: "We agree that in cases where someone has been found, through a formal process, to have violated University standards of conduct, there should be a presumption against awarding new honorifics.... We realize that recent announcements about a specific circumstance may appear to be at odds with these statements and want to take this opportunity to provide clarification... In making this transfer, the University had no intention to confer a new honor on Dr. Simons."

36. Unsatisfied with the university's response to their complaints to the administration, activists turned to the media, including The New York Times and The Washington Post. In mid-September, the university decided it would take further action against Dr. Simons in order to placate critics.

37. Knowing that Dr. Simons was in London where his wife lives and works, and seemingly unable to mount an effective legal challenge to the university's actions, Defendant Alpern called Dr. Simons at around 8 p.m. London time On September 20, 2018, and told the plaintiff that the university was concerned about the public criticism directed at the university's transfer of the plaintiff to the Waldemar Von Zedtwitz Professorship.

38. During the September 20, 2018 conversation. Dr. Alpern also told that plaintiff that the plaintiff had until noon the following day, September 21, 2018, to resign from the Waldemar Von Zedtwitz Professorship. Dr. Alpern refused to give the plaintiff more time to consider the choice.

39. Dr. Simons informed Defendant Alpern that he would not resign. He retained counsel who sought to block the university's unilateral action by way of an action for ex parte injunctive relief filed the morning of September 21, 2018, in the Superior Court for the Judicial District of New Haven. The Superior Court denied Dr. Simons' request for emergency relief, and the Waldemar Von ZedWvitz Professorship was taken from him on September 21, 2018.

40. Yale has provided some financial support in lieu of the chair in the year following removal of the chair, but is not contractually obligated to do so in the future.

41. Dr. Simons subsequently timely complained to the federal Department of Education, to the federal Equal Employment Opportunity Commission (EEOC) and to the Connecticut Commission on Human Rights (CHRO). He has received a release of jurisdiction from the EEOC and the CHRO. The federal Department of Education never responded to, or acknowledged, his complaint. This action is timely filed.

42. Dr. Simons remains an employee of the university.

## BREACH OF CONTRACT

43. Paragraphs one through 42 are incorporated herein.

44. The university and Dr. Simons entered into an employment contract as to the terms, conditions, titles, and compensation of employment in 2008. The university amended that contract in 2009 when it offered Dr. Simons the position of Director of the Yale Cardiovascular Research Center.

45. A material term of the contract was the university's and Dr. Simons' being bound and obligated to the rights and duties imposed by the Procedures Governing the University-Wide Committee on Sexual Misconduct.

46. The university unilaterally and unjustly breached the contract in the following ways:

   a. Imposition of successive and duplicative punishment for violation of the of the policies against sexual harassment;

   b. Unilaterally removing the plaintiff from his endowed chair in response to negative publicity by #MeToo activists and sympathizers;

   c. Removing the plaintiff from his endowed chair without any meaningful opportunity to contest the removal through proper university channels and procedures.

47. As a direct and proximate result of the acts and omissions herein described, Dr. Simons suffered direct economic damages in the form of lost wages, lost grant opportunities, inability to secure alternative employment, and other ascertainable economic loss. Dr. Simons has been marginalized at Yale.

## BREACH OF IMPLIED WARRENTY OF FAIR DEALING

48, Paragraphs one through 47 are incorporated herein.

49,. The university breached its implied warranty of fair dealing with the plaintiff by inducing him to come to the university, offering him a combination of positions and the compensation that flowed from those positions, and leading him to believe that the positions could be taken from him only as a result of renegotiation or under the terms and conditions of written university policies.

50. The decision to remove the plaintiff from the Waldemar Von Zedtwitz Professorship was a craven effort to placate activists and avoid the negative publicity of further criticism and did not follow any Yale procedures or policies.

51. The summary manner of providing him notice of intent to remove him from the position, on short notice while he was out of the country, was unconscionable, and was intended to deprive him an effective right to contest the university's decision in either a court of law or before a university tribunal.

52. As a direct and proximate result of the acts and omissions herein described, Dr. Simons suffered direct economic damages in the form of lost wages, lost grant opportunities and other ascertainable economic loss.

## WRONGFUL DISCHARGE

53. Paragraphs one through 52 are incorporated herein.

54. The defendants engaged in wrongful discharge by orchestrating the plaintiff's removal from the Waldemar Von Zedtwitz Professorship in the manner and means and for the purposes described above.

55. As a direct and proximate result of the acts and omissions herein described, Dr. Simons suffered direct economic damages in the form of lost wages, lost grant opportunities and other ascertainable economic loss, together with emotional distress and suffering.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

56. Paragraphs one through 55 are incorporated herein.

57. The defendants acted in such a matter as negligently cause Dr. Simons to suffer emotional distress and humiliation.

## TITLE IX - DOUBLE JEOPARDY DUE PROCESS CLAIM

58. Paragraphs one through 57 are incorporated herein.

59. Title IX affords due process protections to claimants and respondents in any action alleging sexual harassment.

60. Dr. Simons was accused of sexual harassment, and, after a fully internal adjudication of the Title IX process, was subjected to discipline. Dr. Simons completed the discipline imposed.

61. In response to publicity and complaints of activists, the university took further punitive action against Dr. Simons, effective punishing him twice for the same conduct, in violation of the due process requirements of Title IX. Yale went beyond the adjudicated discipline over and over again: first, by taking away Dr. Simons' directorship of the Cardiovascular Center, then by forcing him to resign as chief of cardiology, and then by taking away his endowed chair five years later.

62. The defendants' acts were intentional and inspired by malice.

63. As a direct and proximate result of the acts and omissions herein described, Dr. Simons suffered direct economic damages in the form of lost wages, lost grant opportunities and other ascertainable economic loss.

### TITLE VII - DISCRIMINATION ON ACCOUNT OF GENDER

64. Paragraphs one through 63 are incorporated herein.

65. Dr. Simons is a Caucasian male.

66. The defendants have never punished a female multiple times for the same conduct in any disciplinary action involving sexual harassment.

67. Upon information and belief, the defendants have subjected only Caucasian males to punishment twice for the same conduct.

15

68.   The defendants acted intentionally and in a discriminatory manner in regard to Dr. Simons for the express purpose of placating those #MeToo activists and sympathizers in the grip of moral panic and self-righteous indignation.

### BREACH OF PRIVACY - PUBLICATION OF PRIVATE FACTS

69.   Paragraphs one through 68 are incorporated herein.

70.   Despite the fact the UWC disciplinary proceedings are intended to be private and confidential, unknown defendants associated with Yale caused private information about Dr. Simons to be publicized to others for the purpose of satisfying their political agenda.

### DAMAGES

71.   The plaintiff claims damages as follows:

    A.   Lost wages and benefits;

    B.   Compensatory damages for lost wages, lost reputation, emotional distress and suffering; loss of professional opportunities;

    C.   An order restoring the plaintiff to the Waldemar Von Zedwitz Professorship, or to a chair of comparable honorific value;

    D.   Punitive damages;

    E.   Attorney's fees and costs;

    F.   Such other relief as this Court deems fair and equitable.

**THE PLAINTIFF CLAIMS A TRIAL BY JURY AS A MATTER OF RIGHT**

THE PLAINTIFF

By _/s/_
NORMAN A. PATTIS
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
203.393.3017
203.393.9745
npattis@pattislaw.com
ct13120