# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL SIMONS, | : | |
| Plaintiff, | : | 3:19-CV-01547 (VAB) |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, | : | |
| PETER SALOVEY, | : | |
| ROBERT ALPERN, M.D., | : | |
| UNKNOWN PERSONS, | : | |
| Defendants. | : | DECEMBER 18, 2019 |

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS AND MOTION TO STRIKE AND FOR MORE DEFINITE STATEMENT

The Plaintiff, Dr. Michael Simons, hereby respectfully requests that the Court deny the Defendants, Yale University, Peter Salovey, Dr. Robert Alpern, and Unknown Persons, motion to dismiss his Complaint in its entirety and the Defendants' motion to strike Count 7, or, in the alternative, order the Plaintiff to provide a more definite statement.

## I.  BACKGROUND

On October 1, 2019, the Plaintiff, Dr. Michael Simons, initiated the instant action against Yale University, Peter Salovey, Dr. Robert Alpern, and Unknown Persons for violations of Titles VII and IX, breach of contract and of the implied warranty of fair dealing, wrongful discharge, negligent infliction of emotional distress, and breach of right to privacy. In 2008, Dr. Simons accepted employment at Yale University in a number of separate and distinct positions: a tenured faculty position, an endowed professorship entitled the Robert W. Berliner Professorship of Medicine, Chief of Cardiovascular Medicine at Yale-New Haven Hospital, and Director of the Yale Cardiovascular Research

Center. Compl. ¶¶ 8, 10. He enjoyed the acclaim of the international medical community and the unparalleled respect of his colleagues. *Id.* at ¶ 8.

In 2010, Dr. Simons sent a love letter to a junior colleague, Dr. Jane Doe, declaring his love and romantic interest in her. *Id.* at ¶ 18. Dr. Doe clearly rebuffed Dr. Simons' interest in her, and, after several emails between the two, Dr. Simons ceased communicating with her in 2011. *Id.* at ¶ 18. Dr. Jane Doe subsequently developed a romantic relationship with another colleague, Dr. Robert Roe, who experienced some professional difficulties at Yale Medical School. *Id.* at ¶ 19. Drs. Doe and Roe blamed Dr. Simons for these difficulties, and Dr. Doe filed a complaint against Dr. Simons with Yale University's University-Wide Committee On Sexual Misconduct (hereinafter, "UWC"). *Id.* at ¶ 19. After a lengthy investigation by retired Connecticut Superior Court Judge Beverly Hodgson, the UWC concluded that Dr. Simons had sexually harassed Dr. Doe and suspended him as chief of cardiology for a period of five years – a suspension later reduced to 18 months by the provost. *Id.* at ¶ 21. The discipline imposed by the UWC did not touch any of the other positions that Dr. Simons held.

Despite the supposed confidentiality of the UWC proceedings, an unknown person(s) leaked the details of the discipline imposed on Dr. Simons to the media. *Id.* at ¶ 21. Facing immense public pressure, the Defendants forced Dr. Simons to resign as Chief of Cardiology and stripped him of his position as Director of the Cardiovascular Research Center at Yale University despite his refusal to resign. *Id.* at ¶ 23. Dr. Simons complained to the Defendants about the leak of supposedly confidential information to the press, but the Defendants took no action to investigate the matter. *Id.* at ¶ 24. Despite the additional discipline imposed on him, Dr. Simons retained his position as the Robert

W. Berliner Professor of Medicine during his suspension, which enabled him to attract research grants and compensation. *Id.* at ¶ 25. Dr. Simons successfully completed his discipline and remained in good standing with Yale University's faculty. *Id.* at ¶ 25.

In early 2018 at the height of the #MeToo movement, Dr. Simons became the victim of another set of leaks about his UWC discipline. *Id.* at ¶ 27. This time, the leakers deliberately informed the Berliner family, which endowed the Robert W. Berliner Professorship of Medicine, of Dr. Simons' UWC discipline. *Id.* at ¶ 27. Predictably, the Berliner family contacted the Defendants and demanded that Dr. Simons be removed from their endowed professorship. *Id.* at ¶ 28. The Defendants decided to draw a middle line by placating the Berliner family and #MeToo activists and avoiding a potential lawsuit from Dr. Simons. *Id.* at ¶ 28. Consequently, they proposed to Dr. Simons that he transfer his endowed professorship to the Waldemar Von Zedwitz Professor of Cardiology position, to which Dr. Simons reluctantly agreed. *Id.* at ¶¶ 29-30.

Immediately upon public announcement of the transfer, #MeToo activists and sympathizers unleashed a torrent of complaints and expressions of outrage on the Defendants. *Id.* at ¶ 32. When the Defendants rebuffed their initial complaints, the activists and the sympathizers turned to the media to make their case. *Id.* at ¶ 36. The Defendants finally caved, and, on September 20, 2018, they issued Dr. Simons an ultimatum: Resign in under 24 hours or be stripped of the Waldemar Von Zedtwitz Professorship. *Id.* at ¶ 38. Dr. Simons refused to acquiesce to this demand and sought emergency injunctive relief in Connecticut state court, which denied his request for emergency relief. *Id.* at ¶ 39. The Defendants subsequently stripped him of his endowed professorship on September 21, 2018. *Id.* at ¶ 39.

Given the emergency nature of his state action, Dr. Simons withdrew it without amending it so he could explore his legal options and prepare a more adequate complaint. He timely complained to the appropriate administrative agencies: the Federal Department of Education, the federal Equal Employment Opportunity Commission ("EEOC"), and the Connecticut Commission on Human Rights ("CHRO"). *Id.* at ¶ 41. He received releases of jurisdiction from the EEOC and the CHRO, but the federal Department of Education never acknowledged his complaint. *Id.* at ¶ 41.

He then proceeded to bring this action on October 1, 2019, and he remains an employee of Yale University. *Id.* at ¶ 42.

## II. ARGUMENT

As a preliminary matter, Dr. Simons does not contest the Defendants' argument that he has not pled diversity jurisdiction because it would be futile to plead it in this action. To the extent diversity jurisdiction is pled in paragraph 2 of the complaint, Dr. Simons believes that it was a drafting error. Regarding the Defendants' supplemental jurisdiction arguments, Dr. Simons has stated plausible claims that fall within the Court's federal question jurisdiction under 28 U.S.C. § 1331 as discussed in detail below. Dr. Simons relies on the well-established principles regarding the Court's supplemental jurisdiction under 28 U.S.C. § 1367 to establish jurisdiction for his state law claims.

