# EXHIBIT 4

# Dr. Simons' Superior Court Complaint

RETURN DATE:  OCTOBER 16, 2018           :        SUPERIOR COURT
                                          :
DR. MICHAEL SIMONS,                       :        J.D. of NEW HAVEN
          Plaintiff,                      :            at NEW HAVEN
                                          :
v.                                        :
                                          :
YALE UNIVERSITY,                          :
PETER SALOVEY,                            :
          Defendants.                     :        SEPTEMBER 21, 2018

### VERIFIED COMPLAINT

1.  In response to public pressure from self-styled activists, the defendants, late on the evening
    of September 20, 2018, through their agents and duly-authorized representatives, issued
    the plaintiff, who was then in London, England, an ultimatum: either resign from his
    prestigious endowed chair at the Yale School of Medicine, or the appointment would be
    taken from him. He was given a deadline of noon, September 21, 2018, to make the
    decision. He seeks an order of this Court enjoining the defendants from breaching their
    contract with him until further proceedings challenging the defendants's threatened
    rescinding of his appointment. The plaintiff will suffer catastrophic reputational harm that
    cannot be compensated in monetary terms in the absence of judicial relief.

2.  The plaintiff, Dr. Michael Simons, is an adult resident of the State of Connecticut. He also
    maintains a residence in London, England. He is a physician and medical researcher.

3.  The defendant, Peter Salovey, is the president of Yale University and the Chris Argyris
    Professor of Psychology at Yale University.

4.  Yale University, herein after "the university", is a private educational institution organized
    and incorporated in the State of Connecticut. It maintains a medical school for the purpose
    of educating  physicians and conducting medical research, and is affiliated with the Yale-
    New Haven Hospital.

5. In 2008, the university offered the plaintiff a tenured professorship, an endowed chair, the RW Berliner Professor of Medicine, and a position as Chief of Cardiology, in the School of Medicine.  The contract also named Dr. Simons Chief of Cardiovascular Medicine at the Yale-New haven Hospital. The plaintiff accepted the offer.  (Attachment A)

6. In 2009, the university appointed Dr. Simons to the position of Director of the Yale Cardiovascular Research Center.

7. At some point thereafter, the plaintiff sent a written note to a colleague, expressing a romantic interest in her.

8. The university then conducted an investigation of whether Dr. Simons had engaged in harassment of the colleague by sending the written note. In 2013, a university disciplinary committee recommended that Dr. Simons be suspended as chief of cardiology for a period of five years.  After an appeal to the university provost, the suspension was reduced to 18 months; this sanction was confirmed by defendant Salovey. No other sanction was imposed.

9. After a series of articles appeared in The New York Times in 2013, the university then forced Dr. Simons to resign as Chief of Cardiology, promising not to take the Director of Cardiovascular Research Center position away from him. After a second article in The New York Times, the university demanded that Dr. Simons resign from the director's position. When he refused to do so, the university took the position away.

10. The plaintiff otherwise retained his tenured professorship, together with the rights and privileges associated therewith. He served his period of suspension while otherwise fulfilling his contractual obligations to the university.

11. In the spring of 2018, the dean of the Yale School of Medicine, Dr. Robert Alpern, approached Dr. Simons on behalf of the university and asked him to swap the Berliner chair for a different endowed chair because of publicity concerns. Dr. Simons agreed to do so.

12. On June 22, 2018, Defendant Salovey sent Dr. Simons a letter confirming Dr. Simons's appointment as the Waldemar Von Zedtwitz Professor of Cardiology, noting that "endowed chairs are awarded to those whose scholarship has brought distinction to the university." Defendant Salovey also noted, "I am delighted to convey our pleasure in your accomplishments," noting that the university's newspaper would "soon publish a story announcing the appointment". (Attachment B)

13. On September 6, 2018, the university released a statement through the university's student newspaper that Dr. Simons was "transfer[ed]" (sic) from the Berliner Professorship to the Waldemar Von Zedtwitz Professorship in part due to concerns raised by the Berliner family, who had provided funding to endow the chair, and in part to make the Berliner Professorship available to a new employee of the university's. The announcement contends: "the University had no intention to confer a new honor on Dr. Simons." (Attachment C)

14. After making this announcement, activists loosely affiliated with an emerging movement galvanized by an intolerance to perceived sexual misconduct, known colloquially by the symbol "#MeToo," wrote an open letter to defendant Salovey to condemn the defendants for honoring Dr. Simons with the new appointment. "We are submitting this letter to voice our disgust," the activists wrote. (Attachment D)

15. The activists also sought the attention of national news media in an effort to apply pressure of the defendants to rescind the contract it had made with Dr. Simons, with articles critical of the defendants appearing as recently as September 19, 2018, in The Washington Post. (Attachment E)

16. In an apparent response to the public criticism of the university's transfer of Dr. Simons to the new Professorship, Dr. Simons was contacted on September 20, 2018, by the Dean of the Yale School of Medicine, Dr. Robert Alpern. Dr. Alpern told the plaintiff that the

university was concerned about the public criticism directed toward it as a result of the announcement of Dr. Simon's transfer to the new Professorship.

17. Dr. Alpern told the plaintiff that he would have until noon on September 21, 2018, to resign from the professorship. If he did not resign, Dr. Alpern told him, the chair would be "taken away." Dr. Alpern told the plaintiff that if he resigned from the professorship by noon, September 21, 2018, the university would pay an annual amount equivalent to the payout from the chair, approximately $140,000 per year, with adjustments each year to reflect the expected growth in the financial value of the chair.

18. Dr. Simons has informed the university that he has no intention to resign from his professorship and that he intends to hold the university to its contractual obligations.

19. Essentially all of Dr. Simons's income is contingent upon his ability to attract grant support for ongoing research in cardiology, and he is widely regarded as one of the nation's leading cardiologists.

20. Given the publicity directed toward this matter, a breach of the contract by the university will irreparably harm the plaintiff by diminishing his ability to attract grant funding, publish scientific papers, and will undermine the significant progress Dr. Simons has made, and is making, combating cardiovascular disease. This harm will accrue simply because activists are not satisfied with the punishment meted out five years ago in response to Dr. Simons's sending of a written communication to a colleague.

21. The university's conduct is unconscionable, in violation of its contract with Dr. Simons, and offensive to public policy. Whatever merit there may have been to the university's decision to discipline Dr. Simons in 2013, the punishment was imposed, the penalty has been paid, and the university's unseemly pandering to the rage of activists is a disproportionate

response to those whose sensibilities are perhaps too tender to appreciate Dr. Simons's

need not pay for a lifetime for an offense that has already been adjudicated and put to rest.

WHEREFORE, the plaintiff requests the following relief pending full adjudication on the

merits of the aforesaid claims:

A.   An order enjoining the university from taking the Waldemar Von Zedtwitz Professor of

Cardiology from Dr. Simons;

B.   An order directing defendant Salovey to require the agents, servants and employees to

cease and desist from attempting to pressure Dr. Simons to resign from the

professorship;

C.   Such other relief as the Court deems fair and equitable.


_____

Dr. Michael Simons

Subscribed to and sworn before me this
21st day of September 2018 via telephone.

Norman A. Pattis
Commissioner, Superior
Court

THE PLAINTIFF

By _____

NORMAN A. PATTIS
383 Orange St., First Floor
New Haven, CT 06511
203.393.3017
203.393.9745
npattis@pattislaw.com
Juris 408681

## CERTIFICATION

The foregoing was hand-delivered this 21st day of September 2018 to Caroline Hendel, Senior Associate General Counsel. Yale University, Office of the Vice President and General Counsel, 2 Whitney Avenue, 6th floor, New Haven, CT 06510. Attorney Hendel was notified in a telephone conversation at 6:45 a.m. that these doings would be filed a 9:00 a.m.

