## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MICHAEL SIMONS,
  *Plaintiff,*

  v.

YALE UNIVERSITY, PETER SALOVEY,
ROBERT ALPERN, M.D., AND
UNKNOWN PERSONS,
  *Defendants.*

No. 3:19-cv-1547 (VAB)

## RULING AND ORDER ON PENDING MOTIONS

Michael Simons ("Plaintiff") sued Yale University ("Yale"), Peter Salovey, and Robert Alpern, M.D., (collectively, "Defendants" or "named defendants") for breach of contract, breach of the implied warranty of fair dealing, wrongful discharge, negligent infliction of emotional distress, and discrimination on the basis of gender under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) ("Title VII"), and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88 ("Title IX"). Mr. Simons also has sued unknown persons for breach of privacy.

Defendants filed a motion to dismiss, a motion for a more definite statement, and a motion to strike.

For the reasons stated below, Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part**, and the motion for a more definite statement, and the motion to strike, are **DENIED**.

The Court also dismisses Dr. Simons's wrongful discharge and negligent infliction of emotional distress claims at this time, and will address the remaining claims at a later stage of this case.

1

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Allegations

In 2008, Dr. Michael Simons began working at Yale University as a tenured professor. Complaint ("Compl.") ¶ 8, ECF No. 1 (Oct. 1, 2019). In addition to becoming a professor, Dr. Simons alleges that he served as Chief of Cardiology at the Yale School of Medicine, and Chief of Cardiovascular Medicine at Yale-New Haven Hospital. *Id.* He also alleges that Yale also offered him an endowed chair, the Robert W. Berliner Professorship of Medicine, named for the former Dean of the Yale School of Medicine. *Id.* Dr. Simons alleges that he relinquished an endowed professorship at Dartmouth College, based on the offer of the Berliner Professorship. *Id.* In 2009, Dr. Simons alleges, Yale University also appointed Dr. Simons to the position of Director of the Yale Cardiovascular Research Center. *Id.* ¶ 10.

Dr. Simons alleges that in April 2011, Yale received a letter from the Office of Civil Rights of the federal Department of Education ("DOE") advising it to take immediate action to address sexual harassment or risk the loss of federal funding under Title IX. *Id.* ¶ 12. Following the letter, the DOE allegedly began a series of highly publicized investigations of colleges and universities to evaluate whether the institutions were taking a sufficiently strong stance against sexual harassment claims. *Id.* ¶13.

In late 2010 and early 2011, Dr. Simons alleges, the DOE concluded that Yale was deficient in how it responded to claims of sexual misconduct on campus. *Id.* ¶ 14. The DOE allegedly told Yale that these deficiencies tended to create and foster a sexually hostile environment toward women. *Id.*

Allegedly in response to the DOE's criticism, Yale created a University-Wide Committee on Sexual Misconduct to enforce the University's Sexual Misconduct Policy. *Id.* ¶ 15. The

University-Wide Committee on Sexual Misconduct adopted procedures that identified the respective rights and responsibilities of an accuser, the accused, and Yale in a complaint about sexual misconduct. *Id.* ¶ 16.

In February 2010, before the formation of the University-Wide Committee on Sexual Misconduct, Dr. Simons alleges that he sent a "declaration of love and romantic interest" to a junior colleague ("Dr. Doe"). *Id.* ¶ 18. Dr. Doe allegedly made clear that she did not feel the same way about Dr. Simons, and after a series of e-mails, communication between the two ended in 2011. *Id.* Dr. Simons alleges that Dr. Doe later began a romantic relationship with another colleague, and when that colleague began experiencing professional difficulties, Dr. Doe and the colleague allegedly blamed Dr. Simons. *Id.* ¶ 19.

In 2013, Dr. Doe filed a complaint with the University-Wide Committee on Sexual Misconduct, alleging that Dr. Simons sexually harassed her. *Id.* ¶ 20. The University allegedly hired former Connecticut Superior Court Judge Beverly Hodgson to investigate the claim. *Id.* ¶ 21. The University-Wide Committee on Sexual Misconduct allegedly concluded that Dr. Simons had sexually harassed Dr. Doe. *Id.*

Dr. Simons alleges that the University-Wide Committee on Sexual Misconduct recommended that Dr. Simons be suspended from his position as Chief of Cardiology for five years. *Id.* Dr. Simons appealed the recommendation. *Id.* After the appeal, Yale's Provost allegedly reduced Dr. Simons's suspension to eighteen months. *Id.* Dr. Simons alleges that, under an express provision of the University-Wide Committee on Sexual Misconduct policy, all proceedings are to be kept confidential. *Id.* ¶ 22. He alleges that the disciplinary action taken against him, however, became public. *Id.* ¶ 23.

