**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL SIMONS, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:19-CV-01547 (OAW) |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, | : | |
| PETER SALOVEY and | : | |
| ROBERT ALPERN, M.D. | : | |
| Defendants. | : | MARCH 16, 2022 |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.**    **Introduction**

The plaintiff, Dr. Michael Simons, is a professor of medicine who was previously Chief of the Section of Cardiology at the Yale University School of Medicine and Director of its Cardiovascular Research Center ("YCVRC"). After he repeatedly pursued a romantic relationship with a junior female doctor who rejected his advances, he was determined to have sexually harassed her and retaliated against her then-boyfriend, another doctor in the same department who was also junior to Dr. Simons. In 2013 the plaintiff was found guilty of violating the University's sexual harassment policy by the University-Wide Committee ("UWC") on Sexual Misconduct and was suspended from his position as Section Chief for

eighteen (18) months.  The details were widely reported in the media, including repeatedly in *The New York Times*.[1]

During Dr. Simons's suspension, the University hired a consultant to do a 360-degree review of his performance and leadership.  When more than 90% of the faculty surveyed were opposed to or unsure about Dr. Simons's leadership, the Chair of the Department of Internal Medicine decided that Dr. Simons should resign as Section Chief.  Similar reactions within the YCVRC led to Dr. Simons's concomitant removal as its Director.  The plaintiff continued to hold the Robert W. Berliner endowed professorship until 2018, when a member of the Berliner family complained that someone who had violated the University's sexual misconduct policy continued to hold a chair endowed by her family.  Dr. Simons agreed to transfer the Berliner chair in order to honor both the family's request and the new Chief of Cardiology, and he agreed to accept the Von Zedtwitz professorship under the identical financial terms.

The fact of the plaintiff being named the Von Zedtwitz chair was perceived by many in the University community as bestowing a new honor on a known sexual harasser; thousands thereafter petitioned the University defendants for removal of the honorific.  For the good of the community, the Dean of the School of Medicine, defendant Dr. Alpern, ultimately decided to

---

[1] *See, e.g.*, T. Lewin, Yale Medical School Removes Doctor After Sexual Harassment Finding, N.Y. Times (Nov. 14, 2014), https://nyti.ms/1BpU9cu; *see also* T. Lewin, Handling of Sexual Harassment Case Poses Larger Questions at Yale, N.Y. Times (Nov. 1, 2014), https://nyti.ms/1wTfpSG.

recommend to defendant President Salovey—and in turn Yale Corporation (*i.e.*, board of trustees)—that the plaintiff's endowed chair be rescinded. The plaintiff was removed as Von Zedtwitz chair but continues as a tenured professor under the identical financial terms as when he held an endowed chair.

In his Complaint, the plaintiff alleges claims for: (1) breach of contract; (2) breach of the implied warranty of good faith and fair dealing; (3) wrongful discharge; (4) negligent infliction of emotional distress; (5) violation of Title IX based on selective enforcement and alleged Constitutional Due Process and Double Jeopardy protections; (6) gender discrimination in violation of Title VII; and (7) breach of privacy. This Court dismissed the plaintiff's wrongful discharge and negligent infliction of emotional distress claims on September 30, 2020; his breach of privacy claim was formally withdrawn by his counsel at the Court's Pre-Filing Motion Conference on November 15, 2021, and dismissed by this Court. *See* Doc. Nos. 44, 83.

The plaintiff cannot establish a breach of contract claim in the first instance because he cannot identify any clause of his contract that the University defendants breached. The plaintiff's nomination or appointment to certain positions was not guaranteed for an express period of time or granted for a term of years, thereby making him at-will as to those positions in any event. Moreover, the plaintiff materially breached the contract first when he violated the

University's faculty handbook and sexual misconduct policies and therefore is barred from recovering under it.

The plaintiff also cannot establish a breach of the implied warranty of good faith and fair dealing, which requires him to demonstrate that the University defendants acted in bad faith to prevent him from receiving the benefits of his contract; and any such claim would be preempted under Connecticut law by the available Title VII statutory remedy in any event. Additionally, as with his breach of contract claim, the plaintiff cannot identify specific benefits of the contract that he was prevented from receiving, and this claim fails on that basis as well.

The plaintiff also cannot establish a prima facie case of Title VII discrimination because: (1) four of his five claimed adverse employment actions are time-barred and barred for his failure to exhaust his administrative remedies by bringing them before the Equal Employment Opportunity Commission ("EEOC") or the Connecticut Commission for Human Rights and Opportunities ("CHRO"); (2) there is no direct evidence of discrimination; (3) he has not suffered an actionable adverse employment action; and (4) he is unable to show that he was treated disparately as compared with any similarly-situated females, because he cannot identify any valid comparators.  Moreover, even if this Court does find that the plaintiff can establish a prima facie case of discrimination, summary judgment should still be granted because the

defendants have articulated legitimate, nondiscriminatory reasons for their actions that the plaintiff cannot prove were pretext for discrimination.

The plaintiff's Title IX claim fails because it is duplicative and preempted by his Title VII claim, and it is legally insufficient in any event. He cannot establish selective enforcement on the basis of gender under Title IX. Specifically, the plaintiff cannot show: (1) that the University was acting in its capacity as a state actor such that his alleged Constitutional Due Process and Double Jeopardy protections apply here; or (2) that the University's actions were affected by the plaintiff's gender, or any form of gender bias, as compared with any similarly-situated female comparator, which—again—he cannot identify.

There are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law on these remaining four counts.

## II.    Facts

On May 22, 2008, the University offered the plaintiff, Dr. Michael Simons, the position of "Chief of the Section of Cardiovascular Medicine and Professor of Internal Medicine at Yale University School of Medicine, and the corresponding position of Chief of Cardiovascular Medicine at Yale-New Haven Hospital." *See* Defendant's Local Rule 56(a)(1) Statement ("Facts"), ¶ 1. The May 22, 2008 Offer Letter set forth the specific terms and conditions of the University's offer of employment and superseded any previous correspondence or discussion

between the plaintiff and the University, and is the contract on which the plaintiff has based his breach of contract claims. *Id.*, ¶ 2, 3. The Offer Letter states that the "Department of Internal Medicine is recommending you for appointment as Professor of Internal Medicine without term in the Traditional Track," which means a Professor "with tenure in this case." *Id.*, ¶ 4.

The Offer Letter further states that the University "will nominate [the plaintiff] to President Levin and the Yale Corporation for a Robert Berliner Professorship." *Id.*, ¶ 5. The person who holds a named professorship such as the Berliner Professorship receives annual income from the endowment associated with it; and it is formally conferred and rescinded only by the Yale Corporation upon the recommendation of the President. *Id.* The Offer Letter does not guarantee the plaintiff's appointment to a Robert Berliner Professorship or establish a term of years for which the plaintiff will hold a Robert Berliner Professorship. *Id.*, ¶ ¶ 6, 7.

