# EXHIBIT 2

1

1          UNITED STATES DISTRICT COURT
               DISTRICT OF CONNECTICUT
2

3    – – – – – – – – – x
     MICHAEL SIMONS,          |
4              Plaintiff,     |
                             |    3:19–CV–01547(VAB)
5          v.                 |
                             |
6    YALE UNIVERSITY,         |
     PETER SALOVEY,           |
7    ROBERT ALPERN, M.D.,     |
     UNKNOWN PERSONS,         |
8              Defendants.    |    July 16, 2021
     – – – – – – – – – x
9

10

11

12          DEPOSITION OF ROBERT ALPERN, M.D.

13               via videoconference

14

15     Taken before Kristine A. Paradis, LSR 338, a
       Court Reporter and Notary Public within and
16     for the State of Connecticut, pursuant to
       Re-Notice and the Federal Rules of Civil
17     Procedure, via videoconference, on July 16,
       2021, commencing at 10:13 a.m.
18

19

20

21

22          FALZARANO COURT REPORTERS, LLC
                   4 Somerset Lane
23          Simsbury, Connecticut 06070
                   860.651.0258
24          www.falzaranocourtreporters.com

25

```
 1        Q     And how about Jonathan Tamir?

 2        A     Jonathan Tamir was the top

 3   businessperson for the department of internal

 4   medicine.

 5        Q     Okay.  Can we go back to page 1, please?

 6   Paragraph 1 says that the department of internal

 7   medicine -- and bullet point number 1 -- I don't

 8   know if you're able to read that.  We might be

 9   able to blow it up.

10        A     I can read it.

11        Q     Okay.  Paragraph 1 says, The department

12   of internal medicine is recommending you for

13   appointment of professor of internal medicine

14   without term in the traditional track effective

15   July 1, 2008.

16              Do you see that?

17        A     Yes.

18        Q     I want to understand what this means.

19   What does it mean to say that he is being

20   recommended for appointment?  Who was the

21   appointing authority?

22        A     So, the appointing authority is the Yale

23   Corporation.

24        Q     Okay.

25        A     Okay.  And there's a series of
```

1    recommendations that would occur.  So, if somebody

2    is being recruited as a professor of internal

3    medicine, the chair of internal medicine would

4    recommend their appointment to the dean of the

5    medical school.  The dean of the medical school

6    would then go through a process.  And so the -- I

7    guess the university Affirmative Action office

8    would have to approve it.

9            But then there's an appointment and

10   promotions committee that includes the senior

11   faculty -- it starts in the department of internal

12   medicine.  The senior faculty would recommend his

13   appointment as professor.  Then it would go to the

14   appointment and promotions committee which I

15   chaired and that's a medical school-wide

16   committee.  And they would review his credentials

17   to be a professor.

18            Then the official medical school

19   committee is the board of permanent officers of

20   the medical school who would vote on his

21   appointment as a professor based on the

22   recommendation of the appointments of the

23   promotions committee.  And then based on that it

24   would go to the Yale Corporation.

25            And the Yale Corporation would then have

```
 1    a vote as to whether he should be a professor at
 2    Yale on the -- with tenure in this case.  And only
 3    the Yale Corporation can make that appointment.
 4    So, that's why we -- our letter always says we are
 5    recommending you.  I can't -- nobody who signed
 6    this letter can make that appointment.
 7         Q    How does anything ever get done at Yale?
 8    There are about six steps there.
 9         A    It's about a year.
10         Q    It takes about a year?
11         A    Yeah.  I actually came here as --
12    thought I came as a professor and found out four
13    months later that I became a professor.
14         Q    All right.  So, ultimately did the
15    Corporation appoint Dr. Simons as professor of
16    internal medicine?
17         A    Yes.
18         Q    What does it mean to say, "without term
19    in the traditional track"?
20         A    So, that's basically what you would call
21    tenure.  So, the traditional track is the tenure
22    track.  And when you get tenure, you are appointed
23    without term.  And that basically means that --
24    it's not impossible to remove you from the
25    university, but it's very difficult.
```

1    Corporation for a Robert Berliner Professorship.

2    Do you see that?

3         A    Yes.

4         Q    What is the Robert -- or what was, I

5    should say -- the Robert Berliner Professorship?

