# EXHIBIT 3

VOLUME I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                                   :
MICHAEL SIMONS,
                                   :
          Plaintiff,
                                   :   Civil Action No.
     vs.
                                   :   3:19-CV-01547(VAB)
YALE UNIVERSITY, PETER SALOVEY,
ROBERT ALPERN, M.D.,               :
UNKNOWN PERSONS,
                                   :
          Defendants.
                                   :
- - - - - - - - - - - - - - - - - x


          REMOTE DEPOSITION of MICHAEL SIMONS, taken

     pursuant to the Federal Rules of Civil Procedure,

     via Zoom, before Frances L. Van Tienen, Licensed

     Shorthand Reporter in and for the State of

     Connecticut, on Wednesday, June 16, 2021, at

     10:17 a.m.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1   that you're referring didn't exist in the version of the

2   UWC procedures that were in effect at the time.  So we want

3   to make sure we're on the same page as you, and Request

4   Number 9 asks you to produce those documents.  It says "See

5   attached,""and there's not a single one attached, so can

6   you produce those documents?

7       A.    Let me ask you so that I understand what is it

8   that you're looking for.  For example, I sent you my

9   original contract letter.  My understanding was that is in

10  response to what is the contract that was negotiated and

11  details of that contract, so my original offer letter is a

12  contract with Yale.

13      Q.    And we have that, and I'm going to get to that

14  in a moment because then you provided some good context for

15  that, and that's fine.  I believe I understand, and I'm

16  going to ask you more questions about what you claim the

17  contract was, but you say that Yale breached the contract

18  and certain other policies, and so we asked you in Request

19  Number 9 to produce those policies that you identified you

20  claim were breached.

21      A.    So this is UWC policy that Yale has.  They have

22  changed a number of times.  I don't know when they exactly

23  changed with regard to the Complaint.  It would seem to me

24  that Yale would be in a position to provide all copies of

25  its policies with different dates and modifications.  I

Electronically signed by Frances Doran (301-157-500-4888)          e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1    happened.

2         Q.    He is listed as the Robert Berliner Professor of

3    Medicine.  Is that different than holding the Berliner

4    Chair?

5         A.    No, it's the same.  It's quite frequent that the

6    same endowment supports several people.  It's the same type

7    of --

8         Q.    So more than one person can be the Berliner

9    professor at one time?

10        A.    Yes.  We've had two or three professors.

11        Q.    Is the Chief of Cardiology typically a Berliner

12   professor?

13        A.    Yes.

14        Q.    Is Dr. Schwartz currently a Berliner professor?

15        A.    He is.

16        Q.    Do you know who else is?

17        A.    The current Chief of Cardiology.

18        Q.    And who is that?

19        A.    I can't think of his name.  I can look it up,

20   but I can't tell you his name off the top of my head.

21        Q.    Did he get the chair right at the time that you

22   transferred to the Von Zedtwitz Chair?

23        A.    They asked me to transfer the Von Zedtwitz Chair

24   so they can give that chair to him.

25        Q.    And you agreed to that?

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 58

1       A.      Unfortunately.   That was Dr. Alpern's idea, and

2    I asked for his assurances that there would be no -- that

3    there would be no problems, and he said that he cleared it

4    with Dr. Salovey, and I was guaranteed that there would be

5    no issues.

6       Q.     Dr. Cabin is the next person you've identified.

7    Is there any more that you want to tell us about his

8    involvement?

9       A.      No, I think that that's probably good enough.

10      Q.      Is the current chief Dr. Velazquez?

11      A.      Yeah, that's him.   Thank you.

12      Q.      How long has he been chief?

13      A.      Probably for three years.

14      Q.      And when he first became Chief of Cardiology,

15   you were still a Berliner professor; is that correct?

16      A.      That's correct.

17      Q.      How long after he became chief, if you recall?

18      A.      Pretty soon based on any contact with me about

19   that, so probably within six months of his appointment.

