# EXHIBIT 4

135

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2
 3    * * * * * * * * * * * * * *
      MICHAEL SIMONS, M.D.,                 COPY
 4                                *
 5            Plaintiff,          *
         VS.
 6                                *    Civil Action No.
                                       3:19-CV-01547(VAB)
 7    YALE UNIVERSITY,            *
      PETER SALOVEY,
 8    ROBERT ALPERN, MD.,         *
      UNKNOWN PERSONS,
 9                                *
         Defendants.
10    * * * * * * * * * * * * * *
                                      October 13, 2021
11                                    9:35 a.m.

12                    - - -

13       WEB CONFERENCE DEPOSITION OF MICHAEL SIMONS
                       VOL. II
14                    - - -
15    APPEARANCES:
16        FOR THE PLAINTIFF VIA ZOOM:
              PATTIS & SMITH, LLC
17            BY:  NORMAN A. PATTIS, ESQUIRE
                   383 Orange Street
18                 New Haven, CT 06511
                   Phone:  (203) 393-3017
19                 Fax:  (203) 393-9745
                   E-Mail:  npattis@pattislaw.com
20
          FOR THE DEFENDANTS VIA ZOOM:
21            CLENDENEN & SHEA, LLC
              BY:  KEVIN C. SHEA, ESQUIRE
22                 JOSEPH BOCCIA, ESQUIRE
                   400 Orange Street
23                 New Haven, CT 06511
                   Phone:  (203) 787-1183
24                 Fax:  (203) 787-2847
                   E-Mail:  kcs@clenlaw.com
25                          jeb@clenlaw.com
```

136

1

2

3

4

5

6

7

8      Continued Web Conference Deposition of MICHAEL

9   SIMONS, via Zoom, the Plaintiff herein, taken on behalf

10  of the Defendants, herein, for the purpose of discovery

11  and for use as evidence in this cause, pending in the

12  District Court for the District of Connecticut, pursuant

13  to Notice before Ashley L. Jusino, Certified Shorthand

14  Reporter, No. 529, and a Notary Public within and for

15  the State of Connecticut, on the 13th day of October,

16  2021 at 9:35 a.m., at which time counsel appeared as

17  hereinbefore set forth. . .

18

19

20

21

22

23

24

25

185

1          Q.     Are you aware of anything to suggest
2    that the corporation is not also the entity with the
3    power to remove an endowed chair upon recommendation by
4    the president?
5          A.     I don't know how that works.  And, I
6    believe, there would have to be a reason.  It could not
7    be done on a whim.
8          Q.     Did you have your salary from Yale
9    reduced to date as a result of your removal from the Von
10   Zedtwitz Chair?
11               MR. PATTIS:  Can you rephrase
12   that, Kevin?  I don't understand it.  Maybe the
13   witness does.  Object to the form.
14         Q.     Doctor, you testified last time that
15   your salary combined from Yale is a package that results
16   in one salary, correct?
17         A.     The overall salary amount has not
18   changed.  The compensation has changed.
19         Q.     So your salary received through your
20   employment by Yale has not reduced to date as a result of
21   the removal of the Von Zedtwitz Chair.  Is that correct?
22         A.     It has not reduced to date.  But my
23   responsibility for maintaining that salary has increased
24   considerably.  I think I explained how salaries work at
25   Yale.

186

1    Q.    And did you say your instability?

2    A.    My responsibility.

3    Q.    Oh.

4    A.    Because we pay our own salary

5    essentially.

6    Q.    But Yale has agreed to cover the amount

7    over-the-cap in order to continue to pay you the same

8    salary or, in fact, even a slightly higher salary in the

9    years since the Von Zedtwitz Chair was removed, correct?

10   A.    They have continued paying that amount.

11   But I don't have an agreement.  And this is all

12   day-to-day and they can cancel it at any time without

13   notice.

14   Q.    Okay.  But they have not done so to

15   date, correct?

