UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL SIMONS, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:19-CV-01547(OAW) |
| v. | : | |
| | : | |
| YALE UNIVERSITY, | : | |
| PETER SALOVEY and | : | |
| ROBERT ALPERN, M.D. | : | |
| Defendants. | : | MARCH 16, 2022 |

### DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT
### OF UNDISPUTED MATERIAL FACTS AND EXHIBITS

The defendants, Yale University ("the University")[1], President Peter Salovey and Dr. Robert Alpern (hereinafter collectively referred to as the "University defendants"), hereby submit their Local Rule 56(a)(1) statement of undisputed facts and exhibits in support of their Motion for Summary Judgment.

    1.    On May 22, 2008, the University offered the plaintiff, Dr. Michael Simons, the position of "Chief of the Section of Cardiovascular Medicine and Professor of Internal Medicine at Yale University School of Medicine and the corresponding position of Chief of Cardiovascular Medicine at Yale-New Haven Hospital." *See* Complaint, at ¶ 8; *see also* May 22, 2008 Offer Letter, attached hereto as Exhibit A, at p.1.[2]

    2.    The May 22, 2008 Offer Letter set forth the specific terms and conditions of the University's offer of employment and superseded any and all previous correspondence or discussions between the plaintiff and the University. Ex. A, p. 1.

---

[1] The University is a private, non-state institution. *See* Plaintiff's Responses to Request for Admission to Facts, Ex. 1 to Affidavit of Kevin Shea in Support of Motion for Summary Judgment ("Shea Aff."), at p. 4; *see also* Complaint, at ¶ 4.

[2] "Usually what happens is if you're the chief of the cardiology division at Yale University, the Yale-New Haven Hospital would make you the chief of its section of cardiology at the hospital. So, it is a slightly different position, but the two are really tied to each other." *See* Dr. Robert Alpern's Deposition Excerpts, Ex. 2 to Shea Aff., p. 45:3-14.

3. The May 22, 2008 Offer Letter is the contract on which the plaintiff has based his breach of contract claims. *See* Complaint, at ¶¶ 43-47; *see also* Michael Simons's June 16, 2021 Deposition Excerpts, Ex. 3 to Shea Aff., p. 32, 108-109; *see also* Michael Simons's October 13, 2021 Deposition Excerpts, Ex. 4 to Shea Aff., p. 206:9-14.

4. The May 22, 2008 Offer Letter states that the "Department of Internal Medicine is recommending you for appointment as Professor of Internal Medicine without term in the Traditional Track," Ex. A, ¶ (A)(1), which means a Professor "with tenure in this case." *See generally* Ex. 2 to Shea Aff., p. 38:1-2, 36:11-38:25 (describing professor appointment process). In essence, a Professor with tenure at the University means that "it's not impossible to remove you from the university, but it's very difficult." *See* Ex. 2 to Shea Aff., p. 38:18-25[3].

5. The May 22, 2008 Offer Letter states that the University "will *nominate* [the plaintiff] to President Levin and the Yale Corporation for a Robert Berliner Professorship." (Emphasis added.) Ex. A, ¶ (A)(2). A professorship, such as the Robert Berliner Professorship (named after a previous dean of the medical school), "is an endowment and an honor. The person who holds the professorship receives the annual income from the endowment." *See* Ex. 2 to Shea Aff., p. 40:4-13[4]; *see also* Complaint, at ¶ 9. It is formally conferred and rescinded only by the Yale Corporation upon the recommendation of the President. *See* Ex. 2 to Shea Aff., p. 40:14-18; *see also* Peter Salovey's July 30, 2021 Deposition Excerpts, Ex. 5 to Shea Aff., p. 22:6-9; *see also Yale University's Objections and Responses to Contention Interrogatories*, Ex. 6 to Shea Aff., at 1 ("It is and has been the policy of the University that the Yale Corporation has the

---

[3] *See* YALE UNIVERSITY FACULTY HANDBOOK at 96 ("A tenure appointment, whether at the rank of professor or associate professor, is a permanent, forward-looking commitment."),
https://medicine.yale.edu/oapd/academicaffairs/processesdocuments/facultyhandbook/

[4] As such, a professorship, such as the Robert Berliner Professorship, is not a position; it is rather "an honor and that comes with the ability to use certain funds." *See* Ex. 2 to Shea Aff., p. 42:3-13. Plaintiff's position is "professor of internal medicine." *See* Ex. 2 to Shea Aff., p. 42:12-13.

