# EXHIBIT B

Recommendation to Provost Ben Polak in the case of the complaint brought to the UWC by Valarie Stanley (acting as a Title IX Coordinator on behalf of Annarita Di Lorenzo) against Michael Simons, and in the case of the complaint brought by Frank Giordano against Michael Simons

On Friday August 30, a hearing was held before a panel of the UWC in connection with the above mentioned complaints. In the complaints both Annarita Di Lorenzo (hereafter: ADL), formerly a postdoctoral research scientist at Yale and currently an assistant professor at Cornell, and Frank Giordano (hereafter: FG), associate professor of Medicine (Cardiology), allege that Michael Simons (hereafter: MS), Professor of Medicine and Section Chief of Cardiovascular Medicine, engaged in various behaviors which amounted to sexual harassment.

In accordance with UWC procedures, a fact-finder was appointed to interview the parties and other witnesses and to gather evidence. The fact-finder, former Judge Beverly Hodgson, submitted a detailed report to the UWC. The parties and the panel received copies of the report. Professor Della Rocca appointed a panel of five UWC members to hear the case:

> Michael Della Rocca, Professor of Philosophy (panel chair)
> Kathryn Lofton, Professor of Religious Studies and American Studies
> John Mayes, Associate Vice President and Chief Procurement Officer
> David Post, Associate Professor of Ecology and Evolutionary Biology
> Asha Rangappa, Associate Dean, Law School

The panel interviewed the parties at the hearing and also interviewed an additional witness: Jack Elias who was, until recently, the chair of the Department of Internal Medicine at Yale School of Medicine. Professor Elias appeared at the request of the panel. Subsequent to the hearing, Michael Della Rocca, on behalf of the panel, contacted Dr. William Sessa in writing who clarified certain aspects of the timing of ADL's departure from Yale. Dr. Sessa's response was shared with the panel and all the parties.

This report will consider in section I the charges of ADL against MS and then consider in section II the charges of FG against MS. Section III contains the panel's recommendations.

I: The Panel's Findings and Conclusions Concerning ADL's complaint

Relevant background facts for ADL's complaint: ADL was a research scientist in Dr. Sessa's lab. Although MS did not supervise ADL directly, Sessa's lab and MS's lab were closely connected and there were weekly joint lab meetings which members of both labs were expected to attend and which were important for the training of research scientists such as ADL.

The events central to ADL's complaint began around December of 2009, the time at which ADL and FG began seeing each other. In early February of 2010, MS began expressing his romantic interest in her. These feelings on MS's part were conveyed in conversations, e-mail messages,

1

and in a letter that MS gave to ADL on February 12, 2010. These e-mail messages and this letter were provided to the fact-finder, the parties and the panel.

Although ADL made her lack of any romantic interest in MS clear from the first time he raised the subject in February 2010 and early on she told MS that she was seeing FG and that she and FG were in love, nonetheless, MS continued to express his desire in the letter, in e-mail messages, and in requests for meetings. Such encounters and communications continued through May of 2010.

As the e-mail documentation indicates, ADL made her lack of interest clear in messages that were polite and respectful but not encouraging. MS viewed these messages and communications as not discouraging or even as encouraging, and he continued his pursuit of ADL until May of 2010 when ADL said that she didn't think it was necessary to meet to discuss this subject any more and when she said that there was nothing left to say beyond asking him to respect her choice.

ADL says that the polite, respectful tone of her communication was due to the fact that she was afraid of alienating or angering MS. This fear stemmed from the fact that MS held a position of power over her partner (now husband), FG, from the fact that MS also held a powerful position as the head of a lab that was closely associated with the lab of which ADL was a member, from the fact that MS was supporting ADL's efforts to get a grant, and from the fact that MS was a prominent figure in a related field of scientific research and thus was able to interfere with ADL's ability to secure professional positions.

The final fact was confirmed by MS himself at the hearing. MS did write a strongly positive letter of recommendation for ADL in 2011 for the position she currently occupies at Cornell. As MS indicated in his opening statement at the hearing, he could have "killed" ADL's candidacy for that position with a single word "and she would never know". MS clearly chose not to do so, but that statement on MS's part indicated that ADL was right to think that MS held power over her career.

MS claimed at the hearing that the e-mail messages and other exchanges were, for a long period, not discouraging. He didn't interpret these e-mails as indicating that she was not interested in him. The panel agrees with ADL that these messages were not plausibly seen in that way, and the panel further agrees that any politeness or respect in those messages can be explained by her fear of retaliation by MS, retaliation that MS was in a position to carry out due to the various respects in which MS held power over her and FG.

