# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MICHAEL SIMONS,     :
  Plaintiff,       :    3:19-CV-01547 (OAW)
            :
v.            :
            :
YALE UNIVERSITY,     :
PETER SALOVEY,      :
ROBERT ALPERN, M.D.,   :
UNKNOWN PERSONS,    :
  Defendants.      :    MAY 6, 2022

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Dr. Michael Simons, has adduced sufficient evidence during discovery to create genuine disputes of material fact as to all of his remaining claims. As such, he respectfully requests the Court to deny the Defendants' motion for summary judgment in their entirety and to schedule his case for trial so he can obtain redress for the Defendants' actions.

## BACKGROUND

By way of background, Dr. Simons sets forth the undisputed facts for purposes of summary judgment. He will supply additional facts as necessary throughout this memorandum.

In 2008, the Defendants recruited Dr. Simons – then a professor of medicine at Dartmouth School of Medicine – to join the Yale School of Medicine under a detailed agreement. *See* Local Rule 56(a)2, Plaintiff's Responses To Defendants' Undisputed Facts, ¶ 1 (hereinafter, "LR 56(a)2, Pl. Resp."). Among the incentives offered to persuade Dr. Simons to leave Dartmouth were several positions: Chief of the Section of Cardiovascular Medicine and Professor of Internal Medicine at Yale University's School

of Medicine, Chief of Cardiovascular Medicine at Yale-New Haven Hospital, and an endowed professorship at Yale School of Medicine entitled the Robert Berliner Professorship. *Id*. at ¶ 1, 5. Additionally, the Defendants committed to establish the Yale Cardiovascular Research Center and name Dr. Simons its first director. *Id*. at ¶ 8. Persuaded, Dr. Simons and Yale University entered into an employment contract by way of a signed Offer Letter on June 10, 2008. *Id*. at ¶ 10.

In August 2013, Dr. Simons was accused of sexual harassment and retaliation in violation of Yale University's policies – accusations that Yale University's University Wide Committee on Sexual Misconduct ("UWC") substantiated. *Id*. at ¶¶ 13-16. The UWC recommended discipline to Provost Benjamin Polak who determined Dr. Simons' final punishment. *Id*. at ¶¶ 18-19.

In an October 14, 2013 decision, Polak suspended Dr. Simons as Section Chief of Cardiology for approximately 18 months and barred him from holding any comparable administrative position at Yale University during the suspension. Dkt. 93-3, p. 2. Polak also reduced Dr. Simons' annual salary by $50,218. *Id*.

After Polak issued his decision, Yale University hired a third-party consultant to conduct a management review of Dr. Simons and his job performance. *Id*. at ¶ 21. As part of that review, the consultant interviewed colleagues and subordinates of Dr. Simons – the great majority of whom responded negatively when questioned about his suitability to lead the Cardiology Section in the future. *Id*. at ¶ 24.

In October 2014, Dr. Simons ceased to hold the position of Section Chief of Cardiology, and the parties dispute the nature of his departure from that position. *Id*. at ¶

26. On November 13, 2014, the Defendants removed Dr. Simons as Director of the Cardiovascular Research Center. *Id*. at ¶ 29.

In or around April 2018, the Defendants asked Dr. Simons to exchange the Robert Berliner Professorship for the Waldemar Von Zedtwitz Professorship. *Id*. at ¶ 32. The parties dispute the reasons for the trade, but Dr. Simons ultimately agreed to the trade. *Id*. at ¶¶ 33-34.

The Yale Medical School communtiy reacted negatively and vocally to Dr. Simons' reassignment to the Waldemart Von Zedtwitz Professorhsip, and they circulated a petition objecting to his new professorship. *Id*. at ¶ 37. After consulting with various groups within Yale University, Defendant Robert Alpern removed Dr. Simons from the Waldemar Von Zedtwitz Chair on September 21, 2018. *Id*. at ¶ 38. The parties dispute the nature of this removal. Dr. Simosn remains a tenured professor at Yale School of Medicine. *Id*. at ¶ 43.

## ARGUMENT

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), after "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Genuine disputes of material fact occur when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation and citation omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). While the nonmovant bears the burden of proof at trial, the movant must show "prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id*. at 272-73 (citing *Celotex*, 477 U.S. at 323). Once the movant makes a showing in either manner, the nonmovant must then "point to record evidence creating a genuine issue of material fact." *Id*. (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Both the movant and the movant must point to specific evidence in the record to carry their burdens in summary judgment. *Id*. (citing *Celotex*, 477 U.S. 324; *Matsushita*, 475 U.S. at 586).

