**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MICHAEL SIMONS,           :
      Plaintiff,           :         3:19-CV-01547 (OAW)
                            :
v.                        :
                            :
YALE UNIVERSITY,          :
PETER SALOVEY,            :
ROBERT ALPERN, M.D.,     :
UNKNOWN PERSONS,      :
      Defendants.        :        MAY 6, 2022

### <u>LOCAL RULE 56(a)2 STATEMENT OF FACTS IN OPPOSITION TO SUMMARY JUDGMENT</u>

### <u>Plaintiff's Response To Defendants' Undisputed Facts</u>

1.     On May 22, 2008, the University offered the plaintiff, Dr. Michael Simons, the position of "Chief of the Section of Cardiovascular Medicine and Professor of Internal Medicine at Yale University School of Medicine and the corresponding position of Chief of Cardiovascular Medicine at Yale-New Haven Hospital." *See* Complaint, at 18; *see also* May 22, 2008 Offer Letter, attached hereto as Exhibit A, at p.1.[1]

**Response: Admitted.**

2.     The May 22, 2008 Offer Letter set forth the specific terms and conditions of the University's offer of employment and superseded any and all previous correspondence or discussions between the plaintiff and the University. Ex. A, p. 1.

**Response: Admitted.**

---

[1] "Usually what happens is if you're the chief of the cardiology division at Yale University, the Yale-New Haven Hospital would make you the chief of its section of cardiology at the hospital. So, it is a slightly different position, but the two are really tied to each other." *See* Dr. Robert Alpern's Deposition Excerpts, Ex. 2 to Shea Aff., p. 45:3-14.

3.     The May 22, 2008 Offer Letter is the contract on which the plaintiff has based his breach of contract claims. *See* Complaint, at ¶¶ 43-47; *see also* Michael Simons's June 16, 2021 Deposition Excerpts, Ex. 3 to Shea Aff., p. 32, 108-109; see also Michael Simons's October 13, 2021 Deposition Excerpts, Ex. 4 to Shea Aff., p. 206:9-14.

**Response: Admitted in part, denied in part. The Plaintiff admits that he has largely based his breach of contract claims on the May 22, 2022 offer letter, but, to the extent that this fact calls for him to admit that the offer letter did not incorporate obligations contained in other documents, he denies the statement.**

4.     The May 22, 2008 Offer Letter states that the "Department of Internal Medicine is recommending you for appointment as Professor of Internal Medicine without term in the Traditional Track," Ex. A, ¶ (A)(I), which means a Professor "with tenure in this case." See generally Ex. 2 to Shea Aff., p. 38:1-2, 36:11-38:25 (describing professor appointment process). In essence, a Professor with tenure at the University means that "it's not impossible to remove you from the university, but it's very difficult." See Ex. 2 to Shea Aff., p. 38:18-253[2].

**Response: Admitted.**

5.     The May 22, 2008 Offer Letter states that the University "'will nominate [the plaintiff] to President Levin and the Yale Corporation for a Robert Berliner Professorship." (Emphasis added.) Ex. A, 1 (A)(2). A professorship, such as the Robert Berliner Professorship (named after a previous dean of the medical school), "is an endowment

---

[2] See YALE UNIVERSITY FACULTY HANDBOOK at 96 ("A tenure appointment, whether at the rank of professor or associate professor, is a permanent, forward-looking commitment."),
https://medicine.yale.edu/oapd/academicaffairs/processesdocuments/facultyhandbook/

and an honor. The person who holds the professorship receives the annual income from the endowment." *See* Ex. 2 to Shea Aff., p. 40:4-13[3]; *see also* Complaint, at 19. It is formally conferred and rescinded only by the Yale Corporation upon the recommendation of the President. *See* Ex. 2 to Shea Aff., p. 40:14-18; see also Peter Salovey's July 30, 2021 Deposition Excerpts, Ex. 5 to Shea Aff., p. 22:6-9; see also Yale University's Objections and Responses to Contention Interrogatories, Ex. 6 to Shea Aff., at 1 ("It is and has been the policy of the University that the Yale Corporation has the authority to appoint faculty members to endowed professorships and to rescind such appointments upon the recommendation of the president.").

