# Exhibit C

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3   - - - - - - - - - x
     MICHAEL SIMONS,         |
 4              Plaintiff,   |
                             |   3:19-CV-01547(VAB)
 5         v.                |
                             |
 6   YALE UNIVERSITY,        |
     PETER SALOVEY,          |
 7   ROBERT ALPERN, M.D.,    |
     UNKNOWN PERSONS,        |
 8              Defendants.  |   July 16, 2021
     - - - - - - - - - x
 9

10

11

12         DEPOSITION OF ROBERT ALPERN, M.D.

13               via videoconference

14

15     Taken before Kristine A. Paradis, LSR 338, a
       Court Reporter and Notary Public within and
16     for the State of Connecticut, pursuant to
       Re-Notice and the Federal Rules of Civil
17     Procedure, via videoconference, on July 16,
       2021, commencing at 10:13 a.m.
18

19

20

21

22         FALZARANO COURT REPORTERS, LLC
                    4 Somerset Lane
23         Simsbury, Connecticut 06070
                     860.651.0258
24         www.falzaranocourtreporters.com

25
```

```
 1   APPEARANCES:

 2        For the Plaintiff:

 3             PATTIS & SMITH, LLC
               383 Orange Street
 4             New Haven, Connecticut 06511
               203.393.3017
 5             npattis@pattisandsmith.com
                  BY:   NORMAN A. PATTIS, ESQ. **
 6

 7        For the Defendants Yale University,
          Peter Salovey, and Robert Alpern, M.D.:
 8
               CLENDENEN & SHEA, LLC
 9             400 Orange Street
               New Haven, Connecticut 06511
10             203.787.1183
               kcs@clenlaw.com
11                BY:   KEVIN C. SHEA, ESQ. **

12
          Also Present:
13

14             Cameron Atkinson, Esq. **
               Pattis & Smith, LLC
15

16

17

18

19

20   ** Via videoconference

21

22

23

24

25
```

```
1                    S T I P U L A T I O N S
2
3              It is stipulated and agreed by counsel for
4    the parties that all objections are reserved until
5    the time of trial, except those objections as are
6    directed to the form of the question.
7              It is stipulated and agreed between counsel
8    for the parties that the proof of the authority of
9    the Notary Public, before whom this deposition is
10   taken, is waived.
11             It is further stipulated that any defects
12   in the Notice are waived.
13             It is further stipulated that the
14   deposition may be signed before any Notary Public.
15
16                 T R A N S C R I P T   L E G E N D
17
     (sic)              - Exactly as said.
18
     (Phonetic)         - Exact spelling not provided.
19
     ( -- )             - Break in speech continuity
20                        and/or interrupted sentence.

21   (...)              - Indicates omission of word[s]
                          when reading OR trailing off
22                        and not finishing a sentence.

23   (As read)          - When reading, adding,
                          deleting or changing words so
24                        as not to be a direct quote
                          from document.
25
```

```
 1   the first year, the 2008-2009 year?
 2                MR. SHEA:  Object to the form.
 3           Answer if you know.
 4                THE WITNESS:  I don't know
 5           specifically.  My guess is he got a
 6           cost-of-living increase.
 7   BY MR. PATTIS:
 8       Q    Do you know whether it was ever
 9   decreased as a result of behavior or performance?
10                MR. SHEA:  Object to the form.  You
11           can answer.
12                THE WITNESS:  Yes, it was decreased
13           when he was no longer chief of the
14           cardiology division.  Then his salary
15           was lowered to a number that was more
16           consistent with that of a professor in
17           the department of internal medicine.
18   BY MR. PATTIS:
19       Q    Do you recall what it was lowered to?
20       A    So, it was somewhere around $300,000.
21       Q    Okay.
22       A    I don't remember if it went to something
23   slightly less than that the first year, but it was
24   in the range of 300,000.  And that was a decision
25   of the department of internal medicine.
```

1    Q    Were you involved in making that
2    decision?
3    A    I believe Gary Desir and I had a
4    discussion and we agreed that he should lower it
5    to whatever he felt was an appropriate salary for
6    the department -- for a professor in internal
7    medicine in cardiology.  But I would not have come
8    up with that number.  I wouldn't know those
9    numbers.
10   Q    And just for the sake of the Court
11   Reporter, how do you spell Mr. Desir or
12   Dr. Desir's last name?
13   A    D-e-s-i-r?
14   Q    And who was he at the time you had that
15   discussion?  What was --
16   A    He was the chair of internal medicine.
17   He had replaced Jack Elias.
18   Q    Did you have any role in creation of the
19   University-Wide Committee on Sexual Misconduct?
20   A    No.  The only role I played at all was
21   the president at the time had a meeting with the
22   deans saying that he thought we should centralize
23   the process of dealing with sexual harassment.
24   And the deans all agreed that that would be a good
25   thing.  And then --

