# Exhibit D

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3     - - - - - - - - - x
       MICHAEL SIMONS,           |
 4             Plaintiff,        |
                                 |   3:19-CV-01547(VAB)
 5         v.                    |
                                 |
 6     YALE UNIVERSITY,          |
       PETER SALOVEY,            |
 7     ROBERT ALPERN, M.D.,      |
       UNKNOWN PERSONS,          |
 8             Defendants.       |   July 16, 2021
       - - - - - - - - - x
 9

10

11

12          DEPOSITION OF ROBERT ALPERN, M.D.

13                 via videoconference

14

15     Taken before Kristine A. Paradis, LSR 338, a
       Court Reporter and Notary Public within and
16     for the State of Connecticut, pursuant to
       Re-Notice and the Federal Rules of Civil
17     Procedure, via videoconference, on July 16,
       2021, commencing at 10:13 a.m.
18

19

20

21

22           FALZARANO COURT REPORTERS, LLC
                    4 Somerset Lane
23           Simsbury, Connecticut 06070
                    860.651.0258
24         www.falzaranocourtreporters.com

25
```

APPEARANCES:

    For the Plaintiff:

        PATTIS & SMITH, LLC
        383 Orange Street
        New Haven, Connecticut 06511
        203.393.3017
        npattis@pattisandsmith.com
           BY:  NORMAN A. PATTIS, ESQ. **

    For the Defendants Yale University,
    Peter Salovey, and Robert Alpern, M.D.:

        CLENDENEN & SHEA, LLC
        400 Orange Street
        New Haven, Connecticut 06511
        203.787.1183
        kcs@clenlaw.com
           BY:  KEVIN C. SHEA, ESQ. **

    Also Present:

        Cameron Atkinson, Esq. **
        Pattis & Smith, LLC

** Via videoconference

```
 1                    S T I P U L A T I O N S
 2
 3            It is stipulated and agreed by counsel for
 4   the parties that all objections are reserved until
 5   the time of trial, except those objections as are
 6   directed to the form of the question.
 7            It is stipulated and agreed between counsel
 8   for the parties that the proof of the authority of
 9   the Notary Public, before whom this deposition is
10   taken, is waived.
11            It is further stipulated that any defects
12   in the Notice are waived.
13            It is further stipulated that the
14   deposition may be signed before any Notary Public.
15
16                  T R A N S C R I P T   L E G E N D
17
     (sic)              - Exactly as said.
18
     (Phonetic)         - Exact spelling not provided.
19
     ( -- )             - Break in speech continuity
20                        and/or interrupted sentence.

21   (...)              - Indicates omission of word[s]
                          when reading OR trailing off
22                        and not finishing a sentence.

23   (As read)          - When reading, adding,
                          deleting or changing words so
24                        as not to be a direct quote
                          from document.
25
```

1         I have to caution --
2              MR. PATTIS:  He can waive on that
3         if he wants.  And, you know -- and,
4         so -- and, you know, Kevin, I guess
5         we're getting into the heartland of the
6         case and this comes up over and again.
7         And I understand your position.  I'm not
8         asking him to say what did counsel tell
9         you?  But I do think it's fair game to
10        say, What was your understanding?  And
11        if the information came from counsel, he
12        may or may not be accurately reflecting
13        what counsel told him.
14             I'm not asking, What did counsel
15        say?  I'm asking what his understanding
16        was.  I believe that is fair game,
17        although I will concede -- on an
18        evidentiary foundation -- it's a close
19        call.
20             MR. SHEA:  Yeah.  I'll let him
21        testify what his understanding is with
22        the understanding that I'm not waiving
23        the attorney-client privilege
24        objections.
25             MR. PATTIS:  I love you, but it's

1      not yours to waive; it's his.  And he
2      can follow your advice or not.
3           MR. SHEA:  Yeah, I will instruct
4      the witness that -- you can -- you can
5      testify if your understanding was based
6      on the advice of counsel.  And I would
7      just caution you and instruct you not to
8      disclose the contents of those
9      conversations.
10          THE WITNESS:  So -- okay.  So, I
11     will just say the rules of -- so, that
12     the UWC makes a recommendation to the
13     provost and the provost then makes a
14     decision.  And then parties are allowed
15     to appeal the provost decision to the
16     president.  And then the president makes
17     the final ruling.  And then the dean
18     implements the decision.
19          And so since this was the first UWC
20     case that I was involved in, the rules
21     were explained to me.  And the rules are
22     that, as dean -- the president and the
23     provost and the dean were not to talk to
24     each other.  That -- I don't know if
25     that's written anywhere, but that's the

1           rules that were -- as I understand them.
2                  And so having had that
3           understanding, I never spoke to the
4           provost or the president.  Had I not had
5           that understanding, I might have --
6    BY MR. PATTIS:
7        Q    Okay.  Got it.  I understand your
8    answer.
9        A    -- talked to the provost.  But that was
10   the rules and so I never did.
11       Q    Were you -- moving on to a different but
12   related topic, were you put under pressure to
13   impose further consequences or discipline on
14   Dr. Simons after *The New York Times* piece
15   appeared?
16              MR. SHEA:  Object to the form of
17         the question.  You can answer.  By whom
18         is part of my objection.
19              THE WITNESS:  So, it's hard to
20         discuss the timing.  There were times
21         afterwards, but initially I don't think
22         so.  I think it evolved with time.
23   BY MR. PATTIS:
24       Q    We allege that in -- I'm going to just
25   read you something.  You don't necessarily need to

1   see the Complaint, although we can if you would
2   like to.
3           We allege in our Complaint that as a
4   result of public reaction to the stories in *The*
5   *New York Times*, the university in 2013 forced
6   Dr. Simons to resign as chief of cardiology.
7           Do you agree that Dr. Simons was forced
8   to resign as chief of cardiology after the UWC
9   decision?
10              MR. SHEA:  Object to the form.  You
11          can answer.
12              THE WITNESS:  I agree to the
13          statement -- the last statement you just
14          made, that he was forced to resign after
15          the UWC decision.
16  BY MR. PATTIS:
17      Q   Who forced him to resign?
18      A   Well -- so, the --
19              MR. SHEA:  Are you talking about
20          the initial 18-month term that was in
21          the UWC thing, Norm?
22              MR. PATTIS:  No, sir.  It's my
23          understanding, Kevin, that there was a
24          recommendation of a five-year
25          suspension; it was reduced to 18 months.

