# Exhibit E

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3     _ _ _ _ _ _ _ _ _ x
       MICHAEL SIMONS,           |
 4                  Plaintiff,   |
                                 |  3:19-CV-01547(VAB)
 5          v.                   |
                                 |
 6     YALE UNIVERSITY,          |
       PETER SALOVEY,            |
 7     ROBERT ALPERN, M.D.,      |
       UNKNOWN PERSONS,          |
 8                  Defendants.  |  July 16, 2021
       _ _ _ _ _ _ _ _ _ x
 9

10

11

12          DEPOSITION OF ROBERT ALPERN, M.D.

13                via videoconference

14

15     Taken before Kristine A. Paradis, LSR 338, a
       Court Reporter and Notary Public within and
16     for the State of Connecticut, pursuant to
       Re-Notice and the Federal Rules of Civil
17     Procedure, via videoconference, on July 16,
       2021, commencing at 10:13 a.m.
18

19

20

21

22           FALZARANO COURT REPORTERS, LLC
                    4 Somerset Lane
23           Simsbury, Connecticut 06070
                    860.651.0258
24         www.falzaranocourtreporters.com

25
```

```
 1   APPEARANCES:

 2        For the Plaintiff:

 3             PATTIS & SMITH, LLC
               383 Orange Street
 4             New Haven, Connecticut 06511
               203.393.3017
 5             npattis@pattisandsmith.com
                 BY:  NORMAN A. PATTIS, ESQ. **
 6

 7        For the Defendants Yale University,
          Peter Salovey, and Robert Alpern, M.D.:
 8
               CLENDENEN & SHEA, LLC
 9             400 Orange Street
               New Haven, Connecticut 06511
10             203.787.1183
               kcs@clenlaw.com
11                BY:  KEVIN C. SHEA, ESQ. **

12
          Also Present:
13
               Cameron Atkinson, Esq. **
14             Pattis & Smith, LLC

15

16

17

18

19

20   ** Via videoconference

21

22

23

24

25
```

```
 1                    S T I P U L A T I O N S
 2
 3           It is stipulated and agreed by counsel for
 4   the parties that all objections are reserved until
 5   the time of trial, except those objections as are
 6   directed to the form of the question.
 7           It is stipulated and agreed between counsel
 8   for the parties that the proof of the authority of
 9   the Notary Public, before whom this deposition is
10   taken, is waived.
11           It is further stipulated that any defects
12   in the Notice are waived.
13           It is further stipulated that the
14   deposition may be signed before any Notary Public.
15
16              T R A N S C R I P T   L E G E N D
17
     (sic)              - Exactly as said.
18
     (Phonetic)         - Exact spelling not provided.
19
     ( -- )             - Break in speech continuity
20                        and/or interrupted sentence.
21   (...)              - Indicates omission of word[s]
                          when reading OR trailing off
22                        and not finishing a sentence.
23   (As read)          - When reading, adding,
                          deleting or changing words so
24                        as not to be a direct quote
                          from document.
25
```

```
 1   put it that way.
 2        A    No.
 3        Q    And in the consultant's report were
 4   there complaints of a sexual nature?
 5             MR. SHEA:  Object to the form.
 6             Answer if you know.
 7             THE WITNESS:  None that I remember.
 8   BY MR. PATTIS:
 9        Q    So, the bottom line is he was a bully;
10   he was difficult?
11        A    Yeah.  I actually do remember
12   conversations with -- I don't remember if I
13   discussed the report with him.  I do remember
14   conversations about his -- how he was perceived in
15   the division with him and he always defended that
16   it wasn't true and that Frank Giordano had
17   poisoned the waters in the cardiology division and
18   that none of this was true.
19        Q    Did you ever speak to Dr. Giordano about
20   that?
21        A    No.
22        Q    Okay.  Was Dr. Simons given an
23   opportunity to address the consultant's report
24   before a decision was made to remove him as chief?
25        A    I don't remember.
```

