# Exhibit F

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
 2

 3    - - - - - - - - - x
      MICHAEL SIMONS,          |
 4               Plaintiff,    |
                               |   3:19-CV-01547(VAB)
 5          v.                 |
                               |
 6    YALE UNIVERSITY,         |
      PETER SALOVEY,           |
 7    ROBERT ALPERN, M.D.,     |
      UNKNOWN PERSONS,         |
 8               Defendants. |   July 16, 2021
      - - - - - - - - - x
 9

10

11

12            DEPOSITION OF ROBERT ALPERN, M.D.

13                   via videoconference

14

15       Taken before Kristine A. Paradis, LSR 338, a
      Court Reporter and Notary Public within and
16    for the State of Connecticut, pursuant to
      Re-Notice and the Federal Rules of Civil
17    Procedure, via videoconference, on July 16,
      2021, commencing at 10:13 a.m.
18

19

20

21

22            FALZARANO COURT REPORTERS, LLC
                     4 Somerset Lane
23            Simsbury, Connecticut 06070
                      860.651.0258
24            www.falzaranocourtreporters.com

25
```

1    <u>APPEARANCES</u>:

2         <u>For the Plaintiff</u>:

3              PATTIS & SMITH, LLC
               383 Orange Street
4              New Haven, Connecticut 06511
               203.393.3017
5              npattis@pattisandsmith.com
                    BY:  NORMAN A. PATTIS, ESQ. **

6

7         <u>For the Defendants Yale University,</u>
          <u>Peter Salovey, and Robert Alpern, M.D.</u>:

8
               CLENDENEN & SHEA, LLC
9              400 Orange Street
               New Haven, Connecticut 06511
10             203.787.1183
               kcs@clenlaw.com
11                  BY:  KEVIN C. SHEA, ESQ. **

12
          <u>Also Present</u>:

13

14             Cameron Atkinson, Esq. **
               Pattis & Smith, LLC

15

16

17

18

19

20   ** Via videoconference

21

22

23

24

25

1          S T I P U L A T I O N S

2

3          It is stipulated and agreed by counsel for

4     the parties that all objections are reserved until

5     the time of trial, except those objections as are

6     directed to the form of the question.

7          It is stipulated and agreed between counsel

8     for the parties that the proof of the authority of

9     the Notary Public, before whom this deposition is

10    taken, is waived.

11         It is further stipulated that any defects

12    in the Notice are waived.

13         It is further stipulated that the

14    deposition may be signed before any Notary Public.

15

16         T R A N S C R I P T   L E G E N D

17
      (sic)              - Exactly as said.
18
      (Phonetic)         - Exact spelling not provided.
19
      ( -- )             - Break in speech continuity
20                         and/or interrupted sentence.

21    (...)              - Indicates omission of word[s]
                           when reading OR trailing off
22                         and not finishing a sentence.

23    (As read)          - When reading, adding,
                           deleting or changing words so
24                         as not to be a direct quote
                           from document.
25

Falzarano Court Reporters, LLC

```
 1   Von Zedtwitz chair in the communication you had

 2   with President Salovey, the written communication?

 3        A    I don't recall whether I mentioned that

 4   it was switching or a new chair.  I think I would

 5   have said that it was switching.  But it wouldn't

 6   have been anything with any explanations.

 7        Q    Okay.

 8        A    It would have been a form letter --

 9        Q    Got it.

10        A    -- that just designated the changes.

11        Q    Now, in President Salovey's letter of

12   June 22, 2018 it reads, "As you know from your

13   previous appointment as the Robert W. Berliner

14   Professor of Cardiology, endowed chairs are

15   awarded to those whose scholarship has brought

16   distinction to the university.  And I'm delighted

17   to convey our pleasure in your accomplishments.

18   *Yale News* will soon publish a story announcing

19   your appointment.  Congratulations."

