# Exhibit G

1                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
2

3    – – – – – – – – – x
     MICHAEL SIMONS,            |
4              Plaintiff,       |
                                |   3:19–CV–01547(VAB)
5           v.                  |
                                |
6    YALE UNIVERSITY,           |
     PETER SALOVEY,             |
7    ROBERT ALPERN, M.D.,       |
     UNKNOWN PERSONS,           |
8              Defendants. |   October 28, 2021
     – – – – – – – – – x
9

10

11

12          DEPOSITION OF NINA STACHENFELD

13              via videoconference

14

15       Taken before Kristine A. Paradis, LSR 338, a
     Court Reporter and Notary Public within and
16   for the State of Connecticut, pursuant to
     Re–Notice and the Federal Rules of Civil
17   Procedure, via videoconference, on
     October 28, 2021, commencing at 10:04 a.m.
18

19

20

21

22

23          FALZARANO COURT REPORTERS, LLC
                   4 Somerset Lane
24          Simsbury, Connecticut 06070
                   860.651.0258
25          www.falzaranocourtreporters.com

1    APPEARANCES:

2         For the Plaintiff:

3              PATTIS & SMITH, LLC
               383 Orange Street
4              New Haven, Connecticut 06511
               203.393.3017
5              catkinson@pattisandsmith.com
                    BY:  CAMERON ATKINSON, ESQ. **

6

7         For the Defendants Yale University,
          Peter Salovey, and Robert Alpern, M.D.:
8
               CLENDENEN & SHEA, LLC
9              400 Orange Street
               New Haven, Connecticut 06511
10             203.787.1183
               kcs@clenlaw.com
11                  BY:  KEVIN C. SHEA, ESQ. **

12

13

14

15

16

17   ** via videoconference

18

19

20

21

22

23

24

25

1                    S T I P U L A T I O N S

2

3              It is stipulated and agreed by counsel

4    for the parties that all objections are reserved

5    until the time of trial, except those objections as

6    are directed to the form of the question.

7              It is stipulated and agreed between

8    counsel for the parties that the proof of the

9    authority of the Notary Public, before whom this

10   deposition is taken, is waived.

11             It is further stipulated that any defects

12   in the Notice are waived.

13             It is further stipulated that the

14   deposition may be signed before any Notary Public.

15

16            T R A N S C R I P T   L E G E N D

17
     (sic)               – Exactly as said.
18
     (Phonetic)          – Exact spelling not provided.
19
     ( -- )              – Break in speech continuity
20                         and/or interrupted sentence.

21   (...)               – Indicates omission of word[s]
                           when reading OR trailing off
22                         and not finishing a sentence.

23   (As read)           – When reading, adding,
                           deleting or changing words so
24                         as not to be a direct quote
                           from document.
25

Falzarano Court Reporters, LLC

```
 1              (Exhibits 1, 4, and 13:

 2               Marked for Identification.)

 3

 4          (Deposition commenced:  10:04 a.m.)

 5

 6          THE COURT REPORTER:  I'm going to

 7     ask counsel, since the remote notary has

 8     sort of expired and we haven't gotten

 9     any further guidance, I've been given

10     this by the Connecticut Court Reporters

11     Association to read:

12          "Will counsel please stipulate that

13     in lieu of formally swearing in the

14     witness, that I will instead ask the

15     witness to acknowledge that their

16     testimony will be true under the

17     penalties of the perjury; that counsel

18     will not object to the admissibility of

19     the transcript based on proceeding in

20     this way; and that the witness has

21     verified that she is, in fact, Nina

22     Stachenfeld?"

23          THE WITNESS:  Yes --

24          MR. ATKINSON:  Yeah.

25          THE WITNESS:  -- I do.
```

```
 1              MR. SHEA:  Yes, I do.
 2              THE COURT REPORTER:  And, Doctor,
 3         are you currently located in the state
 4         of Connecticut?
 5              THE WITNESS:  Yes.
 6              THE COURT REPORTER:  Which town?
 7              THE WITNESS:  New Haven.
 8              THE COURT REPORTER:  And other than
 9         Attorney Shea, is there anyone in the
10         room with you?
11              THE WITNESS:  No.
12              THE COURT REPORTER:  All right.
13         We're all set.
14              MR. ATKINSON:  Thank you, Kristine.
15              Thank you, Dr. Stachenfeld.
16
17              NINA STACHENFELD, Deponent, of Yale
18         School of Medicine, John B. Pierce
19         Laboratory, 290 Congress Avenue,
20         New Haven, Connecticut 06519, was
21         examined and testified, under penalties
22         of perjury, as follows:
23
24
25
```

```
 1                    DIRECT EXAMINATION

 2

 3   BY MR. ATKINSON:

 4        Q    My name is Cameron Atkinson.   I

 5   represent Dr. Michael Simons in a lawsuit that

 6   he's brought against Yale University, Peter

 7   Salovey, Robert Alpern, and some folks whose

 8   identity we don't know and we may never know.

 9             And I'd like to begin by thanking you

10   for appearing this morning.   I know we didn't give

11   you a lot of choice about the matter, but thank

12   you anyway for appearing.

13             Have you ever had your deposition taken

14   before?

15        A    Yes.

16        Q    Okay.   And so you're aware that we're

17   trying to make a record of the words spoken.   And

18   some of the normal conventions that apply in

19   communications sometimes make for what can be

20   called a difficult record.   So, nodding or saying

21   uh-hum or un-uh, helping me along with nonverbal

22   cues, etc. isn't going to get recorded on the

23   proceedings here.

24             So, I'm just going to ask you if I ask

25   you a question and you need to convey no, that you
```

1    please say no.  Or if you mean to say yes, please

2    say yes.  Is that clear to you?

3          A    Yes.

4          Q    Okay.  And I'm not just -- I'm not

5    trying to make this difficult.  I just want to

6    have something that we can read later.

7                I know a lot of us are fast talkers.

8    Don't let me talk over your answers.  If I

9    misinterpret a pause as you thinking or stopping,

10   just let me know you're not finished and obviously

11   I'll let you finish.

12               If you need a break at any time today,

13   just let us know.  The only thing I would ask is

14   that you finish answering the question that's

15   pending before you take a break.

16               If at any point I ask a question that

17   raises in your mind a question of privilege -- so,

18   for example, you've referred in some of your

19   documents or some of your conversations to

20   communications with Yale counsel -- feel free to

21   stop the deposition to discuss that with Attorney

22   Shea.  Is that clear to you?

23         A    Yes.

24         Q    Okay.  And then my next question is a

25   little personal and I apologize, but I guess as a

```
 1   physician you'll understand why I need to ask

 2   this.  Are you taking any medication or do you

 3   have any medical condition or any other reason to

 4   be concerned about your ability to sit for a

 5   deposition today and to recall and testify to

 6   events and testify accurately?

 7        A    Let me clarify that I'm not a physician;

 8   I have a Ph.D.

 9        Q    Okay.  So, then I guess are you taking

10   any medication or do you know of any other reason

11   that would affect your ability to testify

12   accurately here today?

13        A    No.

14        Q    Okay.  That's the last of the

15   preliminary questions that I have.  So, let's jump

16   right in.

17             You obviously just clarified for the

18   record that you're not a physician.  Can you

19   explain to me who you are and what you do at Yale

20   University, please?

21        A    I am a researcher.  So, I do research at

22   the university and at the John B. Pierce

23   laboratory.

24        Q    Okay.  And what's your area of research?

25        A    Physiology.
```

1      Q     Okay.  And would you say -- would it be

2   a fair description to say that your research is

3   somehow tied to the medical school in some way?

4      A     Yes.

5      Q     Okay.  And how long have you been at

6   Yale University in a research capacity?

7      A     Since 1993.

8      Q     Okay.  And taking a step back, do you

9   teach at Yale University as well?

10     A     No.

11     Q     Okay.  So, just so I am clear on

12  understanding, you run a lab affiliated with the

13  Yale School of Medicine, but that doesn't

14  necessarily carry a teaching responsibility?

15     A     Yes.

16     Q     Okay.  I guess my next question, kind of

17  getting to the meat of what we're here about

18  today, you're part of an organization -- are you

19  part of an organization that goes by the acronym

20  SWIM?

21     A     Yes.

22     Q     Okay.  And would you be able to define

23  for us what the acronym SWIM stands for?

24     A     Committee on the Status of Women in

25  Medicine.

```
 1        Q    Okay.  And were you a founding member of

 2   SWIM or did you join SWIM after it was founded?

 3                    MR. SHEA:  Object to the form; you

 4           can answer.

 5                    THE WITNESS:  I joined after it was

 6           formed.

 7   BY MR. ATKINSON:

 8        Q    Okay.  Do you know when it was formed?

 9        A    It was formed in the '70s.  I can't

10   remember the exact year.

11        Q    Okay.  That's fine.  That's close

12   enough.  Did you join as soon as you began working

13   at Yale?

14        A    No.

15        Q    Would you be able to recall when you

16   joined SWIM?

17        A    Not exactly.  I believe about ten years

18   ago.  Maybe less.  I'm sorry I can't remember

19   exactly.

20        Q    That's fine.  I'm not going to force an

21   answer out of you --

22        A    Okay.

23        Q    -- on that.

24             Is it true at this point, or at times

25   relevant at least in 2018 I guess is what I'm
```

```
 1   trying to get at, you were a co-chair of SWIM?

 2        A    Yes.

 3        Q    Okay.  When did you rise to the position

 4   of being a co-chair of SWIM?

 5        A    About four years ago.

 6        Q    So, 2016?

 7        A    Yes, I guess.

 8        Q    Okay.  And what's the process look like

 9   for selecting a chair at SWIM?

10        A    We have an executive committee.  And at

11   that time it was informal among the committee

12   members.  We would discuss it and choose a chair.

13        Q    Understood.

14             Let's talk about SWIM as an organization

15   for a moment.  Does SWIM receive any funding from

16   Yale University or any sort of financial support?

17             MR. SHEA:  Object to the form; you

18             can answer.

19             THE WITNESS:  The only support we

20             receive is a small amount of time of one

21             of the admins in Dean Latimore's office.

22             So, she assists us with scheduling and

23             that kind of support.  But no other

24             financial support.

25
```

Falzarano Court Reporters, LLC

BY MR. ATKINSON:

Q    Okay.  Can you describe -- can we
discuss that a little more?  When you say that you
receive admin assistance from Dean Latimore's
office, when did -- did this sort of admin
assistance always exist for SWIM as far as you can
recall or is it something more of a more recent
development?

