# Exhibit M

```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
 2

 3   –  –  –  –  –  –  –  –  –  x
     MICHAEL SIMONS,              |
 4                 Plaintiff,     |
                                 |   3:19-CV-01547(VAB)
 5           v.                  |
                                 |
 6   YALE UNIVERSITY,            |
     PETER SALOVEY,              |
 7   ROBERT ALPERN, M.D.,        |
     UNKNOWN PERSONS,            |
 8                 Defendants.   |   July 16, 2021
     –  –  –  –  –  –  –  –  –  x
 9

10

11

12            DEPOSITION OF ROBERT ALPERN, M.D.

13                 via videoconference

14

15        Taken before Kristine A. Paradis, LSR 338, a
          Court Reporter and Notary Public within and
16        for the State of Connecticut, pursuant to
          Re-Notice and the Federal Rules of Civil
17        Procedure, via videoconference, on July 16,
          2021, commencing at 10:13 a.m.
18

19

20

21

22            FALZARANO COURT REPORTERS, LLC
                     4 Somerset Lane
23            Simsbury, Connecticut 06070
                     860.651.0258
24            www.falzaranocourtreporters.com

25
```

1   APPEARANCES:

2       For the Plaintiff:

3           PATTIS & SMITH, LLC
            383 Orange Street
4           New Haven, Connecticut 06511
            203.393.3017
5           npattis@pattisandsmith.com
                BY:  NORMAN A. PATTIS, ESQ. **
6

7       For the Defendants Yale University,
        Peter Salovey, and Robert Alpern, M.D.:
8
            CLENDENEN & SHEA, LLC
9           400 Orange Street
            New Haven, Connecticut 06511
10          203.787.1183
            kcs@clenlaw.com
11              BY:  KEVIN C. SHEA, ESQ. **

12      Also Present:

13
14          Cameron Atkinson, Esq. **
            Pattis & Smith, LLC
15

16

17

18

19

20  ** Via videoconference

21

22

23

24

25

S T I P U L A T I O N S

       It is stipulated and agreed by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

       It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public, before whom this deposition is taken, is waived.

       It is further stipulated that any defects in the Notice are waived.

       It is further stipulated that the deposition may be signed before any Notary Public.

T R A N S C R I P T   L E G E N D

(sic)                  – Exactly as said.

(Phonetic)             – Exact spelling not provided.

( -- )                 – Break in speech continuity
                         and/or interrupted sentence.

(...)                  – Indicates omission of word[s]
                         when reading OR trailing off
                         and not finishing a sentence.

(As read)              – When reading, adding,
                         deleting or changing words so
                         as not to be a direct quote
                         from document.

```
 1                    AFTERNOON SESSION

 2                    (1:52 p.m.)

 3

 4   BY MR. PATTIS:

 5        Q    Welcome back, Doctor.  I hope you had a

 6   good lunch.

 7        A    Yes, I did.

 8        Q    Good.  I think when we -- I feel like

 9   I'm on a television show.  In our last exciting

10   episode -- it's As the Deposition Turns -- we were

11   discussing the decision -- the run-up to the

12   decision to removing Dr. Simons as director of the

13   cardiovascular research institution.  And you

14   mentioned a series of town hall meetings, correct?

15        A    (Indicating.)

16        Q    And I have a general idea of what they

17   are from watching election coverage.  But what are

18   town hall meetings within the context of Yale?

19        A    So, I don't know that there is a

20   standard definition, but for me it was a chance to

21   meet with anyone from the Yale community.  So,

22   invitations were sent to everyone at the medical

23   school.  And I don't know if you realize, we have

24   3,000 faculty and 3,000 staff and medical students

25   and graduate students.
```

```
 1              And usually what we did is I made a
 2    presentation and then probably -- it is usually
 3    scheduled for an hour, and I probably left more
 4    than half the time to answer questions from the
 5    community.
 6         Q    Now, with respect to the town halls, I
 7    believe I heard you say just as I was listening to
 8    the lunch bell ring and was distracted, that there
 9    were a number of issues that came up at the town
10    hall meetings.  I want to simply focus on
11    Dr. Simons; okay?
12         A    So, I think in the town hall that I
13    led -- I'm trying to remember if there was one or
14    two.  Mike was not a major topic.  So, I think I
15    probably had to review some of the events for the
16    community.  But then the discussion was more
17    focused on Yale, Yale School of Medicine, and
18    whether we take sexual harassment seriously and
19    whether we would, you know, tolerate a sexual
20    harasser if they had a lot of grant money and were
21    a successful researcher and assuring the community
22    that that wasn't the case and that we really cared
23    about these issues.  And it was more general.
24              And actually I do remember at least one
25    of them where they ended up being dominated by two
```

```
 1   or three people that had their own grievances that
 2   had nothing to do with Mike Simons; that --
 3        Q    Were those two or three people women?
 4        A    So, one was a woman, but her grievance
 5   was not with a man.  And one was a man.  And those
 6   are the two I remember.  And they each had views
 7   of being bullied and not being treated fairly.
 8             And it actually turned out, as I
 9   remember because of these people, being a total
10   waste of time because we actually didn't -- the
11   question-and-answer session didn't deal with the
12   critical issues affecting sexual harassment; it
13   dealt with a few personal grievances.
14             The one town hall where the president
15   and the provost came I would say was more focused
16   on Mike.  And not so much what Mike did but how
17   the process unfolded that dealt with it.
18        Q    I understand.  I understand.
19        A    And actually that was where the provost
20   emphatically stated that he had never spoken to me
21   about the case.  And I think after he did that, I
22   never heard that accusation again.
23        Q    Well, that's great.  That's good.  So,
24   the town hall had some use.
25        A    Yeah, that, to me -- I was in the
```