**A. THE COURT SHOULD DENY THE DEFENDANTS' MOTION TO DISMISS BECAUSE IT CALLS FOR THE COURT TO DRAW INFERENCES ADVERSE TO THE PLAINTIFF IN DIRECT CONTRADICTION OF THE MOTION TO DISMISS STANDARD.**

Under Fed. R. Civ. P. 8(a), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A claim that fails to "state a claim upon which relief can be granted" will be dismissed. *Sterling v. Securus Technologies,*

*Inc.*, No. 3:18-CV-1310 (VAB), 2019 WL 3387043, at *3 (D. Conn. Jul. 26, 2019) (quoting Fed. R. Civ. P. 12(b)(6)) (internal quotations omitted). Courts review complaints challenged by a motion to dismiss under a "'plausibility standard' guided by 'two working principles.'" *Id.* at *3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The first principle is that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at *3 (quoting *Iqbal*, 556 U.S. at 678). Therefore, a complaint requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at *3 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at *3 (quoting *Iqbal*, 556 U.S. at 679). Consequently, a complaint must include enough "factual amplification… to render a claim plausible." *Id.* at *3 (quoting *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation and citation omitted)).

During the review of the complaint on a motion to dismiss under Rule 12(b)(6), courts must take "all factual allegations in the complaint as true." *Id.* at *3 (citing *Iqbal*, 556 U.S. at 678). Furthermore, court must also view "the allegations in the light most favorable to the plaintiff and [draw] all inferences in the plaintiff's favor." *Id.* at *3 (citing *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d. Cir. 2013)).

1. **The Court Should Deny The Defendants' Motion To Dismiss Count One Because The Plaintiff Pleads Sufficient Plausible Facts And The Statute of Limitations Does Not Bar His Claim.**

The well-established elements of a breach of contract claim are "the formation of an agreement, performance by one party, breach of the agreement by the other party and

damages." *U.S. Bank Assoc. v. Eichten*, 184 Conn. App. 727, 761 (2018) (internal quotation and citation omitted). Dr. Simons has alleged the existed of a written contract between Yale University and himself, which the Court must accept as true for purposes of considering the Defendants' motion to dismiss. Compl. at ¶¶ 8-9. Furthermore, there is no question that an agreement was formed between Yale University and Dr. Simons. On May 22, 2008, Yale University sent Dr. Simons an offer of employment at Yale University. *See* **Exhibit 1 – Dr. Simons' Offer Letter.** Dr. Simons accepted that offer, thus forming a contract between Yale University and himself.

Moreover, every aspect of an employer-employee relationship is not governed by an express contract. *Gaudio v. Griffin Health Services Corp.*, 249 Conn. 523, 532 (1999). "It is firmly established that 'statements in an employer's personnel manual may… under appropriate circumstances… give rise to an express or implied contract between employer and employee.'" *Id.* at 532 (quoting *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 564 (1984)); *see also Rafalko v. University of New Haven*, 129 Conn. App. 44 (2011). As part of the agreement formed between Yale University and himself, Dr. Simons agreed to familiarize himself with "[p]olicies for faculty" as set forth in the "Yale University Faculty Handbook." *Id.* at p.1, ¶ 3. Yale University described these policies as representing "essential employment understandings between you and the University." *Id.* at p.1, ¶ 3. Furthermore, the contract indicates that the Faculty Handbook would be revised periodically and the revisions would become part of the essential employment understandings. *Id.* at p., ¶ 3 ("you are urged to read the Faculty Handbook with care, including revisions of the Handbook that are made periodically and become part of these understandings").

As of August 22, 2019, the policies and information set forth in the Faculty Handbook constituted 183 pages. *See* **Exhibit 2 – Yale University Faculty Handbook**. The Handbook devotes a grand total of two and half pages to discussing sexual misconduct, instructing faculty to view other websites and the University-Wide Committee on Sexual Misconduct's (UWC) policies and procedures. *Id.* at p. 175-77. Consequently, the plain language of the contract formed between Yale University and Dr. Simons indicates that the Faculty Handbook outlines material terms of the agreement between them. The plain language also indicates that the contract also contemplated the possibility of revisions and sought to bind Dr. Simons to those revisions, which he agreed to. Those revisions included the revision establishing the UWC as Yale University's method of handling allegations of sexual misconduct. The current Faculty Handbook clearly indicates that the UWC handled all instances of sexual misconduct. *Id.* at p. 175.

Yale University's bold assertion that Dr. Simons did not perform his part under the contract by engaging in sexual misconduct falls flat for several reasons. First, Yale University hired an independent investigator to investigate whether Dr. Simons engaged in sexual misconduct by sexually harassing a colleague. Compl. at ¶ 20. After reviewing the investigator's findings of fact, Yale's UWC concluded that Dr. Simons had sexually harassed a colleague, but did *not* recommended termination or the removal of Dr. Simons from his endowed chair. *Id.* at ¶¶ 21, 25. Instead, the UWC recommended that Dr. Simons be suspended from his position as chief of cardiology for five years. *Id.* at ¶ 21. Second, and even more notably, the provost declined to adopt this harsh recommendation and suspended Dr. Simons for 18 months. *Id.* at ¶ 21. Third, Yale University only forced Dr. Simons to resign as Chief of Cardiology at Yale-New Haven Hospital and as Director of

the Cardiovascular Research Center at Yale University after someone with knowledge of the UWC disciplinary proceedings leaked confidential information regarding his discipline to the media. *Id.* at ¶ 23-24. Fourth, Dr. Simons retained his endowed chair throughout his suspension, successfully completed his suspension, and maintained his position as a member in good standing with Yale University's faculty. *Id.* at ¶ 25. Since his 2013 suspension, Dr. Simons did not commit any further instances of sexual harassment. However, in 2018 – five years after Dr. Simons' suspension, Yale University moved to strip him of his endowed chair due to more media attention created by more leaks of confidential information to the media. *Id.* at ¶¶ 27-31, 35-39.

The question begs to be asked and Dr. Simons is asking it with through this lawsuit: Why did Yale University fail to terminate Dr. Simons or strip him of his endowed chairs based on its own investigation? Why did it take media and public attention – the result of illicit leaks of confidential information by Yale University employees – for Yale University to strip Dr. Simons of his endowed chairs? The answer is simple. Based on its own findings and investigation, Yale University determined that, while Dr. Simons had conducted himself in a way that it thought should be disciplined, he had not committed an egregious violation of Yale University's policies that would constitute a breach of his contract with them and would require his termination. Dr. Simons completed his suspension with fortitude despite his disagreement with it. He maintained his good standing on the faculty, and he did not engage in any other conduct that Yale University needed to discipline him for. *Id.* at ¶ 25. In summary, Dr. Simons performed his part of the contract between himself and Yale.