_____

NORMAN A. PATTIS

A

*Jack A. Elias, M.D.*
*Waldemar Von Zedtwitz Professor of Medicine*
*Professor of Immunobiology*
*Chair, Department of Medicine*
*333 Cedar Street - Room 1072 LMP*
*P.O. Box 208056*
*New Haven, CT 06520-8056*

*Chief, Beeson Medical Service*
*Yale-New Haven Hospital*
*20 York Street*
*New Haven, CT 06510-3202*
*Telephone (203) 785-4119/Fax (203) 785-6954*
*E-mail: jack.elias@yale.edu*

# Yale University

May 22, 2008

Michael Simons, M.D.
A.G. Huber Professor of Medicine
Chief, Section of Cardiology
Director, Angiogenesis Research Center
Dartmouth Medical School
Dartmouth-Hitchcock Medical Center

Dear Mike:

We are delighted to offer you the position of Chief of the Section of Cardiovascular Medicine and Professor of Internal Medicine at Yale University School of Medicine and the corresponding position of Chief of Cardiovascular Medicine at Yale-New Haven Hospital. This letter sets forth the specific terms and conditions of our offer of employment and supersedes any previous correspondence or discussion between you and the School, the Department and the Hospital. We also describe herein the documentation and process required to make your appointment official.

## A. Faculty Appointment, Compensation and Fringe Benefits

1.  The Department of Internal Medicine is recommending you for appointment as Professor of Internal Medicine without term in the Traditional Track, effective July 1, 2008. This appointment is contingent upon completion of the normal Yale University review process, including approvals by the University Affirmative Action Office, the senior faculty of the Department, the Appointments and Promotions Committee, the Board of Permanent Officers of the School of Medicine and the Yale Corporation.

2.  The Department and the Dean will nominate you to President Levin and the Yale Corporation for a Robert Berliner Professorship.

3.  Policies for faculty, including a description of ranks and tracks, are set forth in the Yale University Faculty Handbook, which can be found on-line at: http://www.yale.edu/provost/html/facultyhb.html. Because these policies represent essential employment understandings between you and the University, you are urged to read the Faculty Handbook with care, including revisions of the Handbook that are made periodically and become part of these understandings. If you have specific questions, please contact Ms. Amy Sison at 203-785-4121.

4.  Your salary will be $500,000 per year for the fiscal year July 1, 2008 through June 30, 2009. Consistent with standard practice at the School of Medicine, it will be comprised of a base of $85,000 and a supplement of $415,000. Salary is determined in accordance with School and Department Faculty Salary Guidelines and is reviewed annually, with adjustments based on your overall contribution to the School, the Department and the Hospital.

    As we have discussed, your salary will come from the following sources: (1) Yale-New Haven Hospital (YNHH) will support 16.7% in recognition of your role as Section Chief and 8.3% for multidisciplinary program development. (2) The Robert Berliner Chair will initially generate approximately $107,000/year and can be expected to grow over time. (3) We expect that you will cover a significant

Michael Simons, M.D.
May 21, 2008
Page 2 of 14

percentage of your salary from clinical income and/or research support. (4) The remainder (up to 25%) will be covered by the Section in recognition of your teaching and administrative activities.

In addition to the 16.7% salary support and 8.3% program stipend provided for your role as Section Chief, the Hospital will make an additional program stipend payment of up to 10% of the Chief's salary as an incentive for performance in physician recruiting, EP program development and multi-disciplinary program development (Peripheral Vascular and Heart Transplantation) with the performance criteria mutually agreed to set out in writing. This payment will be coordinated with the YSM fiscal year so that it may be considered in the Cardiology Section's budget development. This element of chief support will be committed for three years. Then the additional program stipend will be reassessed based on the Chief's ability to commit to clinical program development and new program objectives established by the Hospital at that time.

The Chief will also participate in the Program's annual performance incentive plan based upon aggregate clinical productivity results and quality, which will be funded by YNHH as described in section D3 below. The Hospital's fiscal year ends in September and the share of incentive available to the Chief may increase overall compensation by an additional 20%-30% if the performance criteria are achieved. However, while this incentive is paid through and administered by YSM, its variable nature and payout does not lend itself to incorporation in the Cardiology Section's budget.

5.  In accordance with University policy, Yale will provide moving expenses up to $15,000 to relocate your personal belongings from Hanover to New Haven. Please contact Ms. Diane Brown, Transportation Manager of Traffic, Receiving and Stores at Yale (203-432-9961) to make all arrangements for the move. Reimbursement will be made subject to the following guidelines:

    a.  Payments will be made only for billed charges covering packing, transportation and insurance for ordinary household goods.

    b.  The allowance will cover reimbursement for shipping up to 6,000 lbs. plus an additional reimbursement of up to $350 for packing costs.

    c.  No moving funds are available for persons employed on term contracts of less than two years. Employees who terminate from University employment with less than one year of service may be liable for repayment of reimbursed moving expenses.

6.  Please contact the Benefits Office at 203-432-5550 within one month of your appointment to discuss the benefit options available to you and arrange for enrollment in the appropriate plans. Information regarding benefits can be found online at http://www.yale.edu/hronline/benefits.

## B. Responsibilities at the School of Medicine

1.  You will be appointed Chief of the Section of Cardiovascular Medicine in the Department of Medicine. Your responsibilities as Chief include the following:

    a.  Oversight of the Section's resources.

    b.  Meeting or exceeding the Section's business plan targets, including financial performance and aggregate clinical productivity.

    c.  Oversight, growth and development of the Section's clinical, educational and research programs.

Michael Simons, M.D.
May 21, 2008
Page 3 of 14

    d.   Recruitment, mentoring and retention of faculty, trainees and staff.

    e.   Achievement of mutually defined goals, objectives and program development milestones consistent with the recruitment and service line plans of the School and the Hospital.

    f.   Ensuring compliance of the Section with all Department, School, University, Hospital and governmental policies.

    g.   Representation of the Section by yourself or a designee in all planning and policy-making activities of the Department, the School and the Hospital.

    h.   Representation of the Section's faculty in appointments and promotions processes of the Department and the School.

    i.   Support of Medical Staff in credentialing and re-credentialing of YNHH cardiologists.

2.  As a Professor in the Department of Internal Medicine, you will participate in clinical, research and teaching activities assigned by the Chair of the Department. These responsibilities will include:

    a.   Attending on the Cardiology Consultation Service and/or in the Cardiac Care Unit (CCU).

    b.   Teaching house staff, fellows and students.

    c.   Development of a substantial research program supported by peer-reviewed funding.

    d.   Providing research training to fellows and house staff where appropriate.

    e.   Participation in Departmental committees and faculty meetings, including appointments and promotions meetings.

## C. Commitments by the School of Medicine

1.  The School is eager to help you build the Section's research programs in vascular biology, atherosclerosis, myocardial biology and/or cardiac imaging. To this end, we commit to the following:

    a.   <u>Structural.</u> We are pleased to establish the Yale Cardiovascular Research Center (YCVRC) in the Department of Medicine and to name you as its first Director.

    b.   <u>Financial.</u> The Department and the School will provide $15,000,000 to develop the Section's research programs. Of this amount, up to $1,500,000 will be available to cover the reasonable expenses of establishing your laboratory at Yale, including salaries and fringe benefits of laboratory personnel, equipment, supplies, animal per diems and the cost of moving laboratory materials and equipment from Hanover. We expect that the remainder will be used to recruit outstanding new bench and translationally-focused research faculty and to purchase laboratory equipment in connection with these recruitments. Drs. Carolyn Slayman (as Deputy Dean for Academic & Scientific Affairs) and Jack A. Elias (as Chairman of Medicine) look forward to working closely with you on faculty recruitment. Start-up packages may be structured flexibly to meet the requirements of individual candidates, and unspent funds may be carried over annually.