Allegedly as a result of the public reaction to the news stories, Yale forced Dr. Simons to resign as Chief of Cardiology. *Id.* Then, when a second series of stories were published in the *New York Times*, Yale allegedly demanded that Dr. Simons also resign from his position as Director of the Cardiovascular Research Center. *Id.* Dr. Simons alleges that after he refused to resign, Yale took the position away. *Id.*

Throughout his suspension, Dr. Simons allegedly retained the Robert W. Berliner Professorship of Medicine and remained a faculty member in good standing. *Id.* ¶ 25. Dr. Simons alleges that the endowed chair helped him to attract grants and, thus, additional compensation. *Id.*; Plaintiff's Opposition Memorandum ("Pl.'s Mem. In Opp'n") at 3, ECF No. 21 (Dec. 23, 2019).

On or about 2017, reports of sexual misconduct by men allegedly began to surface on social media. Compl. ¶ 26. Dr. Simons alleges that the social media hashtag "#MeToo," "foster[ed] a general climate of hysteria," *id.* ¶ 26, causing unknown persons sympathetic to #MeToo sought to inflict punishment on Dr. Simons. *Id.* ¶ 27. Dr. Simons alleges that one or more of these persons contacted the Berliner family, which endowed the Robert W. Berliner Professorship of Medicine, to inform them of Dr. Simons's misconduct in 2013 and to encourage the family to remove him from the professorship. *Id.* ¶ 27. Eventually, the Berliner family allegedly contacted Yale administrators, who allegedly then begun looking for ways to remove Dr. Simons. *Id.* ¶ 28.

In the spring of 2018, Dean Alpern allegedly asked Dr. Simons to give up the Berliner Professorship in exchange for another endowed chair, the Waldemar Von Zedtwitz Professor of Cardiology, and allegedly stated it was unfortunate, but necessary due to the political climate. *Id.*

¶ 29. On June 22, 2018, Dr. Simons alleges, President Salovey sent Dr. Simons a letter praising him and confirming his new appointment. *Id.* ¶ 31.

On September 6, 2018, however, Yale allegedly released a statement that Dr. Simons had not been given a new honor, but, instead, changed his title, in part due to the Berliner family's concerns. *Id.* ¶ 33. Dr. Simons now alleges that in response to additional complaints made by #MeToo activists, Yale also issued a second statement reiterating that Dr. Simons was not receiving a new honor. *Id.* at ¶¶ 34–35.

Eventually, the media, including the *New York Times* and the *Washington Post*, reported stories on Dr. Simons. *Id.* ¶ 36. On September 20, 2018, while Dr. Simons was in London, Dean Alpern allegedly called and told him to resign from the Waldemar Von Zedtwitz Professorship by the following day. *Id.* ¶¶ 37–38. Dean Alpern allegedly told Dr. Simons that the increase in public criticism prompted the decision, and if Dr. Simons did not resign, he would be removed from the position. *Id.* ¶¶ 37, 39.

Dr. Simons allegedly retained counsel, and on September 21, 2018, he alleges that he petitioned the Superior Court for the Judicial District of New Haven for *ex parte* injunctive relief to stop Yale from unilaterally removing the Professorship. *Id.* ¶ 39. The Superior Court allegedly denied Dr. Simons's request, and Yale then allegedly took the endowed chair away from him. *Id.*

Dr. Simons alleges that he is still employed by Yale, *id.* ¶ 42, and that he allegedly continues to receive financial support in lieu of the endowed chair. *Id.* ¶ 40.

## B. Procedural History

On October 1, 2019, Dr. Simons filed his Complaint, having received releases of jurisdiction from the Equal Employment Opportunity Commission and the Connecticut Commission on Human Rights. ECF No. 1 (Oct. 1, 2019).

On November 27, 2019, Defendants filed a motion to dismiss, a motion to strike and a motion for more definite statement, under Federal Rules of Civil Procedure 12(b)(6), 12(f) and 12(e), respectively. Mot. to Dismiss, ECF No. 16 (Nov. 27, 2019); Mem. In Supp. Mot. To Dismiss, ECF No. 17 (Nov. 27, 2019) ("Defs.' MTD").

On December 23, 2029, Dr. Simons opposed Defendants' motions to dismiss. Pl.'s Mem. In Opp'n, ECF No. 21 (Dec. 23, 2019).

On January 16, 2020, Defendants replied to Dr. Simons's memorandum in opposition. Reply to Resp. to Mot. to Dismiss, ECF No. 24 (Jan. 16, 2020) ("Defs.' Reply").

On August 21, 2020, Defendants filed a supplemental memorandum in support of their motion to dismiss. Suppl. Mem., ECF No. 38 (Aug. 21, 2020) ("Defs.' Suppl. Mem.").