Under the Offer Letter, the Yale School of Medicine further committed "to establish the Yale Cardiovascular Research Center (YCVRC) in the Department of Medicine" and "to name [plaintiff] as its first Director." *Id.*, ¶ 8. The plaintiff was offered a salary of "$500,000 per year for the fiscal year July 1, 2008 through June 30, 2009," which is set in accordance with School and Department Faculty Salary Guidelines and is reviewed annually, with adjustments based on the plaintiff's performance and overall contribution to the School, the Department, and the Hospital. *Id.*, ¶ 9.

On June 10, 2008, the plaintiff agreed to, signed, and returned the Offer Letter to the University, thereby officially accepting its terms. *Id.,* ¶ 10. Thereafter, the plaintiff was nominated for the Robert Berliner Professorship as promised; and he was appointed by the Yale Corporation and held that professorship from 2008 through the Spring of 2018. *Id.,* ¶ 11. The plaintiff accepted the positions of Chief of the Section of Cardiovascular Medicine and Professor of Internal Medicine at the Yale-New Haven Hospital and the Yale School of Medicine, and was named the first Director of the YCVRC, which he also accepted. *Id.,* ¶ 12. In doing so, he agreed to abide by the requirements of the May 22, 2008 Offer Letter "as well as all other University policies and procedures." *Id.*

On or around August 30, 2013, a hearing was held before a panel of the UWC in connection with two complaints brought against the plaintiff: (1) brought by Valarie Stanley (acting as a Title IX Coordinator on behalf of Annarita Di Lorenzo); and (2) brought by Frank Giordano. *Id.,* ¶ 13. Dr. Di Lorenzo, formerly a postdoctoral research scientist at Yale, and Dr. Girodano, associate professor of Medicine (Cardiology) at Yale, brought allegations that the plaintiff engaged in various behaviors that amounted to sexual harassment. *Id.,* ¶ 14.

The UWC Panel, after hearing testimony from the parties, the ex-Chair of the Department of Internal Medicine at Yale School of Medicine, Jack Elias, and receiving written testimony from Dr. William Sessa, concluded, by a preponderance of the evidence, that the plaintiff's

actions of pursuing Dr. Di Lorenzo amounted to sexual harassment because his actions were of a sexual nature that created a hostile and intimidating work and research environment. *Id.,* ¶ 15. The UWC Panel further recognized that Dr. Giordano had a justified fear of retaliation by the plaintiff and that, because of the conflict of interest stemming from Dr. Di Lorenzo's rejection of the plaintiff's romantic interest, the plaintiff's continued decision-making authority over Dr. Giordano's career was a failure of proper leadership and was unprofessional. *Id.,* ¶ 16.

As discipline for the plaintiff's creation of a hostile work environment for Dr. Di Lorenzo and unprofessional exercise of authority over Dr. Giordano, the UWC Panel recommended that the plaintiff be removed as section Chief of Cardiology permanently and that the plaintiff hold no comparable or higher leadership position at the University for a period of five years. *Id.,* ¶ 17. Because the UWC Panel found that the plaintiff "significantly misused the leadership role entrusted to him as section chief," it recommended that the penalties for the plaintiff's violation of the sexual harassment policy and conflicted leadership "be centered on [the plaintiff's] leadership position." *Id.,* ¶ 18.

On October 14, 2013, after considering the UWC Panel's determinations and recommendations, Provost Benjamin Polak formally suspended the plaintiff from serving as Section Chief of Cardiology until June 30, 2015, or approximately 18 months. *Id.,* ¶¶ 19- 20. As a result, the plaintiff's salary "was decreased when he was no longer chief of the cardiology

division . . . to a number that was more consistent with that of a professor in the department of internal medicine." *Id.* After receiving Provost Polak's Decision, the University decided to hire a third-party consultant to perform a "360 Review" of the plaintiff's job performance and leadership, which involved interviews with several of the plaintiff's coworkers and an anonymous written survey of the plaintiff's coworkers. *Id.,* ¶ 21.

The independent consultant interviewed thirty-six (36) persons, consisting of nine (9) professors, eleven (11) associate professors, ten (10) assistant professors, and six (6) others. *Id.,* ¶ 23. When asked whether the plaintiff was suitable to lead the Cardiology Section in the future, only 8% of interviewees answered "Yes." *Id.,* ¶ 24. Conversely, 72% of the interviewees answered "No," the plaintiff was not suitable to lead the Section in the future, and 19% answered that they were "Unsure." *Id.* Further, 81% of the interviewees stated that the plaintiff failed to meet the educational and career development needs of medical students, graduate students, residents, and fellows, and 72% of interviewees stated that the plaintiff did not create a positive work environment characterized by professionalism, honesty, integrity, diversity, respect, collaboration, open communication, and the sensitive management of conflict. *Id.,* ¶ 25.

As a result of the "360 Review," the plaintiff was asked not to return as Section Chief of Cardiology in or around October 2014. *Id.,* ¶ 26. The plaintiff did not bring any type of legal challenge—CHRO complaint or otherwise—in connection with his removal from his position as

9

Section Chief of Cardiology in the Yale School of medicine. *Id.,* ¶ 28. On November 13, 2014, the plaintiff was officially removed from the position of Director of the YCVRC. *Id.,* ¶ 29. Dr. Gary Desir, as the Section Chair of Internal Medicine at Yale School of Medicine, made the decision to remove the plaintiff from the position of Director of the YCVRC as a result of the "360 Review" survey results indicating discord within the YCVRC and dissatisfaction with the plaintiff's leadership skills. *Id.,* ¶ 30. After the plaintiff was removed from the position of Director of the YCVRC, he did not bring any claims in the form of a CHRO complaint, union complaint, or lawsuit. *Id.,* ¶ 31.

In or around April 2018, the plaintiff was asked to exchange his endowed chair, the Robert Berliner Professorship, with another endowed chair, the Waldemar Von Zedtwitz Professorship. *Id.,* ¶ 32. The plaintiff believes that the key motivation behind the University's request that he transfer from the Robert Berliner Professorship to the Waldemar Von Zedtwitz Professorship was to avoid a dispute with the Berliner Family. *Id.,* ¶ 33. The reasons expressed by Dr. Alpern were to maintain Dr. Simons's current income, to avoid a dispute with the Berliner family, and to offer the Berliner chair to the new chief of cardiology. *Id.,* ¶ 33. In agreeing to exchange his Robert Berliner Professorship for the Waldemar Von Zedtwitz Professorship, the plaintiff stated that he would be "happy to swap the chair." *Id.,* ¶ 34.

The plaintiff was officially appointed and confirmed by the Yale Corporation as a

Waldemar Von Zedtwitz Professor of Cardiology on June 22, 2018; and he agrees that he was

not materially affected by the exchange of chairs. *Id.,* ¶ 35. Neither did he suffer any loss of

salary as a result of his agreement to transfer from the Robert Berliner Professorship to the

Waldemar Von Zedtwitz Professorship. *Id.,* ¶ 36.