6         A    So, professorship at Yale is an

7    endowment and an honor.  It's a title that has an

8    endowment.  The person who holds the professorship

9    receives the annual income from the endowment.

10             And I believe the Robert Berliner

11   Professorship was given by a group of donors to

12   honor Robert Berliner who had been the previous

13   dean of the medical school.

14        Q    And do you know, sir -- and I gather

15   from this letter that, again, this is something

16   that only the Yale Corporation could confer,

17   correct?

18        A    Correct.

19        Q    Okay.  And then in the third paragraph

20   it talks about policies for the faculty as found

21   in a university handbook and recites a website,

22   correct?

23        A    Correct.

24        Q    And the letter goes on to say, Because

25   these policies represent essential employment

```
1    he would become part of the school of medicine?

2         A    Yes.

3         Q    And the Robert Berliner Professorship,

4    that was an additional position in addition to his

5    position as professor of internal medicine,

6    correct?

7         A    It's correct.  I wouldn't refer to it as

8    a position.

9         Q    Okay.  Help me with that.  What would

10   you refer to it as?

11        A    It's an honor and that comes with the

12   ability to use certain funds.  But the position

13   was professor of internal medicine.

14        Q    So, it says that his salary would be a

15   base of 85,000 and a supplement of 415,000,

16   correct?

17        A    Correct.

18        Q    Who paid the base?

19        A    So, this description has nothing to do

20   with who pays what.  The school of medicine has a

21   set of guaranteed salaries that are dependent on

22   rank.  And for all professors the base salary is

23   $85,000.

24             So, if somebody is a professor, you

25   cannot take that salary below $85,000.  And so the
```

```
 1        Q    Well, section chief of what, sir?

 2        A    Cardiology.

 3        Q    So, was that part of his job offer, that

 4   he would become section chief of cardiology?

 5                    MR. SHEA:  Object to the form of

 6             the question.

 7                    THE WITNESS:  I believe that he --

 8             usually what happens is if you're the

 9             chief of the cardiology division at Yale

10             University, the Yale-New Haven Hospital

11             would make you the chief of its section

12             of cardiology at the hospital.  So, it

13             is a slightly different position, but

14             the two are really tied to each other.

15   BY MR. PATTIS:

16        Q    Yeah.  Because in the very first

17   sentence of the letter it says, We are delighted

18   to offer you the position of chief of the section

19   of cardiovascular medicine and professor of

20   internal medicine at Yale University School of

21   Medicine and the corresponding position, chief of

22   cardiovascular medicine, at Yale-New Haven

23   Hospital.

24             Is that the relationship you're

25   referring to?
```

```
1    continue to pay that salary, in your mind, year
2    after year?
3                MR. SHEA:  Object to the form of
4           the question.  Calls for a legal
5           conclusion.  I also think it's asked and
6           answered, but --
7                MR. PATTIS:  It might be, but I'm
8           not asking him for a legal conclusion.
9           I'm asking his understanding.
10               MR. SHEA:  Same objection.  Go
11          ahead.
12               THE WITNESS:  Yeah.  So, my
13          understanding is that it does not
14          require that.  We generally in writing
15          offer letters, we have certain
16          constraints.  Faculty sometimes want it
17          stated in different ways but we always
18          write it in a way that we have the
19          freedom to increase or decrease the
20          salary based on performance.  And so
21          that it could be based on academic
22          performance or behavior, we might lower
23          somebody's salary.
24   BY MR. PATTIS:
25       Q   Was Dr. Simons' salary adjusted after
```

```
 1   the first year, the 2008-2009 year?
 2               MR. SHEA:  Object to the form.
 3          Answer if you know.
 4               THE WITNESS:  I don't know
 5          specifically.  My guess is he got a
 6          cost-of-living increase.
 7   BY MR. PATTIS:
 8      Q    Do you know whether it was ever
 9   decreased as a result of behavior or performance?
10               MR. SHEA:  Object to the form.  You
11          can answer.
12               THE WITNESS:  Yes, it was decreased
13          when he was no longer chief of the
14          cardiology division.  Then his salary
15          was lowered to a number that was more
16          consistent with that of a professor in
17          the department of internal medicine.
18   BY MR. PATTIS:
19      Q    Do you recall what it was lowered to?
20      A    So, it was somewhere around $300,000.
21      Q    Okay.
22      A    I don't remember if it went to something
23   slightly less than that the first year, but it was
24   in the range of 300,000.  And that was a decision
25   of the department of internal medicine.
```

```
 1    researchers that he recruited to CVRI.  And they
 2    all spoke very highly of Mike; they liked Mike.
 3    And actually probably half of them were women.
 4    So, that was my understanding of the situation
 5    when all this happened.
 6              Gary was quiet but probably knew a lot
 7    more about what was happening on the ground.  So,
 8    Gary and I decided to do a 360.  And we brought in
 9    a consultant and he did two things:  He met with a
10    lot of faculty to get their opinions.  I believe
11    it was faculty.  He met with a group of people; I
12    can't remember.
13              But he did a survey and the survey went
14    out to members of cardiology.  And I think it was
15    to the faculty, but I'm not positive.  But what
16    struck me in the 360 -- and don't hold me to this
17    number, but it was greater than 90 percent -- and
18    I think it was 92 percent -- did not want him back
19    as chief of cardiology.  And that was a big
20    surprise to me, that the members of the cardiology
21    division did not want him back.
22              And that was the beginning of, you know,
23    I would say a lot of information that unfolded
24    over the years about how many people had been
25    bullied within the cardiology division.  And some
```