20      Q.      So just I'm clear, within about six months of

21   Dr. Velazquez's appointment as Chief of Cardiology, you

22   were contacted with a request to agree to a swap of the

23   Berliner Chair for the Von Zedtwitz Chair so that Dr.

24   Velazquez could be the Berliner Chair?

25      A.      Correct.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1    Q.    Okay.  You just -- you identify her as somebody
2  who is possible?
3    A.    Yes.
4    Q.    How about Margaret Bia?
5    A.    Never met her in my life.  I don't know what she
6  has against me, but she was identified in the New York
7  Times as somebody who knows, and that would be interesting
8  to know how she knew  She was not involved in the UWC
9  process.  She has no reason to know any of this.
10    Q.    So the reason you've identified her is because
11  she was identified in the New York Times?
12    A.    Correct.
13    Q.    And aside from that, you're not aware of any
14  involvement she had?
15    A.    Right.
16    Q.    How about Claire Bowern?
17    A.    Same.  She was very active in social media, and
18  she has no -- she should not have had access to any of this
19  information.
20    Q.    And finally Gary Dasir?
21    A.    Gary Dasir is -- was the chair of medicine at
22  that point.  He's the one who took my directorship of the
23  Cardiovascular Research Center away in which it was
24  unnecessary discipline.  It was not recommended by the
25  committee.  It was done solely in response to pressure from

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1    the press, and, you know, he certainly should know a lot of

2    the stuff that has been going on.

3         Q.    When did he take your directorship away?

4         A.    I believe that was in 2015 or '16.

5         Q.    And you never brought any claims in connection

6    with that at the time, did you?

7         A.    The only claim that I can tell you is that he

8    did something that was illegal.  It's against judicial

9    discipline, as I said.  It was not recommended by anybody.

10   He did it -- he did it without any reason, without any

11   due -- without any due process.  It was pretty horrible.

12   This is not how people behave, at least how they should

13   behave.  It's obviously how they behave.

14        Q.    My question is when he did that in 2015, did you

15   do anything about it at that time?

16        A.    I did not.  What could I do?  Should I complain

17   to the Dean.  Forget it.  I'm not going to do anything

18   about it.

19        Q.    Well, the reason I ask is because I believe one

20   of your claims in this lawsuit is that when the Von

21   Zedtwitz Chair was taken from you, one of your claims is

22   that it was done so summarily while you were in England and

23   you were unable to mount any effective legal challenge to

24   it at the time.  So if we go back to 2015 when the

25   directorship was taken from you and you were here, do you

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 68

1   so this is purely out of any decision.

2       Q.    I'm going to shop sharing the screen.  I just

3   need another few minutes to go to the men's room, and I'll

4   be right back with the next section.

5              (Recess taken)

6              MR. SHEA:  Back on the record.

7       Q.    I'm going to bring up the screen again here.

8   Back to Exhibit 2 your Interrogatory Responses, and I'm

9   going to direct your attention now to Interrogatory Number

10  4 which asks, you among other, things to identify each

11  adverse employment action that was taken against you by the

12  University.  Do you see that?

13      A.    I do.

14      Q.    And in your answer which is 4(c) it says, "The

15  Plaintiff was suspended from his position as Chief of

16  Cardiology in the Yale School of Medicine for 18 months.

17  The Defendants subsequently forced him to resign the

18  position.  The Plaintiff was subsequently forced by the

19  Defendants to exchange the Robert W. Berliner Professorship

20  of Medicine for the Waldemar Von Zedtwitz Professorship of

21  Cardiology.  The Defendants then removed the Plaintiff from

22  the Waldemar Von Zedtwitz Professorship."  Do you see that?

23      A.    I do.

24      Q.    Have I read your answer correctly?

25      A.    Yes.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

```
 1        Q.    And in this lawsuit those are the four adverse
 2   employment actions you claim were taken against you both as
 3   a breach of your contract with Yale and -- question
 4   withdrawn actually.
 5              Referring to your answer to Interrogatory Number
 6   4(c), Doctor, am I correct to understand that those are the
 7   four adverse employment actions that you allege in this
 8   lawsuit that resulted from Yale's discrimination against
 9   you as a Caucasian male?
10        A.    Also my removal from the position as Chief of
11   Cardiovascular Research Center.
12        Q.    Is that the director you mean?
13        A.    Yes, I'm sorry, Director of the Cardiovascular
14   Research Center.
15        Q.    So in addition to the four items identified here
16   in 4(c) which are number 1, suspension from Chief of
17   Cardiology; number 2, forced resignation from Chief of
18   Cardiology; and number 3, removal of Berliner Professorship
19   and number 4, removal of Von Zedtwitz Professorship, you
20   want to add a fifth adverse employment action which is the
21   removal of the directorship; correct?
22        A.    Correct.
23        Q.    When was the directorship removed?
24        A.    I believe in 2015.
25        Q.    Okay.  So the first adverse employment action
```