16   A.    No.

17   Q.    Okay.  That is correct.  Right?

18   A.    They have not done so to date.

19   Q.    Okay.  And did your office location

20   change as a result of your removal from the Von Zedtwitz

21   Chair?

22   A.    No.

23   Q.    Okay.  And you have remained an

24   employee of Yale the entire time, correct?

25   A.    Correct.

187

1    Q.    And you have remained a tenured

2  professor at Yale the entire time, correct?

3    A.    Correct.

4    Q.    And to date you have not suffered a

5  material loss of benefits as a result of your removal

6  from the Von Zedtwitz Chair, correct?

7    A.    What do you -- what do you refer to as

8  benefits?

9    Q.    Well, your salary has not been reduced

10  as a result of your removal from the Von Zedtwitz --

11    A.    My salary has not changed.

12    Q.    Okay.  And you haven't lost any health

13  benefits or whatever 401(k) or other benefits you are

14  offered through Yale, have you?

15    A.    There is no change in health benefits

16  or 401(k).

17    Q.    And did you have any change in the

18  supervisors to whom you report as a result of your

19  removal from the Von Zedtwitz Chair?

20    A.    No, I don't think that that affects

21  that at all.

22    Q.    So with respect to your employment at

23  Yale and your compensation for that employment, did you

24  suffer any material loss as a result of your removal from

25  the Von Zedtwitz Chair other than a change in title?

188

1          A.      There are very few people at Yale who
2    have an endowed chair.  That is an honor and it is highly
3    -- it is highly regarded as a mark of -- as a mark of
4    university commitment of that person and also stability.
5    It is highly valued internationally.  And the scandal
6    around the removal of the chair has given -- has given me
7    tremendous damage on an international and national level
8    because it was so widely covered.  It has setback any of
9    my efforts to find another employment.  If that didn't
10   happen, I would have had a different job by now.
11          Q.      A job in a place other than Yale?
12          A.      Oh, yes.
13          Q.      Okay.  So your complaint about the
14   removal of the Von Zedtwitz Chair is that you claim it
15   has hindered your ability to find employment at places
16   other than Yale because you desire to leave Yale?
17          A.      And it makes my position at Yale
18   unstable.
19          Q.      Did anyone at the University ever
20   directly state that any of the adverse employment actions
21   you claim in this lawsuit were motivated by your gender
22   as a male?
23          A.      Exclusively stated that to me, no.
24          Q.      Are you aware if it was stated to
25   anyone of whom you --

189

1      A.      I don't know that.

2      Q.      Okay.  And did anyone at the university

3 ever directly state that their actions in connection with

4 the adverse employment actions you allege were motivated

5 by your race as a Caucasian?

6      A.      No.  But I can see that they have

7 treated Carlos Mena (Phonetic) very differently than they

8 treated me.

9      Q.      And what did Carlos Mena (Phonetic) do?

10      A.      He was accused of pretty serious sexual

11 harassment issues in the CAS lab and --

12      Q.      Did what?

13      A.      Sexual harassment issues in the CAS lab

14 and other untoward behavior.  None of it has ever made

15 public but he was -- but, you know, he was quietly

16 allowed to step down as head of CAS lab and there were no

17 further -- and there were no further punishments for him

18 as far as I know.

19      Q.      Except that he had to step down?

20      A.      Yes.  After they -- but it was never

21 explicitly linked to anything and it was all kind of

22 hush-hush.  It was a very different treatment.  Were

23 there articles in the newspapers about it?  No.  Was

24 there -- Was there Yale women in medicine complain about

25 him?  No.  It's a very different treatment, isn't it?

190

1      Q.      Did Carlos Mena (Phonetic) hold an
2   endowed chair?
3      A.      I don't think so.
4      Q.      What position did he have that was
5   taken away from him?
6      A.      Director of cardiac interventional
7   level.
8      Q.      And as a result of the sexual claims
9   against him, he had to step down from that position,
10  correct?
11     A.      Correct.
12     Q.      And you don't believe he ever held an
13  endowed chair, correct?