2

authority to appoint faculty members to endowed professorships and to rescind such appointments upon the recommendation of the president.").

6. The May 22, 2008 Offer Letter does not guarantee the plaintiff's appointment to a Robert Berliner Professorship. *See generally* Ex. A, ¶ (A)(2)

7. The May 22, 2008 Offer Letter does not establish a term of years for which the plaintiff will hold a Robert Berliner Professorship. Ex. A.

8. Under the May 22, 2008 Offer Letter, the Yale School of Medicine committed "to establish the Yale Cardiovascular Research Center (YCVRC) in the Department of Medicine" and "to name [plaintiff] as its first Director." Ex. A, ¶ (C)(1)(a).

9. Plaintiff was offered a salary of "$500,000 per year for the fiscal year July 1, 2008 through June 30, 2009," which is set "in accordance with School and Department Faculty Salary Guidelines and is reviewed annually, with adjustments based on [the plaintiff's] overall contribution to the School, the Department and the Hospital." Ex. A, ¶ (A)(4).[5]

10. On June 10, 2008, the plaintiff agreed to, signed and returned the Offer Letter to the University, thereby officially accepting the terms of the Offer Letter. Ex. A, p. 13.

11. Plaintiff was nominated, appointed to and held the Robert Berliner Professorship from 2008 through the Spring of 2018. Ex. 1 to Shea Aff., p. 7; *see* Complaint, at ¶¶ 8, 29-30.

12. Plaintiff accepted the positions of Chief of the Section of Cardiovascular Medicine and Professor of Internal Medicine at the Yale-New Haven Hospital and the Yale School of Medicine. *See* Complaint, at ¶ 8. Plaintiff was named the first Director of the YCVRC, which he also accepted. *See* Complaint, at ¶ 10. By doing so, the plaintiff agreed to abide by the

---

[5] As a result, "we have the freedom to increase or decrease [a professor's] salary based on performance." *See* Ex. 2 to Shea Aff., p. 61:12-23.

requirements of the May 22, 2008 Offer Letter "as well as all other University policies and procedures." Ex. A, p. 13; *see* Complaint, at ¶ 15.

13.     On or around August 30, 2013, a hearing was held before a panel of the University Wide Committee on Sexual Misconduct ("UWC") in connection with two complaints brought against the plaintiff: (1) brought by Valarie Stanley (acting as a Title IX Coordinator on behalf of Annarita Di Lorenzo); and (2) brought by Frank Giordano. *See* UWC Panel Recommendation, attached hereto as Exhibit B, p. 1.

14.     Dr. Di Lorenzo, formerly a postdoctoral research scientist at Yale, and Dr. Girodano, associate professor of Medicine (Cardiology) at Yale, brought allegations that the plaintiff engaged in various behaviors which amounted to sexual harassment. Ex. B, p. 1; *see* Complaint, at ¶ 20.

15.     The UWC Panel, after hearing testimony from the parties, the ex-Chair of the Department of Internal Medicine at Yale School of Medicine, Jack Elias, and receiving written testimony from Dr. William Sessa, the Panel concluded, by a preponderance of the evidence, that the plaintiff's actions of pursuing Dr. Di Lorenzo amounted to sexual harassment because his actions were of a sexual nature that created a hostile and intimidating work and research environment. Ex. B, p. 3; *see also* Ex. 1 to Shea Aff., p. 4 (admitting that "[a]n independent inquiry concluded that the plaintiff had committed sexual harassment in violation of the University's sexual misconduct policy"); *see also* Complaint, at ¶ 21.