ADL reports that throughout the period from February 2010 to the time she left Yale she continued to feel uncomfortable at the joint lab meetings. ADL also reports that she received grant money that would have enabled her to remain at Yale longer and that doing so would have been very desirable in some respects, especially in light of her connection with FG. However, ADL reports that she decided to leave Yale sooner than she otherwise would have because of the unwelcome situation with regard to MS. It is clear that ADL was not able to stay at Yale in a permanent position and that given the desirability of ADL's tenure-track offer from Cornell, it

2

made sense for her to leave Yale at some point. But the panel also finds credible ADL's claim that she hastened the time that she would start at Cornell because of the situation concerning MS.

The panel finds, by a preponderance of the evidence, that MS's actions of pursuing ADL amount to sexual harassment because they were actions of a sexual nature that created a hostile and intimidating work and research environment for ADL. In particular, as noted above, MS actively sought a relationship with ADL, for approximately three months after ADL had clearly indicated that she was not interested and that she was in a relationship with FG. Further, this pursuit and the resulting work and research environment made ADL fearful for her own standing at Yale and in the field in general, made her fearful for the standing of her partner FG, and led her to leave Yale sooner than she otherwise would have.

## II: The Panel's Findings and Conclusions Concerning FG's Complaint

The allegations by FG against MS stem from the fact that FG was romantically involved with ADL and from the fact that MS pursued ADL despite the fact that MS's feelings were not returned.

FG claims that he and MS had been friends and were closely associated from before the time MS had come to Yale in 2008. But then – around the time that FG and ADL started seeing each other – MS's attitude toward FG became noticeably colder.

FG also alleges that this change in attitude toward FG was manifested in a series of decisions MS made that adversely affected FG's career, e.g. decisions about grants that FG was participating in or should have participated in, decisions regarding work assignments, a fall off in invitations to meet with distinguished visiting researchers and physicians, and lab support.

MS contends that he had never been very close to FG and that although, because of their previous acquaintance, MS relied on FG for advice when MS first came to Yale, MS soon developed a negative opinion of FG's productivity and work habits. This shift in his opinion of FG, MS says, began before MS's pursuit of ADL.

FG also claims that MS publicly made derogatory and embarrassing remarks regarding his performance and abilities. Although MS denies making such disparaging remarks, some of these remarks – which go beyond the scope of any legitimate supervisory action – were confirmed by witnesses, and the panel credits FG's allegations in this regard.

Because there were various factors in play and because the basis for a section chief's decisions is often necessarily subjective, the panel was not able to find by a preponderance of the evidence that MS's shift in attitude toward FG and his decisions that negatively affected FG were due to his emotions stemming from the situation concerning MS and ADL. Thus the panel is not able to conclude by a preponderance of the evidence that there was retaliatory behavior that created a hostile work environment with regard to FG.

However, the panel nonetheless finds MS's exercise of his leadership with regard to FG very troubling. At some point in the spring of 2010, Jack Elias – then the chair of Internal Medicine –

learned of the situation created by MS's interest in ADL and by MS's pursuit of that interest. Elias quite rightly decided to take the authority to determine FG's salary away from MS. MS told the panel that he thought that that move was appropriate under the circumstances. However, MS – as section chief for Cardiology – continued to exercise decision-making authority over a number of other central aspects of FG's position at Yale, including FG's participation in – or removal from – grants and other activities.

Given the relation among the three parties in this case, it was inappropriate for MS to continue to exercise this authority over FG. Because of ADL's rejection of MS's romantic interest, ADL's relationship with FG, the disparaging comments made by MS, and the negative decisions made by MS regarding FG's career, FG could understandably fear that decisions made by MS with regard to FG were retaliatory.

While the panel does not conclude by a preponderance of the evidence that MS's actions were, in fact, retaliatory, the panel does recognize that FG had a justified fear of retaliation. The panel finds that, because of the conflict of interest stemming from ADL's rejection of MS's romantic interest, MS's continued decision-making authority over FG was a failure of proper leadership and was unprofessional.

The compromised nature of MS's decision-making with regard to FG was confirmed by MS himself at the hearing. He reported that he had told ADL that he would not harm FG because he did not want to hurt ADL. MS said that he sought to support FG despite his (MS's) diminishing respect for his work and that he did so because he had promised ADL that he would protect FG. Such feelings are not a proper basis for work-related decisions.

### III: The Panel's Recommendations

MS – in creating a hostile work environment for ADL and in his unprofessional exercise of authority over FG – significantly misused the leadership role entrusted to him as a section chief. For this reason, the panel recommends that the penalties for the violation of the sexual harassment policy by MS in connection with ADL and for his improper and conflicted leadership excercised with regard to FG be centered on MS's leadership position.

The panel recommends that MS be removed as section chief of Cardiology permanently and that he hold no comparable or higher leadership position in the University for a period of five years beginning from the time a decision is made in the case of these complaints.

The panel strongly recommends that any further violation of Yale's sexual misconduct policy should result in suspension or termination of MS. This includes any retaliation – direct or indirect – by MS against ADL or FG for bringing these complaints.

Finally, the panel recommends that MS receive training with regard to sexual misconduct.