## I.      The Court Should Deny The Defendants' Motion For Summary Judgment On Dr. Simons' Breach of Contract Claim.

The well-established elements of a breach of contract claim are "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *U.S. Bank Assoc. v. Eichten*, 184 Conn. App. 727, 761 (2018) (internal quotation and citation omitted). Every aspect of an employer-employee relationship is not governed by an express contract. *Gaudio v. Griffin Health Services Corp.*, 249 Conn. 523, 532 (1999). "It is firmly established that 'statements in an employer's personnel manual

may… under appropriate circumstances… give rise to an express or implied contract between employer and employee.'" *Id*. at 532 (quoting *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 564 (1984)); *see also Rafalko v. University of New Haven*, 129 Conn. App. 44 (2011).

Here, the parties agree that the Defendants and Dr. Simons entered into a contract in the form of the May 22, 2008 Offer Letter that they both signed. LR 56(a)2, Pl. Resp. ¶¶ 2-3, 10. Pursuant to that contract, both parties agreed to abide by Yale University policies and procedures. *Id*. at ¶ 12. Those policies included Yale University's Sexual Harassment policies and procedures. LR 56(a)2, Pl. Add. Facts. ¶ 3. Yale University's policies and procedures for handling sexual harassment complaints vested exclusive disciplinary jurisdiction in either the UWC or a school-specific body established for the same purpose. *Id*. at ¶ 4. The invocation of one body's jurisdiction precluded the other body's jurisdiction if the matter arose from the same set of circumstances. *Id*. at ¶ 4.

The UWC handled the accusations of sexual harassment against Dr. Simons. LR 56(a)2, Pl. Resp. ¶¶ 13-18. Because it asserted its jurisdiction and passed judgment, the Defendants' own policies barred them from revisiting the matter and continuing to punish Dr. Simons for the same incidents. LR 56(a)2, Pl. Add. Facts. ¶ 4. Additionally, the UWC was not powerless to recommend the recission of Dr. Simons' endowed chair or his removal from his position as Section Chief of Cardiology or his position as Director of the Cardiovascular Research Center. *Id*. at ¶ 5; *see also* LR 56(a)2, Pl. Resp. ¶¶ 19-20.

These facts clearly demonstrate a contract with clear terms between Dr. Simons and the Defendants. They also demonstrate that the Defendants breached the contract by repeatedly failing to follow their own procedures prohibiting successive punishments

of Dr. Simons. Additionally, the facts also show that Dr. Simons performed his obligations under the contract by submitting himself to the UWC proceedings, completing the punishment and probation imposed, and refraining from committing any more misconduct. LR 56(a)2, Pl. Add. Facts. ¶ 11.

The Defendants first seek to construe Dr. Simons as complaining of his suspension as Chief of Cardiology and Chief of Cardiovascular Medicine. Dr. Simons has no contention with the suspensions imposed by the UWC pursuant to Yale University's UWC procedures and policies. Rather, his contention is with the successive punishments for the same offense that the Defendants subjected him to in violation of their procedures and policies, which were binding upon all parties.

Undaunted, the Defendants further assert that Dr. Simons' violation of their policies against sexual harassment gave them carte blanche to do whatever they wanted with him even if it violated their contract with him. In taking this position, the Defendants ignore the fact that they are the ones who established procedures to address sexual harassment and that they had the ability to strip Dr. Simons of his various positions under those procedures. The body that they established to make those determinations – the UWC – concluded that such harsh measures were unwarranted, and, under the terms of the Defendants' contract with Dr. Simons, its determination was final despite the cries of a #MeToo lynch mob. The Defendants have no one but themselves to blame for the contractual restraints on their ability to successively punish Dr. Simons.

The Defendants also contend that they independently reviewed and removed Dr. Simons as Section Chief of Cardiology and as Director of the Cardiovascular Research Center for his performance. Defendant Alpern, however, conceded that these actions

occurred because of the public reaction to the New York Times stories publicizing the UWC proceedings against him despite their alleged confidentiality. LR 56(a)2, Pl. Add. Facts. ¶¶ 8-9. Their contentions and Defendant Alpern's contrary assertions present a genuine dispute of material fact that can only be resolved by a jury.

What was indisputedly behind the Defendants' actions in every instance alleged in Dr. Simons' claims was a repeated desire to appease intense public pressure by demonstrating that Yale University took sexual harassment seriously. *Id*. at ¶ 14. Thus, it takes no stretch of anyone's imagination to reasonably conclude that every action that the Defendants took against Dr. Simons was predicated on the same circumstances that the UWC originally disciplined him for. The Defendants' own policies and procedures prohibited such gratuitous repetitions of punishment. As such, the Court should deny their motion for summary judgment on Dr. Simons' breach of contract claim.

## II.   The Court Should Deny The Defendants' Motion For Summary Judgment On Dr. Simons' Breach Of The Implied Warranty Of Fair Dealing Claim.

### A.  There are genuine disputes of fact as to Dr. Simons' claim for the breach of the implied warranty of fair dealing.