**Response: Admitted in part, denied in part. The Plaintiff admits all of the facts stated herein except the fact that endowed professorships can only be formally conferred and rescinded only by the Yale Corporation upon the recommendation of the President. The Yale University University Wide Committee (UWC) had the power to recommend the recission of an endowed chair. *See Yale University's Objections and Responses to Contention Interrogatories*, Ex. 6 to Shea Aff., at 1.**

6.     The May 22, 2008 Offer Letter does not guarantee the plaintiff's appointment to a Robert Berliner Professorship. *See generally* Ex. A, ¶ (A)(2).

**Response: Admitted.**

---

[3] As such, a professorship, such as the Robert Berliner Professorship, is not a position; it is rather "an honor and that comes with the ability to use certain funds." See Ex. 2 to Shea Aff., p. 42:3-13. Plaintiff's position is "professor of internal medicine." See Ex. 2 to Shea Aff., p. 42:12-13.

7.     The May 22, 2008 Offer Letter does not establish a term of years for which the plaintiff will hold a Robert Berliner Professorship. Ex. A.

**Response: Admitted.**

8.     Under the May 22, 2008 Offer Letter, the Yale School of Medicine committed "to establish the Yale Cardiovascular Research Center (YCVRC) in the Department of Medicine" and "to name [plaintiff] as its first Director." Ex. A, ¶ (C)(I)(a).

**Response: Admitted.**

9.     Plaintiff was offered a salary of "$500,000 per year for the fiscal year July 1, 2008 through June 30, 2009," which is set "in accordance with School and Department Faculty Salary Guidelines and is reviewed annually, with adjustments based on [the plaintiffs] overall contribution to the School, the Department and the Hospital." Ex. A, ¶ (A)(4).[4]

**Response: Admitted.**

10.     On June 10, 2008, the plaintiff agreed to, signed and returned the Offer Letter to the University, thereby officially accepting the terms of the Offer Letter. Ex. A, p. 13

**Response: Admitted**

11.     Plaintiff was nominated, appointed to and held the Robert Berliner Professorship from 2008 through the Spring of 2018. Ex. 1 to Shea Aff., p. 7; *see* Complaint, at 118, 29-30.

**Response: Admitted**

---

[4] As a result, "we have the freedom to increase or decrease [a professor's] salary based on performance." *See* Ex. 2 to Shea Aff., p. 61:12-23.

12.     Plaintiff accepted the positions of Chief of the Section of Cardiovascular Medicine and Professor of Internal Medicine at the Yale-New Haven Hospital and the Yale School of Medicine. See Complaint, at 18. Plaintiff was named the first Director of the YCVRC, which he also accepted. *See* Complaint, at 1 10. By doing so, the plaintiff agreed to abide by the requirements of the May 22, 2008 Offer Letter "as well as all other University policies and procedures." Ex. A, p. 13; *see* Complaint, at ¶ 15.

**Response: Admitted.**

13.     On or around August 30, 2013, a hearing was held before a panel of the University Wide Committee on Sexual Misconduct ("UWC") in connection with two complaints brought against the plaintiff: (1) brought by Valarie Stanley ( acting as a Title IX Coordinator on behalf of Annarita Di Lorenzo); and (2) brought by Frank Giordano. *See* UWC Panel Recommendation, attached hereto as Exhibit B, p. 1.

**Response: Admitted**

14.     Dr. Di Lorenzo, formerly a postdoctoral research scientist at Yale, and Dr. Girodano, associate professor of Medicine (Cardiology) at Yale, brought allegations that the plaintiff engaged in various behaviors which amounted to sexual harassment. Ex. B, p. 1; see Complaint, at ¶ 20.

**Response: Admitted.**

15.     The UWC Panel, after hearing testimony from the parties, the ex-Chair of the Department of Internal Medicine at Yale School of Medicine, Jack Elias, and receiving written testimony from Dr. William Sessa, the Panel concluded, by a preponderance of the evidence, that the plaintiff's actions of pursuing Dr. Di Lorenzo amounted to sexual harassment because his actions were of a sexual nature that created a hostile and

intimidating work and research environment. Ex. B, p. 3; *see also* Ex. 1 to Shea Aff., p. 4 (admitting that "[a]n independent inquiry concluded that the plaintiff had committed sexual harassment in violation of the University's sexual misconduct policy"); *see also* Complaint, at ¶ 21.

**Response: Admitted.**

16.    The UWC Panel further recognized that Dr. Giordano had a justified fear of retaliation by the plaintiff and that because of the conflict of interest stemming from Dr. Di Lorenzo's rejection of the plaintiffs romantic interest, the plaintiff's continued decision-making authority over Dr. Giordano's career was a failure of proper leadership and was unprofessional. Ex. B, p. 4.