```
 1        Q     When did the conversation take place?
 2        A     My guess is probably a year or two
 3   before the formation of the University-Wide
 4   Committee.  So, I don't remember exactly.  I
 5   remember the meeting, but I don't remember exactly
 6   when it was.
 7        Q     And that would have been President Levin
 8   at that point?
 9        A     That was President Levin.
10        Q     And was Dr. Simons an employee of the
11   university at that point?
12        A     I believe so, yes.  I believe so.
13        Q     You mentioned -- I'm sorry.  I cut you
14   off.
15        A     No, I just said, I believe so.
16        Q     You mentioned that when you were
17   initially alerted to his -- Dr. Simons' --
18   potential employment at Yale, you were told there
19   were concerns about his being mean.  Did anybody
20   complain to you about his meanness at any point
21   while he was an employee at Yale?
22        A     Yes.
23        Q     How often did you receive complaints
24   about his meanness?
25        A     I would say -- I mean, that's -- maybe
```

1   once a month.  It's hard to say exactly.  But they
2   were not infrequent.
3       Q    What sorts of things would people
4   complain about?
5           MR. SHEA:  Object to the form.  You
6       can answer.
7           THE WITNESS:  At the dean's
8       level -- so, young faculty don't come to
9       the dean with complaints.  So, the
10      people who come to the dean are other --
11      are department chairs and other leaders.
12      And so there were -- cardiology was
13      viewed as very successful under Mike.
14          And Mike kept trying to increase
15      its power and its scope and had some
16      very tough meetings with other
17      department chairs.  And those department
18      chairs would come to me and complain
19      about his behavior.
20  BY MR. PATTIS:
21      Q    What would they say?
22      A    Hum?
23      Q    What would they say --
24          MR. SHEA:  Object to the form.
25

1  BY MR. PATTIS:
2      Q    -- that you heard?
3      A    They would just say he was a bully.  He
4  was inappropriately aggressive.  I heard stories
5  about meetings of the division chiefs -- so,
6  that's within the department of internal
7  medicine -- that Mike felt he was above the others
8  and didn't -- wasn't collegial and was very
9  aggressive in discussions.  And then -- and it
10 evolved and it got worse with time.
11          And then it -- and in Jack Elias' last
12 few years, he came to me complaining that he was
13 having great difficulty managing Mike.  And so one
14 of the issues that came up a long time ago
15 nationally was whether cardiology divisions should
16 be separated from the department of medicine and
17 become their own departments.  And a number of
18 chiefs of cardiology wanted to do that.  And
19 basically it got killed.  The people felt you
20 couldn't have a department of internal medicine
21 without cardiology.
22          So, the movement died nationally.  And
23 then I'd say ten years at least after it died Mike
24 brought it up and was very forceful in wanting
25 cardiology to leave the department of internal

1  medicine and to become a department.  And he
2  wanted cardiology and cardiac surgery to form a
3  department.  And that he would be the head of.
4  And it would be outside of internal medicine and
5  outside of surgery.  The head of cardiac surgery
6  also wanted that but didn't want Mike to be the
7  head of it.  He wanted to be the head of it.
8           Anyway, I actually had been through
9  these issues back a decade earlier and I'm an
10 internist and was firmly committed to the fact
11 that there was never going to be a department of
12 cardiology at Yale University while I was dean.
13 So, I pushed back.  Jack Elias kept pushing back.
14          And apparently -- I would say that Mike
15 and Jack in a room, that Mike has a very
16 aggressive personality and Jack does not have an
17 aggressive personality.  And I think that Jack
18 found discussions with Mike painful.  And that
19 he -- to the point where I think he worried them
20 -- he worried about his health from Mike.
21     Q    But yet you described the department as
22 very -- cardiology -- as very -- you described
23 cardiology as very successful under Michael.  What
24 did you mean by that?
25     A    So, it's interesting.  And I have to say

1  at the time I wasn't fully aware of the situation.
2  But the major success was in research.
3       Q    Tell me about that.  Why was it so
4  successful?
5       A    So, my -- well, our department of
6  internal medicine is a really good department of
7  internal medicine and it's really composed of
8  about ten divisions.  And the strength of the
9  department is defined by the strength of each of
10 those divisions.  And we generally have had really
11 strong divisions within the department of internal
12 medicine.  And it's something that I'm very proud
13 of, although it was true long before I got to
14 Yale.
15           Mike, when he came as chief of
16 cardiology, built this cardiovascular research
17 institute and made a number of recruitments of
18 basic scientists in vascular biology.  And I would
19 say that as a group these recruitments were
20 spectacular; that he recruited in people into a --
21 really what's a clinical division that one would
22 not have thought that a clinical division could
23 typically recruit so much talent.
24           And so the cardiovascular research
25 institute I think became one of the best units in

1   vascular biology research that -- in the country.
2   And I think Mike was regarded as -- nationally as
3   a brilliant scientist.  And I think the scientists
4   he recruited to the cardiovascular research
5   institute regarded as a group as being
6   spectacular.  And I think even our own basic
7   science departments which are really more focused
8   on research were amazed at the talent that Mike
9   brought in.  So --
10       Q   Do you -- I cut you off.  I'm sorry,
11  sir.
12       A   No, no.  I think I was done.
13       Q   Do you still regard him as a brilliant
14  scientist, Dr. Simons?
15       A   Yes.  Let me just say that I haven't
16  followed the productivity of his research, but I'm
17  sure he's still a brilliant scientist.  And I
18  imagine that he's continued to be productive.  But
19  I can't speak to that.
20       Q   When's the last time you spoke to
21  Dr. Simons?
22       A   It would have been related to the
23  endowed chair.  Yeah.
24       Q   We've alleged that there was a
25  discussion between you and Dr. Simons on or about

1  September 20th of I believe -- I don't recall the
2  year off the top -- where he was given until the
3  following day to resign a position.  Is that the
4  last communication you had with him or the last
5  discussion you had with him?
6      A    I can't remember if it was that day or
7  the next day.
8      Q    Well --
9      A    I don't remember if there was a
10 follow-up discussion the next day.  But I
11 definitely remember the discussion on that day.
12     Q    We'll return to that a little bit later.
13          Did you become aware at some point that
14 he had been accused of sexual misconduct by a
15 fellow university employee?
16     A    So, I did not know about it until the
17 UWC made a decision.
18     Q    Don't anticipate where I'm going,
19 Doctor.  And I don't mean to be rude to you.  I
20 really am -- I'm not.  I have all the respect in
21 the world for your accomplishments.  Taking a
22 deposition is difficult because we may know things
23 and assume that one another knows things, but
24 somebody else reading this a year or two down the
25 line after I've been hit by a bus, who knows,

1  right?
2        So, you're obviously aware he was
3  accused of sexual misconduct, correct?
4     A   Now, yes.
5     Q   Okay. And you did not know about it,
6  you're saying, until the UWC did what?
7     A   So, I was at a meeting. I still
8  remember the room I was in. And I got a message
9  to call an attorney. And I was informed that the
10 UWC had decided -- basically found him guilty,
11 whatever the term would be, of sexual harassment.
12 And that's the first I heard of it.
13            MR. PATTIS: Kevin, I notice you
14         didn't object to call to an attorney.
15         I'd like to follow up on that a little
16         bit, but I --
17            MR. SHEA: I didn't object because
18         I figure the fact of his -- I mean, even
19         though it -- you know, it was not
20         expressed in the question-and-answer
21         setting, I thought his response
22         disclosed -- basically the answer to the
23         question is how and when did you hear
24         about a decision? And it was through
25         conversation with counsel.