```
1              It's my understanding further that
2         somehow this became public, in part,
3         through The New York Times; that there
4         was a reaction in the university; and
5         that as part of that reaction or
6         incident to that reaction -- that's what
7         I'm trying to find out here --
8         Dr. Simons was asked to do more than
9         serve out the term of his suspension;
10        that he was asked to resign.
11              MR. SHEA:  Okay.
12              MR. PATTIS:  And so that's what I'm
13        attempting to --
14              MR. SHEA:  No, that's fair.  I just
15        wanted to be clear which time.  You're
16        not talking about the initial 18-month
17        suspension; you're talking about --
18              MR. PATTIS:  We're beyond that.
19              MR. SHEA:  Yeah, the --
20              MR. PATTIS:  We're beyond that.
21              MR. SHEA:  Okay.
22              MR. PATTIS:  I don't expect to go
23        back to the initial decision.  If I do,
24        I'll let you know.  But I'm trying to
25        move on because I understand that
```

```
 1                  Dr. Alpern wants to watch the sunrise
 2                  tomorrow and doesn't want to still be
 3                  here with me.
 4                       MR. SHEA:  Okay.
 5                       THE WITNESS:  So, the decision to
 6                  have him not come back, the official --
 7                  the only official person who can make
 8                  that decision is Gary Desir.  And that's
 9                  because he was the chair of internal
10                  medicine.  But Gary and I did have
11                  discussions about what it was best to
12                  do.  And I would say that it was not
13                  related to the response of the
14                  community.
15     BY MR. PATTIS:
16         Q    What was it related to?
17         A    So, we did a 360 review of Mike.  And I
18     think that as dean, as I told you, I was aware of
19     a lot of the senior people who didn't like Mike.
20     And it always seemed to me that he was fighting
21     for cardiology.  So, I had always assumed that
22     Mike was well-liked by the cardiology faculty.
23              And he always seemed to be fighting
24     other leaders to get more for cardiology.  The
25     faculty members that I was closest with were the
```

1  researchers that he recruited to CVRI.  And they
2  all spoke very highly of Mike; they liked Mike.
3  And actually probably half of them were women.
4  So, that was my understanding of the situation
5  when all this happened.
6           Gary was quiet but probably knew a lot
7  more about what was happening on the ground.  So,
8  Gary and I decided to do a 360.  And we brought in
9  a consultant and he did two things:  He met with a
10 lot of faculty to get their opinions.  I believe
11 it was faculty.  He met with a group of people; I
12 can't remember.
13          But he did a survey and the survey went
14 out to members of cardiology.  And I think it was
15 to the faculty, but I'm not positive.  But what
16 struck me in the 360 -- and don't hold me to this
17 number, but it was greater than 90 percent -- and
18 I think it was 92 percent -- did not want him back
19 as chief of cardiology.  And that was a big
20 surprise to me, that the members of the cardiology
21 division did not want him back.
22          And that was the beginning of, you know,
23 I would say a lot of information that unfolded
24 over the years about how many people had been
25 bullied within the cardiology division.  And some

```
1              STATE OF CONNECTICUT
2         I, KRISTINE A. PARADIS, LSR 338, a Notary Public
3    duly commissioned and qualified in and for the State
4    of Connecticut, do hereby certify that pursuant to
5    Re-Notice, there came remotely before me via
6    videoconference on the 16th day of July, 2021, the
7    following named person, to wit:  ROBERT ALPERN, M.D.,
8    who was by me duly sworn to testify to the truth and
9    nothing but the truth; that he was thereupon
10   carefully examined upon his oath and his examination
11   reduced to writing under my supervision; that this
12   deposition is a true record of the testimony given by
13   the witness.
14        I further certify that I am neither attorney nor
15   counsel for, nor related to, nor employed by any of
16   the parties to the action in which this deposition is
17   taken, and further, that I am not a relative or
18   employee of any attorney or counsel employed by the
19   parties hereto, or financially interested in this
20   action.
21        IN WITNESS THEREOF, I have hereunto set my
22   hand this __29th__ day of_____July_____, 2021.
23                         Kristine Paradis
24                         KRISTINE A. PARADIS, CSR #338
                           Certified Shorthand Reporter
25   My Commission expires:  May 31, 2023
```