```
1        Q    Okay.
2        A    I don't remember.
3        Q    Fair enough.  Let's move on.
4             Throughout this period, however,
5   Dr. Simons continued to occupy the Robert W.
6   Berliner Professorship of Medicine, correct?
7        A    Correct.
8        Q    And after he was removed as chief, is
9   that when there was an adjustment to his
10  compensation package?
11       A    Yes.
12            MR. PATTIS:  And I know this is
13            repetitive, Kevin; I'm sorry if it's
14            asked and answered.  I just want to make
15            sure I got it.
16  BY MR. PATTIS:
17       Q    It was because of the reduction -- it
18  was because he was removed as chief that his
19  compensation was adjusted, correct?
20       A    That is correct.
21       Q    Okay.  Give me one second.  I'm about
22  ready to shift on --
23            MR. PATTIS:  Where are you on
24            lunch, Kevin?  I'm about ready to shift
25            topics.  And if your lunch is there,
```

1              this would be a good time or we can
2           proceed.
3                   MR. SHEA:  I should go and ask.
4
5                   (Off-the-record discussion.)
6
7    BY MR. PATTIS:
8        Q    I'd like to move forward a little bit
9    now, Doctor.  At some point there was another
10   round of negative publicity involving Dr. Simons,
11   correct?
12       A    I'm not sure what you're referring to,
13   but I think yes, correct.
14       Q    Well, after he was removed -- okay.  Let
15   me be a little more specific.
16            He gets removed as the chief of
17   cardiology.  Thereafter was there another round of
18   negative publicity involving Dr. Simons?
19       A    So, yeah.  Then there was a round
20   related to his being the director of the
21   cardiovascular research institute.
22       Q    What caused -- how did you become
23   aware -- and when you say there was another round,
24   is that another round of publicity?
25       A    So, I -- no, it was really part of the

1  same thing.  But, you know, there was no question
2  that in my -- and I believe in Gary's mind that he
3  should step down as chief of cardiology.  We -- as
4  I told you, the faculty within the cardiovascular
5  research institute really liked Mike and were very
6  surprised by everything that was playing out.
7        And so it had been my hope to keep him
8  as director of the cardiovascular research
9  institute, remove him from cardiology -- chief of
10 cardiology, and let him focus his efforts on the
11 cardiovascular research institute.  And I think
12 Gary and I were both aligned with that plan.
13       Then the word got out around the campus
14 that he had this other title as head of the
15 cardiovascular research institute and that in all
16 likelihood -- or I can't remember if people knew;
17 the UWC didn't know he held that title when they
18 had him step down as chief of cardiology for
19 18 months.  And the uproar grew.  And the feeling
20 was that had the UWC known that he was the head of
21 the cardiovascular research institute, they would
22 have had him step down from that also.
23       And that clearly was a huge uproar.  And
24 Gary and I did respond to that by -- to try to --
25 for the good of the community to have him step

1  down from that title.
2       Q    So, I want to unpack that.  Give me a
3  second, please.  And I may or may not understand
4  the difference between the role of chief of
5  cardiology and the director of the cardiovascular
6  research institute.  Against the possibility that
7  I don't, what are the differences in the two
8  roles?  What are the -- well, withdrawn.
9            What are the responsibilities of the
10 chief of cardiology as contrasted to the director
11 of cardiovascular research?
12      A    So, the director of the cardiovascular
13 research institute is a very narrow responsibility
14 which would be to ensure research excellence, to
15 mentor young researchers in the institute, to set
16 up collaborative structures, integrate the
17 research.  But it would not have been the career
18 development of the faculty.
19           The support of the faculty comes from
20 their administrative leader who in this case would
21 have been the chief of cardiology.  So, I would
22 say that the chief of cardiology has very broad
23 responsibilities for faculty who -- and the chief
24 of cardiology is developing research programs,
25 clinical programs, education programs, is

1  responsible for faculty development, recruits
2  faculty, keeps them at Yale, helps them develop
3  their careers, and is really the same
4  responsibilities I described to you that the dean
5  has.
6      Q    Right.  Right.
7      A    But the dean has it through the whole
8  medical school; they have it for the division of
9  cardiology.  Head of a research institute is a
10 much more narrow thing.
11           Now, obviously if somebody behaved
12 really badly they couldn't hold that either.  But
13 the -- it definitely doesn't carry
14 responsibilities for faculty development and
15 caretaking of the faculty that the chief of
16 cardiology does.
17     Q    Okay.  Understood.
18          Now, when you did the 360 review with
19 the consultant and were surprised to learn of -- I
20 don't know if hostility is too strong of a word,
21 but of the negative reaction to Dr. Simons, did
22 those findings also reflect the feeling of
23 individuals working in the cardiovascular research
24 institute?
25     A    So, it was done in a blinded way.

1   Q   Got it. Okay.
2   A   So, I wouldn't know. But my personal --
3   the way -- the way things happened to occur at the
4   time I was involved in the recruitment of a lot of
5   the members of the cardiovascular research
6   institute that Mike recruited. And I knew them
7   well. And I knew what they thought about Mike.
8   Q   Okay. Got it. Got it.
9   A   And that was positive.
10  Q   So, is it fair to say then that the
11  decision to remove him as director of
12  cardiovascular research institute was not as a
13  result of the 360 and the consultant's report?
14           MR. SHEA: Object to the form of
15           the question. You can answer.
16           THE WITNESS: Yes.
17  BY MR. PATTIS:
18  Q   What was it a result of then?
19  A   That was the result of the perception of
20  the community that someone who had been found
21  guilty of sexual harassment was being left in a
22  leadership position and that the UWC definitely
23  would have removed him from that position had they
24  known it existed.
25  Q   How do you know that the UWC did not