20             Right?

21        A    Right.

22        Q    And a story ultimately issued in the

23   *Yale News* about Dr. Simons' appointment to the

24   Von Zedtwitz chair, correct?

25        A    Yes.
```

1      Q     And is it fair to say after that story

2  occurred the community was once again in uproar?

3      A     Yes.  I think that some members of the

4  community knew about it before that story.  But

5  that story certainly gave -- when we were trying

6  to tell people it was not an honor, it was not

7  being done honorifically, the story basically

8  provided evidence that it was being done as an

9  honor and --

10     Q     Well, if you -- what reasons other than

11  honorific reasons would exist for giving a person

12  a chair at Yale?

13                  MR. SHEA:  Object to the form.

14                  THE WITNESS:  Our feeling was that

15              we were just changing chairs; that there

16              was no new honor here.  It was not our

17              intent to imply that we were giving a

18              new honor.  And I am assuming -- I do

19              not know that this letter that was sent

20              from Peter was a form letter sent by his

21              staff.

22  BY MR. PATTIS:

23     Q     Yeah, it looks like a form letter to me.

24  It probably was.

25     A     Yeah.

Falzarano Court Reporters, LLC

1        Q    But we'll ask him eventually.

2             Now, that letter, again, is dated on

3    June 22, 2018.  Is it fair to say that thereafter

4    there was considerable consternation among some

5    members of the Yale community involving

6    Dr. Simons?

7        A    Yes.

8        Q    And there were a number of meetings with

9    Nina Stachenfeld, correct?

10       A    Not -- I think there -- so, I'm thinking

11   there was one meeting with Nina and her

12   co-director in which we discussed what was

13   happening with the change of the chairs.  And I

14   believe, if my memory serves me right, that that

15   is when I first heard about the story about the

16   honor.  I think one of them had seen the story

17   before me.

18            Then there were no more meetings with

19   Nina except that I asked to meet with SWIM to

20   discuss this issue as it was growing in the

21   community.  So, I asked for a number of meetings

22   with different groups to discuss this issue and

23   SWIM was one of them.  And Nina was the co-chair

24   of SWIM.

25            MR. PATTIS:  May we have

```
 1              Exhibit 10, please?
 2                   MR. SHEA:  Are we done with 8?
 3                   MR. PATTIS:  Yes, sir.
 4                   MR. SHEA:  Okay.
 5   BY MR. PATTIS:
 6       Q    Earlier you mentioned an open letter or
 7   communication from SWIM regarding Dr. Simons.
 8   Could you review Exhibit 10 and let me know if
 9   that is the communication you were referring to?
10                   MR. SHEA:  You're talking about
11              just the first page of Exhibit 10?
12                   MR. PATTIS:  Yes, sir.
13                   MR. SHEA:  Okay.  Because it's, I
14              guess, a three-page exhibit.
15                   MR. PATTIS:  Yeah.  No, I
16              understand.
17                   MR. SHEA:  Or a four-page exhibit.
18                   (Pause.)
19                   THE WITNESS:  Okay.
20   BY MR. PATTIS:
21       Q    Have you seen this document before?
22       A    I don't specifically remember it.  I
23   imagine I did.  But I would guess that I did, but
24   I don't remember it.
25       Q    Well, I don't know what to do with
```

Falzarano Court Reporters, LLC

```
 1   imagining and guessing.  And I don't mean to be
 2   rude to you; I'm generally trying to be
 3   respectful.
 4          Have you seen any letters of a similar
 5   sort from SWIM?  In other words, that convey the
 6   same sentiments and the same tone regarding
 7   Dr. Simons?
 8       A    So, I think what I would say is I knew
 9   the sentiments of SWIM.  Whether I knew them
10   because of a letter or because of verbal
11   communication, I can't remember.  But that such --
12   a letter like this would have been sent and that I
13   would have seen it is probably likely.
14       Q    I may be wrong, Doctor, and you've seen
15   me err before, so it's not like I'm proud of it; I
16   just do these things.  I thought you referred
17   earlier to an open letter from SWIM.  And if you
18   did, do you think this is that letter?
19       A    I didn't think I referred to an --
20              MR. SHEA:  No, I don't recall that
21          item.
22              MR. PATTIS:  That's my mistake.
23          I read --
24              MR. SHEA:  I believe that he
25          made an -- he had requested a meeting
```

Falzarano Court Reporters, LLC