            MR. SHEA:  Object to the form; you
        can answer.

            THE WITNESS:  We had assistance
        from the Women in Medicine's office of
        the same type and then it moved to Dean
        Latimore's office.  I cannot remember
        the year that that happened.  It might
        have been when they hired Dean Latimore,
        but I really don't remember when.

BY MR. ATKINSON:

Q    Okay.  The Women in Medicine's office,
just --

A    I'm sorry, Office of Women in Medicine.

Q    Office of Women in Medicine.  That's a
formal office maintained by the university?

A    School of medicine.

Q    Okay.  And was SWIM ever officially

```
1   associated with that or did it exist just as a
2   stand-alone organization among faculty?
3                   MR. SHEA:  Object to the form; you
4           can answer.
5                   THE WITNESS:  Can you rephrase that
6           question?
7                   MR. ATKINSON:  Sure.
8                   THE WITNESS:  Because none of those
9           is correct.
10                  MR. ATKINSON:  I apologize.
11  BY MR. ATKINSON:
12      Q    Did SWIM ever have a formal association
13  with the Office of Women in Medicine?
14      A    No.
15      Q    Did it ever have an official
16  relationship with any office at Yale?
17                  MR. SHEA:  Object to the form; you
18          can answer.
19                  THE WITNESS:  Yes.
20  BY MR. ATKINSON:
21      Q    When you say, "yes," can you elaborate a
22  little more on that, please?
23                  MR. SHEA:  Object to the form; you
24          can answer.
25                  THE WITNESS:  The dean's office --
```

```
 1              the school of medicine.  The dean's
 2              office.
 3  BY MR. ATKINSON:
 4      Q    And what nature did that official
 5  relationship take?
 6              MR. SHEA:  Object to the form; you
 7              can answer.
 8              THE WITNESS:  We're considered an
 9              office -- we are considered an office
10              from -- a committee of the dean's
11              office.  I don't know how to clarify it
12              further.
13  BY MR. ATKINSON:
14      Q    Okay.  So, if I may, let me see if we
15  can break it down and I'll kind of walk through it
16  a little more.
17      A    I --
18      Q    So, when you say it's a -- sorry.  Go
19  ahead.
20      A    I wanted to interrupt.  I misspoke
21  before.  The chair -- for the answer to the
22  financial support, the chairs also receive
23  financial support from the school of medicine from
24  the dean's office.  I think it's from the dean's
25  office.  I'm not sure where the money comes from.
```

```
 1   We receive $30,000 a year salary.  I forgot about
 2   that.  So, I misspoke before.
 3        Q    Okay.  So, let's break the two of the
 4   things down here and I think they kind of go hand
 5   in hand.
 6             So, when you say that SWIM is -- so,
 7   you've just described SWIM as a committee to me,
 8   if I heard you correctly.
 9        A    Right.
10        Q    Am I correct in saying that?
11        A    Yes, it's a committee.
12        Q    Okay.  And when you say, "committee," do
13   you know if by -- or do you mean by saying
14   committee and describing SWIM as a committee if
15   it's an official committee established by the dean
16   of the school of medicine's office?
17             MR. SHEA:  Object to the form;
18             answer if you know.
19             THE WITNESS:  I'm not sure exactly
20             how it was established.
21   BY MR. ATKINSON:
22        Q    Well, all right.  So, that's fair
23   enough.
24             Do you know if it currently operates or
25   since you've been a part of SWIM if it's operated
```

1    as a committee under the umbrella of the dean of

2    the school of medicine's office?

3                    MR. SHEA:  Object to the form; you

4              can answer if you know.

5                    THE WITNESS:  It is considered one

6              of the many committees as part of the

7              deanery, yes.

8    BY MR. ATKINSON:

9        Q    So, when you say there are many

10   committees -- and perhaps this will help us

11   clarify some parts of your answer here -- can you

12   give me an example of another committee associated

13   with the dean's office that would be similar to

14   SWIM or just as an example of any committee

15   associated with the dean's office?

16       A    The committee MORE.  And I forget the

17   acronym, but it's a committee involved in

18   promoting minority -- oh, it's the committee for

19   promoting minority retention and advancement.

20       Q    Understood.  So, would it be a fair

21   characterization of SWIM's relationship to the

22   dean's office at Yale Medical School to say that

23   SWIM is a specialized committee of faculty that

24   works on behalf of the dean's office in exploring

25   ways to advance the interest in the diversity of

```
 1  women in the sciences and in the school of

 2  medicine, in particular?

 3              MR. SHEA:  Object to the form of

 4          the question; you can answer.

 5              THE WITNESS:  The word "behalf" is

 6          not the word I would use.  We -- the

 7          committee works to advance -- the

 8          committee works to improve the culture

 9          and climate at the medical school for

10          women.

11  BY MR. ATKINSON:

12      Q   Okay.  And I guess my -- what I'm really

13  trying to understand in terms of your answer here

14  is in terms of that relationship with the dean's

15  office, it wouldn't be like you're formally acting

16  on behalf of the dean's office; you're

17  essentially -- if anything, you're conducting

18  research on behalf of the dean's office, but

19  you're making your own recommendations.  Would

20  that be something closer to the actual --

21  describing the actual relationship accurately?

22              MR. SHEA:  Object to the form; you

23          can answer.

24              THE WITNESS:  The committee really

25          is a committee that is a combination of
```

```
 1              advocacy and suggestion and we work to

 2              suggest ways to improve climate and

 3              culture at the school for women.  So,

 4              the word "on behalf" doesn't really

 5              describe our relationship to the dean --

 6  BY MR. ATKINSON:

 7       Q    Okay.

 8       A    -- or the dean's office.

 9       Q    Okay.  How would you describe your

10  relationship, if I give you an open floor, which

11  is probably --

12       A    As I just did.

13       Q    Okay.

14       A    As I just did.  We --

15       Q    Okay.  Fair enough.  Fair enough.

16              You mentioned earlier the chairs of SWIM

17  receive $30,000 each in terms of support from the

18  dean's financial support or salary from the dean's

19  office, if I say that correctly.  Do you know when

20  that stipend or when that salary boost was put in

21  place?

22       A    I don't remember.  It was I want to say

23  about 2016 -- or 2015, '16.  Somewhere around

24  there.  But I really don't remember the exact

25  year.
```

```
 1       Q     Okay.

 2       A     It was before I was chair.

 3       Q     Did any conditions come attached --

 4       A     No.

 5       Q     -- to that additional salary?

 6       A     No.

 7       Q     No?  But you received it simply by

 8  being -- by virtue of being a co-chair of SWIM?

 9       A     Yes.

10       Q     Okay.  Who's your fellow co-chair at

11  SWIM?

12       A     Elizabeth Jonas.

13       Q     Okay.  To the best of your knowledge, do

14  any other members of SWIM's executive committee

15  receive any sort of salary for being a member of

16  SWIM's executive committee?

17       A     No.

18       Q     Any other form of financial assistance?

19       A     No.

20       Q     Okay.  When did -- shifting gears here a

21  bit, when did -- are you familiar with a person

22  named Michael Simons?

23       A     Yes.

24       Q     When did you first become familiar with

25  Dr. Simons?
```

```
 1        A    I don't remember exactly.  It might be
 2   from The New York Times articles.
 3        Q    Okay.
 4        A    I don't remember when they were
 5   published.
 6        Q    Would you mind repeating the last part
 7   of your answer because --
 8        A    I said I don't remember when they were
 9   published.
10        Q    Got you.  And so The New York Times is
11   the first time you ever hear of Michael Simons?
12        A    I think so.
13        Q    Okay.  And if you'll allow me a second,
14   please.  If I told you that there was a series of
15   stories published in The New York Times about
16   Dr. Simons in 2013, would that help refresh your
17   recollection as to when you first heard of him?
18        A    I guess, if -- I don't -- I really don't
19   remember exactly when I first heard of him.  It's
20   been a long series.  So, it's possible I heard of
21   him prior to those articles.  But that's my
22   strongest recollection.  And if those happened in
23   2013, then, yeah, I would -- then, obviously, it
24   would be 2013.
25        Q    Okay.  And I'm not trying to be
```

1    torturous here, but I just --

2        A    Yeah, I just don't --

3        Q    Yeah, I --

4        A    I'm not trying to lie either.  I just

5    don't -- you know, I really don't remember my

6    first -- the first time I heard --

7        Q    And I appreciate that.  So, the last

8    thing I'm going to ask you on this is just to

9    attempt to round this out, etc.