Falzarano Court Reporters, LLC

```
 1    audience for that one, but I think the medical
 2    school community really wanted to hear from the
 3    president and provost on the issue.  And --
 4        Q    How often were town hall meetings held?
 5              MR. SHEA:  Object to the form.  You
 6         can answer.
 7              THE WITNESS:  Almost never.
 8    BY MR. PATTIS:
 9        Q    Now, when you described the town hall
10    and sexual harassment, tolerating sexual
11    harassment from, you know, a person with a lot of
12    research grants and so forth, it almost sounded as
13    though you were talking about somebody fitting the
14    profile of Mike Simons.  Is it fair to say -- is
15    that a fair statement?
16        A    Yeah.
17              MR. SHEA:  Object to the form.  You
18         can answer.
19              THE WITNESS:  Yes.  I think that
20         the Mike Simons' event was viewed by --
21         there was an element of the community --
22         I can't tell you how large it was --
23         that believed that the dean knew -- not
24         just the dean.  The power structure of
25         Yale knew everything that Mike did and
```

```
 1              that we tolerated it because he had --
 2              he was such a successful researcher.
 3              And the way some people who didn't
 4              understand it at all, they said it was
 5              because he had so much grant dollars.
 6  BY MR. PATTIS:
 7      Q    Got it.  Got it.
 8      A    Okay.  And none of that was true.  And
 9  there's no faculty member that has so much grant
10  dollars that we would ever allow them to
11  misbehave.
12      Q    Well, Dr. Simons wasn't allowed to
13  misbehave; he'd been punished by the UWC.
14  Correct?
15      A    Right.  And that was the first time that
16  anything -- you know, we knew, as we've discussed,
17  he wasn't a nice person.  And a lot of people
18  didn't like him; we didn't know the scope of that.
19  But the actual -- when he actually violated the
20  rules, he got punished.
21      Q    Well, did anybody say at this town hall
22  meeting, yes, we've addressed it; he's been
23  punished.  Let's move on?
24      A    So, I can't specifically remember the
25  discussion, but I think there was a perception
```

```
 1   that we knew what a mean person he was for years

 2   and we tolerated it because he was so successful.

 3        Q    I want to focus on the sexual harassment

 4   component.  You said that when the president and

 5   provost came, one of the primary topics was sexual

 6   harassment; Mike Simons was addressed.  Did either

 7   the president or the provost say, Look, he's

 8   already been punished for this.  The UWC process

 9   worked.

10                MR. SHEA:  Object to the form of

11                the question.  You can answer.

12                THE WITNESS:  Yeah, I don't think

13                it was stated in that way.  I think --

14   BY MR. PATTIS:

15        Q    Was it stated at all in any way?

16        A    I think there was a factual review of

17   the process.  And, you know, what the UWC process

18   is, how it went to the provost, why the provost

19   did what the provost did, how it went to the

20   president, and how -- as I said, the one thing I

21   remembered was their statement that I never spoke

22   with the provost or the president.

23                But it wasn't a -- as I remember it,

24   there wasn't a discussion about Mike; in other

25   words, whether Mike was a good person, bad person,
```

```
 1    whether he'd been punished.  It was the process

 2    that they took.

 3         Q    I understand that.  I mean, the process

 4    that led to his being suspended from the clinic

 5    position, correct?

 6         A    Yes.

 7         Q    And in the course of that discussion did

 8    the president, the provost, you, anyone say, Look,

 9    the process may not be perfect, but it ran its

10    course.  That is done.

11              MR. SHEA:  Object to the form of

12              the question.  You can answer.

13              THE WITNESS:  I don't remember

14              specifically if it was put that way.

15    BY MR. PATTIS:

16         Q    Was it put any -- was the topic of the

17    fact that he had been punished addressed at all?

18              MR. SHEA:  Object to the form.  You

19              can answer.

20              THE WITNESS:  I think the idea --

21              the hope -- the goal of the meeting was

22              to get the community to calm down.

23    BY MR. PATTIS:

24         Q    Well, you said that -- to try to get --

25    I thought you said before the lunch that you
```