To the extent the Defendants construe Count One of the Plaintiff's Complaint to only claim a breach for suspending him in 2013, the Defendants first fail to carefully read Count One and then invite the Court to construe it in the light most unfavorable to Dr. Simons – in clear contravention of the motion to dismiss standard. Court One pleads that Yale University breached the contract by punishing Dr. Simons twice for the same incident. *Id.* at ¶ 46. Count One pleads that Yale University breached the contract by unilaterally stripping Dr. Simons of his endowed chair in an effort to pander to a flash mob of aggrieved #MeToo activists and sympathizers. *Id.* at ¶ 46. Count One pleads that Yale University breached the contract by stripping Dr. Simons of his endowed chair without giving him an opportunity to contest it. *Id.* at ¶ 46. These breaches all occurred in 2018, well within the six-year statute of limitations that Yale University attempts to hang its hat on. Dr. Simons never pled a claim for breach of contract against Yale University for suspending him in 2013.

To the extent that Yale University contests that the six-year statute of limitations bars Dr. Simons from claiming a breach of contract for his suspension and subsequent removals from his positions in 2013 as Chief of Cardiology and Director of the Cardiovascular Research, Dr. Simons pleads that these incidents mark the beginning of a continuing course of conduct on the part of the Defendants in breach of the contract. Consequently, dismissal as it pertains to these incidents would be premature at this stage of the action because Dr. Simons is entitled to discovery that would enable him to prove that the Defendants engaged in a continuing course of conduct in breach of the contract. Moreover, the Defendants will not be prejudiced because they can also raise their statute of limitations defense in a summary judgment motion after Dr. Simons has received a

chance to raise a question of fact about his allegations. Therefore, the Court should deny the Defendants' motion to dismiss Count One of Dr. Simons' Complaint.

**2. The Court Should Deny The Defendants' Motion To Dismiss Count Two Because The Defendants Breached The Implied Covenant of Good Faith And Fair Dealing By Acting in Bad Faith.**

As discussed in the previous section, Dr. Simons pleads a breach of the implied warranty of fair dealing for his suspension and subsequent removals from his positions as Chief of Cardiology and Director of the Cardiovascular Research Center in 2013 as a course of continuing conduct on the part of the Defendants. Furthermore, he plead a breach of the implied warranty of fair dealing for Yale University's craven effort in 2018 to satisfy a flash mob intent on placing Dr. Simons' head on the spike of the #MeToo movement.

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon*, 224 Conn. 231, 238 (1992). The purpose of such an implied covenant is to ensure the fulfillment and protection of the reasonable expectations of the parties. *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558 (1984). In the employment context, an employee must show that the employer committed "an impropriety which contravenes some important public policy…" in order to claim a breach of the implied covenant of good faith and fair dealing. *Carbone v. Atlantic Richfield Co.*, 204 Conn. 460, 470-71 (1987). This standard has gradually evolved into a bad faith standard, which "implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested

or sinister motive…." *Rafalko v. University of New Haven*, 129 Conn. App. 44 (2011) (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432-33 (2004)) (internal quotation omitted).

Yale University enticed Dr. Simons to leave his endowed professorship at Darmouth College to accept an endowed and tenured professorship at Yale University. Yale University led Dr. Simons to believe, by the language of its offer, that appointment and removal from endowed professorships could only be accomplished by following the proper procedures and process at Yale University. **Exhibit 1, p. 1, ¶ 2**. Dr. Simons has alleged that he was summarily removed from his endowed professorship without Yale University following the proper process and procedures, thus breaching its implied warranty of fair dealing with him. Compl. at ¶¶ 48-52.

These actions were taken in bad faith as Dr. Simons alleges. Yale University did not arrive at the conclusion to remove Dr. Simons from his position through the careful deliberation that its processes and procedures called for and that it promised to Dr. Simons. Instead, the Defendants summarily stripped Dr. Simons of the position that he bargained for, namely an endowed chair, in an effort to seek relief from the barrage of scorn and ridicule being rained down on their heads by a flash mob of self-righteous #MeToo activists who bore no regard for the basic principles of fairness. The Defendants did not arrive at the decision to strip Dr. Simons of his chair because of their own careful, independent investigation and conclusions, but rather from the pressure exerted on them by an ill-informed rabble whose only goal was the destruction of Dr. Simons. The manner in which the Defendants reached this decision was in clear contradiction of the promises

that they had made to Dr. Simons, thus constituting bad faith by either a neglect or an outright refusal to follow their contractual obligations.

Dr. Simons has pled sufficient facts to establish a plausible claim for a breach of the implied covenant of good faith and fair dealing. Therefore, the Court should deny the Defendants' motion to dismiss Count Two of the Complaint.

**3. The Court Should Deny The Defendants' Motion To Dismiss Count 3 Of The Complaint Because Dr. Simons Alleges Discharge From Separate & Distinct Positions That Stand As Separate Employments.**

Dr. Simons does not dispute the Defendants' assertion that he has statutory remedies under Titles VII and IX for the same public policy violations that he seeks to assert on his wrongful discharge claim – sex discrimination – which would bar him from recovering on a claim on a common-law wrongful discharge claim. However, Dr. Simons rejects the Defendants' construction of his Complaint and requests the Court to either construe his complaint to plead wrongful discharge in the alternative to both Title VII or Title IX or to grant him permission to amend his complaint to plead wrongful discharge in the alternative. Dr. Simons does not have enough information at this time to determine whether either his Title VII or Title IX claims will be triable claims. Consequently, the Court should allow Dr. Simons to proceed on his wrongful discharge claim because the same discovery required for his Title VII and Title IX claims will suffice for proceeding on his wrongful discharge claim, thus posing no additional burden upon the Defendants.

Furthermore, Dr. Simons does not dispute that, to state a plausible claim for wrongful discharge, he must be discharged from employment. *See, e.g. Geysen v. Securitas Sec. Services USA, Inc.*, 322 Conn. 385 (2016). However, Connecticut law is not clear on whether a wrongful discharge claim requires a complete termination of all

employment relationships or whether a wrongful discharge claim covers the termination of a separate and distinct employment relationship, but not the complete termination of all employment relationships between parties. Furthermore, in consideration of the strong emphasis on public policy as the critical exception to traditional at-will employment, the same emphasis on public policy militates against hastily assuming that a wrongful discharge claim must allege a complete severance of a multi-faceted employment relationship.