Michael Simons, M.D.
May 21, 2008
Page 4 of 14

    c.  Endowment. The Department of Medicine will commit the proceeds from $5,000,000 of its endowment to support the research, clinical and educational activities of the Section and YCVRC. The expected yield of this endowment should be discussed with Ms. Cynthia Walker, the Deputy Dean for Finance and Administration. When Dr. Barry Zaret retires, the Berliner Chair that he occupies will be available for recruitment into the Section. Alternatively, the $3 million that is in the corpus of the Berliner Chair will be added to the endowment noted above and used to support the Section and YCVRC.

       It is important to point out that Cardiovascular Medicine is a high priority fundraising opportunity at YSM. Along these lines, the Dean is happy to ensure you that you will have expert assistance in your fundraising activities and Ms. Jancy Houck, the Associate VP for YSM Development, and her staff look forward to working with you to secure additional endowment for your programs.

2.   The Department will provide the following space in order to allow the Section and the YCVRC to grow and prosper:

    a.  Office Space. The administrative home of the Section of Cardiology will be on Fitkin 3, where your office and support staff will be located. Fitkin 3 also provides office space for clinically active faculty members. As the Section grows, the Department will identify additional faculty offices if needed.

    b.  Research Space. As we have discussed, the Section's primary laboratory space will be on the newly renovated 7th floor of the 300 George Street building, which will provide a superb setting for your own research and for the recruitment of new laboratory-based faculty members. Most of the Section's current researchers (Drs. Jeffrey Bender, Daniel Goldstein, Kerry Russell, Raymond Russell, Larry Young) will move there as well to consolidate strength and help the YCVRC get off to a rapid start. In all, the Department and the School will fit out approximately 20,000 square feet on the 7th floor for the Section and the YCVRC, including laboratory space (approximately 103 workstations), support space and offices. George Zdru, Director of Facilities Planning for the School of Medicine, looks forward to working with you on the details of the renovation. The Department will make every effort to identify additional space as the Section's and the YCVRC's laboratory-based research programs grow.

       You have emphasized the importance of vivarium facilities for your own research and that of other Section and YCVRC members. The 300 George Street building is well-equipped in this regard, with a newly constructed rodent facility run by the Yale Animal Resources Center (YARC). The Director of YARC (James Macy, DVM) is ready to allocate 3,000 cages to Cardiology, which—at the standard ratio of 2.8 mice per cage—will be sufficient to house 8,400 mice. He has informed us that the Cardiology faculty members listed above are currently using a total of 288 cages, leaving more than 90% of the total for you and other new recruits. If you have any further questions, please feel free to contact Dr. Macy directly.

    c.  Zebrafish Facility. The Department and the School welcome your interest in developing a zebrafish-based experimental program in the Section and the YCVRC. Towards this goal, the School will commit resources to create a zebrafish facility on the 7th floor of the 300 George Street Building (or at another mutually agreed upon location) as soon as you have identified and recruited one or more faculty users. Dr. Carolyn Slayman will work with you to determine the appropriate size and configuration of the facility as part of the recruitment process. The School

will cover the cost of constructing the facility, and the Section and the YCVRC will take responsibility for equipping and operating it. In this regard, you have pointed out that a major zebrafish researcher may require a fully automated high-throughput screening facility costing upwards of $1 million to equip. This cost will need to be covered by the $15 million already allocated for building the Cardiology research program, but if/when the initial allocation has been used up and if (as we fully expect) your recruitments have been truly outstanding, additional program-building funds will be provided to you.

d.  Clinical Space. We expect that the Section's clinical programs will grow substantially under your leadership (see below). We are committed to working with you to enlarge and enhance the sites of practice for the Section on the YNHH-YMS campus. After the Smilow Cancer Hospital is completed in 2009, we expect that additional space will become available in the Yale Physicians Building to augment the current Medical Center cardiology practice on Dana 3. This can be used to expand and further develop the general cardiology practice. It may also provide an opportunity to relocate the Heart Failure group from their College Street offices. Faculty of the Cardiology Section will also have access to additional half-day clinic sessions in the Dana 3 specialty clinic, although the number of sessions is expected to be modest.

An important avenue for growth will be in Guilford, where the Department of Medicine has been committed 5,400 sq ft of clinical space at the new Shoreline Clinic. The faculty of the Cardiology Section will be assigned the highest priority for use of this space. The space is configured to accommodate three full-time clinicians and substantial diagnostic equipment. We have agreed to allow pediatric cardiology and others to have use of an office and two exam rooms and access to the cardiology diagnostic equipment for one half-day clinic session per week. In addition, faculty from other sections may be provided access to this clinic space on a part-time basis, if the cardiology faculty does not require all of the space. The major sources of expense for the Shoreline clinic will be rent, lease of equipment and furnishings, personnel costs and physician salaries. The personnel costs are expected to be highly competitive.

Another potential satellite location is the recently acquired Bayer site in West Haven/Orange. Other satellite offices are under consideration as Heart Center or Vascular Center outpatient sites throughout New Haven County. Our planning staff and senior leadership in the Heart and Vascular Center will assist you in developing the best practice locations.

## D.  Commitments by Yale-New Haven Hospital

This section of the letter outlines the resources committed by YNHH with the goal of helping you build a nationally prominent Heart and Vascular Center. Included are investments in clinical faculty recruitment, technology, program and administrative support and clinical space.

1.  YNHH is pleased to offer you an appointment as Chief of the Section of Cardiology in the Hospital's Department of Medicine, co-terminus with your appointment as Chief of the Section of Cardiovascular Medicine at the Medical School. The Hospital appointment will be subject to the approval of the YNHH Board of Trustees. The Hospital has also appointed an administrative Executive Director to consolidate cardiovascular clinical units and be a partner to your clinical leadership team in managing hospital inpatient, outpatient and diagnostic services. To provide effective leadership for the complex array of programs and professional staff, we expect that you, or your designee, will actively lead, in collaboration with leaders in Surgery and Diagnostic Radiology, the development of the Yale-New Haven Heart and Vascular Center, described in our Service Line Plan and reflected in the program commitments of this section.

Michael Simons, M.D.
May 21, 2008
Page 6 of 14

2. To augment the clinical management team, YNHH will support the appointment of an Associate Clinical Chief of Cardiology, with leadership responsibility in the Heart and Vascular Center for physician recruitment and program development. The role of Medical Director of the Heart Center is designed to provide the Associate Chief with the influence and portfolio necessary to be effective in program development and multi-disciplinary service relationships. Therefore, we recommend that the roles remain linked. The salary offset and funding support for this and other positions are summarized in the next section. Appointment, reappointment and replacement of this, and all other hospital-based Medical Director positions noted below, require. joint Hospital and School approval.

3. We propose an aggressive physician recruitment plan to support the clinical vision that has been discussed with you. The plan currently envisions hiring a total of 20 physicians, each receiving a combination of salary support, offset (deficit) funding and performance incentives. The broad guidelines for recruitment are summarized below and detailed in the attached matrix.

In general, three categories of support will be employed.

(i) Leadership positions will receive administrative salary support commensurate with expected effort and established Hospital policies. The Chief will receive total salary support of 25% (16.67% per our established guidelines and 8.33% program stipend). An additional 10% salary support will also be provided if appropriate milestones are met as described above. The Associate Chief will receive 30% salary support (15% for the Associate Chief role/15% as leader of the Heart and Vascular Center). As the Associate Chief is expected to remain clinically active, the 30% of salary support provided recognizes these administrative duties and expected time commitment. The Program's performance incentive plan may increase the Associate Chief's overall compensation by 20%-30% if performance criteria area achieved (see below).