On September 4, 2020, Dr. Simons filed a supplemental memorandum in opposition to Defendants' motion to dismiss. Suppl. Mem, ECF No. 40 (Sept. 4, 2020) ("Pl.'s Suppl. Mem.").

## II.   STANDARD OF REVIEW

### A.  Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his

6

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

**B.  Rule 12(e)**

Under Rule 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). "For a more definite statement to be warranted, the complaint must be so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 456 (E.D.N.Y. 2009) (internal quotation marks and citations omitted). "The rule is designed to remedy unintelligible pleadings, not to correct for lack of detail." *Id.*

### C. Rule 12(f)

Under Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Second Circuit has held that, when a court evaluates a Rule 12(f) motion, "it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation [that movant wishes to strike] would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial.") (citing Fed. R. Civ. P. 12(f)); *Hudson's Bay Fur Sales Canada, Inc. v. Scheflin-Reich, Inc.*, No. 90 CIV. 8026 (RLC), 1991 WL 60377, at *1 (S.D.N.Y. Apr. 8, 1991) ("A motion to strike a matter from a complaint as immaterial will be granted only if no evidence in support of the allegation would be admissible at trial.").

## III.   DISCUSSION

Dr. Simons sets forth seven claims: (1) a breach of contract claim, (2) a breach of implied warranty of fair dealing claim, (3) a wrongful discharge claim, (4) a negligent infliction of

emotional distress claim, (5) a violation of Title IX claim, (6) a violation of Title VII claim, and (7) a breach of privacy claim, which he brings against unknown defendants.

Defendants have moved to dismiss each of these claims. They also have moved to strike the allegations against the unknown defendants or, in the alternative, have asked the Court to order the production of a more definite statement.

The Court will address each of these claims in turn, but first addresses a jurisdictional issue.

### A. Jurisdiction

In order for a lawsuit to be brought before a federal court, the court must have original jurisdiction over the matter. Under 28 U.S.C. § 1331, also known as "federal question jurisdiction," district courts are empowered with "original jurisdiction [over] all civil actions arising under the Constitution, laws, or treaties of the United States." If a lawsuit does not arise from of a "federal question," litigants may also bring cases before federal courts under 28 U.S.C. § 1332, "diversity jurisdiction." In relevant part, diversity jurisdiction is available to parties when the amount in controversy exceeds $75,000 and the litigants reside in different states or countries. *See* 28 U.S.C. § 1332. State law claims can be brought before federal courts either through use of 28 U.S.C. § 1332, or through the courts' exercise of supplemental jurisdiction, under 28 U.S.C. § 1367.

Section 1367(a) explains that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. . . ." 28 U.S.C. § 1367(a). The exercise of supplemental jurisdiction over state law claims is discretionary. *See id.* § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if [,]

(1) the claim raises a novel or complex issue of State law . . . [or] (3) the district court has dismissed all claims over which it has original jurisdiction . . . .").

A district court may dismiss state law claims after all federal questions in the case have been resolved. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 502 (2006) ("[W]hen a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction . . . ."); *Ziming Shen v. City of N.Y.*, 725 F. App'x 7, 16 (2d Cir. 2018), *cert. denied sub nom.*, 139 S. Ct. 78 (2018) ( "[G]iven the dismissal of all claims over which the district court has original jurisdiction, the court may decline to exercise supplemental jurisdiction over this remaining state law claim.. . . .[But, t]he court should balance the factors of judicial economy, convenience, fairness, and comity in making this discretionary determination." (internal quotation marks and citations omitted)).

Defendants raise two jurisdictional arguments. First, they argue that Dr. Simons has failed to prove the existence of diversity jurisdiction and since he has not petitioned to amend his Complaint to argue for supplemental jurisdiction, his claims arising under Connecticut law should be dismissed. Defs.' MTD at 32–34. Second, Defendants argue that, in the event that the Court finds it does have original jurisdiction, it should still use its discretion to not exercise supplemental jurisdiction over Dr. Simons's claims arising under Connecticut law, because his federal claims should be dismissed under Fed. R. Civ. P 12(b). *Id.* at 34–35.

The first of these arguments is moot, as Dr. Simons has conceded that diversity jurisdiction does not exist. Pl.'s Mem. In Opp'n at 4. As to Defendants' second argument, as long as the federal claims in this case remain, the Court declines to dismiss Dr. Simons's state law claims.

10

### B. The Title VII Claim

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the U.S. Supreme Court established a burden-shifting framework to evaluate claims of employment discrimination and outlined the elements of a prima facie case. Consistent with this decision, in the Second Circuit, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) there is "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). A plaintiff's burden for establishing a prima facie case is de minimis. *See Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("We have characterized plaintiff's *prima facie* burden as 'minimal' and 'de minimis.'") (citing *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)).