The fact of the plaintiff being named the Von Zedtwitz chair was perceived by the

university community as the bestowing of a new honor on a known sexual harasser, and the

response within the Yale Medical School community was negative and vocal. *Id.,* ¶¶ 37-38. A

petition circulated among Yale School of Medicine faculty and graduates objecting to Dr.

Simons's new professorship. *Id.*

After consulting with various constituencies within the University, Dr. Alpern (and

ultimately the Yale Corporation) removed the plaintiff from the Waldemar Von Zedtwitz Chair

on September 21, 2018. *Id.,* ¶ 38. The plaintiff did not suffer any loss of salary as a result of his

removal from the Waldemar Von Zedtwitz Professorship. *Id.,* ¶ 39. He did not suffer any loss

of benefits; his office location did not change; the supervisor to whom he reports did not change;

and he remains a tenured professor at the University. *Id.,* ¶¶ 40-43.

On February 28, 2019, the plaintiff filed a complaint with the CHRO alleging violations

of Conn. Gen. Stat. 46a-60(a)(1) and Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e ("Title VII") for the removal of the Von Zedtwitz chair. *Id.,* ¶ 43. On June 11, 2019, the Commission dismissed the plaintiff's complaint and released its jurisdiction. *Id.,* ¶ 44.

Neither the University defendants, nor any employee, agent, or representative of the University, has made any oral or written comments—discriminatory or otherwise—about the plaintiff's gender, race, or ethnicity. *Id.,* ¶ 45. The plaintiff is unable to identify any Caucasian males, other than himself, who are employed by the University and were allegedly punished twice for the same conduct. *Id.,* ¶ 46. But the plaintiff alleges that three other individuals are similarly situated to him and have committed similar and/or comparable misconduct: (1) Amy Chua; (2) Carlos Mena; and (3) Joseph Schlessinger. *Id.*

Of these three individuals, only Amy Chua is claimed to be a female professor with an endowed professorship and from a different protected class than the plaintiff. But Dr. Simons provides no factual basis whatsoever to establish either that Professor Chua is similarly situated in other materials respects, much less that she was treated differently by the UWC or otherwise, or that such disparate treatment was directly or indirectly attributable to her gender. *Id.,* ¶ 47.

## III. <u>Legal Standard</u>

A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986)

(quoting Fed. R. Civ. P. 56(c)).  At summary judgment, "the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56; *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then summary judgment is appropriate. *Celotex*, *supra*, 477 U.S. at 323.

The Supreme Court has stated that where the record taken as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).  To prevail here, the University defendants need not prove a negative.  Rather:

> [They] need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'. . . .  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. . . .  [A] party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, Fed. R. Civ. P. 56(e), and some metaphysical doubt as to the material facts is insufficient.

*Darden* v. *Town of Stratford*, 420 F.Supp.2d 36, 41 (D. Conn. 2006) (*Arterton*, J.) (citations and

internal quotation marks omitted).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . . [T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001); *see also Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (confirming that '[t]rial courts should not treat discrimination differently from other ultimate questions of fact')."

Here, the plaintiff cannot present evidence necessary to establish prima facie claims of breach of contract, breach of the implied covenant of good faith and fair dealing, or discrimination under Titles VII or IX.  Thus, the record in this case, taken as a whole, could not lead a rational trier of fact to find for the plaintiff, and summary judgment should be granted.

IV.   **Argument**

    *a.*    ***The plaintiff cannot establish a <u>breach of contract</u> because he recovered all of the benefits promised and breached the contract first himself in any event.***

The plaintiff cannot maintain his breach of contract claim in the first instance because he cannot identify any clause of his contract that the University defendants breached.  Unlike his employment as a tenured professor on the faculty of the Yale University School of Medicine, the plaintiff's appointments as the Chief of the Section of Cardiovascular Medicine at the School of

Medicine and the Chief of Cardiovascular Medicine at Yale-New Haven Hospital were not guaranteed under his contract (or otherwise) for an express period of time or granted for a term of years, thereby making him at-will as to those positions. *E.g.*, *Iosa v. Gentiva Health Servs., Inc.*, 299 F. Supp. 2d 29, 34 (D. Conn. 2004). So too were the Plaintiff's role as the first Director of the YCVRC and his Robert Berliner and Waldemar Von Zedtwitz Professorships. Facts, ¶¶ 1, 5-8, 34-35.

"Under Connecticut law, a breach of contract claim has four elements: (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages." *Manning v. Cmty. Sols. Inc.*, No. 3:20-CV-00337 (VAB), 2021 WL 4477393, at *4 (D. Conn. Sept. 30, 2021); *Simons v. Yale Univ.*, No. 3:19-CV-1547 (VAB), 2020 WL 5816950, at *8 (D. Conn. Sept. 30, 2020) (both citing *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014)).

The plaintiff's breach of contract claim fails to identify any clause of his contract, express or implied, that was breached by the University defendants. He instead alleges broadly that the University breached its contract (1) by imposing successive and duplicative punishment for the plaintiff's violation of the University's sexual misconduct policies; (2) by removing the plaintiff's Von Zedtwitz Professorship; and (3) by doing so without an opportunity to contest the removal. Facts, ¶ 48. Summary judgment should therefore enter on this basis.

As the parties' agreement itself shows, the plaintiff indisputably received all of the benefits of his contract. Among other things, Dr. Simons (i) was appointed as "Professor of Internal Medicine without term in the Traditional Track," (ii) was appointed "Chief of the Section of Cardiovascular Medicine" at Yale University School of Medicine, (iii) was appointed "Chief of Cardiovascular Medicine at Yale-New Haven Hospital," (iv) was nominated for a Robert Berliner Professorship, and (v) was named as the "first Director" of the YCVRC. Facts, ¶¶ 1-2, 4-5, 8. But Dr. Simons materially breached the contract first when he admittedly violated the University's faculty handbook and sexual misconduct policies, as held by the UWC. Facts, ¶¶ 13-19. He therefore cannot complain of the lawful suspension of his at-will leadership positions as Chief of Cardiology and Chief of Cardiovascular Medicine. *See Weiss v. Smulders,* 313 Conn. 227, 263 (2014) ("Under contract law, it is well settled that a material breach by one party discharges the other party's subsequent duty to perform on the contract.")

Similarly, Plaintiff cannot complain that, as a result of the University's independent review thereafter of Plaintiff's job performance, he was permanently removed as Section Chief of Cardiology and Director of the YCVRC. Facts, ¶¶ 21-30. These positions were at-will, and there is no provision in the contract to the contrary. *Thibodeau v. Design Grp. One Architects, LLC,* 260 Conn. 691, 698 (2002) (parties can terminate an at-will employment relationship "for any reason, or no reason, at any time without fear of legal liability"); *see also Cruz v. Visual*

*Perceptions, LLC.*, 311 Conn. 93, 108 n.12 (2014) (at-will employment relationship overcome only by "express provision" in the contract).