1    were within the department.

2            And I've had spouses of cardiologists

3    come and tell me the bad things that Mike did to

4    their husband.  But I would say it was that 360

5    that made it clear that there was no future for

6    Mike as chief of cardiology.

7        Q    So, I think I understand what you mean

8    by a 360, but I want to clarify it.  That would be

9    a comprehensive review of his accomplishments and

10   relationships with folks at the university; is

11   that a fair statement?

12       A    I think it's more focused on behavior;

13   it wasn't so much his accomplishments, so --

14       Q    Okay.

15       A    And it was -- and I'm not -- I don't

16   think it was comprehensive in the university; I

17   think it was more focused on the cardiology

18   division.

19       Q    Well, because you still regarded him as

20   a brilliant scientist who had bolstered the

21   reputation of the division, correct?

22       A    Yes.  And my opinion on that has never

23   changed.  It's --

24       Q    Well, no, I mean --

25       A    Yeah.

```
 1        Q    -- couldn't one say a few bruised egos,
 2   those are the eggs that got broken to make the
 3   omelette?  I mean, was it a different degree from
 4   that?
 5                   MR. SHEA:  Object to the form.  You
 6             can answer.
 7                   THE WITNESS:  Yeah, I think it was
 8             very different in degree.  I think what
 9             became apparent was that Mike was an
10             extreme bully who was damaging the lives
11             of many people and that it would have
12             been irresponsible for the chair of
13             medicine or the dean to have left him in
14             place no matter how good a researcher he
15             was; that nobody had the right to treat
16             people that way.  And --
17   BY MR. PATTIS:
18        Q    When -- uh-hum.
19             When did the 360 review take place, sir;
20   if you recall?
21        A    It was after we imposed -- so, when we
22   got the memo from Ben, from the provost, and the
23   president didn't reverse it, then we enacted it.
24   And it was subsequent to that that we decided to
25   do the 360.  And I do remember actually a
```

```
 1    conversation with the Title IX coordinator saying

 2    that they were -- the university thought that that

 3    was such a good idea that they were going to do

 4    that from now on.  Anytime anyone got found guilty

 5    by the UWC they were going to do a local

 6    evaluation, whether you call it a 360.

 7              But it was after that because of

 8    concerns about how he was perceived within

 9    cardiology.  But I have to say I remember being

10    really surprised by how negative it was.

11       Q    I forgot the name of the Title IX

12    coordinator.  You mentioned her just moments ago.

13       A    Stephanie Spangler.

14       Q    Okay.  That's what I thought.  Okay.

15              And do you recall who the consultant

16    was?

17       A    So, we can get that for you.  He was an

18    anesthesiologist who did some behavioral work for

19    the medical school.  He wasn't a part of Yale.

20    And there should be a report somewhere in the

21    dean's files.

22       Q    Okay.  He did a written report for you?

23       A    I think so.

24       Q    So, you reject the contention that we

25    have raised based on your personal recollection
```