Electronically signed by Frances Doran (301-157-500-4888)          e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 70

1    you've identified is your suspension from the Chief of

2    Cardiology for 18 months, and that occurred on

3    October 14th, 2013; correct?

4         A.    Correct.

5         Q.    And you did not file at that time or in any of

6    the years following any CHRO complaint or any other type of

7    complaint in connection with that other than your attempt

8    to appeal the UWC decision to President Salovey; correct?

9         A.    So partially correct.  The original UWC

10   recommendation was a five-year suspension.  I appealed it

11   to President Salovey who reduced it to 18 months.  There

12   was no -- there was no recommendation by the UWC to either

13   remove my endowed chair or to remove me as Director of the

14   Cardiovascular Research Center.  I did not appeal -- when

15   that was done when I was forced to resign as the Chief of

16   Cardiology, and then my directorship was taken away.  I did

17   not take legal actions at that time, although I should

18   have, but I took -- I finally took them because the last

19   injustice was the endowed chair.

20        Q.    So the second adverse employment action that you

21   identify is your forced resignation from the Chief of

22   Cardiology position, and that occurred in October of 2014;

23   correct?

24        A.    Yes.

25        Q.    Can you please describe the circumstances under

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1   which you say you were forced to resign that position?

2       A.    It was a meeting in Dr. Alpern's office with him

3   and Richard Aquilla [phonetic] who said that we cannot

4   continue this.

5       Q.    And as with the 18-month suspension, you did not

6   bring any type of legal challenge, CHRO complaint or

7   otherwise in connection with what you claim is the

8   fourth --

9       A.    I did not.

10      Q.    -- alleged incident?

11      A.    I did not.

12      Q.    And then the third we've talked about is you say

13  the forced exchange of the Berliner Professorship, and that

14  was in June 2018; correct?

15      A.    Yes, and we brought an action.

16      Q.    Yes.   I want to get to another document, Doctor.

17  I showing you now a document marked as Defendants'

18  Exhibit 5 for identification.   It's an email exchange

19  between you and Dr. Alpern with a date at the top of

20  April 27th, 2018, and this is an email that you provided to

21  us as part of your discovery responses.   Do you see that

22  email?

23      A.    I do.

24      Q.    Do you recognize it?

25      A.    Yes.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 73

1    to review each page and then let me know when you've done

2    it because I'm going to ask you questions about the

3    exchange generally so --

4        A.    Yes, I read it.  I know this quite well.

5        Q.    Okay.  So starting from the bottom is an email

6    dated April 22nd from you to Dr. Alpern; correct?

7        A.    Yes.

8        Q.    And what prompted you to send the first email in

9    this chain?

10       A.    Because Alpern asked if I would mind swapping

11   the Berliner chair for the -- for the other one, so I asked

12   him how would it work and what are the details there.

13       Q.    Okay.

14       A.    Because each chair comes with a different

15   endowment attached to it.

16       Q.    And according to this flow that you've given us

17   here, he responded to you via the email that's next going

18   up the page on Thursday, April 26th; correct?

19       A.    Right.

20       Q.    And he tells you that it would make a lot of

21   sense for the Chief of Cardiology to offer the Berliner

22   Chair to the new chief; correct?

23       A.    Right.

24       Q.    And he's asking you --

25       A.    Sorry, Kevin, if I jump in.  Do you see a

SCRIBES, INC
1.800.SCRIBES (727-4237)

1  sentence in there while avoiding a dispute with the family?

2     Q.   Yes.

3     A.   I believe that was the key motivation.

4     Q.   And do you believe that that was a legitimate

5  motivation?

6               MR. PATTIS:   On whose behalf?   Objection to

7          form.