14     A.      I don't know that.
15     Q.      Okay.  With respect to your adverse
16  employment actions, were you ever explicitly told by
17  someone at the university that you were being treated
18  differently because of your gender?
19     A.      Well of course nobody will say that.
20     Q.      Okay.  Were you ever explicitly told by
21  someone at the university that you were being treated
22  differently because of your race?
23     A.      People don't say that.  They just do
24  things.
25     Q.      And are you aware of any female

191

1    employees of Yale who were disciplined by the UWC and

2    held an endowed chair?

3            A.      Nothing has been made public that I am

4    aware of.

5            Q.      Are you aware of any non-Caucasian

6    males who were punished by the UWC for sexual misconduct

7    who held endowed chairs?

8            A.      Well, there were two cases in the law

9    school, weren't there?  So it's Chua (Phonetic) and her

10   husband.  They're both -- they're both endowed

11   professors.  Her husband was disciplined for sexual

12   harassment, I believe.

13           Q.      By the UWC?

14           A.      Yes.

15           Q.      Okay.  And did he continue to hold an

16   endowed chair after that?

17           A.      As far as I know.

18           Q.      And is he a Caucasian male?  What is

19   he?

20           A.      He is.

21           Q.      Okay.  And what about --

22           A.      Amy Chua (Phonetic) is also an endowed

23   professor.  There were all sorts of disciplinary actions

24   taken.  I don't know exactly why.  And whether it was UWC

25   or not UWC, it wasn't public.  She's in the same position

192

1   as before.

2           Q.     Okay.  So I just want to be clear.  The

3   question was whether you were aware of any non-Caucasian

4   males who were disciplined by the UWC who had endowed

5   chairs and continued to hold endowed chairs and you

6   identified Dr. Amy Chua (Phonetic) and her husband,

7   correct?

8           A.     Correct.

9           Q.     And her husband is, in fact, a

10  Caucasian male, correct?

11          A.     I think so.

12          Q.     Okay.  And Dr. Amy Chua (Phonetic)

13  herself, you don't believe she was ever disciplined for

14  sexual misconduct?

15          A.     She was disciplined for other things.

16  I don't know exactly what they were.

17          Q.     Okay.  Thank you.

18          A.     And as you know UWC does not make its

19  decisions public unless somebody leaks them.

20          Q.     Turning now to your Title IX claim,

21  doctor.  Your claim under Title IX is based on what you

22  believe is selective enforcement by the UWC of punishment

23  for sexual misconduct, correct?

24          A.     Correct.

25          Q.     Specifically you claimed that you were

193

1   punished successively for your violation of sexual

2   misconduct policy, correct?

3           A.      Yes.

4           Q.      And your complaint about that is that

5   you believe that your successive punishment violates the

6   United States Constitution's protections of due process,

7   in that, you suffered what you claim was essentially

8   double jeopardy by these successive disciplines, correct?

9           A.      Yes.

10          Q.      And the successive disciplines are the

11  discipline following the initial 18 month suspension as

12  Chief of Cardiology, correct?

13          A.      Correct.

14          Q.      So those are specifically your removal

15  as chief permanently by Dr. Desir, correct?

16          A.      Yes.

17          Q.      And your removal by Dr. Desir as

18  Director of the CVRC, correct?

19          A.      Correct.

20          Q.      The exchange of the Berliner Chair for

21  the Von Zedtwitz Chair, correct?

22          A.      Correct.

23          Q.      And the removal of the Von Zedtwitz

24  Chair, correct?

25          A.      Correct.

194

1          Q.     Okay.  So those are the four items that

2   you claim are the successive punishments that violated

3   the Constitutional protection that you claim are embodied

4   in Title IX and resulted in selective enforcement against

5   you, correct?

6          A.     Yes.

7          Q.     Okay.  And by selective enforcement,

8   you mean that you believe you were treated differently

9   than women, correct?

10         A.     Uh-huh.

11         Q.     Is that yes?

12         A.     Yes.

13         Q.     Okay.  And you have claimed that only

14   males have suffered successive discipline instead of

15   females, correct?