16.     The UWC Panel further recognized that Dr. Giordano had a justified fear of retaliation by the plaintiff and that because of the conflict of interest stemming from Dr. Di Lorenzo's rejection of the plaintiff's romantic interest, the plaintiff's continued decision-making

authority over Dr. Giordano's career was a failure of proper leadership and was unprofessional. Ex. B, p. 4.

17. As discipline for the plaintiff's creation of a hostile work environment for Dr. Di Lorenzo and unprofessional exercise of authority over Dr. Giordano, the UWC Panel recommended that the plaintiff be removed as section Chief of Cardiology permanently and that the plaintiff hold no comparable or higher leadership position at the University for a period of five years. Ex. B, p. 4; *see also* Complaint, at ¶ 21.

18. Because the UWC Panel found that the plaintiff "significantly misused the leadership role entrusted to him as section chief," it recommended that the penalties for the plaintiff's violation of the sexual harassment policy and conflicted leadership "be centered on [the plaintiff's] leadership position." Ex. B, p. 4.

19. On October 14, 2013, after considering the UWC Panel's determinations and recommendations, Provost Benjamin Polak formally set forth the plaintiff's punishment via letter. *See* October 14, 2013 Decision, attached hereto as Exhibit C.

20. In his October 14, 2013 Decision, Provost Polak stated that the plaintiff would be "suspended from serving as Section Chief of Cardiology until June 30, 2015." Ex. C; *see* Complaint, at ¶ 23. As a result, plaintiff's salary "was decreased when he was no longer chief of the cardiology division . . . to a number that was more consistent with that of a professor in the department of internal medicine." *See* Ex. 2 to Shea Aff., p. 62:8-17; *see also* Ex. C at 1 (describing salary reduction).

21. After receiving Provost Polak's Decision, the University decided to hire a third-party consultant to perform a "360 Review" of the plaintiff's job performance. *See* Ex. 2 to Shea Aff., p. 110:7-111:6, 112:21-25, 113:4-6. This external, third-party review involved interviews

with several of the plaintiff's coworkers and an anonymous written survey of the plaintiff's coworkers. *See* Ex. 2 to Shea Aff., p. 110:8-14; *see also* November 13, 2014 Email Announcement, attached hereto as Exhibit G.

22.  On July 21, 2014, the University received a written report documenting the results of the "360 Review." *See* 360 Review, attached hereto as Exhibit D.

23.  As part of this "360 Review," an independent consultant interviewed thirty-six (36) persons, consisting of nine (9) professors, eleven (11) associate professors, ten (10) assistant professors, and six (6) others. *See* Interview Results Summary, attached hereto as Exhibit E.

24.  When asked whether the plaintiff was suitable to lead the Cardiology Section in the future, only 8% of interviewees answered "Yes." Ex. E; *see also* Ex. 2 to Shea Aff., p. 110:15-21. Conversely, 72% of the interviewees answered "No," the plaintiff was not suitable to lead the Section in the future, and 19% answered that they were "Unsure." Ex. E; *see also* Ex. 2 to Shea Aff., p. 112:3-16 ("I think what became apparent was that Mike was an extreme bully who was damaging the lives of many people . . . .").

25.  Further, 81% of the interviewees stated that the plaintiff failed to meet the educational and career development needs of medical students, graduate students, residents, and fellows, and 72% of interviewees stated that the plaintiff did not create a positive work environment characterized by professionalism, honesty, integrity, diversity, respect, collaboration, open communication, and the sensitive management of conflict. Ex. E.

26.  As a result of the "360 Review," the plaintiff was asked not to return as Section Chief of Cardiology in or around October 2014. *See* Dr. Gary Desir's Excerpts, Ex. 7 to Shea Aff., p. 33:16-34:15; *see also* October 27, 2014 Email Announcement, attached hereto as Exhibit F; *see also* Ex. 2 to Shea Aff., p. 111:4-6.