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon*, 224 Conn. 231, 238 (1992). The purpose of such an implied covenant is to ensure the fulfillment and protection of the reasonable expectations of the parties. *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558 (1984). In the employment context, an employee must show that the employer committed "an impropriety which contravenes some important public policy…" in order to claim a breach of the implied covenant of good faith and fair dealing. *Carbone v. Atlantic Richfield Co.*, 204 Conn. 460, 470-71 (1987). This standard has gradually evolved into a bad faith

standard, which "implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive…." *Rafalko v. University of New Haven*, 129 Conn. App. 44 (2011) (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432-33 (2004)) (internal quotation omitted).

Dr. Simons more than meets this standard, which the Defendants fail to apprehend because they have misconstrued the nature of his claim. Dr. Simons' breach of the implied warranty of fair dealing claim is not based solely on the motivations for the Defendants' actions, but rather is informed by them. Instead, Dr. Simons bases his claim on the Defendants' neglect in following the procedures that both he and they agreed to.

As discussed above, the parties agree that the Defendants and Dr. Simons entered into a contract in the form of the May 22, 2008 Offer Letter that they both signed. LR 56(a)2, Pl. Resp. ¶¶ 2-3, 10. Pursuant to that contract, both parties agreed to abide by Yale University policies and procedures. *Id*. at ¶ 12. Those policies included Yale University's Sexual Harassment policies and procedures. LR 56(a)2, Pl. Add. Facts. ¶ 3. Yale University's policies and procedures for handling sexual harassment complaints vested exclusive disciplinary jurisdiction in either the UWC or a school-specific body established for the same purpose. *Id*. at ¶ 4. The invocation of one body's jurisdiction precluded the other body's jurisdiction if the matter arose from the same set of circumstances. *Id*. at ¶ 4.

The UWC handled the accusations of sexual harassment against Dr. Simons. LR 56(a)2, Pl. Resp. ¶¶ 13-18. Because the UWC asserted its jurisdiction and passed

judgment, the Defendants' own policies barred them from revisiting the matter and continuing to punish Dr. Simons for the same incidents. LR 56(a)2, Pl. Add. Facts. ¶ 4. Additionally, the UWC was not powerless to recommend the recission of Dr. Simons' endowed chair or his removal from his position as Section Chief of Cardiology or his position as Director of the Cardiovascular Research Center. *Id*. at ¶ 5; *see also* LR 56(a)2, Pl. Resp. ¶¶ 19-20.

Instead of hauling Dr. Simons back before the UWC for reconsideration of his punishment or giving him any opportunity to contest public calls for his punishment, the Defendants, in 2014, forced him to resign as Section Chief of Cardiology after public reaction to New York Times stories regarding the UWC proceedings against him. LR 56(a)2, Pl. Add. Facts. ¶ 8. Despite Dr. Simons elevating the Defendants' Cardiovascular Research Institute to become one of the best units in the country, they forcibly removed him being its director in 2014 because of another round of negative publicity against him. *Id*. at ¶¶ 7-8. Despite knowing that Dr. Simons had completed his original punishment and probation and had not reoffended under their sexual harassment policy, the Defendants first attempted to strong-arm him into resigning the Waldemar Von Zedtwitz Professorship on less than 24 hours' notice and then forcibly removed him when he refused because of more negative publicity. *Id*. at ¶¶ 11-14. At his deposition, Defendant Alpern testified that these repeated summary punishments of Dr. Simons were designed to demonstrate to the public that Yale University took sexual harassment seriously. *Id*. at ¶ 14.

Leaving aside the Defendants' motivations for seeking to punish him again, Dr. Simons rests his breach of the implied warranty of fair dealing on the Defendants' failure to provide him any opportunity to contest these removals before the UWC, which had

exclusive jurisdiction over his punishment. In fact, the Defendants afforded Dr. Simons no opportunity to respond to the calls for his repeated punishment despite their procedures requiring that he be given such an opportunity before the UWC.

The Defendants' failure to afford Dr. Simons any opportunity to be heard constitutes an intentional failure to adhere to their contractual duties that vested exclusive jurisdiction in the UWC over Dr. Simons' punishment. The Defendants intentionally failed to adhere to their contractual duties for an interested purpose – namely, the avoidance of bad publicity and the appeasement of a frenetic lynch mob that wanted to see Dr. Simons punished again and again simply based on unverfied allegations. Thus, Dr. Simons present sufficient material facts to merit the denial of the Defendants' motion for summary judgment.

### B. Title VII and the CFEPA do not preempt Dr. Simons' breach of the implied warranty of fair dealing claim.

Undaunted, the Defendants claim that Title VII preempts Dr. Simons' breach of the implied warranty of fair dealing claim and cite several district court cases in support of their argument. Dkt. 91, pp. 21. Their misconstruction of Dr. Simons' claim, however, does them a grave disservice in their argument.