**Response: Admitted.**

17.    As discipline for the plaintiff's creation of a hostile work environment for Dr. Di Lorenzo and unprofessional exercise of authority over Dr. Giordano, the UWC Panel recommended that the plaintiff be removed as section Chief of Cardiology permanently and that the plaintiff hold no comparable or higher leadership position at the University for a period of five years. Ex. B, p. 4; *see also* Complaint, at ¶ 21.

**Response: Admitted.**

18.    Because the UWC Panel found that the plaintiff "significantly misused the leadership role entrusted to him as section chief," it recommended that the penalties for the plaintiff's violation of the sexual harassment policy and conflicted leadership "be centered on [the plaintiff's] leadership position." Ex. B, p. 4.

**Response: Admitted.**

19.     On October 14, 2013, after considering the UWC Panel's determinations and recommendations, Provost Benjamin Polak formally set forth the plaintiff's punishment via letter. *See* October 14, 2013 Decision, attached hereto as Exhibit C.

**Response: Admitted.**

20.     In his October 14, 2013 Decision, Provost Polak stated that the plaintiff would be "suspended from serving as Section Chief of Cardiology until June 30, 2015." Ex. C; *see* Complaint, at ¶ 23. As a result, plaintiff's salary "was decreased when he was no longer chief of the cardiology division ... to a number that was more consistent with that of a professor in the department of internal medicine." *See* Ex. 2 to Shea Aff., p. 62:8-17; *see also* Ex.C at 1(describing salary reduction).

**Response: Admitted.**

21.     After receiving Provost Polak's Decision, the University decided to hire a third-party consultant to perform a "360 Review" of the plaintiff's job performance. *See* Ex. 2 to Shea Aff., p. 110:7-111 :6, 112:21-25, 113:4-6. This external, third-party review involved interviews with several of the plaintiff's coworkers and an anonymous written survey of the plaintiff's coworkers. *See* Ex. 2 to Shea Aff., p. 110:8-14; *see also* November 13, 2014 Email Announcement, attached hereto as Exhibit G.

**Response: Admitted.**

22.     On July 21, 2014, the University received a written report documenting the results of the "360 Review." *See* 360 Review, attached hereto as Exhibit D.

**Response: Admitted**

23.     As part of this "360 Review," an independent consultant interviewed thirty-six (36) persons, consisting of nine (9) professors, eleven (11) associate professors, ten

(10) assistant professors, and six (6) others. *See* Interview Results Summary, attached hereto as Exhibit E.

       **Response: Admitted.**

       24.    When asked whether the plaintiff was suitable to lead the Cardiology Section in the future, only 8% of interviewees answered "Yes." Ex. E; *see also* Ex. 2 to Shea Aff., p. 110:15-21. Conversely, 72% of the interviewees answered "No," the plaintiff was not suitable to lead the Section in the future, and 19% answered that they were "Unsure." Ex. E; *see also* Ex. 2 to Shea Aff., p. 112:3-16 ("I think what became apparent was that Mike was an extreme bully who was damaging the lives of many people .... ").

       **Response: Admitted in part, denied in part. Dr. Simons admits all of the facts, but denies and objects to the parenthentical quotation that he was an extreme bully as an inadmissible opinion based on hearsay in violation of Federal Rule of Evidence 701. The only basis that Dr. Alpern had to make this statement is what he had been told by other people, which is indisputably hearsay. *See* Plaintiff's Exhibit C, pp. 65-66.**

       25.    Further, 81 % of the interviewees stated that the plaintiff failed to meet the educational and career development needs of medical students, graduate students, residents, and fellows, and 72% of interviewees stated that the plaintiff did not create a positive work environment characterized by professionalism, honesty, integrity, diversity, respect, collaboration, open communication, and the sensitive management of conflict. Ex. E.

       **Response: Admitted.**

26.     As a result of the "360 Review," the plaintiff was asked not to return as Section Chief of Cardiology in or around October 2014. *See* Dr. Gary Desir's Excerpts, Ex. 7 to Shea Aff., p. 33:16-34:15; *see also* October 27, 2014 Email Announcement, attached hereto as Exhibit F; *see also* Ex. 2 to Shea Aff., p. 111 :4-6.