```
 1                    And, yes, I would caution him that,
 2              you know, beyond that he's not to
 3              disclose the contents of attorney-client
 4              privileged communication.  And we don't
 5              intend to waive that with respect to
 6              this.
 7                    MR. PATTIS:  I was hoping you would
 8              waive it.  That's why I asked that.
 9   BY MR. PATTIS:
10        Q     When did that conversation take place?
11        A     So, knowing the meeting I was at, it was
12   in September.
13        Q     Of what year?
14        A     But I can't -- I'm not sure.  It would
15   have been September of the year that the UWC found
16   him -- but I know the meeting I was at occurs
17   every September.
18        Q     How did you react when you heard that?
19        A     Surprised.  Just very unhappy.
20        Q     Did you talk to him about it?
21        A     We did speak about it.  I don't remember
22   whether he contacted me or I contacted him.  I
23   know there were conversations.
24        Q     What do you recall of those
25   conversations?
```

```
 1
 2              (Recess taken:  3:49 p.m. to 3:50 p.m.)
 3
 4          MR. PATTIS:  Well, I didn't get you
 5      onto the tennis courts by 4:00 o'clock,
 6      Doctor, but I did finish by 4:00.  I'm
 7      sorry it took more time than you were
 8      earlier led to believe.  The fault was
 9      entirely mine.  But you've been very
10      gracious and thank you.  I have no
11      further questions.
12          MR. SHEA:  I have no questions.
13
14              (Deposition concluded:  3:50 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
1              STATE OF CONNECTICUT
2       I, KRISTINE A. PARADIS, LSR 338, a Notary Public
3    duly commissioned and qualified in and for the State
4    of Connecticut, do hereby certify that pursuant to
5    Re-Notice, there came remotely before me via
6    videoconference on the 16th day of July, 2021, the
7    following named person, to wit:  ROBERT ALPERN, M.D.,
8    who was by me duly sworn to testify to the truth and
9    nothing but the truth; that he was thereupon
10   carefully examined upon his oath and his examination
11   reduced to writing under my supervision; that this
12   deposition is a true record of the testimony given by
13   the witness.
14       I further certify that I am neither attorney nor
15   counsel for, nor related to, nor employed by any of
16   the parties to the action in which this deposition is
17   taken, and further, that I am not a relative or
18   employee of any attorney or counsel employed by the
19   parties hereto, or financially interested in this
20   action.
21       IN WITNESS THEREOF, I have hereunto set my
22   hand this __29th__ day of____July_____, 2021.
23                      /s/ Kristine Paradis
24                      KRISTINE A. PARADIS, CSR #338
                        Certified Shorthand Reporter
25   My Commission expires:  May 31, 2023
```

Falzarano Court Reporters, LLC