```
 1  know about it?
 2       A    I don't -- I can't -- so, I never spoke
 3  to the UWC --
 4       Q    Got it.
 5       A    -- about any of these issues.  And I
 6  actually don't even know who -- I guess one would
 7  speak to the director of the UWC.  It seemed to be
 8  obvious that members of the UWC -- maybe people in
 9  the community had spoken to people who were on the
10  UWC.  But everybody seemed to acknowledge that the
11  UWC did not know that there was such an entity and
12  that Mike was the director of it and that he had
13  that title.
14       Q    So, I warn you this is another one of
15  those questions that people hate lawyers over.  I
16  don't know what to make of the statement everyone
17  knew.  Can you give me an example of anyone who
18  said that to you?
19       A    I wouldn't remember.  No, I really
20  can't.  It's -- it seemed to just be that -- this
21  is an example where I may learn from -- I know
22  you're going to hate the term -- community --
23       Q    Yeah.
24       A    Yeah.  But, you know, that was the
25  general feeling why people were upset, that -- I
```

1  think the key issue is he was holding a leadership
2  title and he had been found guilty of sexual
3  harassment. And that the -- how could the medical
4  school keep him in that position?
5              MR. SHEA: Norm, that's fine if you
6         want to get another question. That's
7         fine. I just wanted to let you know the
8         lunch came a couple of minutes ago,
9         so --
10             MR. PATTIS: Yup. I'm going to
11        just ask a couple more questions to
12        finish this topic, if that's all right.
13             MR. SHEA: Sure. That's fine.
14             THE WITNESS: I'm hungry.
15 BY MR. PATTIS:
16    Q    Did you ever receive a writing -- a
17 memorandum, let's say -- or a written note from
18 anyone reflecting their belief that the UWC did
19 not know he held the director's position?
20    A    I don't believe I did. I certainly
21 don't remember one.
22    Q    But as you sit here today based on your
23 communications with folks at the university,
24 there's very little question in your mind that
25 this was a widely held belief; the UWC did not

1  know about it?
2       A    That's right.
3       Q    Okay.  And let me just check my notes
4  really quickly.  I just want to finish up one
5  topic before we break.
6            When you say, "the uproar grew," what
7  are you referring to?  And you also used the term
8  there was a "huge uproar."
9       A    So, I think it -- "grew" may be the
10 wrong word.  It started with that *New York Times*
11 article and it wasn't dying out.  And it was clear
12 that to move on -- well, there were a lot of
13 things that had to be done to move on.  But one of
14 the things was the decision on the cardiovascular
15 research institute.
16           There were -- I had town hall meetings
17 with the community where everyone from the
18 community was invited to discuss this topic.  The
19 president and the provost came to the medical
20 school and did a town hall meeting.  There was a
21 feeling that Yale needed to -- and certainly in
22 the medical school needed to implement new
23 procedures to address sexual harassment.  And so
24 there was a lot of sentiment that the medical
25 school should do a lot of things that had nothing

1   to do with Mike Simons, just --
2        Q    All of this --
3        A    -- chatter.
4        Q    All of this over a love letter?  Did
5   that strike you as a little ridiculous?
6             MR. SHEA:  Object to the form of
7        the question.
8             THE WITNESS:  So, I think that it
9        was -- I'm not sure that the community
10       knew exactly what happened.  And, you
11       know, although it was all in the
12       newspaper articles, the -- I'm not -- a
13       lot of the people were angry because
14       other people were angry.
15  BY MR. PATTIS:
16       Q    Yeah, I know.  I hear you.
17       A    And I'm not sure -- I'm guessing a small
18  minority was intimately familiar with the facts
19  and everybody else was just -- a general belief
20  that sexual harassment would be tolerated at Yale
21  University if your research was really good.  And
22  I think that that was the perception that we felt
23  was not true and that we had to convince the
24  community that that was not true.
25       Q    Was Dr. Simons made a scapegoat to deal

1  with the anger of people who were angry about what
2  others thought and felt?
3           MR. SHEA:  Object to the form of
4      the question.
5           THE WITNESS:  Yeah.  No, I think
6      there were a lot of things that were
7      done.  As I said, the vast majority of
8      the things that we did in that case did
9      not have anything to do with Mike
10     Simons.  We --
11          MR. PATTIS:  Okay.
12          THE WITNESS:  -- chief diversity
13     officer.  You know, we had offices
14     formed.  Many -- many, many, many
15     meetings and many policies and
16     procedures to deal with this issue.
17          MR. PATTIS:  My focus is solely on
18     Dr. Simons.  And that's where we'll
19     begin when we've had lunch.
20          MR. SHEA:  Great.
21          MR. PATTIS:  So, how long would you
22     like, Kevin?
23          MR. SHEA:  Half hour?  Does that
24     work?  How about, say, quarter of?
25          MR. PATTIS:  Yeah, quarter of works