```
 1              with SWIM is what --
 2                   THE WITNESS:  Yes.
 3                   MR. SHEA:  -- he testified about.
 4                   MR. PATTIS:  Yeah.
 5  BY MR. PATTIS:
 6       Q    Did you testify earlier about a letter
 7  from SWIM?
 8       A    No.  I think I testified earlier about a
 9  letter from some faculty in the department of
10  medicine.
11       Q    That was it, yeah.
12       A    That was regarded to the original event
13  in -- five years earlier.  And you asked if that
14  was from SWIM and I said I didn't think so.
15       Q    Okay.  I got it.  Thank you.
16                   MR. SHEA:  Wow.  He's got a better
17              memory than you or I do on this.
18                   MR. PATTIS:  Well, he lived it;
19              we're just reading it.
20                   THE WITNESS:  You got it.
21                   MR. PATTIS:  Can we go to the next
22              page of 10, please?
23  BY MR. PATTIS:
24       Q    This was -- and by the way, the first
25  page of 10 bears the number D7063.  The second
```

1   page bears the number D7064.

2           Do you recognize this document at all?

3   I'm sorry to make this a reading exam, sir.

4       A   I don't recognize this.

5       Q   Okay.

6       A   And I --

7       Q   Let's move on.  If you don't recognize

8   it, I'm not going to torture you with it.

9           The next page of this document appears

10  to be notes.  And then it bears 7065.  It says,

11  Meeting called by Dean Alpern for SWIM executive

12  committee, September 18, 2018.

13          So, my first question is:  Did you

14  attend a meeting of the SWIM executive committee?

15      A   Yes.  So, I asked for a meeting with

16  them and I think that this is referring to that

17  meeting.

18      Q   According to these notes it says, Dean

19  Alpern admitted he participated in the decision to

20  switch the endowed professorship for Michael

21  Simons.  Did you make such an admission to the

22  executive committee?

23      A   I probably did, yes.

24      Q   The note goes on to say, He -- meaning

25  you -- stated that he felt the decision was,

```
 1   quote, protecting a decision set forth by the UWC
 2   who did not take away the professorship five years
 3   ago.
 4            Did you say that to them?
 5       A    I would have said something like that.
 6   I don't remember what I specifically said, but
 7   that was -- the idea at the time was to switch the
 8   professorships so that the Berliner family would
 9   not be upset, and at the same time we would
10   protect the decision of the UWC, which -- we would
11   protect the fact that the UWC did not order the
12   chair be taken away.
13       Q    And I'd like to focus on the use of the
14   term "protect."  What were you trying to convey by
15   using that term?
16       A    Basically that the UWC didn't take the
17   chair away and that we -- the idea about changing
18   the chairs was to not take the chair away, not --
19       Q    I cut you off.  I'm sorry.
20       A    To leave Dr. Simons with a chair.
21       Q    The note goes on to say, Members of SWIM
22   pointed out that the UWC was not told he had an
23   endowed professorship, and that the provost
24   already changed the UWC penalty by reducing it
25   initially -- making it less an inviolate decision
```

1   to change.

2          You've testified earlier about what you

3   know about whether the UWC knew that Dr. Simons

4   had an endowed professorship, correct?  You don't

5   have anything further to add than what you said

6   earlier?

7      A    I don't remember what I said about that.

8              MR. SHEA:  I think --

9              MR. PATTIS:  Let me ask you this

10             question then.

11  BY MR. PATTIS:

12     Q    Let me ask you this question then:  Do

13  you believe the UWC was not told that Dr. Simons

14  had an endowed professorship when he was

15  disciplined?

16             MR. SHEA:  Object to the form.  You

17             can answer.

18             THE WITNESS:  I obviously do not

19             know, but I suspect that they were

20             probably aware that he had an endowed

21             professorship.

22  BY MR. PATTIS:

23     Q    Why do you suspect they were probably

24  aware that he had the endowed professorship?

25     A    I would just think that they would think

Falzarano Court Reporters, LLC

1    that somebody with his accomplishments would have

2    an endowed professorship.

3         Q    And also, it would be pretty sloppy to

4    conduct an investigation and not know such a basic

5    fact, correct?

6              MR. SHEA:  Object to the form.

7              Answer if you know.

8              THE WITNESS:  I -- you know, I

9              can't say.

10   BY MR. PATTIS:

11        Q    You tried to explain to the members of

12   the SWIM executive committee that the provost

13   review was part of the UWC process, correct?

14        A    Probably.

15        Q    And did the SWIM person/people then also

16   say, Hey, look, the UWC had only been in existence

17   for two years at the time of Simons' case.  Did

18   they say something like that?

19        A    Yeah, the general discussion -- I'm not

20   sure if it was in that meeting or in other

21   meetings was that in the early years of the UWC

22   they didn't remove honorifics and that they

23   probably -- you know, if one was devising a policy

24   going forward, that they believed it should

25   include that.  And, you know -- and that was the

1  question:  Should a policy going forward include

2  that?

3       Q    But there was no such policy in place at

4  the time that Dr. Simons was disciplined by UWC,

5  correct?

6       A    As far as I know.

7       Q    The note goes on to say at the second

8  bullet point, Dean Alpern defended Simons, quote,

9  who is currently defenseless, end quote, in order

10  to uphold university procedures and precedents.

11           Did you say that to them?

12       A    Yes.  I did make the comment that it

13  was -- one of the jobs of the dean was to defend

14  individual faculty members who would be

15  defenseless.  And, yeah, I did say that.

16       Q    The third bullet point says, It also

17  seemed clear the university feared lawsuits from

18  Dr. Simons should the professorship be taken from

19  him.

20           Do you recall that coming up at a

21  meeting with the SWIM executive committee in

22  September of 2018?

23       A    No.  And I don't remember that being on

24  my mind at the time or --

25       Q    I didn't ask that, no.  I just want to