10           So, the first time you're hearing of

11   Michael Simons and the first time that you can

12   recall of hearing of Michael Simons as you sit

13   here today is in the context of the allegations

14   against him as published in *The New York Times*?

15       A    Yes.

16       Q    How did you react to the allegations

17   published in *The New York Times* against Michael

18   Simons?

19               MR. SHEA:  Object to the form; you

20           can answer.

21               THE WITNESS:  I remember -- I'm not

22           sure I remember exactly.  I was shocked

23           and disappointed.

24   BY MR. ATKINSON:

25       Q    And when you say you were shocked and

```
 1    disappointed, obviously those two words speak for
 2    themselves.  But did your feelings about Michael
 3    Simons spur you to or prompt you to take any
 4    action at that point?
 5        A    No.
 6        Q    Okay.  Did you make any effort to
 7    inquire as to the veracity of The New York Times'
 8    allegations against Michael Simons?
 9        A    No.
10        Q    Did you believe The New York Times'
11    allegations and that first set of stories against
12    Michael Simons?
13        A    Yes.
14        Q    And you believed them without making --
15    without making any independent inquiry as to the
16    veracity?
17        A    Yes.
18        Q    Okay.  Did you make any inquiry as to
19    what kind of colleague Michael Simons was with his
20    fellow faculty?
21             MR. SHEA:  Object to the form; you
22        can answer.
23             THE WITNESS:  I don't remember.
24    BY MR. ATKINSON:
25        Q    Did you know anything of Michael Simons
```

Falzarano Court Reporters, LLC

```
 1   as a researcher or a doctor at all?
 2                MR. SHEA:  Object to the form; you
 3           can answer.
 4                THE WITNESS:  I knew that he was a
 5           very successful researcher.
 6   BY MR. ATKINSON:
 7       Q    And --
 8       A    Well, I found that out after hearing of
 9   him from that article.  I had not heard of him
10   before those articles came out.
11       Q    How did you find out after the articles
12   came out that he was a very successful researcher?
13       A    If I recall, that was in the article.
14   And -- yeah, that's all that I can remember.  I
15   really don't remember how I found that out.
16       Q    At that point after the first set of
17   stories in The New York Times, did Michael Simons
18   become a topic of discussion for SWIM?
19                MR. SHEA:  Object to the form;
20           answer if you know.
21                You're talking about 2013, Cam?
22                MR. ATKINSON:  Correct.  Thank you,
23           Kevin.
24                THE WITNESS:  I don't remember if I
25           was even on SWIM in 2013.
```

```
 1                   MR. ATKINSON:  Fair enough.  Fair
 2            enough.  I'm not going to force you to
 3            recall in that regard.
 4   BY MR. ATKINSON:
 5        Q    Do you know if there was a second set of
 6   stories published in The New York Times about
 7   Dr. Simons?
 8        A    Yes.
 9        Q    And do you recall when that second set
10   of stories was published?
11        A    No.
12        Q    Okay.  That's fair enough.
13            What was your reaction to the second set
14   of stories?
15                   MR. SHEA:  Object to the form; you
16            can answer.
17                   THE WITNESS:  I remember thinking
18            that it focused not only on Dr. Simons
19            but also on Dean Alpern.
20   BY MR. ATKINSON:
21        Q    Focused on Dean Alpern as well?  What do
22   you mean it focused on Dean Alpern?
23        A    That the article focused on not just
24   Dr. Simons but on the school of medicine's
25   response.  That's really the main recollection
```

```
 1   that I have.
 2       Q    Okay.  No, I'm not going to push that
 3   any further.  I appreciate what you are able to
 4   recall.
 5            What do you recall of the second series
 6   of articles saying about Mr. Simons?
 7       A    Nothing.
 8       Q    Okay.
 9       A    I just remember that there was an
10   article and it was back in the paper and it
11   discussed what I already told you.
12       Q    Would it be fair to say that the second
13   set of New York Times stories confirmed your
14   belief of the allegations against Dr. Simons?
15            MR. SHEA:  Object to the form.
16            Mischaracterization.  You can answer.
17            THE WITNESS:  It would -- it
18            would -- those articles didn't change my
19            opinion of Dr. Simons.
20   BY MR. ATKINSON:
21       Q    Okay.  After the second set of stories
22   was published, did you make any efforts to inquire
23   as to the veracity of the allegations against
24   Dr. Simons?
25       A    No.
```

```
 1        Q    As you sit here today, Dr. Stachenfeld,

 2   do you know any of the details of the allegations

 3   against Dr. Simons?

 4                 MR. SHEA:  Object to the form; you

 5            can answer.

 6                 THE WITNESS:  Not beyond what I

 7            have read in the paper.  And -- yeah, I

 8            don't -- in terms -- I'm trying to give

 9            you a -- I'm thinking because I'm trying

10            to give you an honest answer.

11                 So, in terms of facts, no.  Not

12            beyond what I read in the paper.  And --

13            or other -- anything else that's been

14            published.  And I can't remember, so --

15   BY MR. ATKINSON:

16        Q    Okay.

17        A    -- I'll say no.

18        Q    Fair enough.

19            Can you give us a brief description of

20   what your understanding of the allegations against

21   Dr. Simons are?

22        A    My understanding is that he wrote a love

23   letter to a woman in his lab.  And when that was

24   rejected, he retaliated by -- against her then-

25   fiancé, now husband by interfering with his
```

```
 1   professional progress.

 2        Q    Let's unpack a couple of things about

 3   your answer, Dr. Stachenfeld.  Would it make a

 4   difference to you if the female doctor to whom

 5   Dr. Simons wrote a love letter did not work in his

 6   lab but worked in someone else's lab?

 7                  MR. SHEA:  Object to the form; you

 8             can answer.

 9                  THE WITNESS:  I don't know.

10   BY MR. ATKINSON:

11        Q    When you say you don't know, do you mean

12   you don't know how you would have reacted to that?

13                  MR. SHEA:  Object to the form; you

14             can answer.

15                  THE WITNESS:  Yes.

16   BY MR. ATKINSON:

17        Q    Is there anything inherently wrong for a

18   man to write an unsolicited love letter to someone

19   he admires?

20                  MR. SHEA:  Object to the form of

21             the question; hypothetical.  Answer if

22             you're able.

23                  THE WITNESS:  No.

24   BY MR. ATKINSON:

25        Q    Would it have made a difference to you
```

```
 1    if the fiancé of the female doctor that Dr. Simons
 2    wrote the letter to worked in someone else's lab?
 3                    MR. SHEA:  Object to the form.
 4                    THE WITNESS:  Yes.
 5    BY MR. ATKINSON:
 6        Q    What kind of difference would that have
 7    made to you?
 8                    MR. SHEA:  Same objection.
 9                    THE WITNESS:  He could not -- if
10            that -- it would have mattered to me if
11            he could not have retaliated against
12            him.
13    BY MR. ATKINSON:
14        Q    If there were other people who could
15    have interposed to prevent any retaliation against
16    the doctor's fiancé by Dr. Simons, would it have
17    made a difference in you not calling for him to be
18    removed from his endowed professorships at Yale?
19                    MR. SHEA:  Object to the form;
20            hypothetical.
21                    THE WITNESS:  Can you rephrase
22            that?
23                    MR. ATKINSON:  Sure.
24                    THE WITNESS:  I'm not sure I
25            understand it.
```