Falzarano Court Reporters, LLC

1    reached the conclusion for the good of the

2    community he was going to have to step down from

3    the director of the research of cardiovascular

4    institute.

5         A    Yes.  And that -- you know, so I'm gonna

6    be unclear on time sequences, but I think that was

7    after the president and the provost came.  But I'm

8    not sure.  But the -- you know, all of these

9    attempts -- you know, my town hall, the president

10   and the provost -- we very soon announced the

11   president and the provost would come.  And I think

12   it took, like, a month to get it scheduled.  Those

13   were all done with the intent to get this issue

14   under control and to be able to address it but to

15   get everyone to calm down and not have it be a

16   major source of angst.  But --

17        Q    Was it a major source of angst?

18        A    Oh, yeah.  Yeah.  No, this was -- that

19   month -- in the month or two after *The New York*

20   *Times* article, this was a major source of angst at

21   the medical school.

22        Q    Were either of these or any of these

23   town hall meetings videotaped?

24             MR. SHEA:  Object to the form.

25             Answer if you know.

```
 1              THE WITNESS:  I don't believe so.
 2   BY MR. PATTIS:
 3       Q    Do you know whether any effort was made
 4   to record the proceedings of any sort?
 5       A    Not of these meetings, no.
 6       Q    Now, when was the decision made to
 7   remove Dr. Simons as director of the
 8   cardiovascular research institute?
 9       A    I can't give you an exact time.  I
10   remember where we met with Mike, but I don't
11   remember the exact time.
12       Q    Where did you meet with him?
13       A    It was in the Greenberg Center in the
14   basement.
15       Q    What happened at that meeting?
16       A    That's when Gary and I met with Mike and
17   explained to him that he needed to relinquish
18   that -- the -- and I think it was there because I
19   had a meeting and had to then catch a flight or
20   something like that.  So --
21       Q    When you explained to him that he had to
22   relinquish it, were those the terms you used?
23   Mike, we need you to relinquish this.
24       A    Oh, I don't remember the terms I used.
25   We weren't asking him to resign; he was being
```

Falzarano Court Reporters, LLC

1    removed from the position.

2         Q    Well, I guess that's my first question.

3    Did you ask him to voluntarily resign?

4         A    I don't believe we did.  I believe we

5    told him that it was happening.

6         Q    And did he ask why was it happening?

7         A    I don't remember what he asked.  I know

8    that -- once again, I felt badly to have to do

9    that.  Because when we asked him to step down as

10   chief of cardiology, both Gary and I thought that

11   the institute would be a place that he could then

12   go --

13        Q    No, I remember that.  Yeah.

14        A    -- and focus his constructive efforts in

15   the next chapter of his life.  And Gary and I

16   thought that that was the perfect plan going

17   forward.  And we had explained that to Mike; that

18   as chief, he was going to step down as cardiology;

19   he was not going to come back; but that he could

20   be the director of CVRI.