The Defendants recruited Dr. Simons from Dartmouth to work for them in a number of separate and distinct employment relationships united under the umbrella of one contract – a fact borne out by the elaborate contract that they gave him and the position-allocated compensation structure described in the contract. *See* **Exhibit 1**. Furthermore, the UWC discipline imposed by the Defendants also compels this conclusion. Compl. ¶¶ 21, 23. The Defendants did not suspend Dr. Simons from all of the positions that he held under the contract. *Id.* Instead, they initially suspended him only as Chief of Cardiology at Yale-New Haven Hospital, and he retained his other positions as Director of the Cardiovascular Research Center, the Robert W. Berliner Professorship, and a tenured faculty position at Yale University – a decision that demands the plausible inference that his misconduct only came in that specific, separate, and distinct employment relationship with Yale University. *Id.* at ¶ 21.   Bowing to the #MeToo lynch mob's pressure, the Defendants then forced him to resign as Chief of Cardiology and terminated their relationship with him as Director of the Cardiovascular Research Center. *Id.* at ¶ 23. However, the Defendants maintained their relationships with Dr. Simons as the Robert W. Berliner Professor and a tenured faculty member. Dr. Simons does not allege, and

cannot allege at this time due to a lack of ready and sufficiently detailed knowledge, the effect of these terminations on his compensation.

Consequently, Dr. Simons' employment relationships with Yale University fall into three separate and distinct categories. First, Dr. Simons had an employment relationship with Yale University as a practicing doctor, which the Defendants chose to terminate when they stripped him of his job as Chief of Cardiology at Yale-New Haven Hospital. Second, Dr. Simons had an employment relationship with Yale University as a medical researcher, which the Defendants altered when they stripped him of his job as Director of the Cardiovascular Research Center and then of the Waldemar Von Zedwitz Professorship, which they transferred him to from the Robert W. Berliner Professorship. Third, Dr. Simons had an employment relationship with Yale University as an educator, which the Defendants have allowed him to retain at this time.

Semantics can conflate the second and third categories of Dr. Simons' employment relationships with Yale University. The Defendants, in legitimate pursuit of public prestige and in the development of Yale University's overall brand, have sought to harmonize and elevate their faculty members by placing distinguished names in front of the word "Professor" in the vein of an honorific. However, as demonstrated by the Defendants' actions in separating Dr. Simons' endowed professorship from his job as a tenured faculty member for purposes of firing him from his job as an endowed professor, the Defendants consider "a distinguished name professor" to take on a separate and distinct set of duties – namely, significant research and grant attraction duties – from a regular faculty member. In other words, "a distinguished name professor" is a researcher, not an educator, but he may also serve as an educator in a separate employment

relationship as a regular faculty member. This point is driven home by the compensation granted by the Defendants in Dr. Simons' original contract for the Robert W. Berliner Chair. *See* **Exhibit 1, p. 1-2, ¶ 4**.

Consequently, the Defendants assert facts not before the Court at this time, which are more appropriate for resolution on a summary judgment motion. Dr. Simons has plausibly alleged that separate, distinct employment relationships existed between himself and the Defendants. The Defendants wrongfully and completely discharged Dr. Simons from at least one of those relationships, but not all of the employment relationships between Dr. Simons and themselves. Therefore, Dr. Simons has plausibly alleged the elements of a wrongful discharge claim, and he respectfully requests the Court to deny the Defendants' motion to dismiss Count 3 of the Complaint.

Given the unique nature of the case before the Court and the lack of clarity in Connecticut law, Dr. Simons respectfully asks the Court to certify the question of whether a wrongful discharge claim requires a complete termination of all employment relationships or whether a wrongful discharge claim covers the termination of a separate and distinct employment relationship, but not the complete termination of all employment relationships between parties to the Connecticut Supreme Court if the Court is inclined to dismiss Dr. Simons' claim or is unsure of how to decide it. "This Court has the discretion to certify a question of law to the Connecticut Supreme Court 'if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision, or statute of this state….'" *Electrical Contractors, Inc. v. Insurance Co. of Pa.*, No. 3:11cv1432 (VLB), 2012 WL 602321, at *1 (D.Conn. Dec. 3, 2012) (quoting Conn. Gen. Stat. ¶ 51-199b(d)). The

question above presents a significant issue of state law because it defines how the tort of wrongful discharge may be applied to complex and multi-faceted employment relationships in the future. *See generally Ryan v. National Union Fire Insurance Co.*, 692 F.3d 162, 171 (2d. Cir. 2012) ("state courts should be accorded the first opportunity to decide significant issues of state law through the certification process"). In an increasingly diverse business world, this type of situation is likely to recur in subsequent litigation, thus lending support to the need for the Connecticut Supreme Court to decide this question. *See generally Caruso v. Siemens Business Communication Systems, Inc.*, 393 F.3d 66, 72 (2d. Cir. 2004) (justifying decision to certify questions of law to the Connecticut Supreme Court on the grounds that "these issues are likely to recur").

**4. The Court Should Deny The Defendants' Motion To Dismiss Court 4 Of The Complaint Because Dr. Simons Pleads That The Defendants' Conduct Occurred In The Process Of Terminating Him And Involved An Unreasonable Risk of Emotional Distress.**

Dr. Simons reserves, and request the Court to reserve its consideration of, his claims of negligent infliction of emotional distress against the Unknown Defendants until he can identify them. At this time, he lacks specific knowledge on whether to proceed against them in their official capacities as agents authorized to act for Yale University or in their personal capacities.

Dr. Simons does not dispute that he can only state a claim for negative infliction of emotional distress against Defendants Yale University, Peter Salovey, and Dr. Alpern only as it pertains to unreasonable conduct in the termination process. *See Perodeau v. City of Hartford*, 259 Conn. 729, 750 (2002). However, he relies on the same reasoning that support his alternative claim of wrongful discharge contained in Count 3 of the Complaint to allege that the Defendants' conduct did, indeed, occur during the termination

process pertaining to a separate and distinct employment relationship that he had with Yale University. Consequently, he incorporates his argument for Count 3 – Wrongful Discharge (contained in the previous section of the instant memorandum) here, and he respectfully requests the Court to either find that the Defendants' conduct did occur within a termination process of a separate, distinct employment relationship that he had with Yale University or to certify the question to the Connecticut Supreme Court. *See* Section A, Subsection 3, *supra.*

To prevail on the elements of a claim of negligent infliction of emotional distress, Dr. Simons must prove that "the defendant's conduct during the termination process was *sufficiently wrongful* that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." *Perodeau*, 259 Conn. at 751. Connecticut courts have held that ultimatums to resign, usually accompanied by other aggravating circumstances, constitute sufficient allegations of conduct that carried an unreasonable risk of causing emotional distress that might result in illness or bodily harm to enable a plaintiff to survive motions to dismiss or strike. *See, e.g.*, *Noonan v. Miller Mem'l Cmty. Home, Inc.*, 50 Conn. Supp. 367, 373 (Super. Ct. 2007) (holding that allegations of demotion and replacement by younger colleagues, issuance of a severe written reprimand, a search of the plaintiff's office, and an ultimatum to accept a demotion or be fired constituted sufficient allegations to survive a motion to strike).