All other medical directors will receive 15% salary support to cover their administrative responsibilities, except for the medical director of Heart Transplantation, who will receive 50% support due to the additional UNOS/CMS administrative duties. The covered positions will include the Directors of Electrophysiology (EP), Interventional Cardiovascular Medicine, Echocardiography and Nuclear Medicine. Also included will be the Associate Director of EP, Medical Director of the Peripheral Vascular Center, and Medical Director of Heart Transplantation. In recognition of each new lab or program director's service development commitments during the start up period, the Hospital will shift 10% of the Program Development Offset Funding for clinical activity to fixed salary support for three years. However, if as a result of this increase in fixed support and clinical productivity the physician's account is in surplus, the unanticipated gain must be applied to other program development offset funding needs in the section. This additional support should only apply to the directors who will have an external program development focus. This includes the Medical Directors of the Catheterization Laboratory, Electrophysiology Laboratory, Echo Laboratory, Cardiovascular Imaging Program, Peripheral Vascular Disease Program and Heart Failure and Cardiac Transplantation Program. Those that have strictly Hospital administrative functions will remain at the 15% support level.

(ii) The Hospital will also underwrite program development for clinically committed recruitments, including some of the leadership positions. In general, the Hospital will

support faculty physician recruitment by helping you develop five-year business plans for each physician, addressing clinical and academic expectations. Each plan will be assessed and updated every three years. The Hospital will provide a residual clinical expense offset against all net clinical revenue until each physician or program becomes self-sustaining within the business-planning period. This will include coverage for salaries, fringe benefits, malpractice costs and approved standard clinical practice expenses. Physicians who are so supported will be expected to devote 85% of their time (defined by participation in clinic sessions, inpatient service coverage, clinical teaching and procedural sessions by subspecialty) to clinical practice and meet the equivalent business plan targets for productivity (work RVU standards) and service. Additional physicians may be recruited upon achievement of service objectives and productivity thresholds to ensure that the Heart and Vascular Center has sufficient capacity to meet patient needs. As noted in the attached matrix, it is anticipated that 13 of the recruited physicians will be supported in this manner.

(iii)  Finally, the Hospital will provide support for a performance incentive program for faculty physicians in the Section, to be based upon superior results and quality measures. Faculty in leadership positions (including yourself) will be eligible, based upon aggregate performance of the Section or subsection. For purposes of goal congruence, we would prefer that the Chief, Associate Chief and Lab Directors all share in the same performance fund, which should both reinforce your leadership, as we will mutually establish the performance objectives, and drive superior outcomes for the Program. The Hospital will establish a maximum available fund of $1,650,000 per year and will set funding thresholds and award criteria with you each year. The Performance Incentive Program has the potential to make payments of between $100,000-$150,000 for Chiefs and Directors and $50,000 for other participants. The program will be administered by the School through the Department and the Section, and the Hospital will not participate in setting the compensation of any individual faculty member.

Each of these funding commitments and the total recruitment plan is displayed in the following table.

Michael Simons, M.D.
May 21, 2008
Page 8 of 14

| Physician Title | Clinical FTE | RVU Goal | Present Salary Estimate | Total Projected Compensation[B] | Physician Name | Salary Support | Eligible for Pgm Dvlpmt Deficit Offset | Performance Incentive Eligible |
|---|---|---|---|---|---|---|---|---|
| **I.  Directors** | | | | | | | | |
| 1. Chief of Cardiology | 50%[A] | TBD | $500,000 | $650,000 | New | 25% | No | Yes |
| 2. Clinical Chief | 85% | TBD | $400,000 | $630,000 | Cabin | 30% | No | Yes |
| 3. Lab Director - Cath | 85% | TBD | $400,000 | $600,000 | Cleman | 15% | No | Yes |
| 4. Lab Director - EP | 85% | TBD | $300,000 | $600,000 | Batsford | 15% | Yes | Yes |
| 5. Lab Director - ECHO | 85% | TBD | $190,000 | $250,000 | MacNamara | 15% | No | Yes |
| 6. Lab Director, Stress/Nuclear | 85% | TBD | $200,000 | $225,000 | Sinusas | 15% | No | Yes |
| 7. Lab Director - CV Imaging | 85% | TBD | $250,000 | $300,000 | New | 15% | Yes | Yes |
| 8. Medical Director - Peripheral Vasc. | 85% | TBD | $250,000 | $300,000 | New | 15% | Yes | Yes |
| 9.  Director of Interventional Cardiology | 85% | TBD | $400,000 | $500,000 | New | 15% | Yes | Yes |
| 10. Community Director, Preventive Cardiology | N/A | TBD | | $30,000 | | Stipend | | No |
| **II. Physician Teams** | | | | | | | | |
| 1. Heart Failure | | | | | | | | |
| a. HF1 - Txp. Dir. | 85% | TBD | $200,000 | $275,000 | New | 50% | Yes | Yes |
| b. HF2 - HF Dir. | 85% | TBD | $200,000 | $275,000 | New | 15% | Yes | Yes |
| c. HF3 | 85% | TBD | $175,000 | $225,000 | New | 0 | Yes | Yes |
| 2. EP | | | | | | | | |
| a. EP1 - Assoc. Dir. | 85% | TBD | $300,000 | $600,000 | New | 15% | Yes | Yes |
| b. EP2 | 85% | TBD | $200,000 | $300,000 | New | 0 | Yes | Yes |
| 3. General Cardiology | | | | | | | | |
| a. GC1 | 85% | TBD | $175,000 | $225,000 | New | 0 | Yes | Yes |
| b. GC2 | 85% | TBD | $175,000 | $225,000 | New | 0 | Yes | Yes |
| c. GC3 | 85% | TBD | $175,000 | $225,000 | New | 0 | Yes | Yes |
| d. GC4 | 85% | TBD | $175,000 | $225,000 | New | 0 | Yes | Yes |
| 4. Clinical Research | | | | | | | | |
| a. CR1 | 60% | TBD | $200,000 | $250,000 | New | 15% | Yes[C] | Yes |

[A] Clinical and research activities.

[B] Assumes RVU and quality targets are achieved according to mutually agreed upon ramp up schedule.

[C] This position's program development offset will include allowed grant recoveries.

Michael Simons, M.D.
May 21, 2008
Page 9 of 14

4. When the Smilow Cancer Hospital opens, cardiac outpatient diagnostic services will be moved to provide a contemporary, multi-purpose cardiac suite which will include Hospital space for cardiac echo, EKG and Holter monitor services. You and individuals designated by you will participate in the design of this new facility. Opening of the Smilow Cancer Hospital (North Pavilion) may also permit the Hospital to move some general medical acute care units and the MICU from their current South and East Pavilion locations, allowing a Heart Hospital to be created on one floor of the South and East Pavilions by connecting medical services for cardiac inpatient ICU, step-down and acute care. The new Heart and Vascular Center facilities will have distinctive signage and access. You will have an opportunity to participate in inpatient and outpatient facility design and related considerations.

5. YNHH and YSM will work to establish a new structure for cardiovascular imaging that covers all diagnostic modalities and integrates Cardiovascular Medicine and Radiology as equal partners. Financially, this new program would be a separate structure in Yale Medical Group (YMG) and the revenues that it generates will be accounted to all in an open manner.

   Hospital departmental siting of certain diagnostic services will be realigned organizationally to report to the administrative Executive Director of the Heart Center, provided that the service is dedicated to cardiac care. We will jointly evaluate clinical and business opportunities in imaging services and adopt new modalities to ensure that the Heart and Vascular Center maintains a technologically advanced position in the service area.

   We will also support your exploration of alternate professional billing and faculty support arrangements for cardiac imaging and ED Chest Pain Center services with the Radiology Department and the Yale Medical Group. However, training opportunities for Radiology and Cardiology residents and fellows must be preserved in any restructuring. The Hospital will enter into good faith negotiations with the Department regarding management of the technical elements of hybrid diagnostic labs, such as Stress and Holter, to facilitate dedicated management, technology enhancements and program development.