In the initial pleading stage of litigation for a Title VII employment discrimination claim, an "allegation of facts supporting a minimal plausible inference of discriminatory intent suffices...because this entitles the plaintiff to the temporary presumption of *McDonnell Douglas* until the defendant furnishes its asserted reasons for its action against the plaintiff." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016); *see also Dawson v. N.Y. City Transit Auth.*, 624 F. App'x 763, 770 (2d Cir. 2015) ("At the pleading stage, district courts would do well to remember th[e] exceedingly low burden that discrimination plaintiffs face . . . ."). The allegations need not, however, give "plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination." *Littlejohn*, 795 F.3d at 311.

Defendants argue that Dr. Simons has failed to meet the standards set forth for proving a violation of Title VII. While they do not dispute that he can be a member of a protected class, they argue that he has failed to show he is qualified, because although he alleges his academic

credentials, he also alleges that he was found to have violated the University's sexual misconduct policy. Defs.' MTD at 25. They also argue that Plaintiff has failed to allege that his removal from the Waldemar Von Zedtwitz Professorship was a materially adverse change to his employment, because he remains a physician, medical researcher, and faculty member of the Yale School of Medicine and is employed by Yale. *Id.* at 26.

Furthermore, Defendants argue that the fact that the Connecticut Commission on Human Rights and Opportunities ("CHRO") denied Mr. Simons's September 21, 2018 petition for an injunction against his removal is dispositive, because the CHRO determined that Dr. Simons's removal was based on his past misconduct, not his status as member of a protected class. *Id.* at 26–27.

Dr. Simons argues that he has met the pleading standards for a Title VII complaint. He argues that as a Caucasian male he is member of a protected class. Compl. ¶ 65. He also alleges that by still being employed by Yale, and being moved from one endowed chair to another, he has demonstrated his qualifications. Pl.'s Mem. In Opp'n at 27. He also argues that, despite still being employed by Yale, he has faced an adverse employment action because his removal from the endowed chair allegedly will result in a loss of professional benefits in excess of $100,000. *Id.*

Lastly, Dr. Simons argues that he has shown at least minimal support that disparate treatment existed as a result of his gender identity. Specifically, he has alleged that only Caucasian males have been punished twice under the Defendants' sexual misconduct disciplinary policies and that similarly situated women have never been punished multiple times for the same conduct. Compl. ¶¶ 66-67.

The Court agrees.

Dr. Simons's Complaint sufficiently states a claim for disparate treatment at this stage in the litigation. As the Second Circuit has held, "absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn,* 795 F.3d at 311. Dr. Simons's Complaint satisfies this standard and includes allegations as to each of these elements. *See* Compl. ¶ 65 (Plaintiff is a "Caucasian male"); *Id.* ¶ 31 (alleging that upon the exchange of endowed chairs, Dr. Simons received a letter from the President of the University, stating that was he "delighted to convey [the University's] pleasure in [Dr. Simons's] accomplishments"); *Id.* ¶ 55 (alleging he "suffered direct economic damages in the form of lost wages, lost grant opportunities and other ascertainable economic loss, together with emotional distress and suffering"); *Id.* ¶ 66 (alleging "the defendants have never punished a female multiple times for the same conduct in any disciplinary action involving sexual harassment"). At this stage of the case, he is not required to "give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination." *Littlejohn*, 795 F.3d at 311.

Accordingly, Defendants' motion to dismiss Dr. Simons's Title VII claim will be denied.

## C. The Title IX Claim

Title IX provides that, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (1988). The Second Circuit has determined that allegations regarding Title IX disciplinary proceedings on the grounds of gender bias generally fall within two categories: either the plaintiff "was innocent and wrongly found to have committed an offense . . . . [or] the plaintiff

alleges selective enforcement." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Under the latter category, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*

Dr. Simons's Complaint arguably falls within the second category. He argues that Defendants have violated his Title IX due process rights because after the University completed a full internal adjudication under its sexual misconduct policy, he faced discipline for the same behavior a second time. Pl.'s Mem. In Opp'n at 19. He also argues that Yale punishes only Caucasian males twice for the same conduct. Compl. ¶ 67.