Three similar cases reinforce this important point. First, in *Cominelli v. The Rector & Visitors of The Univ. of VA*, 589 F. Supp. 2d 706 (W.D. Va. 2008), *aff'd sub nom. Cominelli v. Rector & Bd. of Visitors of Univ. of Virginia*, 362 F. App'x 359 (4th Cir. 2010), the court dismissed breach-of-contract claims concerning the plaintiff's post-audit removal as Chief of the Division of Gastroenterology and Hepatology and Director of the Digestive Health Center of Excellence, finding insufficient evidence pleaded to rebut the presumption of at-will employment. *Id.* at 713. Second, in *Murtagh v. Emory Univ.*, 152 F. Supp. 2d 1356 (N.D. Ga. 2001), the court entered summary judgment on the plaintiff's breach-of-contract claim that he was promised an appointment to be Chief of the Pulmonary Division because the evidence was undisputed that the Division Chiefs "serve at the pleasure of the Chairman of the Department of Medicine ... and are removable at any time, despite the fact that they are all tenured professors." *Id.* at 1364. Third, in *Geldzahler v. New York Med. Coll.*, 663 F. Supp. 2d 379 (S.D.N.Y. 2009), the court dismissed the plaintiff's breach of contract claim that he was wrongfully discharged as the director in the New York Medical College's oral surgery residency program because there was no fixed duration and no express written policy limiting the right to discharge. *Id.* at 388.

Finally, Plaintiff agreed to transfer his Robert Berliner Professorship with the Waldemar Von Zedtwitz Professorship to avoid a dispute with the Berliner family and to offer the Berliner Professorship to the new Section Chief of Cardiology, and he did not suffer any loss as a result. Facts, ¶¶ 33-36. The Waldemar Von Zedtwitz Professorship was removed from Dr. Simons as a result of, among other things," anger," "upset," and "strong objections" to what was perceived in the University community that Dr. Simons was "being given a new honor." *Id.* ¶¶ 37-38, Plaintiff's endowed professorship was similarly at-will.

Plaintiff, who remains a tenured Professor at the University, testified that the transfer from the Berliner Professorship to the Von Zedtwitz Professorship did not "materially affect[] me," and he did not suffer any loss of salary, benefits, office, or reporting lines as a result of the removal of the Von Zedtwitz Professorship. *Id.* ¶ 35, 39-42. Accordingly, the University defendants submit that summary judgment should enter on the plaintiff's breach-of-contract claim as there is no genuine issue for trial under the parties' agreement.

> **b.** ***The plaintiff's claim for <u>breach of the implied warranty of good faith and fair dealing</u> fails for the same reasons as his breach of contract claim; additionally, he cannot establish any bad faith by the defendants, and any such claim would be precluded under Connecticut law in any event by his available statutory remedies.***

The plaintiff also cannot establish a breach of the implied warranty of good faith and fair dealing, which requires him to establish that the University defendants acted in bad faith to

prevent him from receiving the benefits of a contract. The plaintiff simply cannot establish that the University defendants deprived him of the benefits of his contract in bad faith. Additionally, as with his breach of contract claim, the plaintiff cannot identify the specific benefit(s) of the contract that he was prevented from receiving; he indisputably received all of them. Finally, under Connecticut law, Dr. Simons's breach of implied warranty claim is barred by his available statutory remedies.

A contract in Connecticut "carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Simons*, *supra*, 2020 WL 5816950, at *9 (citing and quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004)); *see also Owen v. Georgia-Pac. Corp.,* 389 F. Supp. 2d 382, 393 (D. Conn. 2005) *(*citing *Franco v. Yale Univ.,* 238 F.Supp.2d 449, 455 (D. Conn. 2002)); *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399 (2016). In these cases, the court "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term...." *Simons v. Yale Univ., supra*, 2020 WL 5816950, at *9. To prove a breach of the implied covenant, the plaintiff must show that the defendant acted in bad faith to "impede[] the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract." *Id.*

The term "bad faith" includes "both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Simons, supra*, 2020 WL 5816950, at *9 (citing and quoting *Habetz v. Condon*, 224 Conn. 231, 237 (1992)).

The plaintiff's proof at the close of discovery falls far short of these evidentiary standards, and he fails to identify the specific benefits of the contract that he was prevented from receiving.  To the contrary, he received all of the benefits promised and, under the plain terms of his contract and Connecticut law, his positions as Chief of the Section of Cardiology at the School of Medicine, Director of the YCVRC and his endowed professorship were all at-will.

In addition, the plaintiff's breach of the implied covenant of good faith and fair dealing claim derives from his belief that the University removed him as Section Chief, Director of the YCVRC, and the Von Zedtwitz professorship in order primarily to avoid negative publicity, and secondarily so that (i) Dr. Alpern could enhance his likelihood of reappointment as the Dean of the School of Medicine and (ii) President Salovey could "preserve his job because he was under a lot of pressure." Facts, ¶ 49. The plaintiff's beliefs do not amount to evidence beyond mere speculation, and they do not (even if genuine) amount to proof of "actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some

20

contractual obligation." *Simons*, *supra*, 2020 WL 5816950, at *9. Finally, the University

defendants testified to ample, reasonable grounds to take these actions. Facts, ¶¶ 26, 30, 37-38.

"Absent allegations and evidence of a dishonest purpose or sinister motive, a claim for breach of

the implied covenant of good faith and fair dealing is legally insufficient." *Alexandru v. Strong*,

81 Conn. App. 68, 81 (2004). Summary judgment should therefore enter here.

      Finally, Dr. Simons's claims are precluded by the federal statutory remedy he has chosen

to seek under Title VII; therefore, this claim fails on this ground as well. *See, e.g. Leichter v.*

*Lebanon Bd. Of Educ.*, 917 F. Supp. 2d 177, 181, 195 (D. Conn. 2013) (stating that "[p]laintiff's

claim for breach of the covenant of good faith and fair dealing based on violation[s] of public

embodied in CFEPA must be preclueded[,] as [he] has failed to establish that CFEPA does not

afford an adequate remedy to address the public policy violation."); *Bagley v. Yale Univ.*, 42 F.

Supp. 3d 332, 359, 361 (D. Conn. 2014) (finding plaintiff's breach of implied covenant of good

faith and fair dealing claim precluded by the statutory remedies, *i.e.*, Title VII, the ADEA, and

CFEPA, because "[t]here is no showing that these statutes would not afford [plaintiff] adequate

remedies."); *Jarnutowski v. Pratt & Whitney*, 103 F. Supp. 3d 225, 243 (D. Conn. 2015) (relying

on *Leichter* and *Bagley* to find that plaintiff "cannot bring a cause of action for breach of the

implied covenant where another statutory remedy is available.").