1   and involvement that he was removed from this

2   position because of public criticism in *The New*

3   *York Times* and other places?

4        A    Yes.

5        Q    And in your view, you would have done so

6   even without that criticism?

7        A    Yes.

8        Q    Did the criticism play any role in your

9   decision to do the 360, to use your term?

10       A    I don't think -- no.  I'm thinking there

11   were just questions raised about his behavior.

12   And so here Gary Desir was very involved.

13       Q    Okay.

14       A    And because -- the person who removes

15   the chief of cardiology is the chair of internal

16   medicine.  And I think Gary had much more

17   awareness of the issues within cardiology than I

18   had --

19       Q    Is Mr. --

20       A    -- so --

21       Q    I'm sorry.  I cut you off.

22       A    No, I was going to say so I was

23   surprised by the report.  I suspect that Gary

24   Desir was not surprised by the report.

25       Q    Does Dr. Desir still work for Yale?

```
 1        Q    Got it.  Okay.

 2        A    So, I wouldn't know.  But my personal --

 3   the way -- the way things happened to occur at the

 4   time I was involved in the recruitment of a lot of

 5   the members of the cardiovascular research

 6   institute that Mike recruited.  And I knew them

 7   well.  And I knew what they thought about Mike.

 8        Q    Okay.  Got it.  Got it.

 9        A    And that was positive.

10        Q    So, is it fair to say then that the

11   decision to remove him as director of

12   cardiovascular research institute was not as a

13   result of the 360 and the consultant's report?

14             MR. SHEA:  Object to the form of

15        the question.  You can answer.

16             THE WITNESS:  Yes.

17   BY MR. PATTIS:

18        Q    What was it a result of then?

19        A    That was the result of the perception of

20   the community that someone who had been found

21   guilty of sexual harassment was being left in a

22   leadership position and that the UWC definitely

23   would have removed him from that position had they

24   known it existed.

25        Q    How do you know that the UWC did not
```

```
 1   whether he'd been punished.  It was the process
 2   that they took.
 3       Q    I understand that.  I mean, the process
 4   that led to his being suspended from the clinic
 5   position, correct?
 6       A    Yes.
 7       Q    And in the course of that discussion did
 8   the president, the provost, you, anyone say, Look,
 9   the process may not be perfect, but it ran its
10   course.  That is done.
11              MR. SHEA:  Object to the form of
12          the question.  You can answer.
13              THE WITNESS:  I don't remember
14          specifically if it was put that way.
15   BY MR. PATTIS:
16       Q    Was it put any -- was the topic of the
17   fact that he had been punished addressed at all?
18              MR. SHEA:  Object to the form.  You
19          can answer.
20              THE WITNESS:  I think the idea --
21          the hope -- the goal of the meeting was
22          to get the community to calm down.
23   BY MR. PATTIS:
24       Q    Well, you said that -- to try to get --
25   I thought you said before the lunch that you
```

```
 1   reached the conclusion for the good of the
 2   community he was going to have to step down from
 3   the director of the research of cardiovascular
 4   institute.
 5       A    Yes.  And that -- you know, so I'm gonna
 6   be unclear on time sequences, but I think that was
 7   after the president and the provost came.  But I'm
 8   not sure.  But the -- you know, all of these
 9   attempts -- you know, my town hall, the president
10   and the provost -- we very soon announced the
11   president and the provost would come.  And I think
12   it took, like, a month to get it scheduled.  Those
13   were all done with the intent to get this issue
14   under control and to be able to address it but to
15   get everyone to calm down and not have it be a
16   major source of angst.  But --
17       Q    Was it a major source of angst?
18       A    Oh, yeah.  Yeah.  No, this was -- that
19   month -- in the month or two after The New York