8     Q.   On Yale's behalf.

9     A.   I don't know.   I would have not done it if I was

10  in Alpern's position, because the family cannot dictate how

11  those funds are used.

12     Q.   Did you ever read the letter that Nancy Berliner

13  sent?

14     A.   My phone went off.

15     Q.   Excuse me?

16     A.   My phone went off.   Sorry about that.

17               I've never seen it.   I don't know where you got

18  it from.

19     Q.   Doctor, I'm showing you now a document that we

20  will mark as Defendants' Exhibit 7 for identification.

21  It's dated February 11th, 2018, and it's from Nancy

22  Berliner to Dr. Alpern.   I'd like to ask you to take a

23  moment and review it and let me know when you've done that.

24     A.   Lovely letter.   Thank you very much.

25     Q.   Have you ever seen this before today?

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 78

1    chair; correct?

2        A.    Correct.

3        Q.    And then you responded to that email that same

4    day on April 26th with the next email up the chain in this

5    Exhibit 6; correct?

6        A.    Yes.

7        Q.    And you expressed these three bullet points that

8    you said if they were met or if they were resolved, you

9    would be happy to swap the chair; correct?

10       A.    Correct.  I wanted to make Alpern a favor

11   because he asked me when he had the phone a call to say

12   about so and so, okay, that's fine.  If you feel that that

13   helps you and that's the best way to go, then I'll do that.

14   I wish I didn't agree.

15       Q.    Well, he responded to your email with the next

16   one up the chain here the same day again, and he says that

17   he gives you his assurance on the first two bullet points

18   that you asked for that, and on the salary issue he said

19   that he wanted to look into it further to understand the

20   required amounts and the timing and that he would get back

21   to you on that ASAP; correct?

22       A.    I think the salary issue that he's referring to

23   is somewhat different than the chair issue.  If you go up,

24   this is what the salary -- this is what the salary issue

25   refers to.

Electronically signed by Frances Doran (301-157-500-4888)            e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1  that's his reply saying we will look into it.  That's what

2  that we will look into this sentence is.

3      Q.    Okay.  And that's where he says I want to

4  consider the chair swap alone, I am not --

5      A.    Yes.

6      Q.    -- agreeing to guaranteeing funding, definitely

7  would not agree to your third bullet as you now write it.

8  Please let us know what your final decision is on the chair

9  swap.  If you do not wish to do this, I will let the

10 University know.

11     A.    So if you go down with this -- hold on.  So he

12 says Brian and I want to address the issue of the salary

13 and so forth.  Basically he says we want to be fair.  So he

14 says dividing the problem into two chairs, separate

15 salary -- salaries are both separate, and I agreed to that

16 position.

17     Q.    You did?  Okay.

18     A.    Yes.

19     Q.    So at the end of the day under the terms that

20 Dr. Alpern proposed here, you agreed to swap the Berliner

21 Chair for the Von Zedtwitz Chair; correct?

22     A.    Yes.

23     Q.    And you did that with the understanding that

24 your salary would remain essentially the same; correct?

25     A.    Would not -- that my salary support would not be

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1    affected, all right, because the chair is a key part of the

2    salary support, and when you first get an endowed chair you

3    get a lump sum of money and the endowment that pays an

4    annual percentage, and that's what your chair is.  As Yale

5    endowment grows every year, your chair endowment grows so

6    the amount of money you get is more.  So if you held the

7    chair for five years, you're getting more money than you

8    were getting give years ago.  Does that make sense?

9          Q.    Well, were you getting more money as you were --

10         A.    Yeah, of course.  That's what happens every

11   year.  So that's what I told him, that the new chair has to

12   have an endowment equivalent to what it was in my Berliner

13   Chair and they have agreed to that.  That's what those

14   bullet points are about, my total salary.

15         Q.    Is that in fact what happened, you agreed to

16   swap the Berliner Chair for the Von Zedtwitz chair, and

17   they did continue to meet the same financial support for

18   your salary under the Von Zedtwitz Chair as they had for --

19         A.    Sorry, I jumped in.  They gave me the same

20   amount of money in the Von Zedtwitz Chair as was in the

21   Berliner Chair.

22         Q.    So you suffered no financial loss when that swap

23   was made; correct?