16         A.     Correct.

17         Q.     Okay.  Are you aware of any other males

18   besides yourself who have suffered successive discipline

19   as you describe it?

20         A.     I don't know because UWC keeps its

21   things private and I don't know the history of these

22   things at Yale.

23         Q.     Okay.

24         A.     But in my case it's pretty obvious.

25         Q.     And as with your Title VII claims, you

1   are not aware of any female who held an endowed chair and

2   was punished by the UWC for violation of Yale's sexual

3   misconduct policy.  Is that correct?

4         A.    Correct.

5              MR. SHEA:  Okay.  Can we take a

6   two-minute break?  I've just finished that section and

7   I want to get to another area.

8              MR. PATTIS:  You read my mind.

9              MR. SHEA:  Okay.  Thanks.

10            (Whereupon, a brief recess was taken.)

11             MR. SHEA:  Doctor, I'm going to

12   shift gears here briefly.  Norm, actually, you know,

13   just the preview of coming attractions here.  I'm

14   going to go to the breach of privacy claim now.  I've

15   just got some questions about that.  And then we'll

16   see where we are after that because then I have

17   another -- then I want to move onto the damages.  But

18   we can talk about what makes sense in terms of a quick

19   food break after I get through the privacy.  And if we

20   want to keep going, we'll keep going.

21             MR. PATTIS:  Thanks.  I could use

22   lunch.  But I mean I know we've got a hard stop at

23   three.  So let's make sure we can get you what you

24   need today.  Okay?

25             MR. SHEA:  Great.  Thanks.

206

1    talked about today.  We talked about it a little bit last

2    time.  That is the first and second counts of your

3    Complaint for breach of contract and breach of the

4    covenant of good faith and fair dealing.  Do you remember

5    discussing those claims last time we were here?

6              A.    Yes.

7                        (Exhibit 14 shown via shared-screen

8    feature on Zoom.)

9              Q.    I will share my screen while I talk so

10   I can narrate this with the documents we used.  Okay?

11   So, Doctor, I am showing you now the document that we

12   marked last time as Defendants' Exhibit 14.  Do you

13   recognize this as your offer letter which you identified

14   as the contract at issue in your claims in this case?

15             A.    Yes.

16                       (Complaint shown via shared-screen

17   feature on Zoom.)

18             Q.    Okay.  And referring to your Complaint.

19   In paragraph 46 of your Complaint you identify three ways

20   in which you claim the university breached that contract,

21   correct?

22             A.    Yes.

23             Q.    Okay.  And just to confirm, last time

24   we took your deposition back in June you stated that with

25   respect to these three claims, and specifically your

207

1  claim of imposition of successive and duplicative

2  punishment for violation of the policies against sexual

3  harassment, you were referring to number (1) your forced

4  resignation as Chief of Cardiology in late 2013; number

5  (2) your removal as director of the CVRC in 2014; and

6  number (3) your removal from the Von Zedtwitz Chair in

7  September 2018, correct?

8          A.     Yes.

9          Q.     Okay.  So what I'd like you to do,

10  doctor, with respect to each one of these three breaches

11  that you say constitute successive punishment in breach

12  of the contract, I want you to tell me with reference to

13  Defendants' Exhibit 14 what part of that contract you

14  claim the university breached first with respect to your

15  forced resignation as Chief of Cardiology in late 2013?

16              MR. PATTIS:   Kevin, are you asking

17  him to reach legal conclusions?  Objection as to form.

18  So, you know, there's an implied claim.  You know as

19  well as I what that means.  So I'm not going to

20  instruct him not to answer but I am going to raise a

21  reservation here about the fact that you're asking him

22  for legal conclusions.  He's a fact witness.