27. The Dean of the Yale School of Medicine testified that the plaintiff was not permanently removed from his position as Section Chief of Cardiology because of public criticism in the *New York Times*[6] and other news outlets, and that the plaintiff would have been removed from that position even without the media criticism. *See* Ex. 2 to Shea Aff., p.113:24-114:12.

28. The plaintiff did not bring any type of legal challenge—CHRO complaint or otherwise—in connection with his removal from his position as Section Chief of Cardiology in the Yale School of medicine. *See* Ex. 3 to Shea Aff., p. 71:5-11.

29. On November 13, 2014, the plaintiff was officially removed from the position of Director of the Cardiovascular Research Center. *See* Ex. G.

30. Dr. Gary Desir, as the Section Chair of Internal Medicine at Yale School of Medicine, removed the plaintiff from the position of Director of the Cardiovascular Research Center as a result of the "360 Review" survey results indicating discord within the Cardiovascular Research Center and dissatisfaction with the plaintiff's leadership skills. Ex. G; *see also* Ex. 7 to Shea Aff., p. 36-37.

31. At the time the plaintiff was removed from the position of Director of the Cardiovascular Research Center, he did not bring any claims in the form of a CHRO complaint, union complaint, or lawsuit. *See* Ex. 3 to Shea Aff., p. 66:5-18.[7]

32. In or around April 2018, the plaintiff was asked to exchange his endowed chair, the Robert Berliner Professorship, with another endowed chair, the Waldemar Von Zedtwitz

---

[6] *See, e.g.,* T. Lewin, *Yale Medical School Removes Doctor After Sexual Harassment Finding,* N.Y. Times (Nov. 14, 2014), https://nyti.ms/1BpU9cu; *see also* T. Lewin, *Handling of Sexual Harassment Case Poses Larger Questions at Yale,* N.Y. Times (Nov. 1, 2014), https://nyti.ms/1wTfpSG.

[7] Plaintiff similarly did not bring a CHRO complaint in connection with his 18-month suspension (and later removal) as Chief of Cardiology. *See* Ex. 3 to Shea Aff., pp. 69:25-70:19, 71:5-11.

Professorship. *See* Ex. 3 to Shea Aff., p. 73:8-12; *see also* April 27, 2018 Email Chain, attached hereto as Exhibit H.

33. The plaintiff believes that the key motivation behind the University's request that the plaintiff transfer from the Robert Berliner Professorship to the Waldemar Von Zedtwitz Professorship was to avoid a dispute with the Berliner Family. *See* Ex. 3 to Shea Aff., pp. 73:24-74:3; *see also* Complaint, at ¶¶ 28, 33. The reasons expressed by Dr. Alpern were to maintain Dr. Simons's current income, to avoid a dispute with the Berliner family, and to offer the Berliner chair to the new chief of cardiology. *See* Ex. H, p. 3[8]; *see also* Complaint, at ¶ 33.

34. The plaintiff agreed to exchange his Robert Berliner Professorship for the Waldemar Von Zedtwitz Professorship, agreeing that he would be "happy to swap the chair." *See* Ex. 3 to Shea Aff., p. 78:7-14; *see also* Ex. H, p. 3; *see also* Ex. 3 to Shea Aff., p. 81:13-22, 83:1-11; *see also* Complaint, at ¶ 30.

35. The plaintiff was officially appointed and confirmed by the Yale Corporation as a Waldemar Von Zedtwitz Professor of Cardiology on June 22, 2018. *See* June 22, 2018 Letter of Appointment, attached hereto as Exhibit I; *see also* Ex. 5 to Shea Aff., p. 52:11-24; *see also* Complaint, at ¶ 31. Plaintiff testified: "I did not think [the exchange of professorships] materially affected me." Ex. 3 to Shea Aff., p. 85:5-6.