As discussed above, Dr. Simons' breach of the implied warrant of fair dealing claim does not rest on allegations of discrimination, but rather the provisions of the contract that governed his relationship with Yale. Dr. Simons produces evidence to show that his contract with Yale contained requirements that certain procedures be followed and that they were not followed. He further produces evidence to show that the Defendants did not follow those procedures for the purpose of avoiding bad publicity due to public pressure. While it is still a matter of dispute as to what motivations that the Defendants

ultimately adopted due to public pressure, the evidence clearly shows that they failed to follow clearly delineated procedures to return Dr. Simons' matter to the UWC for further consideration because they were acting in an interested manner to avoid bad publicity.

All of the cases that the Defendants cite for the proposition that Dr. Simons' claim is precluded do not establish a categorical rule. Instead, as Judge Haight pointed out in *Bagley v. Yale University*, 42 F.Supp.3d 332, 359 (D.Conn. 2014), the question in those cases and their supporting Connecticut cases is whether "the *sole predicate*" for the breach is an alleged violation of an anti-discrimination statute. There is no compelling reason to adopt a categorical rule in this case, especially since the Connecticut Supreme and Appellate Courts have not adopted one. Dr. Simons predicates his claim not merely on sex discrimination in violation of Title VII, but also upon the Defendants' failure to follow the procedures that they bound themselves to via his employment contract.

To the extent that there is overlap between the Defendants' motivation for failing to follow the procedures (the avoidance of bad publicity) and the motivations that they adopted by caving to public pressure, the former controls for purposes of Dr. Simons' breach of the implied warranty of fair dealing claim, and it stands on a different predicate than claims under Title VII because it is a contractual predicate. Thus, Title VII does not preclude Dr. Simons' claim, and the Court should deny the Defendants' motion for summary judgment on this count.

**III.    The Court Should Deny The Defendants' Motion For Summary Judgment On Dr. Simons' Title VII Claim.**

   **A.  Dr. Simons timely filed his Title VII claim.**

The Defendants claim a jurisdictional bar against Dr. Simons' Title VII claim, arguing that he did not file it within 90 days of receiving a release of jurisdiction from the

Connecticut Commission on Human Rights and Opportunities (CHRO).[1] Dkt. 91, pp. 27-28. Their argument sorely misses the legal mark, and it also neglects the factual record.

Title VII suits must be filed within 90 days of receiving a notice of a right to sue from the Equal Employment Opportunity Commission. 42 U.S.C. § 2000e-5(f)(1). While the CHRO is a deferral state agency with a work-sharing agreement with the EEOC – *see Pruitt v. Mailroom Tech., Inc.,* 2007 WL 2302285, at *3 (D. Conn. Aug. 9, 2007) – it failed to operate as such in this case. Dr. Simons does not dispute that he received a release of jurisdiction from the CHRO on June 11, 2019. LR 56(a)2, Pl. Resp. ¶ 44. What the Defendants fail to carefully articulate though is the nature of the CHRO release. It only provided Dr. Simons with a right to sue under Conn. Gen. Stat. § 46a-100, and it remains entirely silent on his rights under Title VII. *See* Dkt. 93-13, p. 2.

The EEOC, however, did issue Dr. Simons a separate right to sue notice on August 6, 2018. LR 56(a)2, Pl. Add. Facts. ¶ 24. Its right to sue notice specifically authorized Dr. Simons to bring an action under Title VII. *Id*. Dr. Simons then brought this action pursuant to that notice on October 1, 2019 – more than thirty days before the 90-day time period allowed by federal law expired. Dkt. 1.

Until Dr. Simons received the EEOC notice of a right to sue under Title VII on August 6, 2018, no release of jurisdiction gave him a right to sue under Title VII. Thus, as a matter of both due process and the specific nature of the authorizations given to Dr. Simons, the Court cannot require Dr. Simons to bring a suit for which he does not have

---

[1] To the extent that the Defendants claim a failure on Dr. Simons' part to exhaust his remedies for conduct other than his removal from the Waldemar Von Zedtwitz Professorship, Dr. Simons does not dispute that he did not exhaust his administrative remedies, and he has never claimed that Title VII applies to those claims.

authorization to bring after the fact. Dr. Simons complied with the administrative requirements for timeliness. Thus, the Court should decline to grant the Defendants' summary judgment motion on these grounds.

### B. Genuine issues of material fact exist as to Dr. Simons' Title VII claims.

Dr. Simons advanced his Title VII claim under both an actual discrimination theory and a disparate impact theory. Addressing Dr. Simons' actual discrimination theory first, Title VII declares that it is "an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's… sex…." 42 U.S.C. § 2000e-2(a). To establish an unlawful practice under an actual discrimination theory, Dr. Simons must show by "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic…." *Young v. United Parcel Serv., Inc.*, 135 S.Ct. 1338, 1345 (2015).