**Response: Admitted in part, denied in part. The Plaintiff admits that his departure as Section Chief of Cardiology was in or around October 2014 and followed the "360 Review." The Plaintiff denies that he was asked not to return as Section Chief of Cardiology. The Plaintiff was forced to resign after public reaction to New York Times stories regarding the UWC proceedings against him. *See* Plaintiffs' Exhibit D, pp. 106-07.**

27.     The Dean of the Yale School of Medicine testified that the plaintiff was not permanently removed from his position as Section Chief of Cardiology because of public criticism in the New York Times[5] and other news outlets, and that the plaintiff would have been removed from that position even without the media criticism. See Ex. 2 to Shea Aff., p.113:24-114:12.

**Response: Admitted.**

28.     The plaintiff did not bring any type of legal challenge-CHRO complaint or otherwise-in connection with his removal from his position as Section Chief of Cardiology in the Yale School of medicine. *See* Ex. 3 to Shea Aff., p. 71:5-11.

**Response: Admitted.**

---

[5] *See, e.g.*, T. Lewin, *Yale Medical School Removes Doctor After Sexual Harassment Finding*, N.Y. Times (Nov. 14, 2014), https://nyti.ms/1BpU9cu; *see also* T. Lewin, *Handling of Sexual Harassment Case Poses Larger Questions at Yale*, N.Y. Times (Nov. 1, 2014), https://nyti.ms/lwTfpSG.

29.     On November 13, 2014, the plaintiff was officially removed from the position of Director of the Cardiovascular Research Center. *See* Ex. G.

**Response: Admitted.**

30.     Dr. Gary Desir, as the Section Chair of Internal Medicine at Yale School of Medicine, removed the plaintiff from the position of Director of the Cardiovascular Research Center as a result of the "360 Review" survey results indicating discord within the Cardiovascular Research Center and dissatisfaction with the plaintiff's leadership skills. Ex. G; *see also* Ex. 7 to Shea Aff., p. 36-37..

**Response: Denied. Dr. Simons was not removed from being Director of the Cardiovascular Research Center because of the "360 Review" survey, but rather because of another round of negative publicity against him. *See* Plaintiff's Exhibit E, pp. 118-26.**

31.     At the time the plaintiff was removed from the position of Director of the Cardiovascular Research Center, he did not bring any claims in the form of a CHRO complaint, union complaint, or lawsuit. *See* Ex. 3 to Shea Aff., p. 66:5-18.[6]

**Response: Admitted.**

32.     In or around April 2018, the plaintiff was asked to exchange his endowed chair, the Robert Berliner Professorship, with another endowed chair, the Waldemar Von Zedtwitz Professorship. *See* Ex. 3 to Shea Aff., p. 73:8-12; see also April 27, 2018 Email Chain, attached hereto as Exhibit H.

**Response: Admitted.**

---

[6] Plaintiff similarly did not bring a CHRO complaint in connection with his 18-month suspension (and later removal) as Chief of Cardiology. *See* Ex. 3 to Shea Aff., pp. 69:25-70:19, 71:5-11.

33.     The plaintiff believes that the key motivation behind the University's request that the plaintiff transfer from the Robert Berliner Professorship to the Waldemar Von Zedtwitz Professorship was to avoid a dispute with the Berliner Family. *See* Ex. 3 to Shea Aff., pp. 73:24-74:3; *see also* Complaint, at ¶¶ 28, 33. The reasons expressed by Dr. Alpern were to maintain Dr. Simons' s current income, to avoid a dispute with the Berliner family, and to offer the Berliner chair to the new chief of cardiology. *See* Ex. H, p. 3[7]; *see also* Complaint, at ¶ 33.

**Response: Admitted.**

34.     The plaintiff agreed to exchange his Robert Berliner Professorship for the Waldemar Von Zedtwitz Professorship, agreeing that he would be "happy to swap the chair." *See* Ex. 3 to Shea Aff., p. 78:7-14; *see also* Ex. H, p. 3; *see also* Ex. 3 to Shea Aff., p. 81 :13-22, 83: 1-11; *see also* Complaint, at ¶ 30.

**Response: Admitted**

35.     The plaintiff was officially appointed and confirmed by the Yale Corporation as a Waldemar Von Zedtwitz Professor of Cardiology on June 22, 2018. *See* June 22, 2018 Letter of Appointment, attached hereto as Exhibit I; *see also* Ex. 5 to Shea Aff., p. 52: 11-24; *see also* Complaint, at ¶ 31. Plaintiff testified: "I did not think [the exchange of professorships] materially affected me." Ex. 3 to Shea Aff., p. 85 :5-6.