```
 1              for me.
 2                   MR. SHEA:  Great.
 3                   MR. PATTIS:  Enjoy your lunch,
 4              guys.  Bye.
 5
 6                   (Luncheon recess:  1:14 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                STATE OF CONNECTICUT
 2       I, KRISTINE A. PARADIS, LSR 338, a Notary Public
 3   duly commissioned and qualified in and for the State
 4   of Connecticut, do hereby certify that pursuant to
 5   Re-Notice, there came remotely before me via
 6   videoconference on the 16th day of July, 2021, the
 7   following named person, to wit:  ROBERT ALPERN, M.D.,
 8   who was by me duly sworn to testify to the truth and
 9   nothing but the truth; that he was thereupon
10   carefully examined upon his oath and his examination
11   reduced to writing under my supervision; that this
12   deposition is a true record of the testimony given by
13   the witness.
14       I further certify that I am neither attorney nor
15   counsel for, nor related to, nor employed by any of
16   the parties to the action in which this deposition is
17   taken, and further, that I am not a relative or
18   employee of any attorney or counsel employed by the
19   parties hereto, or financially interested in this
20   action.
21       IN WITNESS THEREOF, I have hereunto set my
22   hand this __29th__ day of____July_____, 2021.
23                          Kristine Paradis
24                          KRISTINE A. PARADIS, CSR #338
                            Certified Shorthand Reporter
25   My Commission expires:  May 31, 2023
```