```
 1   know whether it came up.  Whether it came up in

 2   the meeting.

 3        A    So, I don't remember it coming up.  And

 4   I would be surprised.

 5        Q    I'm going to read you another sentence

 6   and ask you what, if anything, you recall about

 7   this.  The note says, quote, SWIM faculty

 8   suggested that Yale step up and fight the lawsuit,

 9   show leadership as other companies have done in

10   order to send the message that we no longer

11   tolerate sexual or gender-based harassment.

12             Was there such a discussion at that

13   executive committee meeting?

14        A    So, I don't remember it, but I'm

15   guessing if these were taken as the minutes, that

16   there probably was.  It wasn't really an important

17   part in my mind of any of the decisions.  But if

18   this is written in the minutes, it probably

19   occurred.

20        Q    It goes on to say that -- at the fourth

21   bullet point -- Dean Alpern said he was very

22   surprised by the uproar the decision had caused.

23             Were you very surprised?

24        A    Yes.

25        Q    Why?
```

```
1         A    Because I thought that we were going to
2    represent this as an exchange of professorships
3    and that nobody -- I didn't predict that it would
4    be seen as a new honor being bestowed on Mike
5    Simons.  And so I thought we had solved the
6    problem actually by exchanging the professorships.
7    So, the answer is, yes, I was surprised.
8         Q    On the next page of Exhibit 10, I
9    gather --
10                   MR. PATTIS:  Can we change that
11              page, Cam?  Oh, you did already.  No,
12              no, the one previous.  I'm sorry.  This
13              is the page that has 7069.
14                   MR. SHEA:  7069?
15                   MR. PATTIS:  Yes.
16                   MR. SHEA:  That's going to be the
17              next exhibit or that's Exhibit 11?
18                   MR. PATTIS:  Okay.  Sorry.  My tab
19              got moved and I couldn't tell from which
20              to which.
21                   May we look at Exhibit 11, please?
22    BY MR. PATTIS:
23         Q    The exhibit reads, "Meeting:  Dean
24    Alpern requested to meet with the SWIM executive
25    committee.  Darin Latimore also joined the
```

1  meeting."

2          Did you request an opportunity to meet

3  with the SWIM executive committee?

4     A    Yes.

5     Q    And who is Darin Latimore?

6     A    Darin Latimore was the deputy dean for

7  diversity and inclusion.  He was our chief

8  diversity officer.

9     Q    Okay.

10     A    And so he was always -- as I interacted

11  with SWIM, he also interacted with SWIM.

12     Q    It says you opened the meeting by

13  reporting that you, Yale attorneys, university

14  administration had been working extensively on

15  multiple drafts on an e-mail communication to

16  explain the med school's actions, correct?

17     A    Yes.

18     Q    You were limited in what you could say

19  by these attorneys and that explained what delay,

20  sir?

21     A    I'm not sure.  Maybe the delay in the

22  message coming out.

23     Q    Okay.  Were you under considerable

24  pressure at this point to have a response?

25     A    I think there was a -- there was a

Falzarano Court Reporters, LLC