Falzarano Court Reporters, LLC

```
 1   BY MR. ATKINSON:

 2       Q    If the doctor's fiancé worked in someone

 3   else's lab and someone else could have interposed

 4   to prohibit Dr. Simons from retaliating in any way

 5   against this male doctor, would that have made a

 6   difference in your decision to advocate for

 7   Dr. Simons to be removed from his endowed

 8   professorship at Yale?

 9                MR. SHEA:  Same objection.

10                THE WITNESS:  That's -- I don't

11           know.  That's very --

12                MR. ATKINSON:  Okay.  I'm not going

13           to force an answer on that.

14   BY MR. ATKINSON:

15       Q    The last question that I believe I have

16   on this line is if someone told you here today

17   that Dr. Simons actually spent hours upon hours

18   assisting this doctor's fiancé to try to get his

19   research career back on track after he sent the

20   love letter and that love letter was rejected,

21   would it have made a difference in your perception

22   of Dr. Simons?

23                MR. SHEA:  Object to the form of

24           the question; answer if you're able.

25                THE WITNESS:  No.
```

```
 1   BY MR. ATKINSON:
 2       Q    So, even if there -- so, your testimony
 3   is today is even if there was evidence that
 4   Dr. Simons went out of his way to help the fiancé,
 5   it would not have made a difference in --
 6   withdrawn.  Let me rephrase.
 7            It's your testimony today that even if
 8   Dr. Simons went out of his way to help the fiancé
 9   of this doctor after she rejected his romantic
10   advances, instead of retaliating against him, it
11   would not have changed your view of what he did?
12                MR. SHEA:  Object to the form.
13                THE WITNESS:  That -- you asked the
14                question in two different ways.  So, if
15                the -- if what you're saying is actually
16                the truth, it would make a difference.
17                So -- it would make a difference if he
18                truly did not retaliate.
19   BY MR. ATKINSON:
20       Q    When you say, "it would make a
21   difference," would you -- as sitting here today if
22   that was given to you as the truth, would you
23   advocate for Dr. Simons to be returned to his
24   endowed professorships at Yale?
25                MR. SHEA:  Object to the form of
```

```
 1              the question; hypothetical.  Answer if
 2              you're able.
 3                   THE WITNESS:  I don't know.
 4   BY MR. ATKINSON:
 5        Q    So, your testimony is that even if you
 6   didn't -- even if you knew that Dr. Simons was
 7   innocent of any retaliation against this doctor,
 8   you could not advocate for him to return to be
 9   restored to his endowed professorships?
10                   MR. SHEA:  Object to the form of
11              the question.  Cam, it's a
12              mischaracterization of what she said.  I
13              know you're trying to be polite, but
14              it's getting argumentative.  She did
15              answer the question, so I'm going to
16              also object that it was asked and
17              answered.  But --
18                   MR. ATKINSON:  All right.  That's
19              fair enough.  I'll withdraw the
20              question, Kevin.
21                   And may I have a moment to see
22              where I'm going next, please?
23                   MR. SHEA:  Sure.
24                   (Pause.)
25
```

```
 1   BY MR. ATKINSON:
 2       Q    Dr. Stachenfeld, did SWIM at some point
 3   during your involvement or since you've been
 4   involved with SWIM, did it take an active role in
 5   advocating for Dr. Simons to be removed from first
 6   the Robert W. Berliner professorship of medicine
 7   and then from the Waldemar Von Zedtwitz chair or
 8   professorship of medicine?
 9       A    Yes.
10            MR. SHEA:  Object to the form; you
11            can answer.
12            THE WITNESS:  Yes.
13   BY MR. ATKINSON:
14       Q    Do you recall as you sit here today when
15   SWIM first took that role?
16       A    Not exactly.  It would have been after
17   the decision, you know, had been made and we -- it
18   was -- the understanding of decisions surrounding
19   Dr. Simons were a little unclear as to what --
20   they were a little unclear.  So, once it became
21   clear, we -- if I remember correctly, and I may
22   not -- I believe that SWIM in one of our meetings
23   with Dean Alpern might have discussed it with him.
24       Q    Okay.  Fair enough.
25       A    I'm not sure exactly when that was.
```

 1         Q    So, just to make sure I understand your

 2    answer, when you say the reasoning around the

 3    decisions were unclear, are you referring to SWIM

 4    needing to think through something or are you

 5    referring to the explanations you were getting

 6    from Dean Alpern and other officials at Yale as to

 7    the decisions made concerning Dr. Simons?

 8         A    When I say that it was unclear, it

 9    wasn't the reasons.  There was decisions that came

10    from the university as to -- there was

11    recommendations from the committee -- from the

12    University-Wide Committee on sexual harassment

13    followed by decisions made by the provost.  And

14    then some decisions were changed, if I recall.

15         So, things were a little bit confusing,

16    not about reasons for decisions but the decisions

17    themselves.  And we -- there was some point where

18    the general public -- and when I say that, I mean

19    the general Yale community -- found out that he

20    was going to retain the chair.

21         All of that was sort of a big -- took

22    place over the course of months.  And I can't

23    remember exactly, you know, the specific months

24    and so on.  So, I can't be exactly clear as to

25    when we decided to do this.  And I also don't

1  remember which particular meeting it would have

2  been when we discussed this with Dean Alpern.

3      Q    Fair enough.  Fair enough.

4          Would it be fair to say then by the time

5  you became a co-chair of SWIM in 2016 that

6  Dr. Simons had been on SWIM's agenda for -- at

7  that -- well, I'll just leave it at that, that he

8  had previously been on SWIM's agenda?

9          MR. SHEA:  Object to the form; you

10         can answer if you know.

11         THE WITNESS:  He might have been.

12         It's possible, yeah.  He might have

13         been, but I don't remember exactly.

14  BY MR. ATKINSON:

15     Q    And I'm not trying to be a jerk about

16  this, but after -- I'm trying to clarify the

17  timeline for myself.  After you become co-chair of

18  SWIM in 2016, as you sit here today, can you

19  recall when Dr. Simons first resurfaces on SWIM's

20  agenda?

21         MR. SHEA:  Object to the form; you

22         can answer.

23         THE WITNESS:  Not exactly.

24  BY MR. ATKINSON:

25     Q    Okay.  Do you recall a third set of

```
1   media reports in 2017 surrounding -- and 2018

2   surrounding the Me Too movement that involved

3   Dr. Simons as well?

4            MR. SHEA:  Object to the form; you

5        can answer.

6            THE WITNESS:  No.

7   BY MR. ATKINSON:

8        Q    Okay.  Do you know if Nancy Berliner

9   sent a letter to Dean Alpern in 2018 asking for

10  Dr. Simons to be removed from the Robert W.

11  Berliner professorship of medicine?

12       A    Yes.

13       Q    How did you come to learn of that

14  letter?

15       A    One night I got a copy of that letter

16  sent to me, to my e-mail.

17       Q    Who sent you that letter; if you recall?

18       A    I think it might have come from her.

19  I'm not -- I remember that I was very surprised.

20  I don't know Nancy Berliner, so I just received it

21  as if it was sent to me but copied to me.

22       Q    Understood.  After you received that

23  letter, after you became aware of it did you have

24  any conversations or communications with Nancy

25  Berliner about Michael Simons holding the Berliner
```

1    professorship?

2         A     No.

3         Q     What was your reaction to Dr. Berliner's

4    letter?

5                    MR. SHEA:  Object to the form; you

6              can answer.

7                    THE WITNESS:  I was glad she wrote

8              the letter.

9    BY MR. ATKINSON:

10        Q     Why were you glad she wrote the letter?

11        A     Because I thought it was important that

12   Dean Alpern hear from a member of the family about

13   how she felt about Dr. Simons continuing to hold

14   the chair in her father's name.

15        Q     Understood.  At any point did you, on

16   behalf of SWIM or you in a personal capacity, have

17   discussions with Dean Alpern about removing

18   Dr. Simons from the Robert W. Berliner

19   professorship?

20                   MR. SHEA:  Object to the form; you

21             can answer.

22                   THE WITNESS:  As far as I remember,

23             I never talked to Dean Alpern

24             personally, only in the form of SWIM

25             meetings.  It's possible that as a

1           representative of SWIM there -- I sent

2           communications to him about it.

3  BY MR. ATKINSON:

4       Q    Okay.

5       A    I never sent anything on my own behalf

6  to him; it would have been sent to him on behalf

7  of SWIM.

8       Q    Okay.  If I can take a step back because

9  you said something of interest to me there.

10 You -- if I recall what you just said correctly,

11 you stated that Dean Alpern would meet with SWIM

12 at SWIM meetings.  Would Dean Alpern regularly

13 meet with SWIM?

14      A    We had --

15           MR. SHEA:  Object to the form; you

16           can answer.

17           THE WITNESS:  We had quarterly

18           meetings, yes.

19 BY MR. ATKINSON:

20      Q    And how did these quarterly meetings

21 come about?  Would it be more accurate to describe

22 them as courtesy quarterly meetings or were they

23 something that had become sort of an institutional

24 practice?

25           MR. SHEA:  Object to the form; you

```
 1                  can answer.
 2                      THE WITNESS:  We thought from
 3                  SWIM's perspective they were important
 4                  meetings.  And we discussed issues about
 5                  climate and culture; the primary issues
 6                  important to SWIM at the school.  I
 7                  don't know Dean Alpern's perspective of
 8                  the meetings.
 9                      MR. ATKINSON:  Okay.  Okay.  Fair
10                  enough.  I wouldn't expect you to know
11                  what he thought about it.
12   BY MR. ATKINSON:
13       Q    At any point did SWIM conduct any
14   advocacy calling for Dr. Simons to be removed from
15   the Robert W. Berliner professorship?
16                      MR. SHEA:  Object to the form; you
17                  can answer.
18                      THE WITNESS:  As a group, if I
19                  remember, not -- not beyond meeting with
20                  Dean Alpern to request this.  Yeah.
21                  That's how I remember we advocated for
22                  the --
23   BY MR. ATKINSON:
24       Q    To the best of your knowledge as you sit
25   here today, did any member of SWIM or of its
```

```
 1    executive committee take any steps to learn of the
 2    veracity of the allegations against Dr. Simons?
 3                    MR. SHEA:  Object to the form; you
 4          can answer.
 5                    THE WITNESS:  I don't know.
 6    BY MR. ATKINSON:
 7         Q    Okay.  Was that ever a -- was that ever
 8    a discussion, a topic of discussion within SWIM
 9    that somebody should do that?
10                    MR. SHEA:  Object to the form.
11                    THE WITNESS:  No.
12    BY MR. ATKINSON:
13         Q    Would it be a fair characterization of
14    SWIM's understanding of the allegations against
15    Dr. Simons to have come completely from what was
16    publicly reported in the press?
17                    MR. SHEA:  Object to the form of
18          the question.
19                    THE WITNESS:  I don't --
20                    MR. SHEA:  Answer if you know.
21                    THE WITNESS:  -- know.
22                    MR. ATKINSON:  Okay.  That's fair
23          enough.
24                    If I may have a moment, please.
25                    MR. SHEA:  Certainly.
```

```
 1               (Pause.)
 2               MR. ATKINSON:  I'm going to share
 3          my screen because we do have some
 4          exhibits to go over, Doctor.  So, I'm
 5          going to share my screen.  And let me
 6          know when you can see it.
 7               THE WITNESS:  I can see it.
 8               MR. ATKINSON:  It should read
 9          Exhibit 1.
10               THE WITNESS:  Yes, I can see it.
11  BY MR. ATKINSON:
12      Q    Okay.  I'm going to scroll down.  I'm
13  going to let you review the entirety of Exhibit 1.
14  Let me know when you want the pages changed and
15  let me know when you're done.  All right?
16      A    Okay.
17      Q    Let me zoom out a little.
18      A    You want me to read this entire
19  document?
20      Q    That would be helpful.  Or you can read
21  enough to know that you --
22      A    Okay.  I'm just grabbing my glasses.
23  That's why I asked.
24      Q    Take your time.  Do you need me to go
25  back to the first page?
```