21             And at this meeting in the Greenberg

22   Center my memory is Mike said to me or what is --

23   said to me, You told me I would be able to stay

24   the director of CVRI.  And that was true; that

25   Gary and I did tell him that.  And we actually

Falzarano Court Reporters, LLC

```
 1    believed that.  And we failed to perceive or to

 2    predict how the community was going to continue to

 3    be upset that he held any leadership position

 4    after being found guilty of sexual harassment

 5    and --

 6         Q    Did anybody make any effort to explain

 7    to the community that there was a process and that

 8    it had been completed and he'd already been

 9    punished and done his time, so to speak?  Was any

10    effort like that made?

11                   MR. SHEA:  Object to the form.  You

12              can answer.

13                   THE WITNESS:  Yeah.  You know,

14              there were no forums.  I'm sure -- those

15              conversations did occur and there was,

16              on the one hand, an argument that the

17              UWC didn't remove him from CVRI and then

18              there was the other argument that the

19              UWC didn't know about CVRI.  And had

20              they known about it, they would have

21              removed him.

22    BY MR. PATTIS:

23         Q    Well, how about the following argument:

24    Yale as an institution is responsible.  And if it

25    conducted an investigation of his -- if the people
```

```
 1   who were disciplining him didn't know the jobs
 2   that he held, that's on Yale.  But successive
 3   punishment is unfair.  Did that argument come up?
 4                 MR. SHEA:  Object to the form.  You
 5            can answer.
 6                 THE WITNESS:  Yeah.  I think -- so,
 7            I -- there was no forum in which any --
 8            and this is all hallway conversation.
 9   BY MR. PATTIS:
10        Q    There was no forum for him to defend
11   himself?
12                 MR. SHEA:  Object to the form of
13            the question.
14                 THE WITNESS:  There was no forum to
15            have this discussion about the CVRI.
16            There was just a lot of the community
17            that was upset that he held a leadership
18            position.
19   BY MR. PATTIS:
20        Q    It sounds like he was let go to placate
21   an angry mob.
22                 MR. SHEA:  Object to the form.
23            There's no question pending.
24                 THE WITNESS:  I --
25                 MR. SHEA:  There's no question
```

```
 1                    pending, Doctor.
 2    BY MR. PATTIS:
 3         Q    Was he removed from the research
 4    institute to placate an angry mob?
 5                    MR. SHEA:  Object to the form of
 6               the question.
 7                    THE WITNESS:  I would say no.  I
 8               would say he was removed from the
 9               position to get the medical school to
10               move forward with --
11    BY MR. PATTIS:
12         Q    Move forward to where?
13         A    To pay attention to its other missions
14    of clinical care, research, education.  That we
15    had to get past this issue.
16         Q    What about a sense of fairness,
17    fundamental fairness?  Was that important to the
18    medical school?
19                    MR. SHEA:  Object to the form of
20               the question.
21                    THE WITNESS:  Can I answer?
22                    MR. SHEA:  Yeah, go ahead.
23                    THE WITNESS:  So, I wrestled with
24               this.  So, there's fairness to Mike and
25               there's fairness to the medical school
```

```
 1              community.  And I understand that from
 2              Mike's point of view that he should have
 3              been allowed to stay as the head of --
 4              the director.
 5                   The community viewed this as Yale
 6              not really seriously caring about sexual
 7              harassment; that we had basically taken
 8              a faculty member who was guilty of
 9              sexual harassment and were leaving him
10              in a leadership position which the UWC
11              would have removed him from had they
12              known about it.
13  BY MR. PATTIS:
14       Q    Did Dr. Simons ever say to you during
15  this period, None of this stuff was supposed to be
16  public.  I would like to know how it became
17  public.  Did he say that to you?
18       A    Yes.
19       Q    And what did you respond by saying?
20       A    I don't know.
21       Q    Was there an investigation about how
22  private information regarding Dr. Simons was
23  disclosed to the press?
24              MR. SHEA:  Object to the form.
25              Answer if you know.
```

1                    THE WITNESS:  I don't know.

2    BY MR. PATTIS:

3         Q    Did you request one?

4         A    No.  So --

5         Q    Why not?

6         A    -- Mike requested it.  So, Mike dealt

7    with the university on this, not with me.

8         Q    No, but you're his dean.

9         A    Yeah, but I was -- I had no official

10   role in the UWC proceeding.

11        Q    No, but you told us earlier that one of

12   your responsibilities as dean was caring for the

13   welfare of people in the school.  He was in the

14   school.  Did he ask you to conduct an

15   investigation?

16        A    No, he asked the university to, I think.

17        Q    Your testimony is he never said to you,

18   I would like an investigation to learn how these

19   private facts found their way into *The New York*

20   *Times*?  He never said that to you?