The conduct upon which a plaintiff may recover is not solely limited to the termination process itself. *Laros v. International Insights, Inc.*, 2011 WL 1367078 (Conn. Super. Ct. Mar. 17, 2011). A plaintiff may rely on representations made to him before his

termination process begins, and the reliance, induced by the defendants, aggravates what would otherwise be an innocuous termination. *Id.* In *Laros*, the defendants made false assurances to the plaintiff that her job was secure to assuage her concerns about her financial security, their company was on solid financial footing, and asked her to relocate her family. *Id.* at *1. In reliance on the defendants' promises, the plaintiff sold her house, and the defendants terminated her by telephone while the moving crew was moving her belongings out of her house. *Id.* at *1. The *Laros* court held that her termination was done unreasonably in the context of those statements. *Id.* at *4.

The instant case is very similar to *Laros* in that Dr. Simons did not wish to give up the Robert W. Berliner Professorship in exchange for the Waldemar Von Zedwitz Professorship, but that he agreed to it in reliance on the Defendants' representations that it was an unnecessary necessity. Compl. ¶¶ 29-30. Dr. Simons relied on the Defendants' explanation that it was a necessity and trusted that it would not affect this employment relationship with Yale University. However, the Defendants had other ideas, issuing Dr. Simons an ultimatum to resign from the Waldemar Von Zedwitz Professorship in less than 24 hours or be fired. *Id.* at ¶ 38. When he did not resign, the Defendants summarily terminated this specific employment relationship with him. *Id.* at ¶ 39.

Furthermore, the instant case is also analogous to *Noonan* in the sense that the fanning of a public assassination of Dr. Simons' character by self-righteous and aggrieved #MeToo sympathizers associated with the Defendants provided an aggravating context to the ultimatum that the Defendants issued to Dr. Simons. Just as in *Noonan* and *Laros*, the Defendants engaged in highly unreasonable conduct that they knew to involve an

unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm.

Consequently, Dr. Simons has alleged sufficient facts to enable his claim for negligent infliction of emotional distress to proceed forward. Dr. Simons respectfully requests that the Court deny the Defendants' motion to dismiss Count 4 of the Complaint and to reserve its consideration of Count 4 as it pertains to the Unknown Defendants until Dr. Simons has an opportunity to identify them.

**5. The Court Should Deny The Defendants' Motion To Dismiss Count Five Because The Plaintiff Has Alleged Enough Facts To Support A Plausible Inference That The Defendants Acted With Impermissible Bias Under Title IX To Deny Dr. Simons Due Process.**

To the best of counsel's knowledge, Dr. Simons' Title IX complaint presents an issue of first impression: Whether a university, after a full internal adjudication of sexual misconduct under its Title IX process, subjecting an employee to discipline for the same instance of behavior a second time violates the due process protections afforded by Title IX?

In the instant action, this question arises in the familiar context of fierce emotions and a violently passionate gender bias toward men because of the #MeToo movement. "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d. Cir. 1994); *see also* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance"). Plaintiffs who attack a university disciplinary proceeding for gender bias generally may state two

claims: actual innocence or selective enforcement. *Id.* at 715. Dr. Simons pleads a "selective enforcement" claim.

To state a plausible selective enforcement claim, Dr. Simons must plead that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the [defendant's] gender." *Id.* at 715. To show that the proceeding was affected by gender bias, Dr. Simons must make "a particularized allegation relating to a causal connection between the flawed outcome and gender bias." *Id.* at 715.

The Defendants' reliance on this language to assert that Dr. Simons has not made a particularized allegation suggesting gender bias ignores the Second Circuit's decision in *Doe v. Columbia University*, 831 F.3d 46 (2d. Cir. 2016). In *Doe v. Columbia University*, the Second Circuit held that the plaintiff pled sufficient facts to support a plausible inference of sex discrimination and survive a motion to dismiss when he pled that Columbia University was "motivated… to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students – especially varsity athletes." 831 F.3d at 58. The Second Circuit found that "[t]here is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults." *Id.* at 58. Footnote 11 of the opinion is particularly devastating to the Defendants' assertion:

> It is worth noting furthermore that the possible motivations mentioned by the district court as more plausible than sex discrimination, including a fear of negative publicity or of Title IX liability, are not necessarily, as the district court characterized them, lawful motivations distinct from sex bias. A

> defendant is not excused from liability for discrimination because the
> discriminatory motivation does not result from a discriminatory heart, but
> rather from a desire to avoid practical disadvantages that might result from
> unbiased action. A covered university that adopts, even temporarily, a policy
> of bias favoring one sex over the other in a disciplinary dispute, doing so in
> order to avoid liability or bad publicity, has practiced sex discrimination,
> notwithstanding that the motive for the discrimination did not come from
> ingrained or permanent bias against that particular sex.

*Id.* at 58, n.11.

The facts of *Doe v. Columbia University* are particularly instructive for the instant action. Columbia students were openly criticizing the university for failing to take seriously the sexual assault complaints of female students by male students. *Id.* at 50. The New York Post published an article titled "Columbia drops ball on jock 'rapist' probe: students." *Id.* at 50. The mounting furor was led by the Columbia University Democrats, who ironically stated that Columbia should avoid becoming the next Yale University. *Id.* at 51. The foremost vocal critic of Columbia accompanied the alleged victim to the Title IX hearing at issue in *Doe v. Columbia University* even though she had no prior relationship with her. *Id.* at 52. Based on this environment that the plaintiff alleged, the Second Circuit found that he had plausibly alleged an inference of sex bias. *Id.* at 59.

The striking and immediately noticeable difference between *Doe v. Columbia University* and the instant action is that *Doe v. Columbia University* concerned whether a disciplinary hearing to determine guilt and, if necessary, punishment was biased by public pressure. The instant case concerns whether Dr. Simons was summarily railroaded for an offense that he had already been disciplined for without any process because of public pressure. Consequently, two issues arise in the instant case.

The first issue is the same one that arose in the *Doe v. Columbia University* case. Due to the illicit leaking of Yale University employees, the public obtained wind of Dr.

Simons' past UWC discipline. Compl. ¶ 27. Concerned students and enraged advocates from the #MeToo movement began to place tremendous pressure on Yale University for transferring Dr. Simons to another endowed professorship. *Id.* at ¶¶ 32-36. Consequently, as the result of this pressure, the Defendants reached the conclusion that Dr. Simons had not adequately been punished for his alleged past misdeeds. *Id.* at ¶ 36. This conclusion was driven by a gender-biased thought process that any form of sexual harassment committed by a male is akin to rape no matter how small it is, thus demanding that the male be disbelieved at every turn and destroyed at every opportunity. Therefore, due process is neither required nor respected. The public succeeded in forcing the Defendants to reach this discriminatory conclusion more than five years after his UWC hearing. As a direct result of this discriminatory conclusion and the thought process underlying it, the Defendants chose to summarily discipline Dr. Simons further instead of affording him a hearing upon which to challenge their biased conclusions.