6. We will develop an Atrial Fibrillation Center as the distinguishing element of an enhanced Electrophysiology service. We will remodel and equip EP Lab #2 during FY 2009 with an electroanatomical mapping system, intracardiac echo with phased array for AF ablation and a recording system. The sharing agreement with Pediatrics will be modified to ensure sufficient adult access to cryoablation. We will jointly undertake a close examination of the regional competition and technology options with you and the EP Lab Medical Director before committing to certain EP technology, such as additional bi-plane imaging, stereotaxis or Hansen remote catheter navigation systems. It is anticipated that a new EP director may have specific technology requirements. We will reserve funding in the FY 2008-2009 EP capital budgets to ensure the ability to secure a distinctive and sustainable technical advantage after completing this technology assessment.

   As noted above, YNHH is committed to grow and develop the Electrophysiology service. This will include the recruitment of at least 2 new physicians with expertise in this area. Support for these recruitments will include appropriate salaries and fringes, program development deficit offsetting and participation in the performance incentive program. One of these new positions could be an experienced AF ablator with market competitive compensation. We envision the other might be recruited from the local marketplace. Future faculty growth, we believe, should be based on progress with program development.

Michael Simons, M.D.
May 21, 2008
Page 10 of 14

7. To retain a strong position in the interventional field, our service must offer new drug and device trials. Thus, we support your plan to recruit a Director of Interventional Cardiac Research and up to three study nurses to conduct outcomes research, attract clinical trials from the pharmaceutical and device industries and facilitate the enrollment of patients. We will regard this recruitment as any other clinical faculty recruitment as outlined in section D3, provided that the Director makes the standard clinical time commitment and the Hospital receives expense recoveries as outlined in the grants. The Director will receive 15% salary support provided by the Hospital as outlined in the offer letter in addition to the Program Development Deficit Offset. It is understood that this person, in addition to clinical care, will need to spend time writing grant proposals and interacting with government, private and industry granting organizations. Thus we anticipate that this Director would only be 60% clinically productive because of the research program requirements, but this will not limit this individuals Hospital support program.

8. The Hospital and School plan to establish a Peripheral Vascular Program, in which you will be expected to take a leadership role in coordination with leaders in Surgery and Diagnostic Radiology. Our goal is to develop an interdisciplinary practice model for participating vascular surgeons, cardiac surgeons, interventional radiologists and cardiologists. Hospital privileging will facilitate fair access to resources. The Hospital will market this program and the team of physicians throughout the service area. We will support your plan to recruit an outstanding cardiologist to be a Medical Director of the Peripheral Vascular Program. This person will receive the start-up package outlined in section D3. For the related cardiac leadership responsibilities the Hospital will also provide 15% salary support for this position. In recognition of the program director's service development commitments during the start up period, the Hospital will also shift 10% of the Program Development Offset Funding for clinical activity to fixed salary support for three years as described in D3 above.

9. The Hospital is committed to the success of the Heart Failure and Heart Transplantation program. We have implemented UNOS recommendations for heart transplantation based upon recent site visits to improve clinical outcomes and administrative compliance. Furthermore, we will expect you to appoint a Medical Director of Heart Failure and Transplantation and expand the capacity and capability of the heart failure service. YNHH will provide the start-up packages outlined in section D3 for the Medical Director and an additional physician with expertise in this area. This will include full deficit offset as described in Section D3. The requested CHF/transplant program elements including needed mid-level practitioners, a data entry person and a secretary are either in place or have been committed to the Hospital. YNHH will also provide deficit offset for related clinic rental and expenses and staff costs under the Program Development Deficit Offset arrangement. The UNOS reporting staff and other required administrative personnel will be provided through the Transplantation Center. At the end of the business planning period, additional long-term support will be provided for the physician heart failure/ transplant team as outlined in section D3 or via a joint venture with the YNHH Organ Transplantation Center. Additional heart failure specialists will be supported by the Hospital based upon their clinical time commitment, patient list management needs and UNOS requirements. To ensure the continuity of the infusion service the Hospital will enter into good faith negotiations with you and the Department of Medicine regarding the assumption of technical management and billing responsibilities for this program and the recruitment of additional APRNs to enhance patient service.

10. Primary care cardiology services are provided by members of the Hospital's community-based and University-based medical staff in the local service area. To secure community-based

collaboration in preventive care activities, the Hospital will support the appointment of a community cardiologist to the role of Community Medical Director of Preventive Cardiology. In addition, to further grow primary and preventive cardiovascular services at YNHH, we will work with you to recruit two primary care cardiologists with preventive cardiology expertise to enhance the Section's capacity. When patient volume permits, two additional cardiologists will also be recruited (Section D3). The Hospital expects that you will match Yale-New Haven cardiology coverage with geographic service area needs. We recommend that you employ the Heart and Vascular Center structure to define the diagnostic and preventive care service requirements for the service area.

11. In your correspondence you cited a need for YNHH support for 10 to 11 nurses in the cardiology section, 3 of which would be research nurses. YNHH will support the initial recruitment of two research nurses with the understanding that their productivity and level of external funding will be reviewed at three years. In addition, we will seed funding of additional research nurses if clear momentum is gained in clinical and translational research related to their efforts.

Several of the clinical nurse positions identified in your April 30, 2008 letter are already in place in areas such as Heart Failure and Transplantation. Clinical nurses recruited in support of individual faculty or groups of faculty should be APRNs (or PAs) with the capacity to bill for services which will offset significant proportions of their expense. They should not offset clinical RVUs of faculty supported or diminish their clinical service commitment below 85%, but free such faculty for more productive clinical effort. Our Program Development Deficit Offset Model will allocate the APRNs to the physician or practice groups where they will be utilized and develop RVU targets accordingly. With this caveat, YNHH will recruit the requested APRNs and at three years review their productivity and roles.

12. YNHH is committed to the development of needed specialty clinics in atrial fibrillation and cardiovascular genetics. Additional mid-level provider support will be provided by the Hospital as the CV genetics and atrial fibrillation clinical programs are developed under the business plan principles previously outlined. In addition to APRN support, YNHH will cover the clinic session fees for the proposed atrial fibrillation and cardiovascular genetics and genetics clinics under the Program Development Deficit Offset formula for the new faculty.

13. Hospital policy and practice is to support all of ACGME approved fellows in their clinical years in addition to residents and residency program directors. Support for fellowship direction is provided by the departments and sections.

## E. Prospects for a Joint Program with University College London

The Department, School and YNHH are aware of and excited by the prospects for a joint program in cardiovascular medicine and sciences with University College London (UCL) in the United Kingdom. Assuming that the UCL leadership shares this enthusiasm, we look forward to negotiating in good faith with them to define the details of this arrangement. As we have discussed with you, the offer outlined in the present letter is predicated on your initially giving full-time attention to the Section of Cardiovascular Medicine and accomplishing key faculty recruitments and program development, deferring any active off-site involvement at UCL for at least one year. After you, the School and the Hospital agree that sufficient progress has been achieved and an on-site clinical, research and educational leadership team has been established, we will support your part-time role at UCL with an appropriate adjustment in compensation.