Recently, two decisions in this District have determined that "Title IX affords no private remedy for employment discrimination claims." *See Piscitelli v. Univ. of Saint Joseph*, No. 3:19-CV-01589 (KAD), 2020 WL 3316413, at *1 (D. Conn. June 18, 2020); *Othon v. Wesleyan Univ.*, No. 3:18-CV-00958 (KAD), 2020 WL 1492864, at *11 (D. Conn. Mar. 27, 2020). Another decision in this District, however, has ruled differently. *See Doe v. Cent. Conn. State Univ.*, No. 3:19CV418 (MPS), 2020 WL 1169296, at *7 (D. Conn. Mar. 11, 2020) ("[T]he Second Circuit has not yet determined whether there is a private right of action for employment discrimination under Title IX. . . . After careful consideration, I find that [the plaintiff's] Title IX claims are cognizable and not foreclosed by Title VII . . . .").

Because Dr. Simons's Title IX claim arises out of the same common nucleus of facts as his Title VII claim – which will remain in this case, at least, until the close of discovery – the Court will exercise its discretion and wait until the close of discovery to address this claim. *See Dietz v. Bouldin,* 136 S. Ct. 1885, 1891 (2016) ("[The Supreme] Court has long recognized that a district court possesses inherent powers that are governed not by rule or statute but by the control

necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." (internal quotation marks omitted)).

Accordingly, Defendants' motion to dismiss Dr. Simons's Title IX claim will be denied, and this claim will be addressed at the summary judgment stage of this case.

### D. Breach of Contract

#### 1. Timeliness

Under Conn. Gen. Stat. § 52-576, "No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues. . . ."

Defendants argue that the Dr. Simons's breach of contract claim must be dismissed, because Dr. Simons's suspension was in January 2013 and he filed his Complaint on October 1, 2019, beyond the six-year statute of limitations period. Defs.' MTD at 6–7.

Dr. Simons argues that Defendants breached their contract not through his initial suspension in January 2013, but by allegedly continuing to discipline him for the same action over many years.  Pl.'s Mem. In Opp'n at 9. He argues that his breach of contract claim stems from the Defendants' actions of punishing him twice for the same act, unilaterally removing his endowed chair, and not giving him an opportunity to contest the removal of the endowed chair. Compl. ¶ 46. Because the last of these actions occurred in 2018, *id.* ¶ 39, in his view, he is well within the six-year statute of limitations period.

The Court agrees.

Notably, under Conn. Gen. Stat. § 52-576, the time limit begins "after the right of action accrues." Here, the alleged breach is not the procedures or discipline resulting from the University-Wide Committee on Sexual Misconduct hearing in 2013, *see* Pl.'s Mem. In Opp'n at

9, but rather the subsequent, and allegedly additional, disciplinary or punitive measures taken in 2018. *Id.* As a result, the six-year statute of limitations period does not bar this alleged breach of contract claim.[1]

### 2. The Existence of a Contract

Under Connecticut law, a breach of contract claim has three elements: (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014).

Defendants argue that, if the procedures governing the University-Wide Committee on Sexual Misconduct were a material term of the contract, and those procedures were not in place until after 2011, there could be no formation of an agreement in 2008 or 2009 when Dr. Simons signed his employment contract with the University. Defs' MTD at 7–8. They also argue that even if a contract had been formed, by violating the sexual misconduct policy, Dr. Simons failed to perform the duties to which he was bound, thus abrogating any responsibilities the Defendants had under it. *Id.*

Dr. Simons argues that a contract had been formed and that the express terms of the contract anticipated periodic changes. Pl.'s Mem. In Opp'n at 6. He further argues that his sexual misconduct did not lead to the termination of that contract. In his view, even after hiring an independent investigator and determining he had sexually harassed Dr. Doe, Yale did not terminate him or recommend his removal from his endowed chair. *Id.* at 7. Instead, as he argues, he maintained his position and continued to perform under the contract by staying in good

---

[1] Because Defendants' other arguments for dismissal of Dr. Simons's other claims rest on the same premise, a breach in 2013 rather than a breach in 2018, those arguments similarly fail. *See* Defs.' MTD at 13, 16, 18, 19 (arguing for the dismissal of Dr. Simons's claims of wrongful discharge, negligent infliction of emotional distress, Title IX, and breach of privacy, respectively).

standing throughout his suspension and not having any additional disciplinary issues following the suspension. *Id.* at 8.

The Court agrees.

At this stage of the case, this Court must view the Complaint's allegations in the light most favorable to Dr. Simons. *See Cohen*, 711 F.3d at 359 (2d Cir. 2013) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (quoting *Iqbal*, 556 U.S. at 678)). The more detailed issues related to the nature and extent of any operable employment contract in 2018 shall await a later stage of this case. For now, Dr. Simons's continued employment relationship with Yale suffices for purposes of determining whether a contract between the two parties had been formed. *See Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 532 (1999) ("There cannot be any serious dispute that there is a bargain of some kind; otherwise, the employee would not be working.").