Accordingly, there is no genuine issue of material fact in support of the plaintiff's alleged breach of the covenant of good faith and fair dealing, and the defendants are entitled to judgment as a matter of law on this claim as well.

    *c.*     ***The plaintiff cannot establish a prima facie case of <u>gender discrimination under Title VII</u>; nor can he show that the University's legitimate, articulated non-discriminatory reason for the removal of his endowed chair was false and a pretext for discrimination.***

The plaintiff also cannot survive summary judgment on his Title VII discrimination claim because: (1) four of his five claimed adverse employment actions are time-barred and barred for his failure to exhaust his administrative remedies by bringing them before the EEOC or the CHRO; (2) there is no direct evidence of discrimination; and (3) the plaintiff is unable to show that he was treated disparately as compared with other similarly-situated female(s). Concerning the transfer and removal of his endowed professorship, moreover, the plaintiff has not suffered an adverse employment action. Moreover, even if this Court does find that the plaintiff can establish a prima facie case of discrimination, which he cannot, summary judgment should still be granted because the defendants have articulated a legitimate, nondiscriminatory reason for their action that the plaintiff cannot prove was a pretext for discrimination.

In order for a Title VII disparate treatment claim to survive summary judgment, it must survive the three-part burden-shifting test established in *McDonnell Douglas Corp. v. Green,* 411

U.S. 792, 802, 805 (1973); *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d

Cir. 2006); *Simons*, 2020 WL 5816950, at *6. Under this test:

> [The] plaintiff first bears the minimal burden of setting out a *prima facie* discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

*McPherson, supra*, 457 F.3d at 215 (internal quotation marks omitted). The plaintiff must first

establish a prima facie case of discrimination by showing that "1) he belonged to a protected

class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4)

the adverse employment action occurred under circumstances giving rise to an inference of

discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (internal

quotation marks and citations omitted).

Once a prima facie case has been made, the burden shifts to the University defendants to

"articulate some legitimate, nondiscriminatory reason for the [action]." *Estate of Hamilton v.

City of New York*, 627 F.3d 50, 55 (2d Cir. 2010) (internal quotation marks and citations

omitted). If the University defendants articulate such a reason, the plaintiff "is given an

opportunity to adduce admissible evidence that would be sufficient to permit a rational finder of

fact to infer that the employer's proffered reason is pretext for an impermissible motivation."

*Vivenzio v. City of Syracuse*, 611 F. 3d 98, 106 (2d Cir. 2010). To prevail, the plaintiff must

23

show "*both* that the [proffered, nondiscriminatory reason] was false, *and* that discrimination was the real reason" for the University's actions. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

To prove an inference of discrimination at the prima facie case stage, a plaintiff bringing a claim based on disparate treatment, without direct evidence, must show "that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks and citations omitted). Though "[o]rdinarily, the question whether two employees are similarly situated is a question of fact for the jury[,]" *id.*, a court "can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. Of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001). "Conclusory statements to the effect that similarly situated employees outside of the plaintiff's protected class were treated more favorably than the plaintiff have been held insufficient to defeat summary judgment." *Graham v. Elmira City School Dist.*, No. 6:10-CV-6645T, 2015 WL 1383657, at *5 (W.D.N.Y. Mar. 25, 2015).

To be similarly situated, the two individuals must be "substantially similar as to specific work duties, education, seniority, and performance history...[.]" *Brown v. Waterbury Bd. of Educ.*, 247 F. Supp. 3d 196, 210 (D. Conn. 2017) (quoting *Simpson v. Metro-North Commuter*

*R.R.*, 2006 WL 2056366, at *7 (S.D.N.Y. July 20, 2006)).  The individuals need not be similarly situated "in all respects," but must be "similarly situated in all material respects." *Baker v. Connecticut*, No. 3:03 CV 1894 JCH, 2006 WL 581205, at *6 (D. Conn. Mar. 8, 2006).  What constitutes "material respects" must be judged on "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness[.]" *Id.* Finally, "[i]n the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated. . . . Courts have held that where employees are disciplined by different supervisors, they are not similarly situated." *Brown, supra*, 247 F. Supp. 3d at 209 (internal quotations and citations omitted).

> i.  *The plaintiff has suffered no actionable adverse employment action: he failed to exhaust his administrative remedies as to four of his five claims; all are time-barred; and he has suffered no materially adverse change in the terms or conditions of his employment as a result of the removal of his endowed chair.*

The plaintiff alleges that he has suffered five adverse employment actions: (1) his eighteen-month suspension from the position of Section Chief of Cardiology in the Yale School of Medicine; (2) his removal from the position of Section Chief of Cardiology in the Yale School of Medicine; (3) his removal from the position of Director of the Cardiovascular Research

Center; (4) his transfer from the Robert Berliner Professorship to the Waldemar Von Zedtwitz

Professorship; and (5) his removal from the Waldemar Von Zedtwitz Professorship.  Facts, ¶ 50.

The plaintiff concedes that he did not bring any claim before the Connecticut

Commission on Human Rights and Opportunities ("CHRO") or otherwise as to the first four

alleged adverse employment actions.  Facts ¶¶ 28, 31, n.7.  Only one—his alleged discriminatory

removal from the Von Zedtwitz Professorship—was brought to the CHRO, where it was

dismissed. *See* Doc. No. 1 at ¶ 41; Facts, ¶¶ 44. The Commission released its jurisdiction, but

only with respect to the allegations presented, which concerned his removal from the Von

Zedtwitz Professorship. *Id.*

A party must exhaust his administrative remedies for each discrete act of discrimination

or lose the ability to recover for it. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,

110, 114 (2002).  For a charge to be timely, it must be filed "within 180 days of the alleged

discriminatory act ... or within 300 days if the complainant initially began the proceedings in a

state or local fair employment practices agency." *Lorquet v. Loehmann's Dep't Store*, 354 F.

App'x 480, 481 (2d Cir. 2009); § 2000e-5(e)(1). The "failure to exhaust administrative remedies

permits a court to dismiss the action because no subject matter jurisdiction exists ... This is

especially true where Congress has designed an extensive administrative procedure to protect the

interests of potential plaintiffs." *DiLaura v. Power Auth.*, 982 F.2d 73, 79 (2d Cir. 1992); *see*

*also Garcia v. Saint Mary's Hosp.*, 46 F. Supp. 2d 140 (D. Conn. 1999) ("[f]ailure to follow administrative procedures in pursuing a claim of discrimination forecloses access to judicial relief because it deprives the trial court of subject matter jurisdiction."). Because the plaintiff never filed any CHRO or EEOC charge with respect to his first four claimed adverse employment actions, summary judgment should be granted with respect to them because he failed to timely file any claim or exhaust his administrative remedies as required and the Court therefore does not have subject matter jurisdiction over them.