20   Times article, this was a major source of angst at
21   the medical school.
22       Q    Were either of these or any of these
23   town hall meetings videotaped?
24            MR. SHEA:  Object to the form.
25            Answer if you know.
```

```
 1        A    Oh, it's not Aaron Waxman.  Merle

 2   Waxman.

 3        Q    Can we take a look at Exhibit 16,

 4   please?  I'm looking at an e-mail that purports

 5   to -- and it says, D 7111, allegedly from Aaron

 6   Waxman to you.  Does he -- is there a --

 7        A    Oh, yeah.  Okay.

 8             MR. SHEA:  Let me get this because

 9             I want to see . . .

10             THE WITNESS:  Okay.  I don't know

11             Aaron Waxman.  It sounds like he's an

12             alum.  And so --

13   BY MR. PATTIS:

14        Q    It sounds like -- oh, an alum.  I'm

15   sorry, sir.  Yes.

16        A    Yeah.  So, as this thing was evolving,

17   someone went to the alumni association and the

18   alumnis -- people -- alums got active in

19   protesting this.

20        Q    Do you recall how many e-mails you

21   received from alum who were protesting this?

22        A    So, I don't know how many I received.  I

23   know that there was a petition that was circulated

24   among alums that people forwarded it to me to make

25   sure I knew about it.  And it was a fairly
```

```
 1   aggressive petition against the decision and
 2   against me.
 3              MR. PATTIS:  Kevin, did we get a
 4        copy of that petition?
 5              MR. SHEA:  I believe so.
 6              MR. PATTIS:  I missed it.
 7              MR. SHEA:  I thought I even saw it
 8        in what you sent today.  Is it not in
 9        one of these?  I --
10              MR. PATTIS:  You know, in some of
11        these the SWIM stuff was a little opaque
12        to me, some of it.  So, I'm not --
13              MR. SHEA:  It is to me as well.  It
14        is to me as well.  So, I don't -- I
15        believe you have it; I believe I've seen
16        it.  I don't know where it is right now
17        as I sit here.
18              MR. PATTIS:  So, in terms of going
19        forward -- excuse us for one second,
20        Doctor.  I just want to talk around
21        you -- I don't want to resume this
22        deposition at any point.
23              Can we have an agreement as to the
24        authenticity of documents?  Not their
25        admissibility, but if we've received a
```

```
 1              document from you in discovery, that at
 2              least it came from a search of Yale
 3              files?  And then maybe I'll follow up
 4              with a request to admit or two?
 5                   MR. SHEA:  Yes.
 6                   MR. PATTIS:  Yeah?  Okay.  Good.
 7                   MR. SHEA:  Yes.
 8                   MR. PATTIS:  Then let's move
 9              forward.  That will save everyone some
10              time.
11                   Can we please look at Exhibit 17,
12              please?
13   BY MR. PATTIS:
14       Q    Were you aware that in early September
15   of 2018 that the Yale Daily News had received a
16   copy of the petition circulated among Yale School
17   of Medicine faculty and graduates about Dr. Simons
18   and his new professorship?
19       A    So, I think this may be the petition
20   that I'm referring to.
21       Q    I think it is, yes.
22       A    And I think it was actually generated
23   from alums and then picked up by some of the --
24   some of the existing faculty and maybe even
25   students signed onto it.  But I think it's the
```

```
1    same petition.
2         Q    In September of 2018 were you issued an
3    ultimata or an ultimatum by any group that you
4    needed to act by a certain date or they would
5    publicize something or hold an event or do
6    anything to that effect?
7         A    I don't remember --
8         Q    Okay.
9         A    -- on that.
10        Q    Were you concerned -- was time of the
11   essence for you to act with respect in Dr. Simons'
12   case in September of 2018?
13              MR. SHEA:  Object to the form.  You
14        can answer.
15              THE WITNESS:  Oh, I don't think
16        time was of the essence.  I think there
17        was a feeling that every day that went