24         A.    From the swap of chairs, no.

25         Q.    And then -- question withdrawn.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 83

1              That's it for this exhibit, so let me stop

2     sharing that.  Dr. Simons, going back to the swap of the

3     Berliner Chair for the Von Zedtwitz Chair, is it fair to

4     say that by the end of that conversation with Dr. Alpern

5     all of the conditions that you had asked for had been

6     resolved and you did ultimately agree to the transfer to

7     the Von Zedtwitz Chair?

8         A.    Correct.

9         Q.    And it's fair to say you said you'd be happy to

10    swap the chair; correct?

11        A.    Yes.

12        Q.    And in fact you considered it a positive

13    development in your --

14        A.    I did not.

15        Q.    You didn't?

16        A.    No.  The Berliner Chair is a much more

17    prestigious name.  Just a second.  I had never heard of the

18    Von Zedtwitz Chair before.

19        Q.    I'm sorry?

20        A.    I had never heard of the Von Zedtwitz Chair

21    before.  I was doing them a favor by agreeing to this

22    because they have asked me -- assured me there would be not

23    ill consequences.  So it was my way of doing a friendly

24    gesture, though it's the last time.

25        Q.    So then -- hold on a second.  I'm going to show

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 85

1    for the Von Zedtwitz Chair; did you?

2       A.    I thought it was a minor deal, that its loss was

3    not worth the aggravation and the time, and since Alpert

4    politely asked me and said that they would help me if I

5    agreed, I decided to do that against my better judgment.   I

6    did not think it materially affected me.   What happened

7    after that affected me very much.

8       Q.    You're talking about the removal of the Von

9    Zedtwitz Chair?

10      A.    Correct.

11      Q.    And is that basically your biggest complaint in

12   this lawsuit?

13      A.    As I said earlier, it's the final straw.   There

14   have been a number of injustices going back to the original

15   discipline.   You know, I attempted to play by the rules.

16   Even though I disagreed with what is happening, this is

17   what you have to do to make yourself a better person.

18   Salovey said in the letter which you have saying you know,

19   I'm sorry we have to do this, but you will be a better

20   person for this.   The implications were they were going to

21   place that back into the family.   I did that.   I did

22   everything I was supposed to do.   I did all the training

23   they have asked me to do, all the courses.   I was an

24   exemplary citizen.   I generated income.   I published

25   papers.   You know, I bring glory to Yale by my academic

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 96

1    BY MR. SHEA:

2         Q.    Doctor, are you still a tenured professor at

3    Yale?

4         A.    I am.

5         Q.    And what does that mean?

6         A.    It means presumably that they cannot -- that

7    they cannot fire me.

8         Q.    Except for cause; correct?

9         A.    Except for cause.  What that actually means, I

10   don't know given everything that has gone on.

11        Q.    So even though you no longer hold an endowed

12   chair, you are still a tenured professor at Yale; correct?

13        A.    Yes.

14        Q.    I think we covered this earlier, but I just want

15   to be clear.  As of today, do you know who allegedly leaked

16   the details of your UWC discipline to the New York Times?

17        A.    I don't know, but I do know that --

18        Q.    I'm sorry.

19        A.    I thought my phone was turned off, but give me a

20   second I will turn it off again once and forever.

21              I don't know who did that.  The only thing I

22   know is that Yale refused to investigate the leak.

23        Q.    Do you have a belief about who you believe

24   leaked details of your discipline to the New York Times?

25        A.    Excuse me.  This phone is giving me problems.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1  things.

2       Q.    Okay.   I want to take these one at a time.   With

3  respect to the income you received through your employment

4  at Yale, am I correct to understand that since the Von

5  Zedtwitz Chair was removed the income you received from

6  your employment with Yale has not been reduced?

7       A.    My salary has not been reduced, but the amount

8  of support that goes with it is less than it would have

9  been if the chair was mine.   That's because it goes up 10

10 percent every year.   That means I have to get additional

11 funds somehow to support the salary, and first of all --

12      Q.    Doctor, you have to stop.   Norm's not here

13 anymore.   You have to stop.   I'm sorry.