23              MR. SHEA:   I do understand that.

24  Last time we spoke I asked him specifically about

25  whether he claims any other part of this contract

217

1          So then I want to ask a similar set of

2     questions about your claim for breach of the implied

3     warranty of fair dealing, which is the second count of

4     your Complaint that appears on page 13.

5          And you agree that paragraphs 49 through

6     51 of the Complaint set forth the weighs in which you

7     claim the university breached the covenant of good faith

8     and fair dealing?

9          A.     Correct.

10         Q.     So with respect to those claims, in

11    what ways do you claim you were enticed to leave your

12    position at Dartmouth for Yale?

13         A.     I was offered this job to leave a

14    secured position at Dartmouth that was very successful.

15         Q.     And when was that?

16         A.     In 2008.

17         Q.     2008; okay.  And what promises were

18    made to you in connection with that enticement?

19         A.     They outlined an offer letter that we

20    just discussed in detail.

21         Q.     Okay.  So the offer letter is Exhibit

22    14, correct?

23         A.     Correct.

24         Q.     Okay.  And that's what you say contains

25    the promises that enticed you to leave Dartmouth for

218

1   Yale, correct?

2           A.      Correct.

3           Q.      Okay.  How did the University

4   university lead you to believe that your position could

5   only be taken from you as a result of "renegotiation or

6   under the terms and conditions of written university

7   policies"?

8           A.      That's pretty sel -- that's pretty

9   self-explanatory.  I'm not sure what else I can add to

10  that.

11          Q.      Well, did anyone at the university do

12  anything beyond the written document that's been marked

13  as Exhibit 14 in terms of leaving you to believe that any

14  of those positions could only be taken away from you as a

15  result of renegotiation or under the terms and conditions

16  of written policies and procedures?

17          A.      No.

18          Q.      Okay.  What Yale policies or procedures

19  do you claim were not followed in connection with your

20  claim of breach of the covenant of good faith and fair

21  dealing?

22          A.      I thought that we discussed that in

23  great detail over the last hour.  Do we need to repeat

24  this?

25          Q.      Well, if you're going to tell me that

219

1  your answers about what was violated with respect to your

2  breach of the implied warranty are the same as your

3  answers for the breach of contract claim we can move on.

4  That's fine.

5        A.    Yes.  I don't know that I understand a

6  difference between breach of contract and breach of

7  implied warranty.

8              MR. PATTIS:  You know you are

9  asking him for legal conclusions, Kevin.

10             MR. SHEA:  I'm just asking him

11 what policies or procedures he's claiming.  If there's

12 any others.

13             MR. PATTIS:  Well, you haven't

14 asked the predicate question.  And that is, does he

15 understand what an implied warranty of fair dealing

16 is?  And without that, I don't know that any of these

17 follow-up questions are that revealing frankly.

18       Q.    Doctor, do you understand that in this

19 claim you are making the allegation that Yale breached

20 the contract in the ways you allege in bad faith?

21       A.    Yes.

22       Q.    Okay.  So you claim it was in bad faith

23 because it was done to avoid negative publicity, correct?

24       A.    Correct.

25       Q.    Do you claim any other motive on Yale's

220

1  part for the actions you claim were breaches of the

2  covenant of good faith and fair dealing other than to

3  avoid negative publicity?

4          A.     No.

5                    MR. PATTIS:   Objection as to the

6  form.  Go ahead.  You can answer.

7          A.     I think that's the major reason.   I

8  don't know what else they could be thinking.

9          Q.     Okay.  And in terms of avoiding

10  negative publicity, you'd agree that essentially that was

11  Yale trying to protect its brand, correct?

12                    MR. PATTIS:   Object as to the

13  form.  Yale is an abstract noun.  It bares legal

14  responsibility for the action, omissions of its agents

15  but it doesn't have intentions.  So I'm going -- I'm

16  going --

17                    MR. SHEA:   Okay.  Objection

18  understood.

19          Q.     You claim that the persons who

20  undertook the actions that you allege were breaches of

21  covenant of the good faith and fair dealing were

22  motivated by avoiding negative publicity, correct?