36. The plaintiff did not suffer any loss of salary as a result of his transfer from the Robert Berliner Professorship to the Waldemar Von Zedwitz Professorship. *See* Ex. 3 to Shea Aff., p. 82:15-24; *see also* Ex. 4 to Shea Aff., p. 226:15-229:24.[9]

---

[8] Plaintiff acknowledged both that the Chief of Cardiology is typically a Berliner professor, Ex. 3 to Shea Aff., p. 57:11-13, and that he was contacted to exchange his Berliner chair for the Von Zedwitz chair within about six months of the new Chief of Cardiology's appointment. Ex. 3 to Shea Aff., p. 58:20-25.

[9] Plaintiff also testified, with regard to his grant support, that "[m]y NIH funding has not changed very much. It has been up and down a little bit but it's been stable." Ex. 4 to Shea Aff., p. 230:14-18. Plaintiff's salary, over his grant

37. The response within the Yale medical school community to the plaintiff's transfer from the Robert Berliner Professorship to the Waldemar Von Zedwitz Professorship was negative and vocal. *See* Ex. 2 to Shea Aff., p. 184:20-185:2; 187:21-188:2 ("anger in the community was growing" and "people were very upset about this issue"); *see also* Ex. 5 to Shea Aff., p.57:25-58:4 ("people objected to it"), p. 59:9-16 ("I know many people had strong objections to Michael Simons—to what they perceived as Michael Simons being given a new honor."); *see also* Complaint, at ¶¶ 32, 34. A petition circulated among Yale School of Medicine faculty and graduates objecting to Dr. Simons's new professorship. *See* Ex. 2 to Shea Aff., p. 186; *see also* Complaint, at ¶ 34.

38. After consulting with various groups within the University and based on concern for the welfare of the Medical School community, Dr. Alpern (and ultimately the Yale Corporation) removed the plaintiff from the Waldemar Von Zedtwitz Chair on September 21, 2018. *See* September 21, 2018 Announcement Regarding Endowed Chair, attached hereto as Exhibit J; *see also* Ex. 2 to Shea Aff., p.192:21-194:9, 209:21-210:12; *see also* Ex. 5 to Shea Aff., p. 65 (noting assent at Yale Corporation meeting); 83:23-84:10 ("The corporation appoints and can remove."); *see also* Complaint, at ¶ 39.

39. The plaintiff did not suffer any loss of salary as a result of his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 3 to Shea Aff., p. 107:2-7, 127:16-20; *see also* Ex. 4 to Shea Aff., p. 185:14-25, 186:6-18, 229:21-24.

40. The plaintiff did not suffer any loss of benefits as a result of his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 4 to Shea Aff., p. 186:23-187:1-16.

---

cap, also has been funded by the University so that it has not been reduced since the removal of the Waldemar Von Zedwitz chair. Ex. 4 to Shea Aff., p. 232:4-233:15

41. The plaintiff's office location did not change as a result of his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 4 to Shea Aff., p. 186:19-22.

42. The plaintiff's supervisor, to whom he reports, did not change as a result of his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 4 to Shea Aff., p. 187:17-21.

43. The plaintiff remains a tenured professor at the University. *See* Ex. 3 to Shea Aff., p. 96:2-13; *see also* Ex. 4 to Shea Aff., p. 187:1-3; *see also* Complaint, at ¶ 42.

44. On February 28, 2019, the plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("Commission") alleging violations of Conn. Gen. Stat. 46a-60(a)(1) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"). *See* February 19, 2019, Commission Complaint, attached hereto as Exhibit K; *see also* Complaint, at ¶ 41. On June 11, 2019, the Commission dismissed the plaintiff's complaint. *See* June 11, 2019 Commission Case Assessment Review, attached hereto as Exhibit L. On the same date, the Commission released its jurisdiction. *See* June 11, 2019 Commission Release of Jurisdiction, attached hereto as Exhibit M; *see also* Complaint, at ¶ 41.

45. Neither the University defendants nor any employee, agent, or representative of the University, has made any oral or written comments—discriminatory or otherwise—about the plaintiff's gender, race, or ethnicity. *See* Ex. 4 to Shea Aff., p. 188:19-191:4.