Direct evidence of discrimination exists where "an impermissible criterion," like gender, "was *in fact* a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir. 1996) (internal quotations and citations omitted). It can take the form of "a workplace policy, practice or decision [that] relies expressly on a protected characteristic" or "conduct or statements by persons involved in the decisionmaking process." *Young*, 135 S.Ct. at 1345.

The Second Circuit has held that

[a] covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding

13

that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.

*Doe v. Columbia University*, 831 F.3d 46, 58 n.11 (2d Cir. 2016).

Here, direct evidence abounds that the Defendants successively punished Dr. Simons precisely to avoid bad publicity at the behest of a rabid mob who did not care about facts or fundamental fairness. Defendant Alpern repeatedly conceded in his deposition that the Defendants removed Dr. Simons from the Waldemar Von Zedtwitz Professorship to demonstrate, in the face of enormous public pressure, that Yale University took sexual harassment seriously. LR 56(a)2, Pl. Add. Facts. ¶ 14. In other words, the Defendants' successive punishments of Dr. Simons had nothing to do with the severity of his offense, any repeated misconduct, or any other legitimate reason. Instead, their successive punishments were undisguised pandering to public pressure that could only be satiated by the harshest possible punishments.

The main pressure even came from a committee (SWIM) associated with Defendant Alpern's office and whose co-chairs received substantial financial support from his office. *Id*. at ¶¶ 16-17. SWIM took advantage of its quarterly meetings with Defendant Alpern to pressure him to the point of advocating that he should not be reappointed dean of Yale School of Medicine for his forbearance toward Dr. Simons. *Id*. at ¶ 21.

SWIM's attitude toward Dr. Simons can only be described as virulently sexist. As its co-chair – Dr. Nina Stachenfeld – testified in her deposition, neither she nor any member of SWIM made any effort to personally verify the allegations against Dr. Simons before advocating for his further punishment, believing entirely the allegations published in the New York Times. *Id*. at ¶ 18. Presented with a number of factual postulations about Dr. Simons' alleged conduct, Dr. Stachenfeld conceded that Dr. Simons had done nothing

inherenly wrong by writing an unsolicited love letter and that it would have made a difference in her views if he could not have retaliated against anyone for having his romantic advances spurned and actually helped the people he had been accused of retaliating against. *Id*. at ¶ 19. She further conceded that it was inherently unfair to punish someone twice for the same offense without additional misconduct, but she denied that such a principle should apply to Dr. Simons. *Id*. at ¶ 20. When asked whether she would advocate for Dr. Simons to be restored to his positions if all of her concessions proved to be actually true, Dr. Stachenfeld stated that she did not know, clearly indicating that even Dr. Simons' complete innocence would not be enough for her. *Id*. at ¶ 19.

Dr. Stachenfeld's attitude is emblematic of SWIM's views and the pressure that they exerted on the Defendants. Even Dr. Simons' complete innocence would not be enough for them because he was a man who had been accused of sexually harassing a woman. His gender was enough to merit his punishment on accusation alone and repeated punishments thereafter until SWIM's bloodlust had been satiated.

The evidentiary chain is clear. The Defendants allowed SWIM and its #MeToo allies to hijack its policies and procedures, fundamental fairness, and commonsense to repeatedly punish Dr. Simons for the same offense despite continued good behavior. SWIM and its #MeToo allies did not care about facts, fairness, and commonsense. All that mattered to them was that Dr. Simons was a man accused of sexual harassment. That alone was sufficient to justify his successive punishments, and the Defendants adopted that view to protect their public image.

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

In other words, the Defendants punished Dr. Simons previously based on nothing more than the discriminatory predilections of a woke mob that was part of Yale University's own administration and that it financially supports. Their statements and actions are direct evidence of discrimination.

Turning to Dr. Simons' disparate impact theory, the *McDonnell Douglas* framework controls. Dr. Simons bears an initial burden of showing that "(1) [he] is a member of a protected class; (2) [he] is qualified for the position; (3) [he] suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000). Dr. Simons' burden of establishing a prima facie case of discrimination is "*de minimis*." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).

If Dr. Simons can meet his burden to establish a prima facie case, the Defendants acquire a burden of production to "articulate a legitimate reason for the challenged employment decision…." *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996). Should the Defendants carry this burden, Dr. Simons then acquires a burden of producing "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons preferred by the defendant were false, and that more likely

than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks and alterations omitted).

The Defendants rest their challenge to Dr. Simons' prima facie case on two grounds. First, they claim that Dr. Simons has failed to prove that he was treated disparately as compared with other similarly-situated females. Second, they claim that Dr. Simons has not incurred any adverse employment actions.