**Response: Admitted.**

---

[7] Plaintiff acknowledged both that the Chief of Cardiology is typically a Berliner professor, Ex. 3 to Shea Aff., p. 57: 11-13, and that he was contacted to exchange his Berliner chair for the Von Zedwitz chair within about six months of the new Chiefof Cardiology's appointment. Ex. 3 to Shea Aff., p. 58:20-25.

36.     The plaintiff did not suffer any loss of salary as a result of his transfer from the Robert Berliner Professorship to the Waldemar Von Zedwitz Professorship. See Ex. 3 to Shea Aff., p. 82:15-24; see also Ex. 4 to Shea Aff., p. 226:15-229:24.[8]

**Response: Admitted.**

37.     The response within the Yale medical school community to the plaintiff's transfer from the Robert Berliner Professorship to the Waldemar Von Zedwitz Professorship was negative and vocal. *See* Ex. 2 to Shea Aff., p. 184:20-185:2; 187:21-188:2 ("anger in the community was growing" and "people were very upset about this issue"); *see also* Ex. 5 to Shea Aff., p.57:25-58:4 ("people objected to it"), p. 59:9-16 ("I know many people had strong objections to Michael Simons-to what they perceived as Michael Simons being given a new honor."); *see also* Complaint, at ¶¶ 32, 34. A petition circulated among Yale School of Medicine faculty and graduates objecting to Dr. Simons's new professorship. *See* Ex. 2 to Shea Aff., p. 186; *see also* Complaint, at ¶ 34.

**Response: Admitted.**

38.     After consulting with various groups within the University and based on concern for the welfare of the Medical School community, Dr. Alpern (and ultimately the Yale Corporation) removed the plaintiff from the Waldemar Von Zedtwitz Chair on September 21, 2018. *See* September 21, 2018 Announcement Regarding Endowed Chair, attached hereto as Exhibit J; *see also* Ex. 2 to Shea Aff., p.192:21-194:9, 209:21-

---

[8] Plaintiff also testified, with regard to his grant support, that "[m]y NIH funding has not changed very much. It has been up and down a little bit but it's been stable." Ex. 4 to Shea Aff., p. 230: 14-18. Plaintiff's salary, over his grant cap, also has been funded by the University so that it has not been reduced since the removal of the Waldemar Von Zedwitz chair. Ex. 4 to Shea Aff., p. 232:4-233:15

210:12; *see also* Ex. 5 to Shea Aff., p. 65 (noting assent at Yale Corporation meeting); 83 :23-84: 10 ("The corporation appoints and can remove."); *see also* Complaint, at ¶ 39.

**Response: Admitted in part, denied in part. The Plaintiff admits all of the facts except that Dr. Alpern removed him solely out of concern for the welfare of the Medical School community. The Plaintiff denies that Dr. Alpern's sole motivation was to remove him solely out of concern for the welfare of the Medical School community because he testified to tremendous pressure from groups in the Yale School of Medicine to continue to punish the Plaintiff and anger that the Defendants were not acting despite his prior contentions that removing the Plaintiff would be wrong. *See* Plaintiff's Exhibit F, pp. 166-181, 184-190.**

39.     The plaintiff did not suffer any loss of salary as a result of his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 3 to Shea Aff., p. 107:2-7, 127:16-20; *see also* Ex. 4 to Shea Aff., p. 185:14-25, 186:6-18, 229:21-24.

**Response: Admitted in part, denied in part. The Plaintiff admits that he did not suffer any loss of salary as a result of his removal from the Waldemar Von Zedtwitz Professorship. He, however, denies the implication that his income was not negatively affected because he is now responsible for supporting a greater portion of his salary and because he lost the benefit of the annual compensation increases to the Waldemar Von Zedtwitz Professorship. Ex. 3 to Shea Aff., p. 107; Ex. 4 to Shea Aff., p. 185-86; *see also* Plaintiff's Exhibit R, pp. 81-82, 105-07.**

40.     The plaintiff did not suffer any loss of benefits as a result of his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 4 to Shea Aff., p. 186:23-187:1-16.

**Response: Admitted.**

41.    The plaintiff's office location did not change as a result of his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 4 to Shea Aff., p. 186: 19-22.

**Response: Admitted.**

42.    The plaintiff's supervisor, to whom he reports, did not change as a result of his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 4 to Shea Aff., p. 187:17-21.