```
 1    belief on our part that this was a simple exchange
 2    of chairs.
 3         Q    Okay.
 4         A    And there was a belief in the community
 5    that this was a new honor being bestowed --
 6         Q    I got it.
 7         A    -- on a --
 8         Q    No, I understand.
 9              MR. SHEA:  Can you let him finish?
10         I --
11              MR. PATTIS:  I am.  I'm trying to
12         make the most of the time because we've
13         gone through this and I -- that's all
14         right.
15              MR. SHEA:  Oh, okay.  I just wanted
16         to make sure he was done.
17              THE WITNESS:  We were trying to
18         come up with different communication
19         strategies to make clear to the
20         community what we were thinking and to
21         hopefully convince them that they would
22         agree with us.  And that was -- so,
23         that's what this is referring to.
24    BY MR. PATTIS:
25         Q    The second bullet point, the second
```

Falzarano Court Reporters, LLC

```
 1    sentence says, He -- meaning you -- explained the
 2    decision -- that is, the decision to move him from
 3    one chair to another -- by stating that the UWC
 4    did not take away his endowed professorship at the
 5    time they recommended his other penalties.
 6                Do you recall explaining that to the
 7    SWIM group?
 8         A    I'm sure I would have.
 9         Q    And then SWIM pointed out UWC was not
10    informed that Simons had an endowed professorship.
11    Do you recall that coming up?
12         A    (Reading.)
13                Yeah.  I don't remember that specific
14    discussion.  I think my memory of the discussions
15    with SWIM at this and previous meetings was that
16    the UWC in its early years just didn't think of
17    taking away endowed professorships as a form of
18    punishment.
19         Q    Okay.
20         A    That's what I always thought.  I didn't
21    think it was related to the fact that they didn't
22    know he had a professorship.
23         Q    I understand.  And I just read through
24    the rest of it.  I think we've covered it, or
25    certainly I understand.  But let me switch topics.
```

```
 1              MR. PATTIS:  May I have a moment,

 2         please?

 3              MR. SHEA:  Sure.  Actually, if you

 4         want to take another moment, I can use

 5         another restroom break.  Sorry.

 6              MR. PATTIS:  Yeah.  And I can tell

 7         you, Kevin, I'm probably within an hour

 8         or no more than 90 minutes of being

 9         done, okay, so we're rounding -- we're

10         approaching third and will soon round

11         third and head for home; okay?

12              MR. SHEA:  Thank you.

13

14         (Recess taken:  2:54 p.m. to 3:03 p.m.)

15

16  BY MR. PATTIS:

17      Q    I want to backtrack a moment.  I think I

18  may have an explanation about why you thought you

19  may have seen an e-mail.  I'm not sure.  But I'm

20  going to show you Exhibit 14.