Falzarano Court Reporters, LLC

```
 1      A     No.

 2      Q     Okay.

 3      A     (Witness complies.)

 4            I am reading this.  If you're going to

 5  ask me if I remember it, I'm going to tell you

 6  that I don't, but --

 7      Q     Okay.

 8            MR. SHEA:  Just for the record,

 9            Cam, you know, I know you're marking

10            these exhibits.  Just -- I note that the

11            first page of this exhibit is an e-mail

12            with a Bates stamp 4831.  And to it is

13            attached a three-page document

14            comprised -- actually, I'm sorry, a

15            four-page document comprised of Bates

16            numbers 6805 to 6808.

17            I don't know -- and maybe the

18            doctor can confirm this if she

19            remembers -- but if the attachment is

20            the attachment referred to in the first

21            page of the e-mail.  Because I think the

22            first page of the e-mail talks about a

23            summary of the meeting and it has

24            changed since some of you last saw it.

25            And then it says the attachment --
```

```
 1              it says summary of two meetings if you

 2              look at the attachments.  And when I see

 3              the executive committee meeting minutes,

 4              all I see is a summary of the 9/18/18

 5              minutes.

 6                   So, I just -- I just for risk of

 7              mis -- confusion or mischaracterization,

 8              I just wanted to make sure that that

 9              was --

10                   MR. ATKINSON:  Understood.  So,

11              when I pulled these out of the discovery

12              that you provided to us last night, I

13              guess in terms of my brain processing it

14              I only processed what I believed was the

15              minutes from the meeting -- the

16              attachment labeled "minutes from meeting

17              with Dean Alpern and executive committee

18              of SWIM and Darin Latimore, 9/21/18

19              docs."  So, that would be the attachment

20              that I've provided in this particular

21              exhibit.

22                   MR. SHEA:  Okay.

23     BY MR. ATKINSON:

24         Q    Dr. Stachenfeld --

25         A    Okay.
```

```
 1      Q    -- do you want to continue reviewing the
 2  document?
 3      A    Sure.  If you want -- I finished to the
 4  bottom of -- the bottom of the first page.  If you
 5  want to --
 6      Q    Okay.
 7      A    (Witness complies.)
 8           Okay.
 9      Q    There's two more pages, I believe.
10      A    Okay.  I think . . .
11           (Witness complies.)
12           Okay.  Did you have a question about
13  this?
14      Q    Yes.  But I'll let you read the last
15  page.
16      A    Okay.  (Witness complies.)
17              MR. ATKINSON:  And, Kevin, just for
18              the record, I think the last page of
19              this exhibit, 6808, appears to have been
20              created a lot further or a lot later in
21              time than the minute meetings (sic).
22              So, I'm not going to refer to it in this
23              particular line of questioning.  I'll
24              just be concentrating on the first three
25              pages --
```

Falzarano Court Reporters, LLC

```
 1                   MR. SHEA:  Okay.

 2                   MR. ATKINSON:  -- of the minutes.

 3   BY MR. ATKINSON:

 4        Q    Doctor, I apologize if I moved that

 5   before you were done with it -- or are you done

 6   with it?

 7        A    I'm -- yes, I'm done with it.

 8        Q    Okay.  Perfect.  So, I'm going to take

 9   you back to the first page, which is an e-mail

10   from you to the Executive Board for Committee on

11   SWIM, which I assume -- well, rather than me

12   assuming, is the Executive Board for Committee on

13   SWIM an e-mail address or an e-mail list

14   containing all of the executive board members for

15   SWIM?

16        A    Yes.

17        Q    Okay.  And in this e-mail you -- would

18   it be a fair characterization of this e-mail to

19   say that you're sending a long minute meetings

20   from a meeting between the SWIM executive

21   committee and Dean Alpern?

22        A    Yes.  And Dean Latimore.

23        Q    Okay.  And that meeting would have taken

24   place on September 18, 2018?

25        A    It looks like it.
```

```
 1       Q     Okay.

 2       A     From the next page.

 3       Q     All right.  I'm going to move you down

 4  to the next page.  Who took -- do you recall who

 5  took these minute meetings?

 6       A     I don't, no.

 7       Q     Okay.  But as you sit here today, would

 8  this be regular practice for SWIM's executive

 9  committee to take minute meetings like this?

10                   MR. SHEA:  Object to the form.

11                   THE WITNESS:  We do the best we

12             can.  You know, we -- as I said before,

13             we don't have an admin support that

14             provides -- you know, we have admin

15             support to help us schedule and so on,

16             but we don't have an admin to help take

17             minutes and so on.  So, somebody -- you

18             know, one of the faculty -- tries to

19             take minutes.  And it's not our

20             expertise, so --

21  BY MR. ATKINSON:

22       Q     Right.

23       A     -- we do our best.

24       Q     Doctor, that wasn't a trick question at

25  all.  All I was trying to do was establish that
```

1    you have a regular practice of doing the best you

2    can with these --

3         A    Yes.

4         Q    -- minutes?

5         A    So, we do our best, yeah.

6         Q    Okay.  That's fair enough.

7              So, if I direct your attention to what

8    appears to be the first substantive paragraph of

9    the page labeled 6805, you have recorded here that

10   Dean Alpern is discussing Mike Simons' chair.  And

11   he's indicated that if Mike Simons' case came up

12   today again, the same case came up again, quote,

13   the decision would be to remove the honor,

14   referring to his chair.

15             And do you recall at that meeting if

16   Dean Alpern explained why the University-Wide

17   Committee and the provost did not remove Michael

18   Simons' chair in 2013?

19        A    I don't remember his explanation unless

20   it's in this document.  I don't remember what his

21   opinion was, no.

22        Q    Okay.  Did Dean Alpern take a position

23   at this meeting on whether Yale could remove

24   Dr. Simons from the Robert W. Berliner

25   professorship?

```
 1                    MR. SHEA:  Object to the form; you

 2            can answer.

 3                    THE WITNESS:  If you scroll down, I

 4            think it's in here.  I think he did take

 5            a position that they could not.  But I

 6            don't remember.  And this would be not

 7            something that we as SWIM certainly

 8            understood and we don't understand the

 9            rules.

10  BY MR. ATKINSON:

11      Q    Okay.  So, I'll scroll down.  Let me

12  know where you want me to stop.

13      A    I'm not -- yeah.  So, I'm not -- I don't

14  remember --

15      Q    Okay.

16      A    -- is the answer to the question.  We

17  had so many discussions with Dean Alpern about

18  this, that, yeah -- you know, I don't remember if

19  he explained to us exactly how these changes would

20  work.

21                    MR. ATKINSON:  Okay.  Let me have

22            a -- may I have a moment, please?

23                    MR. SHEA:  Sure.

24                    (Pause.)

25
```

```
1    BY MR. ATKINSON:
2         Q    Dr. Stachenfeld, did Dean Alpern raise
3    in this meeting the question of fairness about
4    punishing Dr. Simons twice for the same offense?
5                   MR. SHEA:   Object to the form; you
6              can answer.
7                   THE WITNESS:   I don't remember.
8              The only thing he would say to us is
9              that since they didn't do it at the
10             time, he didn't know if it could be done
11             later.   I don't think he ever used those
12             words with us --
13   BY MR. ATKINSON:
14        Q    Did he --
15        A    -- that he would be punishing for the
16   same crime twice.   I don't think --
17        Q    Okay.
18        A    -- he --
19        Q    Fair enough.   Fair enough.
20             It does say here in the notes -- and
21   I'll direct your attention back to the 6805
22   page -- that Dean Alpern -- quote, Dean Alpern
23   does not -- and I'll highlight it for you if that
24   will help.
25        A    Okay.
```

Falzarano Court Reporters, LLC

```
 1        Q     It reads, Dean Alpern does not think

 2   that in terms of procedure we can do it, referring

 3   to removing --

 4        A     Right.  I saw that.

 5        Q     If we did, there would be a lawsuit.

 6   Did Dean Alpern ever explain why he thought there

 7   would be a lawsuit?

 8        A     No.

 9        Q     Did he ever explain why, in terms of

10   procedure, he did not think they could remove

11   Dr. Simons from the Berliner professorship?

12        A     What I just told you.  Only that they

13   had not done it in the first time, you know, when

14   the case was originally decided.  He did not think

15   they could do it later.

16        Q     Okay.

17        A     That's the only explanation he gave us.

18   And I guess here he added something about a

19   lawsuit.  But Dean Alpern is not a lawyer, so I'm

20   not sure how he knew that.  I don't know.

21        Q     Would it be fair to say that --

22              MR. ATKINSON:  And I'm going to be

23              very careful with this question, Kevin,

24              and I'm going to alert you to the fact

25              that I am getting close to the line on
```

Falzarano Court Reporters, LLC

```
 1              the attorney/client stuff.  But I'm

 2              going to try not to cross it.  So, I'm

 3              just letting you know as a courtesy.

 4    BY MR. ATKINSON:

 5         Q    Would it be fair, Dr. Stachenfeld, to

 6    say that Dean Alpern was getting his reasoning

 7    from Yale's lawyers?

 8              MR. SHEA:  Object to the form;

 9              answer if you know.  And to the extent

10              that your response would require you to

11              disclose information that you learned

12              solely through communications with

13              counsel, I'd instruct you not to answer.

14              THE WITNESS:  I don't know.  Dean

15              Alpern didn't confide that in us.

16              MR. ATKINSON:  Understood.

17    BY MR. ATKINSON:

18         Q    So, the last question I'm going to ask

19    on this line, Dr. Stachenfeld, is:  Did Dean

20    Alpern address anything or make any statement

21    regarding the fairness of removing Dr. Simons'

22    chair after he had been previously disciplined by

23    the University-Wide Committee?

24              MR. SHEA:  Object to the form;

25              answer if you recall.  I believe it's
```

1           asked and answered, but go ahead and

2           answer.