21        A    No, I think he did want an

22   investigation, but I don't think he ever asked me

23   to conduct that investigation.  I think he always

24   referred to the university in the third person as

25   why is the -- he would say to me, Why is the

```
 1    university not trying to investigate who revealed
 2    this information?
 3        Q    And you were dean of one of the 13
 4    schools at the university.  You didn't take that
 5    as a question or a comment directed to you?  Did
 6    he have to put the personal pronoun "I" on that
 7    for you to own that?
 8              MR. SHEA:  Object to the form.
 9              Object to the form.  Come on, Norm,
10              you're better than that.
11              MR. PATTIS:  Well, I mean, I'm not
12              going to argue with you in your witness'
13              presence, Kevin.  I can say the witness
14              is better than the answers he's giving;
15              okay?
16              MR. SHEA:  Norm, you're being
17              harassing now.
18              MR. PATTIS:  No, I'm not.  I'm
19              responding to you and you're doing more
20              than raising speaking objections.  If
21              you want to call me privately and we can
22              have a discussion, fine.
23              I really don't want to go this way,
24              Kevin.  It's not my style.  I am
25              entitled --
```

```
 1              MR. SHEA:  The questioning is
 2         improper because --
 3              MR. PATTIS:  No, it is not.
 4              MR. SHEA:  -- you are
 5         mischaracterizing the testimony;
 6         they're --
 7              MR. PATTIS:  No, I'm not.
 8              MR. SHEA:  -- compound questions;
 9         and you're harassing him.
10              MR. PATTIS:  No, I'm not.
11              MR. SHEA:  Yes.  Okay.
12    BY MR. PATTIS:
13         Q    When Mr. Simon said to you, Why is the
14    university doing this, did you feel that you were
15    speaking on behalf of the university?
16         A    No.
17         Q    Who were you speaking on behalf of?
18         A    I would say in those conversations I was
19    speaking as a sounding board for Mike; that he
20    would speak to me and the official entity at the
21    university that deals with sexual harassment was
22    one that I was not a part of.  And I had no
23    official role in the UWC and that Mike would tell
24    me that the university should be investigating
25    this; he never implied that I should be
```

```
 1    investigating it.  And I don't -- actually don't
 2    know what conversations he had with the university
 3    regarding whether they did investigate or should
 4    investigate it.
 5        Q    Now, that wasn't the end of his
 6    difficulties with the university, his losing the
 7    directorship of the cardiovascular research
 8    institute, correct?
 9              MR. SHEA:  Object to the form.  You
10         can answer.
11              THE WITNESS:  I'm not sure what
12         you're referring to.
13    BY MR. PATTIS:
14        Q    At this point, at the time that he was
15    relieved of responsibilities as director of the
16    cardiovascular research institute, he still held
17    the Robert W. Berliner Professorship, correct?
18        A    Correct.
19              MR. PATTIS:  May I have a minute,
20         Kevin?
21              MR. SHEA:  Excuse me?
22              MR. PATTIS:  May I have a minute?
23              MR. SHEA:  You mean a break?
24              MR. PATTIS:  No, no.  I'm just
25         looking through documents.  I'm trying
```

```
 1              to explain --
 2                   MR. SHEA:  Oh.  Yeah, yeah, yeah.
 3              No, no, that's fine.  There's no --
 4                   MR. PATTIS:  I know, but, you know,
 5              there's nothing more boring than
 6              watching another lawyer look through
 7              papers.
 8                   MR. SHEA:  Oh, no.  Maybe it
 9              appears different on video, but in
10              person it happens all the time.
11   BY MR. PATTIS:
12        Q    Now, on or about February 11, 2018 you
13   received a letter from Nancy Berliner.
14                   MR. PATTIS:  And can we look at
15              Exhibit 6, please?
16   BY MR. PATTIS:
17        Q    Do you recognize Exhibit 6, sir?
18        A    Let me just read it.
19        Q    Of course.  Yeah.
20                   MR. SHEA:  Norm, just so you know,
21              while he's reading the letter, when you
22              send these documents --
23                   MR. PATTIS:  Yes, sir.
24                   MR. SHEA:  -- to the Court Reporter
25              as PDFs, when we've printed them off,
```

```
1            this document, for example -- this is
2            how it looks when you print it off; okay
3            (showing)?  So, it doesn't come out --
4            like, it's not -- it's looking like it
5            appears on your screen.
6                 MR. PATTIS:  Oh, I see.  As a
7            screenshot.  I got it, yeah.
8                 MR. SHEA:  Or it's -- I don't know
9            what it is.  But I'm saying it looks
10           like they were, like, printed or saved
11           in a different mode than just a
12           document.  Yes, it's a screenshot.
13                MR. PATTIS:  The reason I say that,
14           Kevin, is it's got my tab with the
15           number 6 on it, you know.
16                MR. SHEA:  Okay.  Yeah.  My only
17           point is if you want them to be the
18           document, it's going to the document
19           that's labeled as Exhibit 6.
20                MR. PATTIS:  Got it.  Okay.
21                THE WITNESS:  Okay.
22  BY MR. PATTIS:
23       Q    Are you familiar with this document,
24  sir?
25       A    Yes.  I thought I had received an
```

```
 1   e-mail, but I guess I received a letter.  Okay.
 2        Q    Is it possible you also received an
 3   e-mail?
 4        A    I'm wondering if this came by e-mail.
 5   But anyway, no, this -- I received one document,
 6   so . . .
 7        Q    And this bears a Bates stamp of D16.  Is
 8   this the first time that you heard from Nancy
 9   Berliner involving Dr. Simons' occupancy of the
10   Berliner chair?
11        A    Yes.
12        Q    How did you react when you received this
13   letter?
14        A    I think there was -- so, I got back to
15   Nancy and there was a discussion with the Title IX
16   officer -- again, Stephanie Spangler -- as to who
17   should address it.  And so I can't give you the
18   exact sequence of events, but in the end we
19   decided that Stephanie Spangler should address
20   this.  And I communicated that to Nancy Berliner.
21   I think there was a series of e-mails that
22   communicated that.
23        Q    Prior to -- and is it safe to assume,
24   sir, that you received this communication from
25   Nancy Berliner on or about February 11th of 2018,
```

```
 1    the date of the letter?

 2         A    It depends on how it was sent.  If it

 3    actually came in the mail and went through the

 4    Yale mail system, it probably was about ten days

 5    later.

 6         Q    That's why I said "on or about."

 7         A    Yeah, on or about would be fair.

 8         Q    Prior to receipt of this letter had you

 9    discussed with anybody at Yale removing Dr. Simons

10    from the Berliner chair as the result of his UWC

11    findings?

12         A    Yes.  So, there had been a series of

13    discussions with SWIM.  You know what SWIM is?

14         Q    Yes.  But can you say it, for the

15    record?  I can never get it all out.

16              MR. SHEA:  I can't testify.

17              THE WITNESS:  Yeah, I'm trying to

18         remember what SWIM stands for.

19              MR. PATTIS:  I've got documents

20         later.  We'll do it later.

21              THE WITNESS:  It's a women's

22         organization.  I can't remember what it

23         stands for.  The -- and they had

24         drafted --

25              MR. SHEA:  Status of Women in
```