The second issue is one of first impression. Having been disciplined once for his conduct and having completed his discipline successfully, Dr. Simons was subjected to a second round of discipline for the same misdeed even though he had not offended again. This decision to impose a second round of discipline on Dr. Simons was motivated by the same discriminatory intent that the decision to summarily discipline him without a hearing was. The public leaped to the conclusion that Dr. Simons was a horrible sexual predator with all of the eagerness of a drunken lynch mob – indeed, the public was drunk on gender-bias stoked by the #MeToo movement's hysteria. Therefore, the public demanded as harsh a punishment for Dr. Simons as possible, thoroughly ignoring the fact that he had already been disciplined. The public forced the Defendants to adopt its gender-biased

conclusion and to cravenly acquiesce to its demand to harshly punish Dr. Simons again. Adding insult to injury and as a full demonstration of how much the Defendants bought into the gender-biased agenda of the #MeToo rabble, the Defendants imposed a devastatingly harsh punishment on Dr. Simons without giving him the opportunity be heard to contest that the punishment was unwarranted or excessive. Instead, the Defendants gave Dr. Simons an ultimatum: Resign in less than 24 hours or be stripped of his endowed professorship. *Id.* at ¶ 38. Dr. Simons refused to acquiesce to a #MeToo lynch mob's demands and was subsequently stripped of his endowed professorship without the slightest opportunity to contest the move.

Just like the plaintiff in *Doe v. Columbia*, Dr. Simons alleges enough facts to support a plausible inference that the Defendants' actions in summarily stripping him of his endowed professorship were improperly motivated by gender bias under Title IX. Furthermore, the Defendants' actions in summarily stripping him of the endowed professorship were not accompanied by any form of process, thus trampling underfoot Dr. Simons' due process rights under Title IX like they were organic fertilizer. Therefore, the Court should deny the Defendants' motion to dismiss Count Five.

### 6. The Court Should Deny The Defendants' Motion To Dismiss Count Six Because The Plaintiff Has Alleged Enough Facts To Support A Plausible Claims Of Actual Discrimination And Disparate Impact Under Title VII.

Contrary to the Defendants' assertion, Dr. Simons has complied with and sufficiently pled his compliance with Title VII's exhaustion requirement, mandating that plaintiffs exhaust their administrative remedies. Compl. ¶ 41; *see* 42 U.S.C. §2000e-5(f). Dr. Simons pled that "[h]e has received a release of jurisdiction from the EEOC and the CHRO." Compl. ¶ 41. While Dr. Simons did not pursue a claim under state law in a timely

fashion, he did assert his claim under Title VII in a timely fashion. *See* **Exhibit 3 – EEOC Dismissal & Notice of Rights**. The date of the EEOC dismissal is August 6, 2019. *Id.* Dr. Simons filed the instant action on October 1, 2019, well within the 90-day deadline for asserting his claim. Consequently, Dr. Simons' complaint is timely despite the Defendants' assertions to the contrary.

Dr. Simons pleads his Title VII claim under both an actual discrimination theory and a disparate impact theory. Addressing Dr. Simons' actual discrimination theory first, Title VII declares that it is "an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's… sex…." 42 U.S.C. § 2000e-2(a). To establish an unlawful practice, Dr. Simons must show that sex "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m); *see also Yusef v. Vassar College*, 35 F.3d 709, 715 (2d. Cir. 1994) (relying on this provision of Title VII to interpret Title IX). Because of the Second Circuit's interdependent interpretation of Title VII's and Title IX's provisions concerning sex discrimination, a precedential rule established for Title IX's sex discrimination provision is strongly persuasive when a similar case arises under Title VII and vice-versa. *Yusef*, 35 F.3d at 714 ("courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as case law interpreting Title VII"); *see also Mabry v. State Bd. Of Community Colleges & Occupational Educ.*, 813 F.2d 311, 316 (10th Cir.).

Dr. Simons alleges that the Defendants' decision to strip him of his endowed professorship was made "for the express purpose of placating [] #MeToo activists and

sympathizers in the grip of moral panic and self-righteous indignation." Compl. ¶ 68. Because the Defendants acted for the express purpose of placating a #MeToo lynch mob, the Defendants adopted the #MeToo lynch mob's motivations, namely, that Dr. Simons was a Caucasian male who was guilty by accusation because he was a male accused of making inappropriate sexual advances toward a woman. Compl. ¶ 68. The Defendants also adopted the #MeToo lynch mob's view that Dr. Simons needed to be punished a second time and in the harshest way possible because he was a man accused of sexual harassment. Compl. ¶ 64-68. Again, the Second Circuit's interpretation of Title IX in *Doe v. Columbia* is particularly poignant in the instant case:

> It is worth noting furthermore that the possible motivations mentioned by the district court as more plausible than sex discrimination, including a fear of negative publicity or of Title IX liability, are not necessarily, as the district court characterized them, lawful motivations distinct from sex bias. A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.

831 F.3d 46, 58 n.11 (2d. Cir. 2016).

Just because the Defendants can assert "pure" hearts and argue that they were only worried about negative publicity does not mean that they based their decision to run Dr. Simons out of the Waldemar Von Zedwitz Professorship on a rail with the accompanying tar and feathers on lawful motivations distinct from sex bias. In short, discrimination is discrimination even if it only occurs for a fleeting moment. *Id.* In *Doe v. Columbia*, the Second Circuit held that, in a Title IX sex discrimination context, a plaintiff pleads sufficient facts to support a plausible inference of sex discrimination and survive

a motion to dismiss when he pleads that a university is "motivated… to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students – especially varsity athletes." *Id.* at 58. Dr. Simons has pled that the Defendants have demonstrated a similarly discriminatory motive here, thus pleading a plausible inference of sex discrimination under a Title VII theory of actual discrimination.

Furthermore, the Defendants' reliance on *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d. Cir. 2015) does not provide them any more of a safe harbor than negative publicity does. Dr. Simons does not quibble with the Defendants' recitation of the *Littlejohn* standard for establishing a prima facie case of discrimination under Title VII in absence of direct evidence: "[A]bsent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311. However, the Defendants only recite the short form of the *Littlejohn* rule, unsurprisingly omitting the full rule which deals a fatal blow to their defense:

> If [he] makes a showing (1) that [he] is a member of a protected class, (2) that [he] was qualified for the position [he] sought, (3) that [he] suffered an adverse employment action, and (4) can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation, then [he] has satisfied the prima facie requirements and a presumption of discriminatory intent arises in [his] favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action.