Michael Simons, M.D.
May 21, 2008
Page 12 of 14

**F.  Requirements for Participation in the Yale Medical Group**

1.  All full-time Yale School of Medicine faculty members with appointments in the clinical departments practice medicine through the Yale Medical Group (YMG). In order to begin your clinical practice through YMG, you must satisfy the following requirements:

    a.  Obtain a license to practice medicine in the State of Connecticut, as well as Federal and State of Connecticut Controlled Substance registrations.

    b.  Obtain medical staff privileges at YNHH with appropriate clinical privileges in general internal medicine and cardiology. Medical staff application materials will be forwarded to you upon your acceptance of this position. Please note that the materials you receive will indicate that the application should be returned to the Hospital Chief of Staff's Office with the application fee. You are not responsible for this fee and should not submit a check. Please return your completed application to Ms. Kathleen Bertier in the Department of Medicine office, 333 Cedar Street, 1072 LMP and it will be submitted to the Hospital Medical Staff Office. This application must be completed by three months from your start date.

    c.  Complete and submit to Ms. Joyce Dupee, 135 College Street, Suite 210, New Haven, CT 06510-2483, the YMG Universal Credentialing Application (UCA) by three months from your start date. Upon successful completion of the UCA, the YMG Credentialing Department will forward to you the appropriate pre-printed applications for all YMG contracted managed care carriers, governmental organizations and the YMG Credentialing Application. These applications must be completed and returned within fourteen days. Once they are received, you will be presented to the YMG Credentialing Committee for review and vote. This offer is contingent upon YMG Credentialing Committee approval of your credentials.

2.  Please note the following policies pertaining to YMG faculty physicians:

    a.  You must assign to Yale University, School of Medicine, Yale Medical Group (your employer), all billing rights and enroll as a participating provider in the Medicare, Medicaid and other federal health care reimbursement programs.

    b.  All practice income must be billed and collected through Yale University.

    c.  In consideration of the terms and conditions of the University's offer to provide you with a faculty appointment with an initial salary of $500,000, you agree to execute and abide by the terms and conditions of the attached Non-Competition Agreement for a period of eighteen (18) months after leaving Yale. Please return the signed Non-Competition Agreement to Dr. Jack Elias within one month of accepting this offer.

    d.  In the event that you wish to resign, you agree to give the Department written notice 180 days in advance of the proposed date of your leaving.

Your billings for one (1) month of attending per year on the cardiology service should qualify you for reimbursement for the cost of your medical license under the current Department of Internal Medicine policy. Malpractice insurance will be provided by the Section.

Michael Simons, M.D.
May 21, 2008
Page 13 of 14

By accepting this faculty position, you agree to abide by these requirements as well as all other University policies and procedures. Please review this letter and all attachments thoroughly and do not hesitate to contact us should you have any questions. This offer is valid for thirty days from the date of this letter. Please indicate your acceptance by signing and dating both copies and the attachments, returning one copy to Dr. Jack Elias and keeping the other for your records.

In closing, we are excited about the considerable talent and ability that you will bring to this critical position in the Department of Internal Medicine, the School of Medicine and YNHH. With your leadership and with the programmatic resources described in this letter, we are confident that cardiac care and cardiology-related research will reach a new level of excellence at our medical center. We hope that you will accept this offer and look forward to working with you in the years to come. Best wishes.

Sincerely yours,


Jack A. Elias, M.D.                              Richard D'Aquila
Waldermar Von Zedtwitz Professor of Medicine     Executive Vice President and
Chair, Department of Internal Medicine           Chief Operating Officer, YNHH



Robert Alpern M.D.
Dean, Yale Medical School



Applicant's signature: _____     Date: _____

cc:   Carolyn Mazure, Ph.D. (SHM L 211)
      Carolyn Slayman Ph.D.
      Jonathan Tamir

Enclosures

Michael Simons, M.D.
May 21, 2008
Page 14 of 14

{Appendix A}

**NON-COMPETITION AGREEMENT**

In consideration of my employment by Yale University at its School of Medicine ("University"), I hereby agree to adhere to the following terms and conditions:

I hereby covenant and agree that, for a period of eighteen (18) months following any termination or other cessation of my employment with the University, whether it is with or without cause, voluntary or involuntary, whenever that termination or cessation of employment may occur, I shall not:

1. Practice medicine or provide clinical services to patients within New Haven County or within a twenty (20) mile radius of any off-campus site where I provide clinical services on behalf of my Department and/or Yale Medical Group, for a period of eighteen (18) months after the termination of my employment at the University. This restriction does not apply to research activities which are separate and distinct from the provision of clinical/medical services to patients;
2. Contact any patients of Yale Medical Group for the purpose of soliciting such patients; or
3. Contact any employees of the University for the purposes of soliciting such employees to compete with Yale Medical Group in the provision of clinical medical services to patients.
4. It is the intention of the parties that the provisions of the restrictive covenant herein shall be enforceable to the fullest extent permissible under applicable law, but that unenforceability (or modification to conform to such law) of any provision or provisions hereof shall not render unenforceable, or impair, the remainder thereof. If any provision or provisions hereof shall be deemed invalid or unenforceable, either in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the offending provision or provisions and to alter the bounds thereof in order to render it valid and enforceable.
5. I acknowledge and agree that damages are an inadequate remedy for any breach of the terms and conditions set forth in the Non-Competition Agreement and agree that in the event of a breach of such Agreement, or any part thereof, the University may, with or without pursuing any remedy for damages, immediately obtain and enforce an *ex parte*, preliminary and permanent injunction prohibiting me from violating this Agreement.
6. I further acknowledge and agree that this Agreement is supported by the following adequate consideration:  the University's agreement to appoint me as Professor in the Department of Internal Medicine at an annual salary of $500,000 that it is fair, reasonable and enforceable to its full extent; that the University has an important and legitimate institutional interest that it is seeking to protect with this Agreement; and that enforcement of this Agreement would not interfere with the interests of the public.
7. This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Connecticut.
8. I agree to pay all costs, including the University's reasonable attorney's fees, in connection with any action or proceeding, to enforce this Agreement. This Agreement contains the entire understanding between the University and me and supersedes all prior agreements and understandings relating to the subject matter hereof. The Agreement shall not be amended except by a written instrument thereafter signed by the University and me.

_____                    _____
Michael Simons, MD                                                         Date

B

# Yale OFFICE OF THE PRESIDENT

PO Box 208229
New Haven CT 06520-8229
T 203 432-2550

June 22, 2018

Professor Michael Simons
Department of Internal Medicine
Post Office Box 208017
New Haven, CT 06520-8017

Dear Mike,

I am very pleased to send formal confirmation that the Yale Corporation, at its last meeting, voted to approve your appointment as the Waldemar Von Zedtwitz Professor of Cardiology, effective immediately. As you know from your previous appointment as the Robert W. Berliner Professor of Cardiology, endowed chairs are awarded to those whose scholarship has brought distinction to the university, and I am delighted to convey our pleasure in your accomplishments.

*YaleNews* will soon publish a story announcing your appointment. Congratulations!

With warmest wishes,

Peter Salovey
President
Chris Argyris Professor of Psychology

PS:am/yx

C

# YaleNews

UNIVERSITY STATEMENT

# University statement on assignment of endowed professorships

SEPTEMBER 6, 2018

Recently, members of our community have raised concerns about the assignment of endowed professorships to individuals who have violated University policies. We understand those concerns and agree with a number of the points made. For example, we agree that in cases where someone has been found, through a formal process, to have violated university standards of conduct, there should be a presumption against awarding new honorifics. We also support the authority of formal disciplinary boards, such as the University-Wide Committee on Sexual Misconduct and the Faculty Standards Review Committee, to recommend as possible sanctions, the removal of or future ineligibility for honorific appointments. We realize that recent announcements about a specific circumstance may appear to be at odds with these statements and want to take this opportunity to provide clarification.

Dr. Michael Simons was awarded the Robert W. Berliner Professorship of Medicine in October 2008 upon his arrival at Yale School of Medicine. The Berliner Professorship is named in honor of a former Dean of the Yale School of Medicine.

In the past months, the Berliner family expressed concerns that Dr. Simons continued to hold this professorship. In light of these concerns and to appropriately honor the newly recruited School of Medicine Chief of Cardiovascular Medicine, the Berliner Professorship was reassigned to Dr. Eric Velazquez, and Dr. Simons accepted a transfer to the Waldemar Von Zedtwitz Professorship. In making this transfer, the University had no intention to confer a new honor on Dr. Simons.