Indeed, "Connectiut law recognizes that statements made in employment manuals may give rise to an implied contract between an employer and its employee." *Jones v. HNS Mgm't Co. Inc.*, No. CV020471419S, 2003 WL 22332837, at *4. As a result, the other related issues of whether Dr. Simons performed, and whether Yale breached these agreements, also should wait for another day. *Cf. id.* at *5 (recognizing as sufficient to survive a motion to dismiss allegations "that the defendants demoted her without cause or justification in violation of those procedures stated in the manual . . . .").

Accordingly, Defendants' motion to dismiss Dr. Simons's breach of contract claim will be denied.

### E.  Breach of the Implied Warranty of Good Faith and Fair Dealing

"[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004) (internal quotation marks omitted). In *De La Concha of Hartford, Inc.*, the Connecticut Supreme Court explained,

> The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term…To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.

*Id.* at 433 (internal quotation marks and citations omitted).

Defendants argue that if a contract existed, Dr. Simons has failed to demonstrate the Defendants acted in bad faith when allegedly breaching it. Defs.' MTD at 10. In their view, the Connecticut Supreme Court's decision in *Habetz v. Condon*, 224 Conn. 231(1992), is instructive, if not dispositive. *See* Defs.' MTD at 12 ("Bad faith includes 'both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.'" (quoting *Habetz*, 224 Conn. at 237)). Defendants argue that Dr. Simons has failed to sufficiently plead that they breached the implied warranty of good faith and fair dealing, because he has not alleged any of their actions were "dishonest" or "sinister." *See id.*

Dr. Simons argues that he was "enticed" to leave his position at Dartmouth College by an offer to be appointed an endowed chair, which could not be removed without proper procedures and process. Pl.'s Mem. In Opp'n at 11. He argues that his subsequent removal and the way by which Yale removed him were in bad faith. *Id.* He further alleges that Defendants were

18

negatively influenced by "#MeToo activists," who he has described as not having fairness or his best interests in mind. *Id.*; *see also* Compl. ¶ 36.

The Court agrees.

Since the terms of the contract alleged here are in dispute and Dr. Simons has alleged that Yale acted in bad faith when Yale removed him from his position as an endowed chair, for reasons similar to why Dr. Simon's breach of contract claim continues for now, his breach of the good faith and fair dealing also continues: his Complaint provides sufficient facts to survive a motion to dismiss. *See, e.g. Jones*, 2003 WL 22332837 at *5 (recognizing specifically that allegations "that the defendants demoted her without cause or justification in violation of those procedures stated in the manual" were "sufficient to support a claim of bad faith on the part of the defendants.").

Accordingly, Defendants' motion to dismiss Dr. Simons's claim of breach of the implied warranty of good faith and fair dealing will be denied.

### F.  The Wrongful Discharge Claim

"A claim for wrongful discharge requires the plaintiff to establish that the employer's conduct surrounding the termination of the plaintiff's employment violated an important public policy." *Carnemolla v. Walsh*, 75 Conn. App. 319, 324 (2003). "A breach of the implied covenant of good faith and fair dealing contract claim, however, is different than a wrongful termination claim because the former focuses on the fulfillment of the parties' reasonable expectations rather than on a violation of public policy." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 404 (2016).

Defendants argue that Dr. Simons's wrongful discharge claim should be dismissed, because, in their view, he has failed to allege the elements of common-law wrongful discharge:

(1) he was not discharged; he has not alleged the University's discharge violates public policy; (2) he is potentially entitled to another statutory remedy; and (3) that permitting his discharge to go unredressed would leave a valuable social policy unvindicated. Defs.' MTD at 13–14 (citing *Burnham v. Karl and Gelb P.C.*, 252 Conn 153, 181 (2000); *Lopez v. Burris Logistics Co.*, 952F. Supp. 2d 396, 405 (D. Conn. 2013)). Defendants argue that there are no laws in Connecticut against "wrongful demotion." Defs.' Reply at 5 (citing *Jones*, 2003 WL 22382837, at *2).

Dr. Simons argues that he has brought forward a significant and sufficient public policy argument to support his claim of wrongful discharge: sex discrimination. Pl.'s Mem. In Opp'n at 12. While he recognizes that to state a plausible claim for wrongful discharge, he must be discharged, he argues that Connecticut law is unclear on whether a wrongful discharge claim requires a complete termination of all employment relationships or if the law permits the claim to be brought for the termination of "separate and distinct employment relationships" between the parties even if the plaintiff is still employed. *Id.* at 12–13. As a result, he requests certification of the question to the Connecticut Supreme Court. *Id.* at 15.