Additionally, a Title VII suit must be filed within 90 days of receiving the notice of right to sue from the Equal Employment Opportunity Commission. 42 U.S.C. § 2000e-5(f)(1); *see also Pruitt v. Mailroom Tech., Inc.*, 2007 WL 2302285, at *3 (D. Conn. Aug. 9, 2007) ("The CHRO is a deferral state agency with a work-sharing agreement with the EEOC .... Thus, exhaustion of state procedures through the CHRO allows plaintiff to proceed with her state and federal claims." [Internal citations omitted]); *Ortiz v. Prudential Insurance Co.*, 94 F.Sup.2d 225, 231 (D. Conn. 2001) (recognizing that a "right to sue" letter from the CHRO will be sufficient to advance federal discrimination claims and will satisfy the exhaustion requirement vis-a-vis the EEOC). Applying this authority to the plaintiff's Title VII claim disposes of it in its entirety. The plaintiff alleges that he received a release of jurisdiction from the CHRO but omits the date on which it was issued. Doc. No. 1 at ¶ 41. That release of jurisdiction was issued on June 11,

2019. *See* Facts, Ex. M.  The plaintiff filed this lawsuit on October 1, 2019.  Accordingly, the

plaintiff's action alleging a Title VII violation was filed 112 days later, on October 1, 2019,

instead of within 90 days, by September 9, 2019, as required.  Therefore, the plaintiff's action is

time-barred and should be dismissed on that basis alone.  42 U.S.C. § 2000e-5(f)(1).

      ii.  *The plaintiff has no direct or indirect evidence to support a claim of gender discrimination in any event.*

Moreover, the plaintiff's Title VII claim is devoid of direct evidence of discrimination.

He alleged discrimination on the basis of gender, *e.g.,* Doc. No. 1 at ¶ 68, but in his deposition,

Dr. Simons acknowledged that neither the University defendants, nor any employee, agent, or

representative of the University, has made any oral or written comments—discriminatory or

otherwise—about the plaintiff's gender, race, or ethnicity. Facts, ¶ 45.

Similarly, the plaintiff is unable to show that he was treated disparately as compared with

other similarly-situated female(s).[2] In discovery, the plaintiff alleges that three other individuals

are similarly situated to him and have committed similar and/or comparable misconduct: (1)

Amy Chua; (2) Carlos Mena; and (3) Joseph Schlessinger. Facts, ¶ 46. Of these three individuals,

---

[2] To the extent that plaintiff maintains that the University defendants have violated 42 U.S.C. § 1981 because he "is Caucasian male" and that the University "has only subjected Caucasian males to punishment twice for the same conduct," Doc. No. 1 at ¶¶ 1, 65, 67, summary judgment should enter.  See *Johnson v. Andy Frain Servs., Inc.*, 638 F. App'x 68, 70 (2d Cir. 2016) (affirming dismissal of Title VII and § 1981 claims for failing to state a plausible claim).  Plaintiff was also unable to identify other Caucasian males employed by the University who were allegedly punished twice for the same conduct. Facts, ¶ 46.

only Amy Chua is alleged to be a female professor with an endowed professorship and from a different protected class than the plaintiff. *Id.*, ¶ 47. But Dr. Simons provides no factual basis whatsoever to establish that he and Professor Chua were similarly situated in other material respects, much less treated differently by the UWC or otherwise, or that such disparate treatment was directly or indirectly attributable to gender. *Id.* Absent such evidence, summary judgment should enter because the plaintiff has failed to prove that he and Professor Chua were similarly situated in all material respects. *E.g., Baker*, *supra*, 2006 WL 581205, at *6.

Concerning the transfer and later removal of his endowed professorship, summary judgment should also enter because it is undisputed that the plaintiff suffered no loss of salary or benefits resulting from his voluntary transfer of the Berliner Professorship or the University defendants' ultimate removal of the Von Zedtwitz Professorship. Facts, ¶¶ 35-36, 39-40. "The law does not support a claim that a title change, with no change in salary or benefits, is considered an adverse employment action." *White v. Fuji Photo Film USA, Inc.*, 434 F. Supp. 2d 144, 152 (S.D.N.Y. 2006); see also *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364 (S.D.N.Y. 2005) (where employee retained same position, same salary, and benefits, then no adverse action); *see also Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 60 (2006) (in the discrimination context, an adverse employment action must have a "materially adverse change in the terms and conditions" of employment); *Ivanov v. Builderdome, Inc.*, No. 19-CV-3422 (LJL),

2021 WL 2554620, at *15 (S.D.N.Y. June 22, 2021) (change of plaintiff's title from "creative director" to "designer consultant" and eventual removal of profile altogether from website did not affect terms or conditions of employment and was not adverse employment action); *Klein v. New York Univ.*, 786 F. Supp. 2d 830, 846 (S.D.N.Y. 2011) (no adverse employment action in academic setting when there was "no evidence that the lack of the title materially impacted [the plaintiff's] conditions of employment," including her compensation and benefits). In any event, the plaintiff supplies no direct or indirect evidence of discrimination concerning the transfer and later removal of his endowed professorship, as demonstrated *supra* at p. 28-29.

    iii. *The defendants have articulated a legitimate, non-discriminatory reason for the removal of the plaintiff's endowed chair, and he cannot show that reason to be false or a pretext for gender discrimination.*

    Finally, the University defendants have proffered a legitimate, nondiscriminatory reason for the removal of the Von Zedtwitz chair—namely, their concern for the welfare of the Medical School community. Facts, ¶¶ 37-38. The plaintiff cannot provide any valid factual basis to suggest that their stated actions were false *and* a pretext for unlawful discrimination. As such, summary judgment should enter on this basis as well. *St. Mary's Honor Ctr. v. Hicks, supra*, 509 U.S. at 515.

> **d.** **The plaintiff's _Title IX_ claim is duplicative of and preempted by his Title VII claim; and it is time-barred and legally and factually insufficient in any event.**

The plaintiff's Title IX claim first fails because it is duplicative and preempted by his Title VII claim, and it is otherwise time-barred. The plaintiff's Title IX claim also fails because he cannot establish selective enforcement on the basis of gender under Title IX, or any alleged constitutional violations. Specifically, the plaintiff cannot show: (1) that the University's actions were affected by the plaintiff's gender, or any form of gender bias, as compared with any similarly-situated female comparator; or (2) that the University was acting in its capacity as a state actor or assessed criminal punishments such that his alleged Constitutional Due Process and Double Jeopardy protections may apply.

Under Title IX[3], complaints alleging gender bias in the context of disciplinary proceedings

> generally fall within two categories: either the plaintiff was innocent and wrongly found to have committed an offense or the plaintiff alleges selective enforcement. Under the latter category, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.