18        by was -- with this issue festering was
19        not good for Yale.
20   BY MR. PATTIS:
21        Q    Because?  Because why?
22        A    Well, because the anger in the community
23   was growing.  It wasn't -- you know, people were
24   very upset about this issue.  And we believed that
25   if we could explain our intentions, it would die
```

```
1    down.  And every day that went by made it clear
2    that we were wrong.
3         Q    Did anybody step forward on Dr. Simons'
4    behalf and say, Wait, he was punished five years
5    ago.  This is ridiculous to punish him all over
6    again.  Did anybody come forward with that in
7    protest?
8                   MR. SHEA:  Object to the form.  You
9              can answer.
10                  THE WITNESS:  There were a few
11             faculty who came up very quietly to me.
12   BY MR. PATTIS:
13        Q    Do you think they were afraid to come
14   out publicly?
15        A    Yes.  And, you know, basically expressed
16   that point of view.  But there were very few of
17   them.
18        Q    How many men are on the executive board
19   of SWIM?
20                  MR. SHEA:  Object to the form.  You
21             can answer if you know.
22                  THE WITNESS:  I don't think any.
23   BY MR. PATTIS:
24        Q    Does that raise questions in your mind
25   about how representative that group is of the
```

```
1    ever publish a statement from SWIM that is
2    consistent with the boldfaced print in the middle
3    of this document?
4         A    So, my memory is that the Yale Daily
5    News published articles on this and that they
6    likely included statements from SWIM like this.  I
7    don't think it was an article specifically on
8    this, but I think it was included in an article.
9         Q    Now, at some point a decision was made
10   to remove Dr. Simons from the Von Zedtwitz chair,
11   correct?
12        A    Yes.
13        Q    Give me one second, please.  I've got
14   too much paper here.
15             Who did you discuss the -- and I'm just
16   asking for names, not the contents of the
17   discussion.  Who did you discuss that with?
18        A    So, I am not sure what you mean by that
19   question.  Discussing the decision or discussing
20   the issue or --
21        Q    Okay.  Let me back up for a second.
22             Who decided to remove Dr. Simons from
23   the Von Zedtwitz chair?
24        A    That decision would have been mine.
25        Q    And who did you consult with before
```

```
1    making that decision?
2         A    So, I consulted -- so, there were a lot
3    of informal discussions around the school related
4    to this at the time.  I specifically discussed it
5    with my leadership team to get their feedback.
6              And there were three groups that I felt
7    it was important to discuss it with.  So, one
8    was -- I think we called it the dean's council.
9    Basically it was all the department chairs and
10   center directors that -- as I told you earlier, we
11   had lunch every Friday.  And at one of those
12   meetings this was a topic.
13             I also about five years earlier had
14   formed a faculty advisory council which was
15   elected by the faculty.  And the idea for the
16   faculty advisory council was to give a voice from
17   the faculty to the dean.  And so every 20 or 30
18   faculty got to elect one member to the faculty
19   advisory council.
20             And I met -- they met twice a month:
21   once a month without me and once a month with me.
22   And that was an important group to consult with.
23   That's exactly what they were formed for, as a
24   faculty advisory council to the dean.
25             And then the third group that I met with
```

```
 1    was SWIM.  That was the meeting that we referred
 2    to earlier when I asked to meet with SWIM.
 3              And then as the decision was coming
 4    towards the final parts, I met with the university
 5    officers.  So, this would be Peter Salovey's
 6    leadership group.  And we discussed this issue
 7    specifically.  So, I tried to get input from lots
 8    of different groups, in addition to lots of
 9    informal conversations.
10         Q    In any of these conversations did