14                  (Discussion off the record)

15                  (Recess taken)

16      Q.    Doctor, I know we're having technical

17 difficulties that have slowed us down today, and I know

18 we're going to suspend and come back to continue another

19 day, but I want to make sure we try and use the rest of the

20 time that we have here today officially so that next time

21 we can hopefully go a little more smoothly and that we

22 don't have the technical thing, but also I just want to try

23 and understanding some things about the rest of your claim.

24 Okay?

25      A.    Yes.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 108

1      Q.    So the first claim that you brought in this

2    lawsuit is a breach of contract claim, and that's coupled

3    with a claim for a breach of the covenant of good faith and

4    fair dealing which was also based on the contract.  Do you

5    understand that?

6      A.    Yes, I do.

7      Q.    And when we asked you to identify the contracts,

8    let's see here, you identified the document I'm showing you

9    now which we're going to mark as Defendants' 14, and it is

10   a letter to you dated May 15th, 2008.  Do you recognize

11   this?

12     A.    Yes, I do.

13     Q.    And this is a 14-page document that is Bates

14   stamped D-1 through D-14, and am I correct to understand

15   that this is the document you were referring to earlier

16   when you said this was the contract that contains the terms

17   that you challenge in this lawsuit?

18     A.    Yes.

19     Q.    And do you -- question withdrawn.

20           So with respect to your claim for breach of

21   contract and your claim for the breach of the covenant of

22   good faith and fair dealing, am I correct to understand

23   that the document I'm showing you now that we've marked as

24   Defendants' Exhibit 14 is the contract on which those

25   claims are based?

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

```
1        A.    Yes.

2        Q.    And are you aware of any amendment to this

3   contract?

4        A.    No.

5        Q.    So there's no other contract that you claim you

6   have with Yale with respect to your claims in this lawsuit

7   other than the one that I'm showing you right now and

8   that's been marked as Defendants' Exhibit 14; is that

9   correct?

10       A.    Correct.

11       Q.    Can you tell me -- question withdrawn.

12             In this document paragraph number 2 on the first

13  page of Exhibit 11 says that "The Department and the Dean

14  will nominate you to President Levin and the Yale

15  Corporation for a Robert Berliner Professorship;" correct?

16       A.    Yes.

17       Q.    Are you aware of any other term of this contract

18  relevant to the Berliner professorship?

19       A.    No.

20       Q.    And the contract merely provides that they will

21  nominate you for the professorship; correct?

22       A.    No.  It is understood in this context that this

23  is a formality and that the endowed professorship is a

24  given.  I did not accept the position and move to Yale

25  until the endowed professorship was actually approved by
```

Electronically signed by Frances Doran (301-157-500-4888)          e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 112

1      A.     I do.

2      Q.     And you have in paragraph 46 of this count
3  identified three breaches of contract; correct?

4      A.     Yes.

5      Q.     And these are the three contract breaches that
6  you claim by Yale in this lawsuit; correct?

7      A.     Yes.

8      Q.     And so when you talk about A, the first breach,
9  you are talking about the imposition of successive and
10 duplicative punishment for the violation of the policies
11 against sexual harassment.  Is that intended to address the
12 removal of the endowed chair?

13     A.     The removal of the endowed chair, forcing me to
14 resign as the Chief of Cardiology, removing the
15 directorship from the Cardiovascular Center which none of
16 these were in the original suspension document.  These were
17 all made up later on in response to publicity.

18     Q.     So the initial discipline was the suspension
19 from the chief position; correct?

20     A.     For 18 months, correct.

21     Q.     And so --

22     A.     Nothing else.

23     Q.     So it's the successive and duplicative
24 punishment that you claim is the breach; correct?

25     A.     Correct.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 113

1    Q.    So you're talking about the punishment that

2  followed the original punishment; correct?

3    A.    I do.

4    Q.    Okay.  So I just want to make sure I'm clear

5  what you are claiming as the breaches of contract in this

6  lawsuit, and I --

7    A.    Subsequent actions taken by the University

8  without any due process and punished repetitively for

9  the same issue.

10   Q.    Okay.  And so you're not complaining about the

11  original discipline as a breach of the contract because you

12  accepted that discipline; correct?