23          A.     Yes.  In part.

24          Q.     Well, are you aware of any other

25  motivation by those individuals who you claim breached

221

1  that covenant --

2          A.      Yes.

3          Q.      -- other than avoiding negative

4  publicity?

5          A.      Yes.

6          Q.      What?

7          A.      Alpern was in the process of being

8  renewed as the Dean of Medicine and this was a major

9  destruction and a major problem for him and people were

10  objecting to his -- to his -- to his reappointment.  And

11  he thought that by doing this he would -- he would

12  placate with the Mobb and ease his -- and ease his -- and

13  ease his reappointment.  It's exclusively tied to that.

14          Q.      Okay.

15          A.      And he did it for that purpose.

16          Q.      Okay.  And what's your basis for saying

17  that other than the timing?

18          A.      The timing is pretty revealing by

19  itself and he was clearly worried about his -- about his

20  reappointment.  It was not going well.  There were a lot

21  of negative reactions to him as you can see in email's

22  that were provided us to.  I'm convinced that he was

23  motivated by that.

24          Q.      I understand that that's your belief.

25  I'm asking, do you have any evidence that Dr. Alpern told

222

1    anybody that?

2              A.     I think we will find that out.

3              Q.     But you're not aware of any as you sit

4    here, are you?

5              A.     As of this moment, no.

6              Q.     Okay.  So aside from the individuals

7    who you claim breached the covenant of good faith and

8    fair dealing wanting to avoid negative publicity and Dr.

9    Alpern specifically who you believe was trying to

10   preserve his ability to be reappointed --

11             A.     And I believe --

12             Q.     -- are you aware of any other motives

13   you claim by those individuals beyond that in connection

14   with your claim of bad faith?

15             A.     I think Peter Salovey acted also to

16   preserve his job because he was under a lot of pressure

17   as well.  So I think both of them were motivated by self

18   -- by self -- by self-preservation.

19             Q.     Okay.

20             A.     As well as negative publicity.

21             Q.     And do you have any evidence to support

22   that belief with respect to President Salovey's

23   motivations?

24             A.     Not yet.

25             Q.     Okay.  And other than those three

223

1   motivations you've identified, number (1) avoiding

2   negative publicity; number (2) Dr. Alpern's desire to be

3   reappointed; and number (3) President Salovey's desire to

4   protect his own job, do you claim any other bad faith

5   motivation by any of the actors at Yale who you claim

6   carried out this breach of the covenant of good faith and

7   fair dealing?

8              A.    No.    I think this was largely

9   self-serving.  No.

10             Q.    Okay.

11             A.    Not other than this three items.

12             Q.    So when you say self-serving, you mean

13  they were doing it, the individuals you believe to

14  protect their own reputations and/or the reputation of

15  Yale, correct?

16             A.    To protect their own jobs.

17             Q.    Well, for Dean Alpern and President

18  Salovey, you think it was to protect their own jobs?

19             A.    Yes.

20             Q.    Okay.  And what did you do when you

21  hired Reputation Defender for yourself?  Why did you do

22  that?

23             A.    I wanted to maximize my ability to find

24  new jobs and to also -- and to also, you know, diminish

25  the impact of negative publicity.

226

1          A.        I'm not sure it's correctly formulated.

2          Q.        So am I correct to understand that

3    Supplement A where it says you estimate $100,000.00 for

4    the loss of the Von Zedtwitz Professorship is not

5    correctly stated?

6          A.        Yes.  It's not correctly stated.

7          Q.        Okay.  So that's a mistake?  That was

8    supposed to be tied to the loss of the directorship

9    position?

10         A.        Yes.

11         Q.        Okay.  Well, with respect to the loss

12   of the Von Zedtwitz Chair, that happened at the end of

13   2018, correct?