46. The plaintiff is unable to identify any Caucasian males, other than himself, who are employed by the University and were allegedly punished twice for the same conduct. *See* Ex. 3 to Shea Aff., pp. 118-120. But the plaintiff alleges that three other individuals are similarly situated to him and have committed similar and/or comparable misconduct: (1) Amy Chua; (2) Carlos Mena; and (3) Joseph Schlessinger. *See* Ex. 4 to Shea Aff., p. 189-192:19.

47. Of these three individuals, only Amy Chua is alleged to be a female professor with an endowed professorship and from a different protected class than the plaintiff. But Dr. Simons provides no factual basis whatsoever that Professor Chua was similarly situated in other material respects, treated differently by the UWC or otherwise, or that such disparate treatment was directly or indirectly attributable to her gender. *See* Ex. 3 to Shea Aff., p. 120-121; *see also* Ex. 4 to Shea Aff., p. 191:5-192:16, 194:25-195:4.

48. The plaintiff alleges that the University breached its contract by (1) imposing successive and duplicative punishment for the plaintiff's violation of the University's sexual misconduct policies; (2) removing the plaintiff's Von Zedtwitz Professorship; and (3) doing so without an opportunity to contest the removal. *See* Ex. 3 to Shea Aff., p. 112-114, *see also* Ex. 4 to Shea Aff., p. 206:18-207:8; *see also* Complaint, at ¶¶ 43-47.

49. The plaintiff's breach of the implied covenant of good faith and fair dealing claim derives from his belief that the University removed him as Section Chief of Cardiology in the Yale School of Medicine, Director of the Cardiovascular Research Center, and the Von Zedtwitz professorship in order primarily to avoid negative publicity, *see* Ex. 4 to Shea Aff., p.219:18-220:4, and secondarily so that (i) Dr. Alpern could enhance his likelihood of reappointment as the Dean of the School of Medicine and (ii) President Salovey could "preserve his job because he was under a lot of pressure." Ex. 4 to Shea Aff., p. 221:6-222:17, 222:25-223:11.[10]

50. The plaintiff alleges that he has suffered five adverse employment actions: (1) his eighteen-month suspension from the position of Section Chief of Cardiology in the Yale School of Medicine; (2) his removal from the position of Section Chief of Cardiology in the Yale School of Medicine; (3) his removal from the position of Director of the Cardiovascular Research

---

[10] In essence, plaintiff alleges that both Dr. Alpern and President Salovey "were motivated . . . by self-preservation." Ex. 4 to Shea. Aff., p. 222:17-18.

Center; (4) his transfer from the Robert Berliner Professorship to the Waldemar Von Zedtwitz Professorship; and (5) his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 3 to Shea Aff., p. 68:7-69:24; *see also* Plaintiff's Responses to Defendant's First Set of Interrogatories and Request for Production of Documents to the Plaintiff, Ex. 8 to Shea Aff., answers to Nos. 4 & 13.

51. The plaintiff alleges that the University defendants have violated his Title IX double jeopardy and due process rights because, after the University completed a full internal adjudication under its sexual misconduct policy, he faced discipline for the same behavior a second time. *See* Complaint ¶ 61. He also alleges that Yale punishes only Caucasian males twice for the same conduct. *See* Complaint ¶ 67. The plaintiff, therefore, brings his Title IX claim for alleged selective enforcement by the UWC and successive punishment for sexual misconduct because of his gender. *See* Ex. 4 to Shea Aff., 192:20-193:3; *see also* Complaint, at ¶¶ 58-63.

THE DEFENDANTS

BY: _____
KEVIN C. SHEA (ct13781)
PATRICK T. CLENDENEN (ct09574)
CLENDENEN & SHEA, LLC
400 Orange Street
New Haven, CT 06511
Telephone: 203-787-1183
Fax: 203-787-2847
kcs@clenlaw.com
ptc@clenlaw.com

CERTIFICATION:

    This is to certify that a copy of the foregoing has been sent to all required notification parties either via operation of the Court's electronic notification system or by first-class mail, postage pre-paid to anyone unable to accept such notification on March 16, 2022.

_____
CLENDENEN & SHEA, LLC