The Defendants' first argument ignores their own discovery responses. In their interrogatory responses, the Defendants admitted that they had investigated and/or disciplined female employees based on accusations of sexual harassment, sexual assault, or other sexual misconduct since 2008. LR 56(a)2, Pl. Add. Facts. ¶ 1. It further admitted that it has never disciplined a female employee or a female student twice for the same instance of sexual harassment, sexual assault, or other sexual misconduct. *Id*. at ¶ 1. In other words, it has never treated any female member of its community – student or employee – like it treated Dr. Simons. That failure alone is enough to doom their argument.

The Second Circuit, however, already foreclosed it by holding that even momentary gender discrimination is disparate treatment:

> [a] covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.

*Doe v. Columbia University*, 831 F.3d 46, 58 n.11 (2d Cir. 2016). Thus, Dr. Simons more than carries his burden to establish disparate treatment.

The Defendants' second argument fares no better. While Dr. Simons did not suffer any loss of salary as a result of his removal from the Waldemar Von Zedtwitz Professorship, he now has greater uncertainty in his compensation because he is now responsible for supporting a greater portion of his salary that the Defendants are temporarily assisting him with. LR 56(a)2, Pl. Resp. ¶ 39; LR 56(a)2, Pl. Add. Facts. ¶ 23. Additionally, Dr. Simons lost the 5 to 10% annual increases in compensation per year that endowed professorships guarantee their holders. LR 56(a)2, Pl. Add. Facts. ¶ 23. Stripping Dr. Simons of a guaranteed form of compensation, its guaranteed increases, and subjecting him to uncertainty as to his compensation is indisputably an adverse employment action as it represents a materially adverse change in the terms and conditions of Dr. Simons' employment.

Having failed to rebut Dr. Simons' prima facie case, the Defendants claim that they acted out of concern for the welfare of the Medical School community. Their legal assertion is belied by Defendant Alpern's testimony. Defendant Alpern repeatedly testified that the Defendants acted to demonstrate to the public that they took sexual harassment seriously. LR 56(a)2, Pl. Add. Facts. ¶ 14. Thus, they completely denied Dr. Simons any opportunity to contest the manner in which he was being treated, and Defendant Alpern attempted to strong-arm Dr. Simons into resigning the Waldemar Von Zedtwitz Professorship on less than 24 hours' notice to help the Defendants save face. *Id*. at ¶ 12.

███████████████████████ SWIM and the public at large, however, did demand Dr. Simons' head, and the Defendants obliged by repeatedly giving it to them.

The Second Circuit has already held that avoiding bad publicity is not a legitimate excuse for railroading someone on the basis of their gender. The Defendants conducted precisely such a railroading to avoid bad publicity. Thus, Dr. Simons has carried his final burden of production: showing a genuine dispute of material fact that discrimination was more likely the reason for the Defendants' actions than their supposed concern for the Medical School community.

For these reasons, the Court should deny the Defendants' motion to dismiss Dr. Simons' Title VII claim.

## IV. The Court Should Deny The Defendants' Motion For Summary Judgment On Dr. Simons' Title IX Claim.

### A. Title IX contains a private right of action for employment discrimination claims, including those that overlap with Title VII claims.

Title IX itself is silent as to whether it establishes any private right of action for discrimination against students, let alone employees. *See* 20 U.S.C. § 1682. A strict interpretation of its text would constrain all Title IX remedies to those provided and sought by federal agencies. The Supreme Court, however, rejected a strict textualist interpretation and held that Title IX created an implied private right of action for individuals in *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979).

*Cannon* did not segregate Title IX's substantive rights. Instead, it recognized a private right of action for all of Title IX's substantive rights. *Cannon*, 441 U.S. at 689-709, 717. In its analysis, the *Cannon* Court examined "whether the statute was enacted for the benefit of a special class of which the plaintiff is a member." *Id*. at 689. The *Cannon* Court described the special class benefited by Title IX in a manner consistent with Title IX's text:

"Title IX explicitly confers a benefit on persons discriminated against on the basis of sex, and petitioner is clearly a member of that class for whose special benefit the statute was enacted." *Id*. at 694 (emphasis added); *see also* 20 U.S.C. § 1681. Thus, while the *Cannon* petitioner was a student, the *Cannon* Court's language refers to persons – in other words, everyone – who is protected by Title IX.

The Supreme Court explicitly confirmed this interpretation in *North Haven Bd. of Ed. v. Bell*, 456 U.S. 512 (1982) and specifically held that it included employees. *Bell*, 456 U.S. at 520 (Title IX's "broad directive that 'no person' may be discriminated against on the basis of gender appears, on its face, to include employees as well as students. Under that provision, employees, like other 'persons' may not be 'excluded from participation in,' 'denied the benefits of,' or 'subjected to discrimination under' education programs receiving federal financial support"). Thus, after reviewing Title IX's legislative history, the Supreme Court explicitly recognized that "employment discrimination comes within the prohibition of Title IX." *Id*. at 530.