**Response: Admitted.**

43.    The plaintiff remains a tenured professor at the University. *See* Ex. 3 to Shea Aff., p. 96:2-13; *see also* Ex. 4 to Shea Aff., p. 187:1-3; *see also* Complaint, at ¶ 42.

**Response: Admitted.**

44.    On February 28, 2019, the plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("Commission") alleging violations of Conn. Gen. Stat. 46a-60(a)(I) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"). *See* February 19, 2019, Commission Complaint, attached hereto as Exhibit K; *see also* Complaint, at ¶ 41. On June 11, 2019, the Commission dismissed the plaintiff's complaint. *See* June 11, 2019 Commission Case Assessment Review, attached hereto as Exhibit L. On the same date, the Commission released its jurisdiction. *See* June 11, 2019 Commission Release of Jurisdiction, attached hereto as Exhibit M; *see also* Complaint, at ¶ 41.

**Response: Admitted.**

45.    Neither the University defendants nor any employee, agent, or representative of the University, has made any oral or written comments-discriminatory

or otherwise-about the plaintiff's gender, race, or ethnicity. *See* Ex. 4 to Shea Aff., p. 188: 19-191:4.

**Response: Admitted in part, denied in part. The Plaintiff admits that he testified that neither the University defendants nor any employee, agent, or representative of the University has made any oral or written comments-discriminatory or otherwise-about his race or ethnicity. The Plaintiff denies that he testified that neither the University defendants nor any employee, agent, or representative of the University has made any oral or written comments-discriminatory or otherwise-about his gender. *See* Ex. 4 to Shea Aff., pp. 188-191. Instead, he testified that he simply did not know. *Id*.**

46.     The plaintiff is unable to identify any Caucasian males, other than himself, who are employed by the University and were allegedly punished twice for the same conduct. *See* Ex. 3 to Shea Aff., pp. 118-120. But the plaintiff alleges that three other individuals are similarly situated to him and have committed similar and/or comparable misconduct: (1) Amy Chua; (2) Carlos Mena; and (3) Joseph Schlessinger. *See* Ex. 4 to Shea Aff., p. 189-192:19.

**Response: Admitted.**

47.     Of these three individuals, only Amy Chua is alleged to be a female professor with an endowed professorship and from a different protected class than the plaintiff. But Dr. Simons provides no factual basis whatsoever that Professor Chua was similarly situated in other material respects, treated differently by the UWC or otherwise, or that such disparate treatment was directly or indirectly attributable to her gender. *See* Ex. 3 to Shea Aff., p. 120-121; *see also* Ex. 4 to Shea Aff., p. 191:5-192:16, 194:25-195:4.

**Response: Admitted.**

48.    The plaintiff alleges that the University breached its contract by (1) imposing successive and duplicative punishment for the plaintiff's violation of the University's sexual misconduct policies; (2) removing the plaintiffs Von Zedtwitz Professorship; and (3) doing so without an opportunity to contest the removal. *See* Ex. 3 to Shea Aff., p. 112-114, *see also* Ex. 4 to Shea Aff., p. 206:18-207:8; *see also* Complaint, at ¶¶ 43-47.

**Response: Admitted.**

49.    The plaintiff's breach of the implied covenant of good faith and fair dealing claim derives from his belief that the University removed him as Section Chief of Cardiology in the Yale School of Medicine, Director of the Cardiovascular Research Center, and the Von Zedtwitz professorship in order primarily to avoid negative publicity, *see* Ex. 4 to Shea Aff., p.219: 18-220:4, and secondarily so that (i) Dr. Alpern could enhance his likelihood of reappointment as the Dean of the School of Medicine and (ii) President Salovey could "preserve his job because he was under a lot of pressure." Ex. 4 to Shea Aff., p. 221 :6-222:17, 222:25-223:11.[9]

**Response: Admitted in part, denied in part. The Plaintiff admits the accuracy of the description of his allegations, but denies the implication that they form the sole basis for his claim. *See* Complaint, ¶¶ 48-53.**

50.    The plaintiff alleges that he has suffered five adverse employment actions: (1) his eighteen-month suspension from the position of Section Chief of Cardiology in the Yale School of Medicine; (2) his removal from the position of Section Chief of Cardiology

---

[9] In essence, plaintiff alleges that both Dr. Alpern and President Salovey "were motivated ... by selfpreservation." Ex. 4 to Shea. Aff., p. 222: 17-18.

in the Yale School of Medicine; (3) his removal from the position of Director of the Cardiovascular Research Center; (4) his transfer from the Robert Berliner Professorship to the Waldemar Von Zedtwitz Professorship; and (5) his removal from the Waldemar Von Zedtwitz Professorship. *See* Ex. 3 to Shea Aff., p. 68:7-69:24; *see also* Plaintiff's Responses to Defendants' First Set of Interrogatories and Request for Production of Documents to the Plaintiff, Ex. 8 to Shea Aff., answers to Nos. 4 & 13.