21              Please take a moment to review it, sir.

22              MR. PATTIS:  That says 15 on it,

23         Cam.

24              MR. ATKINSON:  I think that's where

25         the inconsistency in the numbering
```

```
 1        A    Oh, it's not Aaron Waxman.  Merle
 2   Waxman.
 3        Q    Can we take a look at Exhibit 16,
 4   please?  I'm looking at an e-mail that purports
 5   to -- and it says, D 7111, allegedly from Aaron
 6   Waxman to you.  Does he -- is there a --
 7        A    Oh, yeah.  Okay.
 8              MR. SHEA:  Let me get this because
 9         I want to see . . .
10              THE WITNESS:  Okay.  I don't know
11         Aaron Waxman.  It sounds like he's an
12         alum.  And so --
13   BY MR. PATTIS:
14        Q    It sounds like -- oh, an alum.  I'm
15   sorry, sir.  Yes.
16        A    Yeah.  So, as this thing was evolving,
17   someone went to the alumni association and the
18   alumnis -- people -- alums got active in
19   protesting this.
20        Q    Do you recall how many e-mails you
21   received from alum who were protesting this?
22        A    So, I don't know how many I received.  I
23   know that there was a petition that was circulated
24   among alums that people forwarded it to me to make
25   sure I knew about it.  And it was a fairly
```

1   aggressive petition against the decision and

2   against me.

3            MR. PATTIS:  Kevin, did we get a

4          copy of that petition?

5            MR. SHEA:  I believe so.

6            MR. PATTIS:  I missed it.

7            MR. SHEA:  I thought I even saw it

8          in what you sent today.  Is it not in

9          one of these?  I --

10           MR. PATTIS:  You know, in some of

11         these the SWIM stuff was a little opaque

12         to me, some of it.  So, I'm not --

13           MR. SHEA:  It is to me as well.  It

14         is to me as well.  So, I don't -- I

15         believe you have it; I believe I've seen

16         it.  I don't know where it is right now

17         as I sit here.

18           MR. PATTIS:  So, in terms of going

19         forward -- excuse us for one second,

20         Doctor.  I just want to talk around

21         you -- I don't want to resume this

22         deposition at any point.

23          Can we have an agreement as to the

24         authenticity of documents?  Not their

25         admissibility, but if we've received a

```
 1              document from you in discovery, that at
 2              least it came from a search of Yale
 3              files?  And then maybe I'll follow up
 4              with a request to admit or two?
 5                   MR. SHEA:  Yes.
 6                   MR. PATTIS:  Yeah?  Okay.  Good.
 7                   MR. SHEA:  Yes.
 8                   MR. PATTIS:  Then let's move
 9              forward.  That will save everyone some
10              time.
11                   Can we please look at Exhibit 17,
12              please?
13   BY MR. PATTIS:
14        Q    Were you aware that in early September
15   of 2018 that the Yale Daily News had received a
16   copy of the petition circulated among Yale School
17   of Medicine faculty and graduates about Dr. Simons
18   and his new professorship?
19        A    So, I think this may be the petition
20   that I'm referring to.
21        Q    I think it is, yes.
22        A    And I think it was actually generated
23   from alums and then picked up by some of the --
24   some of the existing faculty and maybe even
25   students signed onto it.  But I think it's the
```

Falzarano Court Reporters, LLC

```
 1   same petition.
 2        Q    In September of 2018 were you issued an
 3   ultimata or an ultimatum by any group that you
 4   needed to act by a certain date or they would
 5   publicize something or hold an event or do
 6   anything to that effect?
 7        A    I don't remember --
 8        Q    Okay.
 9        A    -- on that.
10        Q    Were you concerned -- was time of the
11   essence for you to act with respect in Dr. Simons'
12   case in September of 2018?
13             MR. SHEA:  Object to the form.  You
14             can answer.
15             THE WITNESS:  Oh, I don't think
16             time was of the essence.  I think there
17             was a feeling that every day that went
18             by was -- with this issue festering was
19             not good for Yale.
20   BY MR. PATTIS:
21        Q    Because?  Because why?
22        A    Well, because the anger in the community
23   was growing.  It wasn't -- you know, people were
24   very upset about this issue.  And we believed that
25   if we could explain our intentions, it would die
```