3                 THE WITNESS:  Did he -- did he make

4           a statement about whether he personally

5           thought it was fair?

6                 MR. ATKINSON:  Correct.

7                 THE WITNESS:  I don't remember.

8    BY MR. ATKINSON:

9      Q    Okay.

10     A    It could be in these minutes that I

11   could reread, but I don't remember.

12                MR. ATKINSON:  Allow me a second,

13          please.

14                (Pause.)

15   BY MR. ATKINSON:

16     Q    I'm going to highlight again on the same

17   page for you -- and if you need me to zoom in --

18   the notes of Dean Alpern in response to a SWIM

19   faculty's point that states that, quote, To come

20   along five years later and raise the penalty is

21   not right.  We would lose any lawsuit because of a

22   lack of following proper procedure.

23                I'm not going to touch the second

24   sentence, obviously.  But what is your

25   understanding of Dean Alpern saying that coming

```
 1    along five years later and raising the penalty is
 2    not right?
 3                   MR. SHEA:  Object to the form; you
 4            can answer if you know.
 5                   THE WITNESS:  I'm not sure.  It
 6            seemed to me to relate to the sentence
 7            after it.
 8                   MR. ATKINSON:  Okay.  Okay.  Then I
 9            guess I do need to go there.
10    BY MR. ATKINSON:
11       Q    What was your understanding of the
12    sentence after it, We would lose any lawsuit
13    because of a lack of following proper procedure?
14       A    He seemed -- basically what we talked
15    about earlier; that he seemed to think that there
16    would be legal liability.  But I don't know
17    that -- where he got that information, if he was
18    just making it up --
19       Q    Okay.
20       A    -- or --
21       Q    That -- that's fair enough.  I wouldn't
22    expect you to know that.
23            Let's take a step back for a second.
24    Did you know prior to advocating for Dr. Simons to
25    be removed from the Berliner professorship that he
```

```
1    had been previously disciplined by the university?
2         A    Yes.
3         Q    Do you know if Dr. Simons completed that
4    discipline without any further incidents?
5                   MR. SHEA:  Object to the form; you
6              can answer if you know.
7                   THE WITNESS:  Can you repeat the
8              last part of that question?
9                   MR. ATKINSON:  Sure.
10   BY MR. ATKINSON:
11        Q    Do you know if Dr. Simons completed the
12   discipline imposed by the university without any
13   further incidents of sexual misconduct?
14        A    No.
15        Q    Okay.  Are you aware as you sit here
16   today of apart from the incident we've been
17   discussing that you read in the newspapers, if
18   Dr. Simons has engaged in any other sexual
19   misconduct at Yale or any other place?
20        A    No.
21        Q    Does it strike you as inherently unfair
22   that someone who completes a term of discipline
23   and for all intents and purposes to the best of
24   your knowledge has not committed -- has not
25   re-offended, for lack of a better term, should be
```

```
 1    punished for the same offense that he's already
 2    been disciplined for?
 3                    MR. SHEA:  Object to the form;
 4            mischaracterization.  Answer if you're
 5            able.
 6                    THE WITNESS:  Yes.
 7    BY MR. ATKINSON:
 8        Q    Would that apply to your view of
 9    Dr. Simons?
10        A    No.
11                    MR. SHEA:  Object to the form.
12                    THE WITNESS:  Oh, sorry.
13                    MR. SHEA:  You can answer.
14                    THE WITNESS:  No.
15    BY MR. ATKINSON:
16        Q    Why would it not apply to your view of
17    Dr. Simons?
18                    MR. SHEA:  Same objection.
19                    THE WITNESS:  The awarding of an
20            honorific like an endowed chair is an
21            indication that the school of med -- is
22            a signal of respect and honor by the
23            university.  Removing that is not
24            necessarily a punishment; it's an
25            indication that the award is something
```

```
 1              that the university no longer wants
 2              to -- that the university no -- that
 3              that individual no longer deserves that
 4              honorific.  That, to me, is not a
 5              punishment; that's just an indication
 6              that that honorific is no longer
 7              deserved by that person.
 8   BY MR. ATKINSON:
 9        Q    Did you understand -- so, pardon me.  I
10   withdraw that.  That was the wrong lead-in.
11              Do you know what benefits attach to an
12   endowed professorship at the Yale School of
13   Medicine?
14        A    Yes.
15        Q    And what is your understanding of those
16   benefits?
17        A     There is a name and there's some
18   monetary benefits.  And they differ depending on
19   the chair, on the endowed chair.
20        Q    I'm not trying to be argumentative with
21   this question, but I don't know -- I can't think
22   of a better way to ask it at this point.  Don't
23   you think that losing the financial benefits of
24   holding an endowed chair is a substantial
25   punishment?
```

```
 1              MR. SHEA:  Object to the form;
 2         hypothetical; without all the facts;
 3         mischaracterization.  Answer if you're
 4         able.
 5              THE WITNESS:  No.
 6  BY MR. ATKINSON:
 7    Q    Okay.
 8    A    The money on these endowed chairs is
 9  less important than the name.
10              MR. ATKINSON:  Okay.  Understood.
11         I'll move on.
12              May I have a minute, please?
13              MR. SHEA:  Sure.  Actually, Cam,
14         we're about at an hour and 15 out.  Can
15         we take a quick two-minute break for a
16         restroom or whatever?
17              MR. ATKINSON:  Sure.  That will
18         enable me to catch up on what I need to
19         do.  We'll reconvene in five.
20              MR. SHEA:  Sure.
21              MR. ATKINSON:  Thank you.
22
23         (Recess taken:  11:13 a.m. to 11:23 a.m.)
24
25
```

```
 1   BY MR. ATKINSON:
 2       Q    Okay.  Doctor, when we left off we were
 3   talking about the decision from Yale, essentially
 4   the discussions with SWIM to remove Dr. Simons
 5   from the Robert W. Berliner professorship of
 6   medicine.  Do you recall learning at some point
 7   that Yale University did remove Dr. Simons from
 8   the Robert W. Berliner professorship of medicine
 9   and reassigned him to the Waldemar Von Zedtwitz
10   chair?
11               MR. SHEA:  Object to the form; you
12          can answer.
13               THE WITNESS:  Yes.
14   BY MR. ATKINSON:
15       Q    How did you react when you heard that
16   news?
17               MR. SHEA:  Same objection.
18               THE WITNESS:  I was really
19          surprised.
20   BY MR. ATKINSON:
21       Q    Why were you surprised by the move?
22       A    I was surprised because -- surprised
23   that -- this is just recalling.  You have to
24   remember it happened quite a while ago.
25               My recollection is I was surprised that
```

Falzarano Court Reporters, LLC

```
 1   they would make any move about the Berliner chair.

 2   I was thinking they might transfer that chair to

 3   the new chief of cardiology that had come in, but

 4   then surprised that given the opportunity to

 5   transfer that chair, they would give Dr. Simons a

 6   new chair and then do it -- yeah.  So, that was

 7   why I was surprised.

 8        Q    Did Dean Alpern ever explain to SWIM why

 9   he made -- why the transfer happened the way it

10   did?

11        A    The only explanation that I can remember

12   is it was -- he told us that it was about the

13   money.

14        Q    And when he told -- when you say he told

15   you it was about the money, what do you mean by

16   that?

17        A    That he was able to -- this is just what

18   he told us.  That he was able to convince

19   Dr. Simons to agree to it because he kept the

20   money associated with the new chair the same as

21   the old one.

22        Q    Okay.  I'm not asking you to go further

23   than that.

24             Did SWIM -- do you know if SWIM renewed

25   its advocacy efforts after the transfer was made
```

```
 1   to have Dr. Simons removed from the Waldemar Von
 2   Zedtwitz chair?
 3                    MR. SHEA:  Object to the form; you
 4            can answer.
 5                    THE WITNESS:  We did ask -- we
 6            asked the dean not to do this, but it
 7            was too late because it was already
 8            done.  We asked the dean to be
 9            transparent about the change in chairs
10            and hear from other individuals at the
11            medical school.  This was in June.  And
12            few people were there; a lot of people
13            leave in the summer and --
14   BY MR. ATKINSON:
15       Q    Can I interrupt you a second, Doctor,
16   just for clarification?  This is June 2018?
17       A    I think so, yeah.
18       Q    Okay.  Please continue.  I apologize.
19       A    We just -- all we really did was ask him
20   to be transparent about the change.  So --
21       Q    So --
22       A    Yeah.
23       Q    So, it would be a fair characterization
24   of your actions in June 2018 that you did not
25   advocate for the removal of Dr. Simons from the
```