Falzarano Court Reporters, LLC

```
 1                  Medicine.
 2                       THE WITNESS:  Okay.  Did you hear
 3                  that?
 4                       So, they had drafted a set -- what
 5                  they thought should be guidelines that
 6                  the medical school should adopt for
 7                  dealing with sexual harassment.  And one
 8                  of those guidelines was a rule that when
 9                  someone is found guilty of sexual
10                  harassment, they would lose all
11                  honorifics.  And included in those
12                  honorifics was endowed chairs.
13                       And there were many meetings with
14                  SWIM in which that document was brought,
15                  edited, brought back, edited, brought
16                  back, and many discussions in general
17                  that did not include Mike specifically.
18                  But then there were a few discussions
19                  that mentioned Mike specifically.
20      BY MR. PATTIS:
21           Q    Had these discussions taken place before
22      you received the letter from Nancy Berliner?
23           A    Yes.  And -- definitely.
24           Q    Do you have any reason to believe that
25      someone from SWIM or affiliated with SWIM may have
```

```
 1   leaked information to the New York Times?

 2        A    About this issue or about --

 3        Q    About Dr. Simons at any point.

 4        A    You know, I never knew initially when

 5   The New York Times covered the story years

 6   earlier.  Somebody went to the New York Times.  I

 7   don't know who it was.  And I don't know if they

 8   were in SWIM or not in SWIM.

 9        Q    Okay.

10        A    And I don't think there was -- I don't

11   think The New York Times covered this, but I could

12   be wrong.

13        Q    And then this is the last question I'll

14   ask on the press disclosure issues.  At any point

15   since you've received this suit until today and

16   including all of time, have you ever been given

17   any information as to the identity of the person

18   or persons who leaked confidential information to

19   the New York Times?

20        A    No.

21        Q    Okay.  Then I won't -- and if I go back

22   there again, remind me, You promised; okay?

23        A    But I would like to know if you find

24   out.

25        Q    And we would like to know if you find
```

```
1    out.
2                   MR. PATTIS:  Can we take a look at
3              Exhibit 7, please?
4    BY MR. PATTIS:
5         Q    Take a moment to review that, Doctor.
6    I'll have a few questions.
7              (Pause.)
8                   MR. SHEA:  Now, this one is normal
9              even though it has your -- this is my
10             point.  This has your sticky, but it's a
11             normal perspective.  The other one was,
12             like, a --
13                  MR. PATTIS:  We were rushing when
14             we did these last night, Kevin.  I'm
15             sure that explains that.
16                  MR. SHEA:  Oh, yeah, no, I
17             understand it.  I'm just saying it's
18             your exhibit.
19                  MR. PATTIS:  I got it.  I got it.
20                  MR. SHEA:  When you -- you might
21             want to change it.
22                  MR. PATTIS:  Thank you, sir.
23             (Pause.)
24                  THE WITNESS:  Okay.
25
```