*Id.* at 311 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993)).

The Defendants' own actions demonstrate that Dr. Simons was eminently qualified for his position as the Waldemar Von Zedwitz Professor even after he was disciplined for alleged sexual harassment. First, the Defendants allowed him to keep the Robert W. Berliner Professorship during and after his suspension. Compl. ¶ 25. Second, they awarded him the Waldemar Von Zedwitz Professorship after the initial barrage of negative publicity from the #MeToo lynch mob. Compl. ¶¶ 29-31. These actions belie the Defendants' assertion that Dr. Simons was unqualified for his endowed professorship because they, acting independently of the #MeToo lynch mob's hysteria, made the determination that he was qualified to keep the Robert W. Berliner Professorship during and after their discipline of him. Furthermore, the Defendants also thought that Dr. Simons was so qualified that, even after the #MeToo lynch mob came calling for Dr. Simons' head on a spike, they transferred him to the Waldemar Von Zedwitz Professorship. This is certainly not the treatment that an unqualified individual would receive.

The Defendants also misrepresent the adversity of the employment action that they ultimately took against Dr. Simons. An endowed professorship such as the Waldemar Von Zedwitz Professorship bestows substantial economic and professional benefits on its holder. Endowed professorships reduce "a faculty member's dependence on grants, thereby increasing their financial security. It further facilitates the success of grant applications, as the prestige of having an endowed chair reflects the applicant's standing in the scientific community and positively affects grant funding bodies' view of the applicant." Compl. at ¶ 9. These substantial economic and professional benefits

exceed more than $100,000 annually. Consequently, the Defendant's adverse employment action against Dr. Simons caused him substantial economic harm as well as a decrease in the prestige of his professional reputation.

Dr. Simons has already discussed the discriminatory intent element of the *Littlejohn* test in his previous discussion of *Doe v. Columbia*. He has pled that the Defendants adopted the sexual discriminatory intent of the #MeToo lynch mob, thus pleading a plausible inference of sex discrimination under a Title VII theory of actual discrimination. Therefore, the Court should deny the Defendant's motion to dismiss Count 6 of the Complaint under the Plaintiff's actual discrimination theory.

Turning to Dr. Simons' disparate impact theory, "a plaintiff must show that a facially neutral employment policy or practice has a significant disparate impact" in order "to establish a prima facie case of disparate impact." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d. Cir. 1998) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-32 (1971)). Dr. Simons has alleged that the Defendants' sexual misconduct disciplinary policies has been applied in a selectively discriminatory fashion against males. Compl. at ¶¶ 64-68. To the best of his limited knowledge – limited because of the highly confidential nature of the Defendants' UWC proceedings, the Defendant alleges that only Caucasian males have been punished twice under the Defendants' sexual misconduct disciplinary policies and that similarly situated women have not. Comp. at ¶¶ 66-67. These allegations are sufficient to establish a theory of disparate impact, which the Plaintiff should be allowed to test via discovery. Therefore, the Court should deny the Defendant's motion to dismiss Count 6 of the Complaint under the Plaintiff's actual discrimination theory.

**7. The Court Should Deny The Defendants' Motion To Dismiss Count Seven Because The Plaintiff Requires More Time And The Court's Intervention To Name The Unknown Defendants, And The Plaintiff Has Alleged That Sufficient Time Has Passed To Render The Invasion of His Privacy A Fresh And Actionable Tort.**

Dr. Simons only pleads his allegations in Count Seven against the persons who went out of their way in 2018 to inform the Robert E. Berliner family of the details of his UWC proceeding. Compl. ¶¶ 27, 68-69. Those persons, currently unknown to Dr. Simons, may or may not be named defendants in this action or persons otherwise affiliated with Yale University. Consequently, dismissal of Count Seven of Dr. Simons' complaint is premature because he has not had an opportunity to avail himself of pre-discovery remedies that will foreseeably enable him to name the Unknown Defendants.

Turning to the merits of Count Seven, Dr. Simons' breach of privacy claim falls under the "unreasonable publicity given to [the plaintiff's] private life" category. *Davidson v. Bridgeport*, 180 Conn. App. 18, 29 (2018). Unlike much of Connecticut law, a person's right of privacy did not come expressly from the common law, but rather from a law review article written by Samuel Warren and Louis Brandeis. *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 126 (1982) (citing Warren & Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193 (1890)). The development of the right and the breach of privacy tort did not occur under an express common law tradition of evolution through application, but rather through an academic tradition of theorizing. *Id*. at 126. Consequently, in recognizing the tort for invasion of privacy in 1982, the Connecticut Supreme Court relied on two guiding authorities: Prosser's treatise on torts and the Restatement (Second), Torts. *Id*. at 125-26 (citing Prosser, Torts (4th Ed. 1971) § 117, p. 802; Restatement (Second), Torts § 652A).

The fundamental principle of the right of privacy is "the right to be let alone." *Id.* at 125-26 (citing Prosser, Torts (4th Ed. 1971) § 117, p. 802; 3 Restatement (Second), Torts § 652A, comment a). Warren and Brandeis both highlight this principle as the culmination of a gradual evolution and sophistication of a civilized society that realized that "only a part of the pain, pleasure, and profit of life lay in physical things." Warren & Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193, 195 (1890). In accordance with this principle, the academic tradition and, ultimately, the common law developed the antecedents to the causes of action Connecticut has recognized for the invasion of privacy. Consequently, the Connecticut causes of action must be viewed in the context of their historical antecedents. *Goodrich*, 188 Conn. at 127-28.

As the historical antecedents relate to the instant action, the 3 Restatement (Second), Torts § 652D, viewed in context of the fundamental right of privacy "the right to be let alone," is the controlling antecedent. *Id.* at 132-33. Therefore, to state an actionable claim, a plaintiff must allege that "the matter publicized is of a kind that '(a) would be highly offensive to a reasonable person, and (b) is not of *legitimate concern* to the public. (Emphasis added).'" *Id.* at 133 (quoting 3 Restatement (Second), Torts § 652D, p. 383). The Restatement (Second) states that this cause of action "depends upon publicity given to the private life of the individual." 3 Restatement (Second), Torts § 652D, comment a. There is a distinct difference, for purposes of the "private facts" cause of action, between publicity and publication. *Id.* Publication, as a term of art, refers to "any communication by the defendant to a third person." *Id.* Publicity, as a term of art, "means that the matter is made public by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.*

In short, the standard for the "private facts" publicity element is "a communication that reaches, or is sure to reach, the public." *Id*.