We share the community's strong and unflagging commitment to uphold standards of conduct essential to the maintenance of a safe, respectful, and inclusive campus. And we rely on the community's ongoing engagement, including its questions and criticism as well as its creativity and contributions, in our efforts to realize that commitment.

CAMPUS & COMMUNITY

# Yale

Managed by the Office of Public Affairs & Communications

Copyright © 2018 Yale University · All rights reserved · Privacy policy · Accessibility at Yale

D

9/21/18, 6:01 AM

OPINION    UNIVERSITY    CITY    SPORTS    SCITECH    CULTURE    YTV    WKND    MAG    PHOTO    Q

# Med profs rally against Simons title

SERENA CHO & ADELAIDE FEIBEL | 12:16 AM, SEP 07, 2018
STAFF REPORTERS



Eric Wang

In an open letter addressed to University President Peter Salovey, School of Medicine faculty members, students and alumni joined forces on Tuesday to condemn the University's decision to award a new endowed professorship to cardiology professor Michael Simons, who was found guilty of sexual harassment in 2013.

As of 10 p.m. on Thursday, the letter had 611 signatures from YSM faculty members, alumni and students, according to one of three organizers of the petition, who asked to remain anonymous to better reflect the "voices of the collective community." At least 185 members of the University's medical faculty members — ranging from assistant to emeritus professors — have signed the letter so far, constituting the biggest group among the letter's signatories. So far, 105 current YSM students and 80 alumni have also signed the letter, the letter's organizers said.

"A professor who was found to have committed sexual harassment by an independent review and removed from his section chief position, Dr. Michael Simons, was not only allowed to continue in a prestigious academic role, but was also recently awarded an endowed chair," the letter states. "We are submitting this letter to voice our disgust and disappointment with this decision. We hope this letter sends that message in support of those targeted by his harassment as well as to the past, present, and future victims of harassment at Yale and around the country who will see this action and be discouraged from speaking up."

Alumni, faculty members and students have circulated the letter around social media and forwarded emails to colleagues and friends over the past three days. Elizabeth Woo MED '25, president of the Yale School of Medicine Student Council, sent an email to the School of Medicine student body on Wednesday inviting them to sign the petition.

Simons and Medical School Dean Robert Alpern did not respond to requests for comment.

Yale spokeswoman Karen Peart said in a statement to the News on Thursday that Simon's previous endowed title, the Berliner professorship, was reassigned to the current chief of cardiology, Eric Velazquez. The University made the decision in light of concerns from Berliner family's that Simons continued to hold professorship named in his honor, Peart said, and to honor Velazquez, who was hired as chief of cardiology in early June. Simons then accepted a transfer to the Waldemar von Zedtwitz professorship, Peart said.

"We agree that in cases where someone has been found, through a formal process, to have violated University standards of conduct, there should be a presumption against awarding new honorifics," Peart said. "We realize that recent announcements about a specific circumstance

may appear to be at odds with these statements and want to take this opportunity to provide clarification … In making this transfer, the University had no intention to confer a new honor on Dr. Simons."

The University's handling of sexual harassment allegations against Simons has previously made national headlines.

In 2013, a University-Wide Committee on Sexual Misconduct panel found Simons guilty of sexually harassing a postdoctoral researcher and recommended that he be removed from his position at the helm of the cardiology department. But Provost Benjamin Polak rejected that recommendation and reduced the penalty to an 18-month suspension.

Amid faculty backlash, and with a New York Times article about the case in the works, Yale announced in November 2014 that Simons had decided not to return to his position as cardiology chief. Simons was removed as director of the Cardiovascular Research Center that same month. In a letter to the New Haven Register in 2014, Simons said he took responsibility for what he did, which he defined as "briefly pursu[ing] a junior but not subordinate colleague."

This spring, Nancy Berliner '75 MED '79 — the daughter of former Dean of the School of Medicine Robert Berliner and former School of Medicine professor — contacted representatives of the School of Medicine to say she was "quite upset and appalled" that Simons still held her father's professorship, Berliner confirmed in an interview with the News. Months later, at the end of July, the University announced Simons' new professorship in a press release. The release was removed from the school's website a few days later after a number of faculty members voiced concerns to Alpern, the medical school dean.

Paula Kavathas, professor of immunology and member of SWIM, said she disagreed with Peart's statement that the Von Zedtwitz Professorship was a mere "transfer." Rather, she said, it represents "a new award to replace the loss of the Berliner chair."

Kavathas said that members of SWIM had met with Alpern on several occasions to express that they were "disturbed" that Simons still held the Berliner chair. But instead, the School of Medicine did not take action until the Berliner family expressed its outrage.

"The award of the Berliner chair to the new chief of cardiology was an opportunity for the Dean to remove this great distinction from a faculty

member found guilty of sexual harassment," Kavathas said. "However, he chose instead to award him a new chair. I personally found this shocking and many of my colleagues have expressed similar reactions."

In a statement to the News, Velazquez, who now holds Simons' old title, said that he cannot "speak to [and does not] know details about the past," but can "clearly address the future" of the School of Medicine's cardiovascular medicine offerings.

"We are strengthened by the diversity that represents all of us, that allows us to support each other, and by our common mission to provide outstanding care to the community we serve locally and globally," Velazquez said. "The Section of Cardiovascular Medicine will not condone harassment of any kind."

Letter signatory Edward Miller, professor of Medicine and Radiology and Biomedical Imaging and director of the Yale Cardiovascular Medicine Fellowship program said that among the program's current cardiology fellows, 44 percent of whom are women, the news of Simons' endowed professorship "strikes a particularly divisive chord."

"It's my job and responsibility as program director to listen to those concerns, advocate for our trainees, and support them to ensure their career goals are fulfilled, free of harassment," Miller said.

Miller said that he and other faculty members involved in the fellowship program will host an open forum this Monday with all the trainees to discuss Simons' endowed professorship and the responses from the cardiology department and the broader Yale community. Miller, who has never worked with Simons personally since he was appointed to the School of Medicine faculty in 2015, asserted that Simons has had no role or responsibilities in the fellowship program since 2015.

Still, not everyone within the section of Cardiovascular Medicine supports the petition. Cardiology professor Alexandra Lansky said that she supported the Salovey's decision "to recognize Professor Simons' academic excellence and contributions to Yale University with this new endowed professorship."

"I have known Professor Simons to be a person of integrity, with an academic track record that is nothing less than outstanding and undeniably merits recognition with this endowed professorship," Lansky said.

A female fourth-year medical school student, who asked to remain anonymous because she is currently applying to residency programs at various universities and does not want to face retaliation in the application process for her comments, said that "what everyone knows, but isn't being said is that [Simons] is being awarded and staying because he brings tons of research money to the school."

The student said it has been encouraging for her and her classmates to see that the faculty members they look up to are just as upset about Simons' endowed professorship as they are.

Still, she said that the School of Medicine community should not have to voice "overwhelming public support" in order to bring about change when there is already "overwhelming evidence" that Simons violated University policy.

"No one's denying [Simons' misconduct]. Not only is it getting tolerated, but it's being weirdly appreciated," the student said. "We're able to see the perpetrators of sexual violence as whole humans, but we don't do this for the victim."

Simons left Dartmouth for Yale in 2008.