Dr. Simons does not dispute that another statutory remedy exists, but has requested that the Court construe his Complaint to plead wrongful discharge in the alternative to his Title VII and Title IX claims or to grant him permission to amend his complaint to do so. Pl.'s Mem. In Opp'n at 12.

The Court disagrees.

There is no viable basis under Connecticut law for Dr. Simons's wrongful discharge claim. Decades ago, the Connecticut Supreme Court recognized "an exception to the traditional rules governing employment at will so as to permit a cause of action for wrongful discharge where the discharge contravenes a clear mandate of public policy." *Sheets v. Tedd's Frosted*

*Foods, Inc.*, 179 Conn. 471, 474 (1980). The Connecticut Supreme Court clarified there that the issue of wrongful discharge involved the termination of the employment relationship. *See id.* at 474–75 ("The plaintiff does not challenge the general proposition that contracts of permanent employment, or for an indefinite term, are terminable at will. Nor does he argue that contracts terminable at will permit termination only upon a showing of just cause for dismissal . . . ." (internal citations omitted)).

Connecticut's "appellate courts, however, have not expanded the cause of action for wrongful discharge recognized in *Sheets* to include wrongful demotions." *Jones*, 2003 WL 22332837 at *2 (collecting cases)). Indeed, since *Sheets*, subsequent decisions have only reaffirmed the notion that a wrongful discharge claim is premised on a termination of the employment relationship. *See Parsons v. United Techs. Corp.*, 243 Conn. 66, 79 (1997) (noting "that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one . . . ."); *see also Burnham v. Karl and Gelb, P.C.*, 252 Conn. 153, 159 (2000) (addressing the viability of a common-law wrongful discharge claim involving an "alleged retaliatory termination.").

In any event, even if that was not the prevailing law, Dr. Simons's wrongful discharge claim suffers from another fatal flaw: the existence of a statutory remedy for his alleged wrongful demotion. The Connecticut Supreme Court also has made clear that common-law wrongful discharge claims are precluded by the availability of a statutory remedy. *See Burnham*, 252 Conn. at 162 ("The existence of this statutory remedy precludes the plaintiff from bringing a common-law wrongful discharge action based on an alleged violation of § 31-51(b).") (referencing *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn. App. 643, 648 (1985) (finding that a

plaintiff can a bring wrongful discharge claim only when he or she is otherwise without remedy)).

Certainly, the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, which provides statutory protection at least equal to that of Title VII – one of Dr. Simons's claims already – provides an adequate remedy at law for Dr. Simons's alleged wrongful demotion. *See Bridgeport Hosp. v. Commission on Human Rights & Opportunities*, 232 Conn. 91, 108 (1995) ("[W]e are properly guided by the case law surrounding federal fair employment legislation . . . ."). To the extent that Dr. Simons is arguing that the statutory remedies under Connecticut's employment statute (or even Title VII) are not equivalent to those available under the common-law wrongful discharge claim, the Connecticut Supreme Court already has addressed and rejected that argument as well. *See Burnham*, 252 Conn. at 164-65 (recognizing that there is nothing in the relevant precedent "to suggest that a statutory remedy must be equivalent to a potential common-law cause of action for wrongful termination in order for the common-law cause of action to be precluded.").

Accordingly, Defendants' motion to dismiss Dr. Simons's wrongful discharge claim will be granted.

### G. The Negligent Infliction of Emotional Distress Claim

Under Connecticut law, there are four "elements of the cause of action for negligent infliction of emotional distress: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003).

The Connecticut Supreme Court has determined that a claim of negligent infliction of emotional distress cannot arise from conduct occurring within a continuing employment context, which the court distinguished from conduct occurring in the termination of employment. *See Perodeau v. City of Hartford*, 259 Conn. 729, 762–63 (2002). The court explained there that "extending the tort of negligent infliction of emotional distress to ongoing employment relationships would open the door to spurious claims." *Id.* at 758.

Defendants argue that Dr. Simons's claim for negligent infliction of emotional distress should be dismissed because he remains employed by Yale and he has not alleged that the conduct involved in his demotions created an unreasonable risk of emotional distress that might result in bodily harm. Defs.' MTD at 17.

Dr. Simons does not dispute Defendants' argument that he can only claim negligent infliction of emotional distress in the termination process. Pl.'s Mem. In Opp'n at 16. But he argues that even though he remains employed by Yale, he was terminated from a separate, distinct relationship within that employment. *Id.* at 17. He further alleges that the removal from those positions caused him to suffer emotional distress and humiliation. Compl. ¶ 57. He has, again, requested that the court certify the question of whether losing various positions, but remaining employed constitutes termination. *Id.*

The Court disagrees.