---

[3] "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

*Simons*, 2020 WL 5816950, at *7–8 (citation and alterations omitted); *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Dr. Simons claims here that the Defendants have violated his Title IX double jeopardy and due process rights because, after the University completed a full internal adjudication under its sexual misconduct policy, he faced discipline for the same behavior a second time. Facts, ¶ 51. He also argues that Yale punishes only Caucasian males twice for the same conduct. *Id.* The plaintiff therefore brings his Title IX claim for alleged selective enforcement by the UWC and successive punishment for sexual misconduct because of his gender. *Id.*

Dr. Simons alleges that his discriminatory and successive punishment in violation of Title IX is composed of his initial 18-month suspension as Chief of Cardiology, his permanent removal from that position, his removal as the Director of the Cardiovascular Research Center, the exchange of the Berliner Chair for the Von Zedtwitz Chair, and the removal of the Von Zedtwitz Chair. *Id.,* at ¶ 51. But Dr. Simons again provides no factual support that only Caucasian males have been punished twice, that a similarly-situated woman was treated differently, or that such disparate treatment was directly or indirectly attributable to gender. *Id.* ¶ 47.

   i. *The majority of district courts in the Second Circuit have held that there is no
      implied right of action for employees under Title IX.*

At the motion to dismiss stage of the case, this Court exercised its discretion to await the

close of discovery to address the plaintiff's Title IX claim. *Simons, supra*, 2020 WL 5816950, at

*7–8. Notably, "[a]n overwhelming majority of district courts in this Circuit have found that an

implied private right of action *does not* exist [sic] under Title IX for employees alleging gender

discrimination in the terms and conditions of their employment." (Emphasis in original) *Gayle v.

Children's Aid College Prep Charter Sch.*, 18 CIV. 9874 (GBD), 2019 WL 3759097, at *5

(S.D.N.Y. July 29, 2019).

For example, four recent decisions in this Circuit have determined that "Title IX affords

no private remedy for employment discrimination claims." *See Piscitelli v. Univ. of Saint Joseph*,

No. 3:19-CV-01589 (KAD), 2020 WL 3316413, at *1 (D. Conn. June 18, 2020); *Othon v.

Wesleyan Univ.*, No. 3:18-CV-00958 (KAD), 2020 WL 1492864, at *11 (D. Conn. Mar. 27,

2020); *Dikambi v. City U. of New York*, No. 19-CV-9937 (RA), 2021 WL 4198252, at *6

(S.D.N.Y. Sept. 14, 2021), *reconsideration denied*, 19-CV-9937 (RA), 2021 WL 5518187

(S.D.N.Y. Nov. 24, 2021) ("Because the Court is not persuaded that Plaintiff, as an employee of

a public funded university, is a member of the 'special class' for whose benefit Title IX was

created, ... it declines – absent controlling precedent – to read the statute as implying such a

[private] right of action." [Internal citation omitted]); *Xanthakos v. City U. of New York*, 17-CV-

9829, 2020 WL 5026930, at *9 (S.D.N.Y. Aug. 24, 2020) ("This Court joins in that reasoning

and agrees that Title VII is the exclusive remedy for employees alleging employment

discrimination on the basis of sex. An implied right of action under Title IX would disrupt the

balanced remedial scheme of Title VII [.]"); *but see Castro v. Yale University*, 518 F.Supp.3d

593 (D. Conn. 2021); *Doe v. Cent. Conn. State Univ.*, No. 3:19CV418 (MPS), 2020 WL

1169296, at *7 (D. Conn. Mar. 11, 2020) ("[T]he Second Circuit has not yet determined whether

there is a private right of action for employment discrimination under Title IX.... After careful

consideration, I find that [the plaintiff's] Title IX claims are cognizable and not foreclosed by

Title VII....").

The small minority of district courts that have found otherwise argue that the Supreme

Court's decisions in *Cannon v. University of Chicago*, 441 U.S. 677 (1979)] and *North Haven

Board of Education v. Bell*, 456 U.S. 512 (1982), "read together, support the proposition that

there is an additional *implied* cause of action for employment discrimination under Title IX for

employees of educational institutions receiving federal funds." (Emphasis in original.) *Gayle*,

*supra*, 2019 WL 3759097, at *5; *see, e.g., Castro, supra*, 518 F. Supp. 3d at 605; *see also Doe v.

Cent. Conn. State Univ., supra*, 2020 WL 1169296, at *6. Moreover, these courts rely on the

Supreme Court's more recent decision in *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167

(2005), which held that retaliation was a form of gender discrimination within the meaning of Title IX. *See, e.g.*, *Castro*, 518 F. Supp. 3d at 605-08.

In *Jackson*, however, the claim was based on the school board "retaliating against [the plaintiff] for protesting the discrimination against the girls' basketball team," not discriminatory employment practices. *See Jackson*, 544 U.S. at 172. The proposition that every statute prohibiting discrimination also necessarily incorporates a right to be free from retaliation for reporting discrimination is difficult to square with Title VII, which contains an anti-discrimination provision and a separate express anti-retaliation provision. *See Wilcox v. Lyons*, 970 F.3d 452, 463 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2754 (2021). In at least the mind of Congress, retaliation is not always included within the conceptual ambit of discrimination. *See Gomez-Perez v. Potter*, 553 U.S. 474, 496-497 (2008) (Roberts, C.J., dissenting) (explaining that although "broad bans on discrimination, standing alone, may be read to include a retaliation component," differences in the "text and structure of" the ban, along with factors such as "the broader ... scheme of which [the ban] is a part," can counsel in favor of the opposite conclusion—that retaliation is not included).

Further, reliance on *Bell* is misplaced because it involved a challenge to the validity of administrative regulations terminating federal funding of educational institutions that discriminated on the basis of sex in their employment practices. *See Piscitelli, supra*, 2020 WL

3316413, at * 11 (citing *Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118, 128 (W.D.N.Y. 2001) ("[*Bell*] is a far cry from holding that Title IX also authorized, like Title VII, private causes of action in this court by the employee to remedy such discrimination."). Likewise, "nowhere in *Cannon* does the Court create a private right of action for an *employee* of a federally-funded educational institution to sue his or her employer for employment discrimination under Title IX." (Emphasis in original.) *Gayle*, *supra*, 2019 WL 3759097, at *5; *See also Cannon*, *supra*, 441 U.S. at 704–09 (holding that a *student* has a private right of action to sue a federally-funded educational institution for sex-based discrimination in its admissions).

Dr. Simons's Title IX claim arises from the same common nucleus of facts as his Title VII claim. *See Simons*, *supra*, 2020 WL 5816950, at *8. Consistent with the majority of courts in this Circuit, therefore, this Court should find Dr. Simons is not entitled to bring a private cause of action for money damages under Title IX. *See Vega v. State Univ. of New York Bd. of Trustees*, No. 97 CIV. 5767, 2000 WL 381430, at *3 (S.D.N.Y. April 13, 2000) ("To hold that Title IX permits a private right of action for employment-related discrimination would be to offer employees of educational institutions receiving federal funds a mechanism for relief that differs significantly from the avenues available for other employees."); *see also Philpott v. New York*, 252 F. Supp. 3d 313, 31-319 (S.D.N.Y. 2017) ("allowing employees to sue for discrimination under Title IX would enable many federal employees to bypass the remedial process that

Congress established under Title VII"); *Supino v. SUNY Downstate Med. Ctr.*,

19CV1315ENVVMS, 2021 WL 4205181, at *9 (E.D.N.Y. Mar. 15, 2021) ("[plaintiff's] Title IX

claims, being the mirror image of her Title VII claims that have already survived dismissal, are

dismissed as duplicative").

     ii.  *Any Title IX claim concerning actions prior to October 1, 2016 would be time barred.*

     The Court should also now apply Connecticut's three-year statute of limitations for

actions founded upon a tort to alleged violations of Title IX.  *See Curto v. Edmundson*, 392 F.3d

502, 504 (2d Cir. 2004); C.G.S. § 57-577.  To the extent that the plaintiff continues to seek

redress here for his suspension in 2013 for violating the University's sexual misconduct policy,

or any other actions that took place prior to October 1, 2016, the claim is time-barred.  C.G.S. §

52-577.  This bar applies equally to his initial 18-month suspension as Chief of Cardiology, his

permanent removal from that position, his removal as the Director of the YCVRC.

     iii. *The plaintiff cannot establish selective enforcement or any Constitutional claim under Title IX in any event.*

     Even if not pre-empted or time-barred, the plaintiff fails to make or support particularized

facts supporting his gender-bias-based selective enforcement claim under Title IX.  To the

contrary, there are none; only conclusory statements and beliefs; as demonstrated *supra* at p. 22-

30 with respect to the plaintiff's Title VII claim, he has no valid basis for this gender

discrimination claim, either.  Plaintiff simply does not present or provide facts suggesting that

the University ever received a complaint against a similarly-situated female faculty member

comparable to the complaint lodged against the plaintiff or that the University treated such a

female faculty member differently. *See, e.g., Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184,

211 (W.D.N.Y. 2013) (dismissing selective enforcement claim for failing to allege more

favorable treatment of similarly situated comparator).[4] As explained in *Doe v. New York Univ.*,

438 F. Supp. 3d 172 (S.D.N.Y. 2020), *appeal dismissed* (June 8, 2020), "courts in this circuit

have consistently dismissed selective enforcement claims absent allegations that a school treated

similarly situated members of the opposite sex—that is, members of the opposite sex facing

comparable disciplinary charges—differently." (Citation omitted, internal quotation marks

omitted.) *Id.* at 182

   Summary judgment should therefore enter on the plaintiff's Title IX claim, including his

constitutional claims that the University's conduct was a violation of the Double Jeopardy

Clause or a "violation of the due process requirements of Title IX." Doc. No. 1 at ¶ 61. The

Double Jeopardy Clause claim fails because it "protects only against the imposition of multiple

---

[4] *See also Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 415-16 (N.D.N.Y. 2019) (same); *Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 404 (W.D.N.Y. 2017) (same); *Prasad v. Cornell Univ.*, 2016 WL 3212079, at *18 (N.D.N.Y. Feb. 24, 2016) (same); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015) (same); *Curto v. Smith*, 248 F. Supp. 2d 132, 147 (N.D.N.Y. 2003) (same), *aff'd in part, appeal dismissed in part sub nom. Doe v. Anonymous Unnamed Sch. Employees & Officials of Cornell Univ. Coll. of Veterinary Med.*, 87 F. App'x 788 (2d Cir. 2004), *aff'd*, 93 F. App'x 332 (2d Cir. 2004).

*criminal* punishments for the same offense," and it thus does not extend to civil penalties. *Dubin v. Cty. of Nassau*, 277 F. Supp. 3d 366, 398 (E.D.N.Y. 2017) (quoting *Hudson v. United States*, 522 U.S. 93, 99 118 S. Ct. 488, 139 L.Ed.2d 450 (1997) (emphasis in original)); *see also Doe v. Univ. of S.C.*, No. CV 3:18-161-TLW-PJG, 2018 WL 1215045, at *6 n.10 (D.S.C. Feb. 12, 2018) ("It is well settled that the Double Jeopardy Clause does not apply to academic disciplinary proceedings"), *report and recommendation adopted*, No. 3:18-CV-161-TLW-PJG, 2018 WL 1182508 (D.S.C. Mar. 6, 2018); *see also Ctr. for Participant Ed. v. Marshall*, 337 F. Supp. 126, 137 (N.D. Fla. 1972) (finding a university disciplinary proceeding was civil in nature, rather than criminal, because it did not involve a loss of life or liberty, and therefore, the Double Jeopardy Clause was not implicated); *Paine v. Bd. of Regents of Univ. of Tex. Sys.*, 355 F. Supp. 199, 203 (W.D. Tex. 1972) (providing that a university's disciplinary rules were civil, remedial, or administrative in nature; thus, they did not implicate the Double Jeopardy Clause).

The due process clause claim fails as a matter of law, too, because such a claim can only be brought, if at all, against state actors. *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995) (equal protection); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL–CIO*, 954 F.2d 801, 806 (2d Cir.1992) (due process). The University is private, and the plaintiff admits that the University is a private, non-state institution. Facts ¶ 1, n.1; *see Khan v. Yale Univ.*, 511 F. Supp. 3d 213, 222 (D. Conn. 2021)

(acknowledging that the University's "UWC proceedings are not quasi-judicial because Yale, as a private institution, is not a state actor"); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d at 461–63 (as "a private college, and not a state actor, the federal Constitution does not establish the level of due process that [the University] had to give [the plaintiff] in his disciplinary proceeding").

In sum, even if not pre-empted by Title VII, which it is, the plaintiff's Title IX claims concerning his suspension and other actions occurring prior to 2016 are time-barred. Most critically, however, he has failed to present credible and admissible facts from which a plausible, valid inference of gender bias could be drawn, and summary judgment should enter. Summary judgment should likewise enter on any purported claims for violation of constitutional double jeopardy or due process in the absence of any alleged criminal punishments or state action as required.

## V.    Conclusion

For all of the foregoing reasons, the University Defendants' Motion for Summary Judgment should be granted on the remaining Counts I, II, V, and VI.

THE DEFENDANTS

BY: _____

KEVIN C. SHEA (CT13781)
PATRICK T. CLENDENEN (CT09574)
CLENDENEN & SHEA, LLC
400 Orange Street
New Haven, CT  06511
Telephone:  203-787-1183
Fax: 203-787-2847
kcs@clenlaw.com
ptc@clenlaw.com

CERTIFICATION:

This is to certify that a copy of the foregoing has been sent to all required notification parties either via operation of the Court's electronic notification system or by first-class mail, postage pre-paid to anyone unable to accept such notification on March 16, 2022.

_____
CLENDENEN & SHEA, LLC