11    anybody ever raise the issue of successive
12    punishment; that is, punish him twice --
13    Dr. Simons twice for the same thing?
14                   MR. SHEA:  I'm just going to object
15              to the form of the question and only
16              caution the witness that if his answer
17              would require him to disclose the
18              contents of attorney-client
19              communications, he should not discuss
20              that.  But if you --
21                   MR. PATTIS:  I didn't hear that any
22              lawyers came up in that group, Kevin.  I
23              may not have made a good enough list.
24              So, I would have otherwise said that.
25                   That's correct, Doctor.
```

```
 1              please, Cam?
 2                   MR. SHEA:  I thought you were going
 3              to ask for Defendant's Exhibit A.
 4                   MR. PATTIS:  I was, but I know
 5              you're sharper than that.
 6    BY MR. PATTIS:
 7         Q    Take a moment to read the bottom portion
 8    of that, Dr. Alpern.  And when you've had a chance
 9    to do so, please let me know.
10              (Pause.)
11         A    Okay.
12         Q    This is an e-mail dated Friday,
13    September 21 at 1:51 p.m., correct?
14         A    Correct.
15         Q    And it's to Sonia Caprio?
16         A    So, this memo went to the entire Yale
17    community.  So, Sonia Caprio is one faculty member
18    who is a professor in the department of pediatrics
19    who happened to reply to it.  But she was not the
20    only recipient.
21         Q    Okay.  In it you say, I have removed
22    Dr. Simons from the Von Zedtwitz chair, correct?
23         A    Yes.
24         Q    Did you have the power to remove him
25    from the chair?
```

```
 1        A    So, to be exact, only the Yale
 2    Corporation could have done that.
 3        Q    When did the Yale Corporation remove
 4    Dr. Simons from the Von Zedtwitz chair?
 5                MR. SHEA:  Object to the form.
 6            Answer if you know.
 7                THE WITNESS:  Yeah.  So, I don't
 8            know.
 9    BY MR. PATTIS:
10        Q    Do you know if, in fact, they had?
11        A    I'm never privy to that information, but
12    I believe that they had.
13        Q    Have you nominated someone else to fill
14    that chair since the removal of Dr. Simons?
15        A    So, this is one of the chairs that have
16    been divided many times.
17        Q    Yeah.
18        A    So, there are many Von Zedtwitz
19    professors.  So, it would be hard to say that any
20    specific one appointed to that got his chair.
21        Q    Well, who keeps track of how many
22    available chairs there are for you -- to make
23    appointments to, I should say?
24                MR. SHEA:  Object to the form.
25                THE WITNESS:  Yeah.  So, this was
```

```
 1                STATE OF CONNECTICUT

 2        I, KRISTINE A. PARADIS, LSR 338, a Notary Public

 3    duly commissioned and qualified in and for the State

 4    of Connecticut, do hereby certify that pursuant to

 5    Re-Notice, there came remotely before me via

 6    videoconference on the 16th day of July, 2021, the

 7    following named person, to wit:  ROBERT ALPERN, M.D.,

 8    who was by me duly sworn to testify to the truth and

 9    nothing but the truth; that he was thereupon

10    carefully examined upon his oath and his examination

11    reduced to writing under my supervision; that this

12    deposition is a true record of the testimony given by

13    the witness.

14        I further certify that I am neither attorney nor

15    counsel for, nor related to, nor employed by any of

16    the parties to the action in which this deposition is

17    taken, and further, that I am not a relative or

18    employee of any attorney or counsel employed by the

19    parties hereto, or financially interested in this

20    action.

21        IN WITNESS THEREOF, I have hereunto set my

22    hand this  29th  day of___July_____, 2021.

23                    Kristine Paradis

24               KRISTINE A. PARADIS, CSR #338
                   Certified Shorthand Reporter
25    My Commission expires:   May 31, 2023
```

Falzarano Court Reporters, LLC