13   A.    Yes.  At least there was some semblance of a

14  process no matter how flawed it is.

15   Q.    And you claim that what you described as the

16  forced resignation of the chair of cardiology, the removal

17  as the director of the Cardiology Center and the removal of

18  the Von Zeidtwitz Chair are the successive and duplicative

19  punishment that constitute the breach for which you're

20  suing here?

21   A.    Correct.

22   Q.    And so just to make sure I'm clear, the breach

23  is the forced resignation of the chair of cardiology after

24  your original 18-month suspension, the removal of you as

25  the director of the Cardiology Institute and the removal of

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 114

1    the Von Zedtwitz Chair that you had agreed to swap for the

2    Berliner Chair.  Those are the three successive and

3    duplicative punishments that you claim are breaches of your

4    contract; correct?

5         A.    Yes.

6         Q.    And B and C are really just more detail about

7    the actual removal of the Von Zedtwitz Chair; correct?

8         A.    You can look at it that way I suppose.  They say

9    what they say.

10        Q.    Well, that's the chair you're talking about

11   though; correct?

12        A.    Yes.

13        Q.    The Von Zedtwitz Chair?

14        A.    There's no other.

15        Q.    All right.  So we have identified the contract

16   that you claim was breached which is your --

17               MR. PATTIS:  I'm going to object as to the

18               form there.  I mean you've identified an

19               employment contract.  University handbooks, as

20               you know, can constitute contracts, in terms of

21               Sheets versus Teddy's Frosted Foods and all those

22               other claims.

23               MR. SHEA:  I agree with that.

24               MR. PATTIS:  Okay.  If you agree, I'm going

25               to shut up then.  Objection withdrawn.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 118

1     Q.    With respect to that claim you have alleged that

2  the -- actually, I'll get to your exact words.  You have

3  alleged that the defendants have never punished a female

4  multiple times for the same conduct in any disciplinary

5  action involving sexual harassment and that the defendants

6  have subjected only Caucasian males to punishment twice for

7  the same conduct.  Do you see that at paragraphs 66 and 67

8  of your Complaint?

9     A.    I do.

10    Q.    Okay.  The first question is who besides you as

11 a Caucasian male was punished twice for the same contact to

12 your knowledge?

13    A.    I don't know that I'm in a position to answer

14 that question.  Yale would be in a much better position

15 especially given their confidentiality policies.  Yale is

16 certainly a very busy institution, but it's a long logbook.

17 I'm not personally familiar with that, but I'm sure Yale

18 colleagues would be able to gave you names chapter and

19 verse.

20    Q.    I understand, but today and when we reconvene

21 are my opportunities to discover the facts that you know --

22    A.    I don't know --

23    Q.    You have to let me finish my question.  Today

24 and when we reconvene is my opportunity to discover the

25 facts that you know to support the allegations you've made

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1  in this lawsuit, so I'm asking you are you aware of any

2  other Caucasian males besides you who are employed by Yale

3  and were punished twice for the same conduct?

4      A.    I do not know examples because of UWC

5  confidentiality policies.  I don't know what was done to

6  whom.

7      Q.    Do you know if it's ever happened to any other

8  Caucasian male besides you to have been punished twice for

9  the same conduct that was found to be in violation of the

10 UWC?

11     A.    The same answer as before.  I don't know such

12 cases because of UWC confidentiality policy.

13     Q.    But are you even aware if such cases exist?

14     A.    They may well exist.  I don't know what the

15 details are.

16     Q.    But you don't know of any?

17     A.    Do I know of any?  How would I know?  For

18 example, the case of Chua and her husband.  I don't know

19 what the initial allegation was.  I don't know what actions

20 were taken.  How am I in any position to say whether they

21 were punished once or twice.  This is not a question I can

22 answer.

23     Q.    But I need to know what information you know to

24 support your allegation.

25     A.    I have no such information because it not

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 120

1    available to individuals.

2         Q.    Because it says, "UPON information and belief,

3    the Defendants have subjected only Caucasian males to

4    punishment twice for the same conduct."  So am I correct --

5         A.    I cannot give you another example.

6         Q.    Okay.  So am I correct in understanding that the

7    only information you have about that is you know that it

8    happened to you; correct?

9         A.    Yes

10        Q.    And you're not aware of any other Caucasian male

11   who was punished twice for the same conduct as you sit here

12   today; is that correct?

13        A.    I cannot conclude that somebody was or was not

14   punished twice, because I don't know what the first or

15   second punishment would have been.

16        Q.    Okay.  Now, can you identify any similarly

17   situated female employee of Yale who was found to have

18   committed any violation of the UWC?

19        A.    I don't know if the Chua case is a UWC case or

20   not.

21        Q.    If what case?

22        A.    Amy Chua.

23             MR. PATTIS:  Tiger mom.

24        Q.    Yes.

25        A.    I don't think if that is a UWC case or not.  I

Electronically signed by Frances Doran (301-157-500-4888)          e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1    don't know how that was handled.

2         Q.    What happened with that?

3         A.    There was an initial discipline imposed.

4    Information was leaked as always.  It got to the press.

5    There was something else that happened to her, so I don't

6    know what she did with her endowed professorship, but

7    nothing else happened to her.  She didn't lose her

8    positions.

9         Q.    And all this came out quite recently; right?

10        A.    It's been going on for several years.

11        Q.    Other than Amy Chua -- how do you say the name?

12        A.    I don't really know.  It could be Chu.  It could

13   Chua.  I'm sorry I never heard it actually pronounced.

14   It's spelled C-h-u-a.

15        Q.    Other than Amy Chua, are you aware of any other

16   similarly situated employees at Yale who you claim have

17   been treated differently than you?

18        A.    I don't have a specific example to give.

19        Q.    Okay.  I'm going to pause there for one second.

20   I know we only have -- I said I wanted to finish up by 2:30

21   or so.  I know Fran is going to do her other deposition at

22   3:00, so give me a two-minute break here.  I just want to

23   check with --

24             MR. PATTIS: You said 2:00, but what's time

25             among gentlemen?  As Einstein once observed, it's

1      A.     I think they are fearful of negative publicity

2 and that's why.

3      Q.     And you are aware that Yale had been getting

4 negative publicity for several years over alleged Title 9

5 violations in other respects; correct?

6      A.     Yale was featured prominently in the news for

7 all sorts of malfeasances.

8      Q.     Do you believe that it's in bad faith for Yale

9 to take steps to protect its reputation?

10     A.     I think it's in bad taste to act without any

11 proper precedent after violating written promises given to

12 me that the swap would not be -- would not be adverse

13 without out any kind of due process, and I believe it's in

14 bad faith, I believe it's bad management, and I believe

15 Yale will be far worse for it.

16     Q.     And as you sit here today with respect to your

17 income from Yale, since the Von Zedtwitz Chair was removed,

18 that income has not decreased to date; is that correct?

19     A.     The income from Yale has not decreased, that is

20 correct.

21     Q.     Okay.  I'm just going to go for like ten more

22 minutes here.  I just want to ask one more group of

23 questions about something I haven't brought up yet.

24 Doctor, we'll mark this as Exhibit 15.  This was the

25 Damages Analysis that was submitted on your behalf by your

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 134

1                          C E R T I F I C A T E

2          I hereby certify that I am a Notary Public, in and for

3     the State of Connecticut, duly commissioned and qualified

4     to administer oaths.

5          I further certify that the deponent named in the

6     foregoing deposition was by me duly sworn, and thereupon

7     testified as appears in the foregoing deposition; that said

8     deposition was taken by me stenographically in the presence

9     of counsel and reduced to typewriting under my direction,

10    and the foregoing is a true and accurate transcript of the

11    testimony.

12         I further certify that I am neither of counsel nor

13    attorney to either of the parties to said suit, nor am I an

14    employee of either party to said suit, nor of either

15    counsel in said suit, nor am I interested in the outcome of

16    said cause.

17         Witness my hand and seal as Notary Public

18    this 28th day of June, 2021.

19

20                          Frances L. Van Tienen
                            Notary Public
21                          CSR License No. 00192

22    My Commission expires:
      October 31, 2024
23

24

25

SCRIBES, INC
1.800.SCRIBES (727-4237)

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59