14         A.        Yes.

15         Q.        Okay.  So I want to show you now a

16   document we will mark as 24.  So, doctor, we will be

17   marking as Exhibit 24 the W-2's that you provided to us

18   for the years 2018 through 2020.  Do you see those on the

19   screen?

20         A.        No, I see only you on the screen.

21                   (Whereupon, the W-2's were marked as

22   Defendants' Exhibit 24 for Identification.)

23                   (Exhibit 24 shown via shared-screen

24   feature on Zoom).

25         A.        These are the W-2's.

227

```
1        Q.      These are your W-2's for the years 2017
2    through 2020, correct?
3                    MR. PATTIS:   You're scrolling
4    awfully quickly.
5        Q.      There's 2017 (Indicating).   There's
6    2018 (Indicating).   Do you see that?
7        A.      Yeah.
8        Q.      Okay.   And then on the third page is
9    2019 (Indicating).   Do you see that?
10       A.      Yes.
11       Q.      Okay.   And on the fourth page is 2020,
12   correct?
13       A.      You're starting at 2017?   I gave you
14   everything going back to 2008.
15       Q.      That's correct.
16       A.      Okay.
17       Q.      So this exhibit, which is four pages,
18   is comprised of your W-2's for the years 2017 through
19   2020 only, correct?
20       A.      Correct.
21       Q.      Okay.   And your Supplemental Discovery
22   Responses dated August 16th, 2021 we will mark as Exhibit
23   25.
24                   (Whereupon, the Supplemental Discovery
25   Responses were marked as Defendants' Exhibit 25 for
```

228

1    Identification.)

2            Q.      And under your supplemental response to

3    Interrogatory No. 12 you have listed your compensation

4    for each of those years from 2008 through 2020 as derived

5    from your W-2's, correct?

6            A.      Correct.

7            Q.      Is that yes?

8            A.      Yes.  Yes.

9            Q.      Okay.  So according to your 2017 tax

10   return you received $259,000.10 in wages from Yale for

11   the year 2017, correct?

12           A.      Right.

13           Q.      Okay.  The 2017 tax return, that was

14   the year before you were removed from the Von Zedtwitz

15   Professorship, correct?

16           A.      Yes.

17           Q.      Okay.  And then in your 2018 tax return

18   you received $260,000.00 in wages, correct?

19           A.      Yes.

20           Q.      Okay.  And during this year you were

21   first transferred from the Berliner Chair to the Von

22   Zedtwitz Chair and then later removed from the Von

23   Zedtwitz Chair, correct?

24           A.      Correct.

25           Q.      And during that year, 2018, you made

229

1   slightly more in wages than you had in 2017, correct?

2          A.      Correct.

3          Q.      Okay.  And then in 2019 you reported to

4   the IRS that you earned $262,452.00 in wages, correct?

5          A.      Correct.

6          Q.      And this was the year after your

7   transfer from the Berliner Chair, correct?

8          A.      Uh-huh.  Correct.

9          Q.      Is that yes?

10         A.      Correct.

11         Q.      And that was the year after your

12  removal from the Von Zedtwitz Chair, correct?

13         A.      Correct.

14         Q.      And, again, during this year you made

15  more than you had in the previous year, correct?

16         A.      The numbers are correctly shown.  But

17  what I just stated several times, the endowed chair does

18  not directly affect compensation.  I'm not sure I need to

19  say it again.  But I can if you'd like me to do.  Endowed

20  chair is not linked to the total amount of compensation.

21         Q.      Understood.  But your total amount of

22  compensation did not decrease to date as a result of your

23  loss of the Von Zedtwitz Chair, correct?

24         A.      Correct.

25         Q.      Okay.  So, doctor, what are NIH grants?

230

1      A.      NIH grants are grants from the Federal

2  Government to faculty at American universities to conduct

3  research and academic activities.  It's the main form of

4  support for research activities.

5      Q.      How many NIH grants do you currently

6  have?

7      A.      Four, I think.

8      Q.      Which ones?

9      A.      Do you want numbers?

10      Q.      Yeah.

11      A.      I will have to send them to you.  They

12  have pretty long numbers.  If you want my grand funding,

13  I can send it to you.

14      Q.      How many NIH grants did you have in

15  2018 prior to your removal from the Von Zedtwitz Chair?

16      A.      My NIH funding has not changed very

17  much.  It has been up and down a little bit but its been

18  stable.

19      Q.      What is an RO1?

20      A.      It's a form of -- it's a form of an NIH

21  award.  It's the main type of research award that

22  supports faculty research.

23      Q.      Doctor, am going to show you now a

24  document that we'll mark as Exhibit 26.  It is a

25  three-page document that is a letter dated April 11th,

232

1  two of them -- but all of them taken, I guess, add up to

2  essentially 100 percent NIH maximum.  NIH maximum, I

3  believe, is currently $185,000.

4         Q.     Meaning, that no matter how many of

5  these grants that you have, once you get to that maximum,

6  be it $180,000 or so, you can't personally derive anymore

7  income --

8         A.     No.

9         Q.     -- from them other than that.  Is that

10 correct?

11        A.     You don't have that amount from one or

12 from five.  It doesn't matter.  But you cannot exceed

13 that number.

14        Q.     You cannot exceed the number?

15        A.     That's right.

16        Q.     And that number goes to pay part of

17 your salary, correct?

18        A.     Yes, it does.

19        Q.     Okay.  And so when you talk about

20 funding for your over-the-cap salary, you're talking

21 about the ability to generate funds so that you can, for

22 example, if you have a salary of approximately

23 $300,000.00 make up that $120,000.00 difference between

24 the NIH cap and the amount of your salary, correct?

25        A.     Correct.

233

1      Q.      So in lieu of other sources of

2  over-the-cap funding, am I correct to understand that

3  since the Von Zedtwitz Chair was removed, Yale has been

4  providing that over-the-cap funding itself from other

5  sources in order to keep your salary from being reduced

6  since?

7      A.      Correct.

8      Q.      Okay.  Doctor, going back now to

9  Exhibit 2 from the first session of your deposition which

10  is your responses to our Interrogatories and Requests for

11  Production.  You see I have on the screen now your

12  response to Interrogatory No. 15?

13      A.      I do.

14      Q.      Okay.  The first lost employment

15  opportunity you list there is nomination to the National

16  Academic of Sciences, correct?

17      A.      Uh-huh.

18      Q.      Is that yes?

19      A.      Yes, it is.

20      Q.      Okay.  What is the name of the position

21  for which you were in consideration?

22      A.      It's not a position.  It's an honor

23  that greatly enhances ones market value.

24      Q.      And how does that come about?

25      A.      It comes about from your -- from your

299

1                    C E R T I F I C A T E
2
3    UNITED STATES DISTRICT COURT
4    DISTRICT OF CONNECTICUT
5
6          I, ASHLEY L. JUSINO, Court Reporter and Notary
     Public within and for the State of Connecticut, duly
7    commissioned and qualified, do hereby certify that
     pursuant to Notice, MICHAL SIMONS, the deponent herein,
8    was by me first duly sworn to testify to the truth, the
     whole truth and nothing but the truth of his knowledge
9    touching and concerning the matters in controversy in
     this case; that he was thereupon carefully examined upon
10   his oath and his testimony reduced to writing by me; and
     that the deposition is a true record of the testimony
11   given by the witness.
12         I further certify that I am neither attorney
     or counsel for, nor related to or employed by, any of
13   the parties to the action in which this deposition is
     taken, and further that I am not a relative or employee
14   of any attorney or counsel employed by the parties
     thereto or financially interested in the action.
15
         IN WITNESS WHEREOF, I have hereunto set my
16   hand this 26th day of October , 2021, at
     Norwalk, Connecticut.
17
18                              _____
19                              Ashley L. Jusino, CSR
                                Notary Public
20                              State of Connecticut
21
     My Commission Expires:
22   November 30, 2022
     No. 529
23
24
25