The Supreme Court bolstered this principle in *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) when it held that a girls' basketball coach had a private cause of action under Title IX for retaliation after his school fired him for complaining about sex discrimination in the school's athletic program. Jackson was unequivocally an employee of the school, not a student. *Jackson*, 544 U.S. at 171. Nonetheless, the Supreme Court recognized that he had a private cause of action under Title IX for retaliation – a form of employment discrimination. *Id*. at 176-77, 178.

*Jackson* attached no qualifications to Title IX claims brought by employees. *See, e.g., id*. at 171 (Title IX retaliation claims extend to "individual[s]," not individuals who

cannot bring Title VII claims); *id*. at 173 (20 U.S.C. § 1681(a) "broadly" encompasses "any person"); *id*. at 179 & n.3 (Title IX is "broadly worded" and its "beneficiaries plainly include all those" subjected to sex discrimination). *Jackson* also indicated that the Supreme Court had consistently interpreted Title IX's private cause of action broadly…." *Id*. at 169.

The conclusion that *Jackson* reached is clear. Employees have a private right of action for discrimination in federally funded programs – a conclusion that the majority of the federal circuits have reached. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3rd Cir. 2017); *Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203 (4th Cir. 1994); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988); *cf. Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995); *Waid v. Merrill Area Pub. Schs.*, 91 F.3d 857 (7th Cir. 1996).

Additionally, the Supreme Court has held that Title VII does not provide an exclusive remedy for workplace discrimination, permitting claims to proceed under both 42 U.S.C. § 1981 and Title IX. *Johnson v. Ralway Exp. Agency, Inc.*, 421 U.S. 454, 459 (1975); *see also Jackson*, 544 U.S.167. Thus, Supreme Court precedent permits, if not explicitly establishes a right for, Dr. Simons to bring a Title IX claim for sex-based employment discrimination despite its overlap with Title VII. *See also Castro v. Yale University*, 518 F.Supp.3d 593 (D.Conn. 2021) (same).

**B. There is no question that material facts render Dr. Simons' claim of Title IX discrimination more than sufficient to survive summary judgment.**

The Second Circuit routinely relies on its Title VII precedent to interpret Title IX. *Yusef v. Vassar College*, 35 F.3d 709, 715 (2d. Cir. 1994) (relying on a provision of Title VII to interpret Title IX). Because of the Second Circuit's interdependent interpretation of Title VII's and Title IX's provisions concerning sex discrimination, a precedential rule established for Title IX's sex discrimination provision is strongly persuasive when a similar

case arises under Title VII and vice-versa. *Yusef*, 35 F.3d at 714 ("courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as case law interpreting Title VII"). Thus, Dr. Simons does not dispute that the same standards that apply to his Title VII claim also apply to his Title IX claims.

The Defendants raise a preliminary question first by claiming that Connecticut's three-year statute of limitations for tort claims applies to Dr. Simons' Title IX claims. They, however, neglect that the continuing course of conduct doctrine tolls the statute of limitations as to Dr. Simons' removal as Section Chief of Cardiology and as Director of the Cardiovascular Research Center, which occurred prior to October 1, 2016. *See Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (holding that the continuing course of conduct doctrine applies to Title VII claims). In this case, the Defendants repeatedly took actions that punished Dr. Simons under the guise that they were looking out for everyone's best interests. Instead, they quietly stripped Dr. Simons piece-by-piece of the career accomplishments and positions that he had worked hard to earn and which he reasonably expected to hold as part of his contract with Yale. They repeatedly concealed that they were doing so for the sole purpose of placating public pressure brought by a committee attached to Defendant Alpern's office. Thus, the continuing course of conduct doctrine applies because, if for no other reasons, the Defendants muddied the waters as to their real motivations for successively punishing Dr. Simons.

As with his Title VII claim, Dr. Simons advances two theories for his Title IX claim: actual gender discrimination and disparate impact. The legal principles are the same. First, for his actual gender discrimination under Title IX, Dr. Simons must show by direct

evidence that the Defendants' decisions to successively punish him were motivated by his gender or were a substantial factor in their decisions. *de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir. 1996). He more than carries that burden.

As the Second Circuit has held, even momentary gender discrimination to placate public outrage is sex discrimination in violation of Title IX:

> [a] covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.

*Doe v. Columbia University*, 831 F.3d 46, 58 n.11 (2d Cir. 2016).

Here, every successive punishment that the Defendants levied against Dr. Simons was imposed to avoid bad publicity. In 2014, they forced him to resign as Section Chief of Cardiology after public reaction to New York Times stories regarding the UWC proceedings against him. LR 56(a)2, Pl. Add. Facts. ¶ 8. Despite Dr. Simons elevating the Defendants' Cardiovascular Research Institute to become one of the best units in the country, they forcibly removed him being its director in 2014 because of another round of negative publicity against him. *Id*. at ¶¶ 7-8. Despite knowing that Dr. Simons had completed his original punishment and probation and had not reoffended under their sexual harassment policy, the Defendants first attempted to strong-arm him into resigning the Waldemar Von Zedtwitz Professorship on less than 24 hours' notice and then forcibly removed him when he refused because of more negative publicity. *Id*. at ¶¶ 11-14. At his deposition, Defendant Alpern testified that these repeated punishments of Dr. Simons

were designed to demonstrate to the public that Yale University took sexual harassment seriously. *Id*. at ¶ 14.

Thus, having adopted the uninformed public sentiment which cared nothing about the facts of Dr. Simons' alleged misconduct, the Defendants denied Dr. Simons any opportunity to contest successive punishments or to have their suitability determined in any manner remotely hinted at in the Defendants' UWC procedures, which confined exclusive jurisdiction over his offense to the UWC. *Id*. at ¶¶ 4, 18. Instead, the Defendants summarily removed Dr. Simons from his positions at the behest of #MeToo activists whose leader conceded at her deposition that, even if Dr. Simons was shown to be completely innocent of his original misconduct, she did not know if he should be restored to his positions. *Id*. at ¶ 19. In other words, the Defendants adopted the views of a mob who did not care about facts or fundamental fairness, but simply about punishing Dr. Simons for past misconduct that it had no knowledge of.

Dr. Stachenfeld and SWIM, however, had more interested motives that underlied the views that the Defendants adopted. As she implied in an email to SWIM celebrating Dr. Simons' removal from the Waldemar Von Zedtwitz Professorship, the only appropriate course of action was to replace Dr. Simons and men like him with women. *Id*. at ¶ 21. Dr. Stachenfeld and SWIM's complete disregard for basic principles of fairness was entirely gender-driven, and the Defendants adopted it on multiple occasions precisely as the Second Circuit held that universities cannot in *Doe*.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

Their actions toward Dr. Simons had everything to do with placating the public pressure on them, and they momentarily adopted the virulently sexist attitude of a lynch mob. Thus, Dr. Simons clearly presents sufficient facts for a jury to conclude that the Defendants engaged in actual discrimination against him because of his gender.

Turning second to Dr. Simons' disparate treatment theory, the record clearly indicates that Yale University has never punished a woman successively for the same offense. Since 2008, the Defendants have investigated and/or disciplined female employees based on accusations of sexual harassment, sexual assault, and other sexual misconduct. *Id*. at ¶ 1. It has never disciplined a female employee or female student twice for the same conduct. *Id*. at ¶ 1.

████████████████ case demonstrates that the Defendants take a fairly relaxed approach to handling incidents of sexual assault or harassment. Their relaxed approach, however, only lasts until the public finds out about its decisions as it did for Dr. Simons. Instead of investigating the violation of Dr. Simons' rights to confidentiality under the UWC procedures when breaches of that confidentiality occured, *see id*. at ¶¶ 2, 10. the Defendants immediately turned to how they could placate the intense public pressure on them. In other words, Dr. Simons' legal rights and best interests did not matter.

The Defendants' actions constitute the precise type of momentary hysterical gender discrimination that the Second Circuit held was discrimination in *Doe*. The

Defendants repeatedly adopted a gender-discriminatory attitude toward Dr. Simons to avoid bad publicity with no regard for fairness or their own procedures. Thus, *Doe* does not require Dr. Simons to show an "ingrained or permanent bias against [a] particular sex" to prevail on a disparate impact claim. *Doe*, 831 F.3d at 58 n.11. Dr. Simons has produced enough facts to show that he made out a prima facie case of discrimination, that the Defendants had no legitimate reason for the adverse actions they took against him, and that any reasons they can offer were pretextual at best.

Thus, the Court should deny the Defendants' motion for summary judgment on Dr. Simons' Title IX claim.

## CONCLUSION

For the foregoing reasons, Dr. Simons respectfully asks the Court to deny the Defendants' motion for summary judgment in its entirety.

THE PLAINTIFF

/s/ Norman A. Pattis /s/
/s/ Cameron L. Atkinson /s/
NORMAN A. PATTIS, Esq.
CAMERON L. ATKINSON, ESQ.
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
Tel:  (203) 393-3017
Fax: (203) 393-9745
npattis@pattisandsmith.com
catkinson@pattisandsmith.com

## **CERTIFICATION OF SERVICE**

The undersigned hereby certifies that, on May 6, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ Norman A. Pattis /s/*