**Response: Admitted.**

51.     The plaintiff alleges that the University defendants have violated his Title IX double jeopardy and due process rights because, after the University completed a full internal adjudication under its sexual misconduct policy, he faced discipline for the same behavior a second time. *See* Complaint ¶ 61. He also alleges that Yale punishes only Caucasian males twice for the same conduct. *See* Complaint ¶ 67. The plaintiff, therefore, brings his Title IX claim for alleged selective enforcement by the UWC and successive punishment for sexual misconduct because of his gender. *See* Ex. 4 to Shea Aff., 192:20-1 93:3; *see also* Complaint, at ¶¶ 58-63.

**Response: Admitted.**

### ADDITIONAL MATERIAL FACTS[10]

1.     Since 2008, Yale University has investigated and/or disciplined female employees based on accusations of sexual harassment, sexual assault, or other sexual misconduct. *See* Exhibit A., p. 36. It has never disciplined a female employee or female

---

[10] All exhibits referred from this point forward in this statement are attached as exhibits to this statement of facts.

student twice for the same instance of sexual harassment, sexual assault, or other sexual misconduct. *Id*. at pp. 37-38.

2.      Yale University handles complaints of sexual harassment in accordance with Title IX's requirements under its University-Wide Committee on Sexual Misconduct ("UWC") and it requires that information about UWC proceedings be kept confidential. *See* Exhibit A, pp. 40-41.

3.      Yale University formed a contract with Dr. Simons through an offer letter that required him to abide by Yale University Sexual Harassment policies and procedures as articulated in the faculty handbook. *See* Exhibit I, p. 13.

4.      These policies and procedures vested exclusive jurisdiction over sexual harassment matters in either the UWC or a specific school at Yale University that maintained its own body to resolve sexual harassment matters. The invocation of one body's jurisdiction precluded the other body from hearing it if it arose from the same set of circumstances. *See* Exhibit J, pp. 2, 14; *see also* Exhibit O, p. 5.

5.      The Yale University University Wide Committee (UWC) had the power to recommend the recission of an endowed chair. *See Yale University's Objections and Responses to Contention Interrogatories*, Ex. 6 to Shea Aff., at 1.

6.      Between February 2010 and May 2010, Dr. Simons wrote a love letter to a colleague who was not a subordinate and continued to email her in an attempt to woo her even after she told him that she was in a relationship with one of his subordinates. *See* Exhibit K, pp. 25-26.

7.      Under Dr. Simons' leadership, the Defendants' Cardiology division was very successful. *See* Exhibit C, pp. 67-69. Additionally, Dr. Simons elevated the Defendants'

Cardiovascular Research Institute to become one of the best units in the country. *Id*. at pp. 68-89.

8.     The Defendants forced the Plaintiff to resign in 2014 as Section Chief of Cardiology after public reaction to New York Times stories regarding the UWC proceedings against him. *See* Exhibit D, pp. 106-07.

9.     The Defendants removed Dr. Simons from being Director of the Cardiovascular Research Center in 2014 because of another round of negative publicity against him. *See* Plaintiff's Exhibit E, pp. 118-26.

10.     After the Defendants became aware that information pertaining to Dr. Simons' UWC proceedings had been leaked to the Robert W. Berliner family, Yale University alumni, and the New York Times, they failed to conduct any investigation into how the confidentiality of the UWC proceedings had been leaked. *See* Exhibit A, pp. 42-46.

11.     Dr. Simons completed the punishment and probation imposed upon him by the Defendants and has had no further instances of misconduct. *See* Exhibit B, pp. 20-21.

12.     On September 20, 2018, Defendant Alpern knew that Dr. Simons was in London, United Kingdom late in the day. *See* Exhibit L, p. 204. He arranged to have a conversation with him. *Id*. In that conversation, Dr. Alpern gave Dr. Simons an ultimatum: resign the Waldemar Von Zedtwitz Professorship by noon, September 21, 2018 or be forcibly removed from it. *Id*.

13.     Defendant Alpern then forcibly removed Dr. Simons from the Waldemar Von Zedtwitz Professorship on September 21, 2018. *See* Exhibit L, pp. 201-202.

14.     The underlying motivation behind the Defendants' repeated punishment of Dr. Simons was to demonstrate, in the face of intense public pressure, that Yale University took sexual harassment seriously. *See* Exhibit M, pp. 130, 141-42, 154, 158-59.

15.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

16.     The primary voice advocating for Dr. Simons' repeated discipline and ultimate removal from the Waldemar Von Zedtwitz Professorship was Yale University's Committee on the Status of Women In Medicine (SWIM). *See* Exhibit M, pp. 130-160; *see also*, Exhibit G, p. 32-34.

17.     SWIM is considered "a committee of the dean's office" at Yale School of Medicine, specifically Defendant Alpern's office. *See* Exhibit G, pp. 13-16. It also received administrative assistance from Dean Latimore's office. *Id*. at pp. 11-12. SWIM's co-chairs also receive a $30,000 per year salary from Defendant Alpern's office in addition to their normal salaries. *Id*. at pp. 14-15, 18-19. Defendant Alpern met quarterly with SWIM to discuss climate and culture at Yale School of Medicine. *Id*. at pp. 37-38

18.     Dr. Nina Stachenfeld is a co-chair of SWIM. Exhibit G, p. 19. Her knowledge of Dr. Simons and his UWC matter came entirely from what she read in the New York

Times and other news sources. *Id*. at pp. 19-21. Neither Dr. Stachenfeld nor any member of SWIM made any effort to personally verify the allegations against Dr. Simons before advocating for his further punishment. *Id*. at pp, 25-26, 38-39.

19.    Despite admitting that there was nothing wrong about Dr. Simons writing unsolicited love letters and conceding that it would have made a difference if Dr. Simons could not have retaliated against anyone for having his romantic advances spurned and actually helped the people he had been accused of retaliating against, Dr. Stachenfeld would not answer whether she would advocate for Dr. Simons to be restored to his endowed professorships if she could verify as true what she conceded would have made a difference. *See* Exhibit G, pp. 27-31.

20.    Dr. Stachenfeld also conceded that it was inherently unfair to punish someone twice for the same offense without additional misconduct, but contended that her concession did not apply to Dr. Simons. *See* Exhibit G, pp. 53-54.

21.    Dr. Stachenfeld's position and complete disregard for fundamental fairness was emblematic of SWIM. After Dr. Simons had been removed from the Waldemar Von Zedtwitz Professorship, Dr. Stachenfeld wrote a letter to SWIM celebrating his removal and called for action to increase the percentage of women in leadership roles, implying that its goal was to replace men like Dr. Simons with women. *See* Exhibit Q, p. 1.

22.    Dr. Stachenfeld also testified that she opposed Defendant Alpern's reappointment as dean of Yale Medical School and used Dr. Simons' matter as an example on why he should not be reappointed in conversations with a member of the Yale Corporation's Board of Trustees. *See* Exhibit G, pp. 70-71.

23.    As the result of the Defendants' removal of Dr. Simons from the Waldemar

Von Zedtwitz Professorship, Dr. Simons lost the annual increases in compensation that accompany endowed professorships at Yale in addition to certainty as to his total compensation. *See* Exhibit R, pp. 81-83, 105-06. The mimimum increase to the annual increases in compensation ranges between 5 to 10% per year. *Id*. at pp. 105-07.

24.     Dr. Simons filed an EEOC complaint against the Defendants for removing him from the Waldemar Von Zedtwitz Professorship. The EEOC released its jurisdiction over the matter on August 6, 2018, giving Dr. Simons the right to sue under Title VII for the first time. *See* Exhibit P.

<div style="margin-left: 50%;">

THE PLAINTIFF

/s/ Norman A. Pattis /s/
/s/ Cameron L. Atkinson /s/
NORMAN A. PATTIS, Esq.
CAMERON L. ATKINSON, ESQ.
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
Tel:  (203) 393-3017
Fax: (203) 393-9745
npattis@pattisandsmith.com
catkinson@pattisandsmith.com

</div>

**<u>CERTIFICATION OF SERVICE</u>**

The undersigned hereby certifies that, on May 6, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ Norman A. Pattis /s/*