```
 1    down.  And every day that went by made it clear
 2    that we were wrong.
 3         Q    Did anybody step forward on Dr. Simons'
 4    behalf and say, Wait, he was punished five years
 5    ago.  This is ridiculous to punish him all over
 6    again.  Did anybody come forward with that in
 7    protest?
 8                   MR. SHEA:  Object to the form.  You
 9             can answer.
10                   THE WITNESS:  There were a few
11             faculty who came up very quietly to me.
12    BY MR. PATTIS:
13         Q    Do you think they were afraid to come
14    out publicly?
15         A    Yes.  And, you know, basically expressed
16    that point of view.  But there were very few of
17    them.
18         Q    How many men are on the executive board
19    of SWIM?
20                   MR. SHEA:  Object to the form.  You
21             can answer if you know.
22                   THE WITNESS:  I don't think any.
23    BY MR. PATTIS:
24         Q    Does that raise questions in your mind
25    about how representative that group is of the
```

1  community at Yale?

2           MR. SHEA:  Object to the form.

3           THE WITNESS:  Yeah.  So, I didn't

4       form SWIM.  The dean's office did not

5       form SWIM.

6  BY MR. PATTIS:

7       Q    Not the question.

8       A    Yeah.  So, I -- yeah, I can't pass

9  judgment on --

10      Q    Yeah, you can.  I mean, is that

11 representative of the community?  If a group of

12 angry women get together and form a group, is that

13 the community or is that one voice in the

14 community that others may be afraid to oppose?

15          MR. SHEA:  Object to the form.

16          THE WITNESS:  Yeah, I think you

17      have to say it's a group of women who

18      are very committed to these issues.  And

19      you could say that they reinforce each

20      other.  But I actually don't know how

21      they decided who gets on the executive

22      committee.

23 BY MR. PATTIS:

24      Q    Suppose a group of men were formed at

25 Yale -- the men's committee opposed to sexual

```
 1    hysteria -- and it had 50 men on the board and it
 2    came out in Dr. Simons' support.  Would you have
 3    regarded that as a voice in the community that you
 4    should heed?
 5                    MR. SHEA:  Object to the form of
 6              the question.  Hypothetical.  Answer if
 7              you can.
 8                    THE WITNESS:  Yeah.  You know, I
 9              would say that I would have heeded
10              advice from any group --
11    BY MR. PATTIS:
12         Q    Okay.
13         A    -- that -- actually, I'm sure we'll be
14    getting to it -- sought advice from many different
15    groups.
16         Q    I'd like to take a look at Exhibit 19.
17    This appears to be an e-mail from Paula Kavathas
18    I'm not sure I'm pronouncing her name correctly.
19    Do you know who that is?
20         A    Yes.
21         Q    Who is she?
22         A    Paula was a member of the executive
23    committee of SWIM and was always a very active
24    member of SWIM.
25                    MR. SHEA:  Can I just ask here what
```

```
 1              starts.  What's your 14?
 2                   MR. PATTIS:  Mine is an e-mail
 3              dated March 27, 2018 from Margaret Bia,
 4              B-i-a.
 5                   MR. SHEA:  That's your 13, Cam.
 6                   MR. PATTIS:  Well, Doctor, there's
 7              a joke among lawyers, If we could count,
 8              we would have gone to medical school.
 9              Instead we just argue with our own
10              shadows.
11  BY MR. PATTIS:
12       Q    Doctor, are you still there?
13       A    Yes.
14       Q    Okay.  Can you please read this and let
15  me know when you've had a chance to do so?
16       A    So, it's from --
17       Q    To yourself, sir.
18       A    (Reading.)  Okay.
19       Q    Have you seen this e-mail before?
20       A    I actually don't think so.
21       Q    Okay.  Now, does Professor Stachenfeld
22  go by the name Nina?
23       A    Yes.  To me.
24       Q    So, although she's Stephanie, Stephanie
25  and Nina are the same person?
```

STATE OF CONNECTICUT

1    I, KRISTINE A. PARADIS, LSR 338, a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Re-Notice, there came remotely before me via videoconference on the 16th day of July, 2021, the following named person, to wit:  ROBERT ALPERN, M.D., who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this __29th__ day of_____July_____, 2021.

_Kristine Paradis_

KRISTINE A. PARADIS, CSR #338
Certified Shorthand Reporter
My Commission expires:  May 31, 2023

Falzarano Court Reporters, LLC