Falzarano Court Reporters, LLC

```
 1   Von Zedtwitz chair at that time; you simply asked
 2   for reforms in the process?
 3               MR. SHEA:  Object to the form; you
 4          can answer.
 5               THE WITNESS:  We did not talk to
 6          him about the process and we did -- if
 7          you want to use the word "advocate," I
 8          don't know.  We did ask him to
 9          reconsider.  And we asked him for
10          transparency with the school.
11               MR. ATKINSON:  Understood.
12   BY MR. ATKINSON:
13       Q    At any point thereafter June 2018 did
14   SWIM take the position -- take a public position
15   that Dr. Simons needed to be removed from the
16   Waldemar Von Zedtwitz chair?
17               MR. SHEA:  Object to the form; you
18          can answer.
19               THE WITNESS:  I don't remember.
20               MR. ATKINSON:  If I may have a
21          moment, Kevin.
22               (Pause.)
23               All right.  I'll move on from
24          there.
25
```

Falzarano Court Reporters, LLC

```
 1  BY MR. ATKINSON:
 2       Q    Dr. Stachenfeld, do you remember a
 3  letter to Peter Salovey or do you know or recall
 4  of a letter to Peter Salovey circulating in the
 5  form of a petition around Yale University?
 6       A    Yes.
 7       Q    Did you sign that letter?
 8       A    I can't remember, but it's very likely
 9  that I did.  I don't remember.
10       Q    Okay.  And I'm going to show you what I
11  believe is that letter.  And I'm going to let you
12  tell me if that's the letter.
13            MR. ATKINSON:  So, I'm going to
14            share my screen.  I'm referring to
15            Exhibit 13, Kevin.  And it's one full
16            page, Doctor.
17            THE WITNESS:  (Witness reading
18            document.)  Okay.  That looks like it.
19            I honestly don't remember the exact
20            letter.
21  BY MR. ATKINSON:
22       Q    Okay.  But as you sit here today, would
23  this be something similar to what you believe
24  circulated at the time?
25       A    Yes, it --
```

```
1                    MR. SHEA:  Object to the form; you
2           can answer.
3                    THE WITNESS:  Yes, it very much
4           could be.
5    BY MR. ATKINSON:
6        Q    Okay.  When this letter circulated, was
7    it in response to Dr. Simons being transferred to
8    the Waldemar Von Zedtwitz chair?
9        A    Yes.
10       Q    And would it be fair to say that SWIM
11   wanted to see Dr. Simons removed from the Waldemar
12   Von Zedtwitz chair?
13                   MR. SHEA:  Object to the form of
14          the question.
15                   THE WITNESS:  Yes.
16                   MR. ATKINSON:  I'll move on from
17          there.
18   BY MR. ATKINSON:
19       Q    I'm going to move -- well, before I move
20   to the next exhibit, Dr. Stachenfeld, was Dean
21   Alpern the only one you communicated with about
22   these decisions?
23                   MR. SHEA:  Object to the form.
24                   THE WITNESS:  About this dec --
25                   MR. ATKINSON:  The decision --
```

Falzarano Court Reporters, LLC

```
1                    THE WITNESS:  About what decisions?
2                    MR. ATKINSON:  The decision to
3              first transfer Dr. Simons to the
4              Waldemar Von Zedtwitz chair and then
5              ultimately to remove him from that
6              chair.
7                    MR. SHEA:  Object to the form.
8                    THE WITNESS:  I don't remember
9              beyond this letter.  This letter
10             obviously is a communication to
11             President Salovey.
12   BY MR. ATKINSON:
13        Q    Did you or SWIM have any direct
14   communications with professor or President Salovey
15   regarding Dr. Simons' chairs?
16                   MR. SHEA:  Object to the form.
17                   THE WITNESS:  I don't remember.
18                   MR. ATKINSON:  Okay.
19   BY MR. ATKINSON:
20        Q    Do you know who Catherine Bond Hill is,
21   Dr. Stachenfeld?
22        A    Yes.
23        Q    Do you recall discussing with her
24   Dr. Simons' chairs?
25        A    Yes.  Oh, okay.  Sorry, yes.  If that's
```

```
 1   who you meant, yes.  The answer to the last

 2   question would be yes.

 3        Q    Well, I --

 4        A    I'm sorry.  I thought you were asking if

 5   we had spoken to Dr. Salovey about it.

 6        Q    I'm not trying to trick you,

 7   Dr. Stachenfeld.  I wanted you to tell me what you

 8   could recall.  I understand if you can't recall,

 9   etc., and I accept those answers as fair.  So, I'm

10   not trying to trick you with this line of

11   questioning.

12             When you talked -- do you recall what

13   your conversation with Catherine Hill was?

14        A    I recall a lot of it, yes.

15        Q    Can you share what you can recall today?

16        A    We did speak to her about this chair.

17   And we also spoke to her about our dean.  And I

18   believe we spoke to her also about President

19   Salovey.

20        Q    Okay.  And when you -- let's unpack the

21   three of those.

22             When you spoke to her about this chair,

23   how did that conversation proceed?  Can you give

24   me an idea -- can you give us an idea of the

25   substance of that conversation?
```

 1          A    Not terribly well.  I don't -- you know,

 2     it was quite some time ago, so I don't remember.

 3          Q    Is Catherine Hill a member of the Yale

 4     board of trustees?

 5          A    Yes.

 6          Q    Is talking to her as a faculty member or

 7     a research employee at Yale a rare thing to do?

 8          A    Very much.

 9          Q    Would it be the kind of thing that you

10     would -- would it be the kind of conversation that

11     you would report on back to the executive board

12     for SWIM?

13          A    Yes.

14          Q    If I showed you a -- well, I'm going to

15     just move you to Exhibit 4.  So, I will share my

16     screen with you.  I'm going to pull it out so you

17     can see the pages.  Let me know when you need me

18     to move the screen for you.

19               (Pause.)

20          A    Okay.  You can move it down if you want.

21          Q    Yes.  There's, like, one more full

22     paragraph.  So, I've covered the end of the page

23     there for you.

24          A    (Witness complies.)  Okay.

25          Q    And then I'll move it down.  That's the

```
 1    rest of the e-mail.

 2        A     Okay.

 3              MR. ATKINSON:  Kevin, would it be a

 4        fair description just for the record

 5        that we're looking at an e-mail from

 6        Dr. Stachenfeld to the executive

 7        committee for SWIM dated Friday,

 8        September 21, 2018?

 9              MR. SHEA:  Yeah, I think that's a

10        more appropriate question for the

11        witness.  But, yes, I --

12              MR. ATKINSON:  All right.

13    BY MR. ATKINSON:

14        Q     Dr. Stachenfeld --

15        A     Yes.

16        Q     -- is this an e-mail to SWIM -- to the

17    executive committee of SWIM from you?

18        A     Yes.

19        Q     And it's dated Friday, September 21,

20    2018, correct?

21        A     Yes.

22        Q     And would it also be appropriate to say

23    that this is a recap of your impressions of your

24    meeting with Catherine Hill?

25        A     Yes.
```

```
 1        Q    And in this e-mail do you recall -- does
 2   it inform the executive committee of SWIM that you
 3   discussed Michael Simons with Ms. Hill?
 4        A    Yes.
 5        Q    If I can highlight the sentence I'm
 6   referring to, it says, quote, We also discussed
 7   the Mike Simons' case in the context of the
 8   general climate of the YSM.
 9             I'm assuming YSM refers to Yale School
10   of Medicine.  Am I correct in that?
11        A    Yes.
12        Q    Does that refresh your recollection to
13   some extent or does this e-mail refresh your
14   recollection to some extent of the conversation
15   that you had with Dr. Hill regarding the Michael
16   Simons endowed professorships?
17             MR. SHEA:  Object to the form; you
18             can answer.
19             THE WITNESS:  Yes.  I really can't
20             remember exactly what we discussed with
21             her about -- you know, or how we phrased
22             it to her.  But, yeah, I can imagine
23             that we told her our concerns about him
24             retaining the endowed chair.
25
```

Falzarano Court Reporters, LLC

 1  BY MR. ATKINSON:

 2      Q    And I believe the e-mail, if I move you

 3  down to the next paragraph, states that Dr. Hill

 4  clearly understood our concerns.  Was it your

 5  impression that Dr. Hill did not agree with the

 6  decision to move Mike Simons to the Waldemar Von

 7  Zedtwitz chair?

 8                  MR. SHEA:  Object to the form.

 9                  THE WITNESS:  I don't know what she

10              thought about changing the chairs.  I

11              only -- her -- the point she made that's

12              stated here is that -- and previous

13              arguments that had been given to us had

14              been that the UWC didn't do it; it

15              hadn't been done before -- were not

16              great arguments; that she had the

17              argument that families should not be

18              involved in -- who has the named chair

19              and this -- and I think it's described

20              in there.  And discussing that there

21              could be other instances where a family

22              gets involved, it could set a different

23              precedent that we may not want to set.

24  BY MR. ATKINSON:

25      Q    Did you understand Dr. Hill's

Falzarano Court Reporters, LLC

```
 1    arguments --
 2         A    Yes.
 3         Q    -- in that regard?
 4         A    I did.
 5         Q    Did you agree with those arguments?
 6                   MR. SHEA:  Object to the form.
 7                   THE WITNESS:  I thought that it was
 8              an excellent argument -- I thought it
 9              was a very good argument.  And if -- I'm
10              not -- I would have to think about it,
11              how it applied to this particular
12              instance.  Because there's a difference
13              between a chair -- a family pulling a
14              chair because of a point of view versus
15              a family wanting to pull the chair
16              because of an individual's behavior.
17              But I thought it was a better argument
18              than we had been given in the past.
19                   MR. ATKINSON:  Understood.
20    BY MR. ATKINSON:
21         Q    Did you also discuss at this meeting
22    with Dr. Hill that Yale University was considering
23    whether to reappoint Dean Alpern to another term
24    as dean of the Yale Medical School?
25                   MR. SHEA:  Object to the form.
```

 1                 THE WITNESS:  Yes.

 2    BY MR. ATKINSON:

 3        Q    Did you and SWIM support Dean Alpern's

 4    reappointment?

 5                 MR. SHEA:  Object to the form.

 6                 THE WITNESS:  I don't want to speak

 7             for everyone on SWIM.  That's not fair.

 8                 MR. ATKINSON:  Understood.  So,

 9             I'll rephrase the question.

10    BY MR. ATKINSON:

11        Q    Did you re-support (sic) Dr. Alpern's

12    reappointment as dean of Yale Medical School?

13        A    No.

14                 MR. SHEA:  Object to the form; you

15             can answer.

16                 THE WITNESS:  I'm sorry.

17                 MR. SHEA:  That's okay.

18    BY MR. ATKINSON:

19        Q    Why didn't you support Dean Alpern's

20    reappointment?

21        A    Because I did not think he was

22    supportive in the issues that I found important

23    with regard to climate and culture for women at

24    the school.  And that extended also to

25    underrepresented minorities and ways to improve

Falzarano Court Reporters, LLC

1    the school.  There -- for me personally, those

2    were important reasons.

3        Q    Did Michael Simons' case play any --

4    have any role or any impact on your decision not

5    to support Dean Alpern's reappointment as dean of

6    the Yale Medical School?

7        A    It was not a major point; it was an

8    example of his -- of his -- it was an example of

9    what I described as his inability to move forward

10   in improving the environment for women at the

11   school.

12       Q    Understood.  Did Dr. Hill give you any

13   indication as to whether she supported the

14   reappointment -- or if she was taking a position

15   is probably a better way to say it, on Dean

16   Alpern's reappointment as dean of Yale Medical

17   School?

18       A    No.

19       Q    I'm going to move on.  Dr. Stachenfeld,

20   as you sit here today, well withdrawn.  Let me set

21   this up.

22            At some point did Yale remove Dr. Simons

23   from the Waldemar Von Zedtwitz chair?

24       A    Yes.

25       Q    Do you recall when?

 1        A     Not exactly.  Not exactly.  I don't
 2   remember the date.
 3        Q     Well, would it be sufficient to refresh
 4   your recollection if I told you it was in
 5   September of 2018?
 6        A     Okay.  Yes.
 7        Q     Okay.  As you sit here today, do you
 8   think Yale University would have removed
 9   Dr. Simons from the Waldemar Von Zedtwitz
10   professorship if SWIM had not engaged -- had not
11   brought public attention to him continuing to hold
12   it?
13                 MR. SHEA:  Object to the form.
14                 THE WITNESS:  I don't know.
15   BY MR. ATKINSON:
16        Q     Do you feel that SWIM played a critical
17   role in achieving Dr. Simons' removal from the
18   Waldemar Von Zedtwitz professorship?
19                 MR. SHEA:  Object to the form.
20                 THE WITNESS:  I don't know.
21   BY MR. ATKINSON:
22        Q     Was it your hope that SWIM would play
23   such a critical role in influencing a decision
24   from Yale University to remove Dr. Simons from the
25   Waldemar Von Zedtwitz professorship?

```
 1                    MR. SHEA:  Object to the form.

 2                    THE WITNESS:  Yes.

 3                    MR. ATKINSON:  Kevin, I'm going to

 4             take -- if we can take a five-minute

 5             break, I'll review my notes.  I think

 6             I'm done, but I would like to make sure

 7             that I've covered everything I want to

 8             cover.

 9                    MR. SHEA:  No problem.

10                    MR. ATKINSON:  Thank you.

11                    MR. SHEA:  See you in five.

12             Thanks.

13

14             (Recess taken:  11:45 a.m. to 11:50 a.m.)

15

16    BY MR. ATKINSON:

17        Q    Doctor, are you ready?

18        A    Yes.

19                    MR. ATKINSON:  Kevin?

20                    MR. SHEA:  (Indicating.)

21                    MR. ATKINSON:  Perfect.  I just

22             have a couple more questions,

23             Dr. Stachenfeld.

24    BY MR. ATKINSON:

25        Q    Are you familiar with a person named
```

```
 1   Frank Giordano?

 2        A    No.

 3        Q    Are you familiar with a person named

 4   Annarita DiLorenzo?

 5        A    No.

 6             MR. ATKINSON:  Okay.  No further

 7             questions.  Thank you for being here

 8             today, Doctor.  I hope we do meet under

 9             more pleasant circumstances when we do

10             meet again.

11             THE WITNESS:  Thank you.

12             MR. ATKINSON:  But thank you for

13             being here.  You've been gracious and

14             I'm glad to have gotten you out of here

15             on time as I promised, so --

16             THE WITNESS:  Thank you.  I

17             appreciate that.

18             MR. SHEA:  Cam, I want to thank you

19             for that also.  Because I see my number

20             one job in representing these witnesses

21             to be able to keep my word to them about

22             when we're going to meet and when

23             they'll be done.  So, I appreciate you

24             allowing me to keep my word.  Thank you.

25             MR. ATKINSON:  Well, I do my best,
```

```
 1              Kevin.  You're a real gentleman, so --
 2              got to bugger you up a little bit on the
 3              record, so . . .
 4                   THE WITNESS:  Well, thank you.  I
 5              really do appreciate it.  I do have this
 6              meeting.  I didn't just make that up,
 7              so . . .   That's on the record too.
 8
 9                   (Deposition concluded:  11:52 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                 STATE OF CONNECTICUT

 2      I, KRISTINE A. PARADIS, LSR 338, a Notary

 3  Public duly commissioned and qualified in and for

 4  the State of Connecticut, do hereby certify that

 5  pursuant to Re-Notice, there came remotely before

 6  me via videoconference on the 28th day of October,

 7  2021, the following named person, to wit:  NINA

 8  STACHENFELD, who testified to the truth and nothing

 9  but the truth; that she was thereupon carefully

10  examined upon penalty of perjury and her

11  examination reduced to writing under my

12  supervision; that this deposition is a true record

13  of the testimony given by the witness.

14      I further certify that I am neither attorney

15  nor counsel for, nor related to, nor employed by

16  any of the parties to the action in which this

17  deposition is taken, and further, that I am not a

18  relative or employee of any attorney or counsel

19  employed by the parties hereto, or financially

20  interested in this action.

21      IN WITNESS THEREOF, I have hereunto set my

22  hand this 15th day of November 2021.

23                    Kristine Paradis

24              KRISTINE A. PARADIS, CSR #338
                Certified Shorthand Reporter
25  My Commission expires:   May 31, 2023
```

Falzarano Court Reporters, LLC

1                              INDEX

2    WITNESS                                      PAGE

3    NINA STACHENFELD

4        Direct Examination by Mr. Atkinson        6

5

6                    PLAINTIFF'S EXHIBITS
                     (For Identification)
7
     EXHIBIT                                       PAGE
8
      1  E-mail, 9/24/18 with attachments          40
9
      4  E-mail, 9/21/18                           65
10
     13  Letter to President Salovey              61
11

12

13

14

15

16

17   Reporter's note:  Exhibits retained by
                       Attorney Atkinson.
18

19

20

21

22

23

24

25

                 Falzarano Court Reporters, LLC

```
1                          JURAT

2    _  _  _  _  _  _  _  _  _  x
     MICHAEL SIMONS,            |
3                    Plaintiff, |
                                |   3:19-CV-01547(VAB)
4           v.                  |
                                |
5    YALE UNIVERSITY,           |
     PETER SALOVEY,             |
6    ROBERT ALPERN, M.D.,       |
     UNKNOWN PERSONS,           |
7                    Defendants. |  October 28, 2021
     _  _  _  _  _  _  _  _  _  x

8

9

10            With the addition of the changes,
          if any, indicated on the attached errata
11        sheet, the foregoing is a true and
          accurate transcript of my testimony
12        given in the above-entitled action on
          October 28, 2021.

13

14        _____

15                     Nina Stachenfeld

16

17   Subscribed and sworn to before me, the undersigned
     authority, on this, the _____ day of
18   _____, 2021.

19

20        _____

21

22

23   My Commission expires:

24   kap

25
```

Falzarano Court Reporters, LLC

ERRATA SHEET

The ORIGINAL JURAT and ERRATA SHEET must be
notarized (even if there are no corrections) and
returned within 30 days of receipt to the attorney
who took the DIRECT EXAMINATION.  All other counsel
of record must be sent a COPY, along with a COPY to
our office for our records.


Page   Line        From              To

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____    _____

    Date                        Nina Stachenfeld


Sworn to before me this _____day of
_____, 2021.



                            _____

                            Notary Public

My Commission expires: _____

kap

Falzarano Court Reporters, LLC