1    BY MR. PATTIS:

2         Q    That's a letter that you wrote to

3    Ms. Berliner or Dr. Berliner, correct?

4         A    Right.

5         Q    What did you mean when you say, "I also

6    want you to know that I take seriously my

7    obligation to address complaints of sexual

8    misconduct fully and appropriately, an obligation

9    which includes respecting and implementing the

10   outcomes and disciplinary recommendations of the

11   formal complaint process conducted by the

12   University-Wide Committee on Sexual Misconduct."

13             What were you trying to say to her

14   there?

15        A    I think in her letter she was accusing

16   Yale of having a tradition of not paying attention

17   to these issues.  And I was trying to tell her

18   that I do take it very seriously and emphasizing I

19   believe that my role in the UWC process is

20   implementing the outcomes and disciplinary

21   recommendations.  So, emphasizing the fact that I

22   am not the UWC.

23        Q    You also told her, however, that

24   removing Dr. Simons from the Berliner chair would

25   be an additional sanction, correct?

1         A      Correct.

2         Q      Do you believe it would have been an

3     additional -- did you believe that when you wrote

4     it?

5         A      Yes.

6         Q      And do you believe that it was an

7     additional sanction now?

8                     MR. SHEA:  Object to the form.  You

9             can answer.

10                    THE WITNESS:  Yes.

11    BY MR. PATTIS:

12        Q      Why do it, then?

13        A      I think it came down to the same issue

14    we spoke about earlier, which is balancing

15    fairness to Mike Simons against fairness to the

16    community.  And the community, again, was in an

17    uproar.  So, you're talking about the Berliner

18    chair or the global thing of all the chairs?

19        Q      Right now I'm simply talking about

20    Exhibit 7.  And that refers specifically to the

21    Berliner chair, sir.

22        A      Okay.  So, in the case of the Berliner

23    chair we didn't take it away; we were actually --

24    the answer -- so, let me -- because I think I was

25    answering a different question and I --

```
 1        Q    Understood.

 2        A    So, in the case of the Berliner chair, I

 3   know Nancy Berliner and was fairly convinced that

 4   this -- she was going to take this to the extreme

 5   and to damage Mike Simons and damage Yale.  And

 6   the -- it was my feeling -- and I believe I had a

 7   conversation with Stephanie Spangler about this.

 8   And then I won't comment if there were discussions

 9   with attorneys.  But that a good solution would be

10   to exchange chairs.

11        Q    Okay.

12        A    And that was done in everyone's

13   interest.  And so that led to a conversation with

14   Mike Simons as to whether he would agree.  In this

15   case, this was a recommendation to Mike.  This was

16   not something that was forced upon Mike.

17        Q    So, the recommendation was that he

18   relinquish the Berliner chair and assume the

19   Waldemar Von Zedtwitz Professorship of Cardiology,

20   correct?

21        A    Correct.

22        Q    And he agreed to do so?

23        A    He did.

24        Q    Did he seem reluctant as you perceived

25   him?
```

```
 1        A    He was -- I don't know if "reluctant" is

 2   the right word.  He was concerned.  He was

 3   concerned that this would blow up.  And he

 4   actually seemed to predict what would follow more

 5   than I predicted it.  He was very concerned that

 6   once the chairs were changed, that the process

 7   would be sabotaged.

 8              And I actually thought that -- and I

 9   still believe today that had we not done this,

10   Nancy Berliner would have taken this -- and not

11   just Nancy, but a few others involved would have

12   taken this and come after Yale and Mike Simons.

13   So --

14        Q    To do what?

15        A    To create another public exposure of --

16        Q    Well, they did anyhow.

17        A    Well, we didn't know that.

18        Q    Yeah, I hear you.

19        A    We thought we were heading it off.  I

20   agree they did anyhow.  If I knew then what I knew

21   now, I wouldn't have bothered.

22        Q    I hear you.  Have you ever heard the

23   expression, You don't negotiate with terrorists?

24              MR. SHEA:  There's not a question

25              pending.  Well --
```

```
 1   BY MR. PATTIS:
 2        Q    Have you ever heard that expression?
 3                  MR. SHEA:  You can answer.
 4                  THE WITNESS:  Yes.
 5   BY MR. PATTIS:
 6        Q    And isn't it true that in some
 7   respects -- I refer to the pressures brought to
 8   bear on you all as incident to the so-called Me
 9   Too movement.  Did you ever draw that association?
10                  MR. SHEA:  Object to the form.
11                  THE WITNESS:  Yeah.  I don't -- I
12             don't -- no, I don't think so.  I think
13             that would be too simple a statement.
14   BY MR. PATTIS:
15        Q    Give me a more nuanced expression.
16        A    Well --
17        Q    What was it the reflection of?
18        A    I think --
19                  MR. SHEA:  Object to the form.  You
20             can answer.
21                  THE WITNESS:  Yeah.  I think that,
22             you know, over the last decade the
23             importance of sexual harassment has
24             really grown, and as it should have.
25             And awareness of sexual harassment and
```

```
 1                   the concern that institutions of all
 2                   kinds in society have not dealt with it.
 3                   I think it has become apparent.  And I
 4                   certainly learned over the last decade a
 5                   lot more about things that have happened
 6                   at medical schools in general -- and
 7                   certainly at Yale and every other
 8                   medical school -- that I probably wasn't
 9                   aware of in 2010.
10                       So, people -- I think people wanted
11                   to know that a school like Yale School
12                   of Medicine, which was my concern, and
13                   that the dean were taking sexual
14                   harassment very seriously.
15   BY MR. PATTIS:
16        Q    You don't think that suspending a man
17   from a position for 18 months reflects taking it
18   seriously?
19        A    I think it does.  But a lot of members
20   of the community felt that it deserved more.
21        Q    Would you agree that Dr. Simons was
22   treated unfairly in this process?
23                   MR. SHEA:  Object to the form of
24                   the question.
25                   THE WITNESS:  That's a --
```

Falzarano Court Reporters, LLC

```
 1   BY MR. PATTIS:
 2        Q    It's a judgment I'm asking you to make.
 3        A    If he was an isolated entity -- so, if I
 4   was a judge and then -- you know, I might -- if I
 5   was considering him without the school, you know,
 6   then you might make one decision.  But when you
 7   look at the whole entity as dean of the medical
 8   school -- and that's how a lot of these decisions
 9   had to be made.
10        Q    I don't understand that, but the jury
11   may some day.
12             Let's take a look at Exhibit 8.
13                MR. SHEA:  Exhibit A?
14                MR. PATTIS:  Eight.
15                MR. SHEA:  Oh, sorry.
16                MR. PATTIS:  I'm sorry.
17   BY MR. PATTIS:
18        Q    Sir, have you seen Exhibit 8 before?
19        A    I'm not sure.  But I'm aware of it.
20        Q    Now, prior to this -- this is a letter
21   to Michael Simons from President Salovey dated
22   June 22, 2018, correct?
23        A    Yes.
24        Q    Before June 22, 2018 had you had
25   discussions with President Salovey about
```

```
 1                    STATE OF CONNECTICUT
 2       I, KRISTINE A. PARADIS, LSR 338, a Notary Public
 3  duly commissioned and qualified in and for the State
 4  of Connecticut, do hereby certify that pursuant to
 5  Re-Notice, there came remotely before me via
 6  videoconference on the 16th day of July, 2021, the
 7  following named person, to wit:  ROBERT ALPERN, M.D.,
 8  who was by me duly sworn to testify to the truth and
 9  nothing but the truth; that he was thereupon
10  carefully examined upon his oath and his examination
11  reduced to writing under my supervision; that this
12  deposition is a true record of the testimony given by
13  the witness.
14       I further certify that I am neither attorney nor
15  counsel for, nor related to, nor employed by any of
16  the parties to the action in which this deposition is
17  taken, and further, that I am not a relative or
18  employee of any attorney or counsel employed by the
19  parties hereto, or financially interested in this
20  action.
21       IN WITNESS THEREOF, I have hereunto set my
22  hand this __29th__ day of____July_____, 2021.
23
24            KRISTINE A. PARADIS, CSR #338
              Certified Shorthand Reporter
25  My Commission expires:  May 31, 2023
```

Falzarano Court Reporters, LLC