The instant action presents a unique set of circumstances to the Court. The nature of Dr. Simons' discipline had previously been published to the media in 2013 in violation of confidentiality that ostensibly guards UWC proceedings. Compl. ¶ 23. In reaction to the subsequent public backlash, the Defendants forced Dr. Simons to resign from his position as Director of Yale's Cardiovascular Research Center, thus temporarily assuaging the public. *Id.* at ¶ 23. Dr. Simons completed the discipline imposed by the Defendants and returned to his duties, going 3-4 years without being subjected to the scorn of the public or the media. This included almost a full year during which the #MeToo movement inflamed the passions of ordinarily reasonable and highly intelligent people, compelling them to become deranged maniacs hell-bent on the destruction of anyone accused of sexual misconduct with no regard for basic principles of fairness and human decency. *Id.* at ¶ 26. However, unknown defendants with knowledge of Dr. Simons' UWC discipline informed the Berliner family in 2018 and, through the Berliner family, re-fanned the flames of public scorn. *Id.* at ¶¶ 27-28, 69-70.

This re-publicization of Dr. Simons' confidential UWC discipline constitutes a breach of a proceeding in which he was assured privacy and every person acquainted with the proceeding had an obligation to preserve its confidentiality. The publication of such confidential information would be highly offensive to any reasonable person with an expectation of confidentiality in a disciplinary proceeding. Furthermore, the public does not have a legitimate interest in learning about the employment relationship between a private individual and a private employer. Despite the previous publicization of Dr.

Simons' UWC discipline, sufficient time had elapsed to remove the confidential information from the public eye. Consequently, the Court should find that the re-publicization of the confidential UWC proceedings constitutes a fresh invasion of Dr. Simons' privacy and deny the Defendants' motion to dismiss Count 7 on the merits.

## B. THE COURT SHOULD DENY THE DEFENDANTS' MOTION TO STRIKE BECAUSE THE PLAINTIFF HAS RECEIVED NO TIME TO DISCOVER WHO THE UNKNOWN DEFENDANTS ARE. THE COURT SHOULD ALSO DENY THE DEFENDANTS'S MOTION FOR A MORE DEFINITE STATEMENT.

Dr. Simons could not name the individuals who disclosed the details of his UWC proceeding to the Berliner family, and, by extension, to the world for a second time because he does not know their identities and he has not had an opportunity to identify them. The Defendants rely on *In re Murphy*, 482 F. App'x 624, 627 (2d. Cir. 2012) for the proposition that "As a general rule, the use of 'John Doe' to identify a defendant is not favored…." *In re Murphy*, 482 F. App'x 624, 627 (2d. Cir. 2012) (quoting *Feliciano v. County of Suffolk*, 419 F.Supp.2d 302, 313 (E.D.N.Y. 2005)) (internal quotations omitted). However, in their characteristic haste to dispose of Dr. Simons, the Defendants fail to read and inform the Court of the two sentences immediately following the one on which they rely from *In re Murphy*.

> That said, we have recognized that situations arise in which the identity of alleged defendants may not be known prior to the filing of a complaint. *See e.g., Valentin v. Dinkins*, 121 F.3d 72, 75–77 (2d Cir.1997). In such situations, "the plaintiff should be given an opportunity through discovery to identify the unknown defendants." *Id.* at 75 (internal quotation marks omitted); *see also Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir.1998) (finding it appropriate to allow plaintiffs to identify defendants as "John Doe" at the complaint stage "until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials.").

*Id.* at 627. Dr. Simons has not received any opportunity to identify the unknown defendants in the instant action and will be requesting that opportunity from the Court in the appropriate set of papers.

The Defendants also mischaracterize the nature of Dr. Simons' action in Connecticut Superior Court, which is clearly described in the Complaint, as affording him an opportunity to discover the Unknown Defendants' identities. On September 21, 2018, Dr. Simons filed an emergency action in Connecticut Superior Court, only seeking ex parte injunctive relief to stop the Defendants from stripping him of his endowed professorship as they threatened to do in their ultimatum on the previous night. Compl. ¶ 38-39; *see also* **Exhibit 4 – Dr. Simons' Superior Court Complaint**.  Notably, Dr. Simons did not plead a claim for damages. **Exhibit 4.** The Superior Court denied Dr. Simons the emergency relief that he sought. **Exhibit 5 – Superior Court Order Denying Mot. For Ex Parte Relief**. The Defendants then stripped Dr. Simons of his endowed professorship. Compl. ¶ 39. Dr. Simons subsequently withdrew his action in order to evaluate his options. Because Dr. Simons did not plead or request anything more than injunctive relief in his initial action and withdrew it before discovery or amendment, he has not received the opportunity to discover the Unknown Defendants contrary to the Defendants' characterization.

Dr. Simons' complaint does not allege facts so vague on the merits as to be incomprehensible. The only ambiguity that the Defendants need clarified is the identities of the Unknown Defendants. Dr. Simons will readily provide their identities as soon as he discovers their identity, if possible, through early discovery as granted by the Court. Dr. Simons lacks the capacity to comply with an order for a more definite statement unless

the Court grants him the necessary pre-discovery tools to discover the Unknown Defendants' identities. Consequently, an order to provide a more definite statement identifying the Unknown Defendants would be premature as Dr. Simons has not yet obtained the ability to comply with such an order.

Consequently, the Court should deny the Defendants' Motion to Strike Count Seven of the Complaint and the Defendants' Motion, in the alternative, For A More Definite Statement.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the Plaintiff, Dr. Michael Simons, respectfully requests the Court to deny the Defendants' Motion To Dismiss in its entirety, to deny the Defendants' Motion to Strike in its entirety, and to deny the Defendants' Motion For A More Definite Statement in its entirety.

THE PLAINTIFF


By: _____

NORMAN A. PATTIS
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
203.393.3017
203.393.9745
npattis@pattislaw.com
ct13120

## CERTIFICATE OF SERVICE

I, **NORMAN A. PATTIS, ESQ.**, hereby certify that, on October 31, 2019, the foregoing document, **MEMORANDUM OF LAW**, served in accordance with the Federal Rules of Civil Procedure, and/or the District of Connecticut's Local Rules, and/or the District of Connecticut's Rules on Electronic Service upon the following parties and participants.

**Kevin C. Shea, Esq**
**Benjamin Levites, Esq.**
**Clendenen & Shea, LLC**
400 Orange Street
New Haven, CT 06511
Tel. (203)-787-1183
Fax: (203)-787-2847
kcs@clenlaw.com
bhl@clenlaw.com


BY:  _____

Norman A. Pattis (ct13120)