**Serena Cho** | serena.cho@yale.edu

**Adelaide Feibel** | adelaide.feibel@yale.edu

E

Controversy over sexual misconduct case roils Yale University – The Washington Post                    9/21/18, 6:00 AM

The Washington Post

**Speaking of Science**

# Controversy over sexual misconduct case roils Yale University

## A medical school researcher who was punished five years ago was given a new honor.

By Carolyn Y. Johnson and



Carolyn Y. Johnson
Science reporter
Email ✉ Bio ↗ Follow 🐦
Ben Guarino



Ben Guarino
Reporter covering biology, genetics, nature, paleontology and the culture of science
Email ✉ Bio ↗ Follow 🐦
September 19

Five years ago, a Yale University committee concluded that Michael Simons, a cardiologist and leading researcher at its medical school,

was guilty of sexually harassing a junior researcher. Now, the controversy over his behavior and Yale's response has erupted again. A petition signed by more than 1,000 faculty members, medical trainees, students and alumni landed in Yale President Peter Salovey's mailbox last week, questioning why an endowed chair — a prestigious honor — was given to Simons this summer.

"We are submitting this letter to voice our disgust and disappointment with this decision," the letter said. "Yale should be a leader in preventing harassment and addressing it appropriately when it happens, rather than cultivating an environment in which it flourishes."

The years-long saga, triggered by Simons's inappropriate advances toward a younger female researcher who eventually left Yale, is a window into the aftermath of sexual harassment cases and how tensions can continue to simmer long after allegations have been vetted and sanctions have been meted out. In the #MeToo moment, the challenges of recognizing, confronting and investigating sexual misconduct have gotten most of the attention, but Simons's case shows how misconduct can leave festering wounds — particularly at academic institutions where people in positions of power may have tenure, a lifetime job appointment that is difficult to revoke.

"On the one hand, we send a message that we are serious about sexual misconduct in the abstract, and yet we continue to reward individuals who have been found in violation of our misconduct policies. It sets the appearance of a double standard," said Claire Bowern, a linguistics professor who chairs the Yale Women Faculty Forum. "It's a problem when someone continues to accrue the rewards and status and offices of the profession, while at the same time having been disciplined."

A recent report published by the National Academies of Sciences, Engineering and Medicine described the sweeping extent of harassment in academia. About 50 percent of female medical students reported being harassed by faculty or staff members.

Despite parity in the enrollment of men and women in medical schools, "things are not getting better," said Esther K. Choo, a physician at Oregon Health & Science University's Center for Policy and Research in Emergency Medicine. "It's like this five-lane highway, with a ton of traffic all heading in one direction — in the direction of not uncovering and addressing sexual harassment within these institutions of academia and of medicine."

Choo and her colleagues wrote in an editorial published last week in the New England Journal of Medicine that "what began as a smoldering fire is now scorching the curtains and the roof, threatening the integrity of the entire house of medicine." A survey published in JAMA found that 30 percent of women who worked in academic medical facilities reported being harassed between 2014 and 2016.

A petition to the National Institutes of Health asks the country's biggest funder of biomedical research to reconsider whether people who are found guilty of sexual misconduct are eligible for certain kinds of grants and honors. NIH Director Francis Collins announced new initiatives this week, including a new policy on harassment, processes that will make it easier to report harassment, and training and education campaigns. The National Academies also face demands to revoke membership when people commit misconduct.

"It is clear we must do more to change the fundamental culture of our organizations," Collins said in a statement.

The American Association for the Advancement of Science announced a new mechanism Saturday that will allow it to kick out fellows who breach professional ethics standards, including sexual harassment.

The National Science Foundation on Wednesday announced it would require institutions that receive grant funding to notify the agency if a scientist who receives funding is found to have committed harassment.

Simons's case illustrates how misconduct cases can cause painful division for years after they've ended, raising pointed questions about whether penalties are harsh enough and whether powerful people are being unfairly protected. After a universitywide committee found in 2013 that Simons had sexually harassed a junior colleague, Simons stepped down as chief of cardiology. Although the committee initially recommended a five-year suspension from positions of leadership, the penalty was softened to 18 months — leading many to question whether the sanctions were sufficient. Simons did not respond to interview requests, and a Yale spokeswoman said the university does not comment on such investigations.

That could have been the end of the story. But this year, family members of Robert Berliner, a former dean of the medical school, made it clear to the university that they no longer thought it was appropriate for Simons, who had been awarded the Berliner professorship 10 years ago, to continue in the endowed chair position that carried the family name, which was first reported by the Yale Daily News.

"I was totally appalled and told them I wanted them to do something about it, and so did my mother," said Nancy Berliner,

chief of hematology at Brigham and Women's Hospital in Boston and Robert Berliner's daughter.

Berliner's chair was given to another cardiologist in August. But Yale issued a news release in late July announcing that Simons was being "newly named" to a different endowed chair. On his Twitter account, Simons tweeted a link to the release, calling it "A new Chair ..." on Aug. 1.

The university took down the news release. The tweet was deleted last week. Spokeswoman Karen Peart said that the university agrees with many of the arguments being made by concerned members of the community, including that when someone has violated standards of conduct, "there should be a presumption against awarding new honorifics."

She said that the university supports the ability of disciplinary committees to recommend sanctions, such as removing such honors. But, she added, "In making this transfer, the University had no intention to confer a new honor on Dr. Simons."

Said Berliner: "They took the chair away from him and gave him another chair. They can split hairs however they like. It was not my intention to be a difficult family. I thought there was a principle involved." She added that she was shocked when Yale gave Simons a new endowed chair.

Peart would not disclose how much funding is attached to the new chair, also called an endowed professorship, but she said it is the same amount as the Berliner chair. Paula Kavathas, a member of the executive board of the Committee on the Status of Women in Medicine, said endowed chairs typically come with about $130,000 in funding, which is typically used for salary or research.

A Yale website describes endowed chairs as "widely recognized as the most prestigious honor a university can bestow on an accomplished faculty member."

To critics, the idea that this is a transfer and not a new chair seems like a hollow excuse.

"What is the motivation to accommodate this man to such great lengths that it gets the entire Yale community in an uproar," said Lynn Fiellin, an associate professor of medicine. "That's an extreme honor, and he doesn't deserve something honorable in this context."

That led to a grass-roots uprising — the petition to Salovey calls for "new, innovative leadership" and the transformation of a culture in the medical school that values "prestige and funding above safety and a positive, thriving working environment not only for women, but for the faculty in general."

Simons is a leading researcher and is listed as a principal investigator on more than $3 million in grant funding in 2018, according to an NIH database.

"People like Michael Simons are bringing in millions and millions of dollars. And that is the reputation of the school. Its ranking," said Choo, a Yale alumna.

The case has sparked discussions on campus that reflect the national conversations about how to proceed after a person has committed misconduct and the worry that institutions may not hold their stars accountable. Last Tuesday, more than two dozen cardiology trainees met to discuss concerns about how the case had been handled and on Thursday, the petition with 1,044 signatures was delivered to the president's office.

"When I was a trainee, more than 40 years ago, there were no mechanisms that we were aware of, where we could formalize a complaint — and what people did was just talk among each other about who the harassers were, it was just informal and people tried to stay away from them," Kavathas said. "I think that the fact the community is discussing this is very positive. I think it will put people on notice, that the community cares about this."

**Read More:**

Sex harassment can make victims physically sick, studies reveal

Women in medicine shout #MeToo about sexual harassment at work

**Carolyn Y. Johnson**
Carolyn Johnson is a science reporter. She previously covered the business of health and the affordability of health care to consumers. Follow 🐦

**Ben Guarino**
Ben Guarino is a reporter for The Washington Post's Speaking of Science. Before joining The Post in 2016, he worked as a freelance science journalist, an associate editor at the Dodo and a medical reporter at the McMahon Group. He also has a background in bioengineering. Follow 🐦

𝕿𝖍𝖊 𝖂𝖆𝖘𝖍𝖎𝖓𝖌𝖙𝖔𝖓 𝕻𝖔𝖘𝖙

# The story must be told.

Your subscription supports journalism that matters.

Try 1 month for $1