As with his wrongful discharge claim, there is no basis for this claim under Connecticut law. As the Connecticut Supreme Court already has made clear, the ongoing nature of Dr. Simons's employment with Yale precludes his negligent infliction of emotional distress claim. *See Perodeau*, 259 Conn. at 748–49 (when considering "whether individual municipal employees may be found liable for negligent infliction of emotional distress arising out of

actions or omissions occurring within the context of a continuing employment relationship, as distinguished from actions or omissions occurring in the context of termination of employment," the Connecticut Supreme Court "conclude[d] that they may not.")

Accordingly, Defendants' motion to dismiss Dr. Simons's claim of negligent infliction of emotional distress will be granted.

### H.  The Breach of Privacy Claim Against Unknown Persons

In Connecticut,

> the law of privacy has not developed as a single tort, but as a complex of four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff to be let alone.

*Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 127-28 (1982) (internal quotation marks omitted). The four categories of invasion of privacy are: (a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public. *See Foncello v. Amorossi*, 284 Conn. 225, 234 (2007) (citing Restatement (Second) of Torts § 652A (1977)); *see also Rizzitelli v. Thompson*, No. CV095009384S, 2010 WL 3341516, at *4 (Conn. Super. Ct. Aug. 2, 2010).

Dr. Simons has set forth a breach of privacy claim under the third category, alleging that unreasonable publicity was given to his private life. Pl.'s Mem. In Opp'n at 29. He has clarified in his memorandum in opposition to the Defendants' motion to dismiss that the claim of breach of privacy is being brought solely against the unknown persons who he alleges informed the Berliner family of the details of his UWC proceedings in 2018. *Id.* Dr. Simons argues that these defendants were associated with Yale, gained access to the confidential information of his UWC

disciplinary proceedings, and publicized that information. Compl. ¶ 70. He does not, however, bring this claim against the named defendants. *Id.*

The named defendants argue that the claims against unknown persons should be stricken under Federal Rule of Civil Procedure 12(f). Defs.' MTD at 36. Alternatively, they request that the Court order Dr. Simons to produce a more definite statement under Federal Rule of Civil Procedure 12(e). *Id.* at 37. They argue that an alleged violation without naming the person(s) responsible is too vague and ambiguous for them to reasonably prepare a response. *Id.*

The Court disagrees.

"Although the decision to grant a motion for a more definite statement lies within the discretion of the district court, [s]uch motions are generally disfavored . . . and are not intended to substitute for the normal discovery process." *Liberty Mut. Ins. Co. v. Howmet Casting & Servs.*, Inc., No. 3:15-CV-01408 (VAB), 2016 WL 5661999, at *3 (D. Conn. Sept. 29, 2016) (internal quotation marks omitted) (alteration in original); *see also Vaden v. Lantz*, 459 F. Supp. 2d 149, 151 (D. Conn. 2006).

As this Court explained in *Liberty Mut. Ins. Co.*, "[t]he preferred course is to encourage the use of discovery procedures to apprise the parties of the factual basis of the claims made in the pleadings." *Id.* As a result, the Court will not require the filing of a more definite statement at this time, as the named defendants will not be prejudiced by Plaintiff using discovery to uncover the names of the "unknown defendants."

Similarly, the Court will not strike the unnamed defendants under Federal Rule of Civil Procedure 12(f), at this stage in the case.  Like Rule 12(e), Rule 12(f) "[m]otions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Correction Officers Benevolent Ass'n of Rockland Cty. v. Kralik*, 226

F.R.D. 175, 177 (S.D.N.Y. 2005). In this case, Dr. Simons's breach of privacy claim is related to his alleged demotion from the endowed chairs, indicating that there is "bearing on the issue in dispute." *See id.* Striking a part of a pleading under Rule 12(f) is a drastic remedy that courts in this Circuit seldom use. *See, e.g.*, *Gierlinger v. Town of Brant*, No. 13-CV-00370 AM, 2015 WL 3441125, at *1 (W.D.N.Y. May 28, 2015) (dismissing motion to strike); *D'Alosio v. EDAC Techs. Corp.*, No. 16-CV-769 (VAB), 2017 WL 1439663, at *2 (D. Conn. Apr. 21, 2017) (dismissing motion to strike on the same grounds); *see also Lipsky*, 551 F.2d at 894 (stating, "Rule 12(f) should be construed strictly against striking portions of the pleadings on the grounds of immateriality, and if the motion is granted at all, the complaint should be pruned with care.").

Accordingly, the motion for a more definite statement, and the motion to strike related to the breach of privacy claim will be denied.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part**, and the motion for a more definite statement, and the motion to strike, are **DENIED**.

The Court dismisses Dr. Simons's wrongful discharge and negligent infliction of emotional distress claims at this time and will address the remaining claims at a later stage of this case.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of September, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE