# Exhibit R

VOLUME I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                                   :
MICHAEL SIMONS,
                                   :
            Plaintiff,
                                   :   Civil Action No.
     vs.
                                   :   3:19-CV-01547(VAB)
YALE UNIVERSITY, PETER SALOVEY,
ROBERT ALPERN, M.D.,               :
UNKNOWN PERSONS,
                                   :
            Defendants.
                                   :
- - - - - - - - - - - - - - - - - x


            REMOTE DEPOSITION of MICHAEL SIMONS, taken

        pursuant to the Federal Rules of Civil Procedure,

        via Zoom, before Frances L. Van Tienen, Licensed

        Shorthand Reporter in and for the State of

        Connecticut, on Wednesday, June 16, 2021, at

        10:17 a.m.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

```
 1                A P P E A R A N C E S

 2

    NORMAN A. PATTIS LAW OFFICES
 3  Attorneys for the Plaintiff
    383 Orange Street
 4  New Haven, Connecticut  06510
    (203) 393-3017
 5  NPattis@pattisandsmith.com
        By:  NORMAN A. PATTIS, ESQ.
 6

 7

    CLENDENEN & SHEA, LLC
 8  Attorneys for the Defendants
    400 Orange Street
 9  New Haven, Connecticut  06511
    (203) 787-1183
10  kcs@clenlaw.com
        By:  KEVIN C. SHEA, ESQ.
11           JOSEPH BOCCIA, Esq.

12

13

14

15

16

17

18

19
      .
20

21

22

23

24

25
```

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 78

1   chair; correct?

2       A.    Correct.

3       Q.    And then you responded to that email that same

4   day on April 26th with the next email up the chain in this

5   Exhibit 6; correct?

6       A.    Yes.

7       Q.    And you expressed these three bullet points that

8   you said if they were met or if they were resolved, you

9   would be happy to swap the chair; correct?

10      A.    Correct.  I wanted to make Alpern a favor

11  because he asked me when he had the phone a call to say

12  about so and so, okay, that's fine.  If you feel that that

13  helps you and that's the best way to go, then I'll do that.

14  I wish I didn't agree.

15      Q.    Well, he responded to your email with the next

16  one up the chain here the same day again, and he says that

17  he gives you his assurance on the first two bullet points

18  that you asked for that, and on the salary issue he said

19  that he wanted to look into it further to understand the

20  required amounts and the timing and that he would get back

21  to you on that ASAP; correct?

22      A.    I think the salary issue that he's referring to

23  is somewhat different than the chair issue.  If you go up,

24  this is what the salary -- this is what the salary issue

25  refers to.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 79

1       Q.    Okay.  So you then say the terms under which you
2   are willing to agree to the swap; correct?
3       A.    So you see the salary bullet point here?
4       Q.    Yes.
5       A.    It says, "The school will commit to covering my
6   over-the-cap salary and overhead expenses."
7       Q.    Yes.
8       A.    Do you have any idea what this is about?
9       Q.    No, and that's one of the reasons we're going to
10  suspend today's deposition, because the damages information
11  is something that I think -- that's why we've asked you to
12  identify how much you were making in each one of the years,
13  what your salary and benefits are.
14      A.    So unfortunately it's not that simple.  So if
15  you want a five-minute course in Yale accounting, I can
16  give it to you.
17      Q.    I would like you to tell me your understanding
18  of the arrangement.
19      A.    So the W-2s will tell you is what my salary is,
20  but that's all they will you.  The salary comes from
21  several sources, and the Yale faculty members expect it to
22  cover their salary from different sources of income.  One
23  of them is research funds.  It so happens that the amount
24  of research funds you can give is limited by how much NIH
25  allows you to do.  This is called the cap.  So if for

Electronically signed by Frances Doran (301-157-500-4888)                                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1   argument sake my salary is 300 and the NIH cap is 180, the

2   most I can get from NIH with 300 which is my salary is 180.

3   The amount above that is referred to as over-the-cap

4   salary.

5        Q.    In your example is that 120,000?

6        A.    Correct.  And that amount -- obviously in

7   addition to that salary there's an overhead.  So with

8   Yale's roughly 35 percent overhead that 120 becomes, I

9   don't know, 160.  So how about that 160,000?  So that's

10  where the endowed chair comes in, then it's common that the

11  University supports certain percentages of the faculty

12  salaries because it's not possible to generate enough

13  income to cover over-the-cap expenses, and by the way there

14  are very few people who can come to 100 percent of the

15  over-the-cap expense coverage.  Very few could do that.  So

16  you need support from the University to cover your

17  over-the-cap expenses if your salary is higher.

18           It was not an issue when I had all the other

19  positions because there were other sources of income that

20  covered them, but without them my only two sources of

21  income became NIH and endowed chair.  So that's why I said

22  I want to be sure that the school covers my over-the-cap

23  expenses regardless of the endowed chair issue because I

24  have no other way of doing it, and I know you do it for

25  other faculty members, you should do it for me as well, and

Electronically signed by Frances Doran (301-157-500-4888)                                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1   that's his reply saying we will look into it.  That's what

2   that we will look into this sentence is.

3        Q.    Okay.  And that's where he says I want to

4   consider the chair swap alone, I am not --

5        A.    Yes.

6        Q.    -- agreeing to guaranteeing funding, definitely

7   would not agree to your third bullet as you now write it.

8   Please let us know what your final decision is on the chair

9   swap.  If you do not wish to do this, I will let the

10  University know.

11       A.    So if you go down with this -- hold on.  So he

12  says Brian and I want to address the issue of the salary

13  and so forth.  Basically he says we want to be fair.  So he

14  says dividing the problem into two chairs, separate

15  salary -- salaries are both separate, and I agreed to that

16  position.

17       Q.    You did?  Okay.

18       A.    Yes.

19       Q.    So at the end of the day under the terms that

20  Dr. Alpern proposed here, you agreed to swap the Berliner

21  Chair for the Von Zedtwitz Chair; correct?

22       A.    Yes.

23       Q.    And you did that with the understanding that

24  your salary would remain essentially the same; correct?

25       A.    Would not -- that my salary support would not be

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1   affected, all right, because the chair is a key part of the

2   salary support, and when you first get an endowed chair you

3   get a lump sum of money and the endowment that pays an

4   annual percentage, and that's what your chair is.  As Yale

5   endowment grows every year, your chair endowment grows so

6   the amount of money you get is more.  So if you held the

7   chair for five years, you're getting more money than you

8   were getting give years ago.  Does that make sense?

9        Q.   Well, were you getting more money as you were --

10       A.   Yeah, of course.  That's what happens every

11  year.  So that's what I told him, that the new chair has to

12  have an endowment equivalent to what it was in my Berliner

13  Chair and they have agreed to that.  That's what those

14  bullet points are about, my total salary.

15       Q.   Is that in fact what happened, you agreed to

16  swap the Berliner Chair for the Von Zedtwitz chair, and

17  they did continue to meet the same financial support for

18  your salary under the Von Zedtwitz Chair as they had for --

19       A.   Sorry, I jumped in.  They gave me the same

20  amount of money in the Von Zedtwitz Chair as was in the

21  Berliner Chair.

22       Q.   So you suffered no financial loss when that swap

23  was made; correct?

24       A.   From the swap of chairs, no.

25       Q.   And then -- question withdrawn.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1          That's it for this exhibit, so let me stop

2     sharing that.  Dr. Simons, going back to the swap of the

3     Berliner Chair for the Von Zedtwitz Chair, is it fair to

4     say that by the end of that conversation with Dr. Alpern

5     all of the conditions that you had asked for had been

6     resolved and you did ultimately agree to the transfer to

7     the Von Zedtwitz Chair?

8          A.     Correct.

9          Q.     And it's fair to say you said you'd be happy to

10    swap the chair; correct?

11         A.     Yes.

12         Q.     And in fact you considered it a positive

13    development in your --

14         A.     I did not.

15         Q.     You didn't?

16         A.     No.  The Berliner Chair is a much more

17    prestigious name.  Just a second.  I had never heard of the

18    Von Zedtwitz Chair before.

19         Q.     I'm sorry?

20         A.     I had never heard of the Von Zedtwitz Chair

21    before.  I was doing them a favor by agreeing to this

22    because they have asked me -- assured me there would be not

23    ill consequences.  So it was my way of doing a friendly

24    gesture, though it's the last time.

25         Q.     So then -- hold on a second.  I'm going to show

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1    you now a document we are marking as Defendants' Exhibit 8

2    for identification.  Do you recognize this?

3         A.    Yes, I do.

4         Q.    What is it?

5         A.    It's a Tweet I posted from my Twitter account.

6         Q.    So you announced the swap as the new chair;

7    correct?

8         A.    That's right, so that my colleagues would know

9    how to address correspondence to me.

10        Q.    So why would you have announced it on your

11   Twitter if you didn't consider it to be a positive

12   development?

13        A.    So that my colleagues would know what's

14   happening.  What else is the purpose of that account?  I

15   didn't say it was a honor.  I didn't say it was this.  It's

16   just something that happened to me, and this is Yale, and

17   it's linked to a Yale press release.  So it's a simple

18   recounting of the news.  It's not an endorsement.  It's not

19   saying that I'm happy about it.  This is what happened, and

20   this is linked to a Yale announcement.

21        Q.    But as you've noted in this lawsuit, you claim

22   one of your injuries is damage to your reputation; correct?

23        A.    That's right.

24        Q.    You don't believe there was any damage to your

25   reputation as a result of the swap of the Berliner Chair

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1  for the Von Zedtwitz Chair; did you?

2      A.    I thought it was a minor deal, that its loss was

3  not worth the aggravation and the time, and since Alpert

4  politely asked me and said that they would help me if I

5  agreed, I decided to do that against my better judgment.  I

6  did not think it materially affected me.  What happened

7  after that affected me very much.

8      Q.    You're talking about the removal of the Von

9  Zedtwitz Chair?

10      A.    Correct.

11      Q.    And is that basically your biggest complaint in

12  this lawsuit?

13      A.    As I said earlier, it's the final straw.  There

14  have been a number of injustices going back to the original

15  discipline.  You know, I attempted to play by the rules.

16  Even though I disagreed with what is happening, this is

17  what you have to do to make yourself a better person.

18  Salovey said in the letter which you have saying you know,

19  I'm sorry we have to do this, but you will be a better

20  person for this.  The implications were they were going to

21  place that back into the family.  I did that.  I did

22  everything I was supposed to do.  I did all the training

23  they have asked me to do, all the courses.  I was an

24  exemplary citizen.  I generated income.  I published

25  papers.  You know, I bring glory to Yale by my academic

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

```
1              given it to you, Norm, I'll just refer you to --
2                   MR. PATTIS:  The form of the question was
3              all I was concerned about.
4                   MR. SHEA:  Just for your -- just going
5              forward, the document that begins on Bates stamp
6              number D-61 which is not part of what I've shown
7              so far is the UWC procedures that were revised,
8              and they are effective according to the document
9              itself as of August 12th, 2020.  So the document
10             that I'm showing now I believe was in effect
11             prior to that meeting at all times relevant to
12             this lawsuit.
13                  MR. PATTIS:  Okay.
14    BY MR. SHEA:
15        Q.   So what I'm referring to now, Doctor, you talked
16    about Yale's violation of -- or somebody's violation of the
17    UWC confidentiality procedures; correct?
18        A.   Correct.
19        Q.   And I'm referring you now to Exhibit 11 and the
20    section on Confidentiality and Honesty.  Do you see there
21    on the line that I've highlighted right there that says
22    that the members of the Yale community who are involved are
23    expected to maintain the confidentiality of the information
24    in these proceedings; correct?
25        A.   Correct.
```

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1      Q.   And then the next sentence says an individual

2   who asks the UWC to address an informal complaint may

3   request that it be kept confidential from the accused or

4   other persons involved in the events.  Do you know if that

5   was done here?

6      A.   This was a formal complaint, so this statement

7   does not apply.

8      Q.   Okay.  Are you aware of any other UWC policy or

9   procedure concerning confidentiality that was in effect at

10  the time you believe this leak occurred or prior to that

11  other than what's on the screen right now under Section 3

12  of Exhibit 11?

13     A.   What's on the screen right now talks about the

14  name of the person who makes an accusation will be kept --

15  will be kept -- will be kept confidential in an informal

16  complaint.

17     Q.   I'm talking about the paragraph before that.

18  I'm talking about the first paragraph.

19     A.   Yes.  I don't think there are any other rules.

20  I think this is the one that is in force.

21     Q.   Okay.  So where does it say that they are

22  required to be confidential?

23     A.   What does the sentence "expected to maintain

24  confidentiality of procedures and information mean?"  So

25  certainly it's my interpretation of this, and then you have

1   a leak of the statement where it is expected that these

2   proceedings are confidential.

3       Q.    And my question is are you relying on any other

4   provision besides that in your claim that Yale or somebody

5   at Yale breached the confidentiality of the UWC

6   proceedings?

7       A.    It's been told to me numerous times during the

8   UWC process that proceedings are confidential and will not

9   be disclosed.  I do not know what specific policy anybody

10  referred to.  This is the same illegal proceedings.  I did

11  not have legal representation for most of it, and I don't

12  know that any document was given to me saying in black and

13  white that it will always be confidential, but it's

14  certainly understood by all parties involved that there is

15  a strict confidentiality in these procedures.  Nobody would

16  think otherwise.

17      Q.    Well, the section you have relied on in your

18  answers to the discovery requests in this case refer to

19  Sections 3.3 and 3.4 of the UWC procedures, and I just want

20  to refer to that because that is -- I don't believe that

21  was in effect at the time, and I'm going to -- we'll mark

22  this as Defendants' Exhibit 12.  You'll see this is UWC

23  policy on the first page here.  It's page 1 of 11.  It says

24  that -- oh, that says effective October 16.  Sorry, that's

25  a different one.  I have a different one.  That's the wrong

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1    one, sorry.  This is the same.

2         A.    This is 2015.

3         Q.    This is 2016, but it says the same -- it's the

4    same exact language there except that it says --

5                   MR. PATTIS:  Objection.  I'm not sure it is

6              the same.

7                   MR. SHEA:  The first sentence is the same.

8              It's after that.

9         A.    It says "must be held in strict confidence."

10        Q.    It says all documents prepared by, prepared for

11   or received in connection must be held in strict

12   confidence.  Okay.  So this -- I stand corrected.  This one

13   is effective October 26th, 2015, but there's no section 3.3

14   in this.  That's where we come to --

15                  MR. PATTIS:  I'm the one who drafted the

16             Complaint, not Dr. Simon, so if I made a

17             scribner's error educate me or --

18                  MR. SHEA:  This is the 2015 one, Norm..

19                  MR. PATTIS:  Yeah.  This is paragraph 3.

20             There's a paragraph 3.  Is that a subset of

21             another paragraph.

22                  MR. SHEA:  No, it's not.  That's what I'm

23             going to show you.  So we'll mark as Exhibit 13

24             the UWC 2020 policy which is up on the screen

25             now, and this one you'll see at the bottom says

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1        UWC Procedure Effective August 12th, 2020, and in

2        the one --

3             MR. PATTIS:  I don't see that.  Oh, I got

4        it.

5             MR. SHEA:  Do you see that.

6             MR. PATTIS:  Yeah, I do.

7             MR. SHEA:  This is the one that has if you

8        go down to -- this has a 3.3 with Confidentiality

9        and Honesty and then has a 3.4 for Retaliation

10       which is something that you've also claimed was

11       violated in your Interrogatory Responses.  So I

12       only see -- Norm, it should be correct, right,

13       because you now have the --

14            MR. PATTIS:  If it's wrong -- I need to

15       study these.  I don't know whether this -- go up

16       to 3.3, will you, please?

17            MR. SHEA:  Sure.

18            MR. PATTIS:  Top of 3.3.  We're not there

19       yet.  We're on 3.4.

20            MR. SHEA:  I'm on 3.3.  Is everybody seeing

21       3.3 up there?

22            THE WITNESS:  I do.

23            MR. PATTIS:  It incorporates some of the

24       other stuff, but you and I will sort that out.

25       If there's a scribner's error in there, we'll

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1          correct it, and we'll seek permission to amend

2          the Complaint.

3               MR. SHEA:  Okay.

4      A.    It was said to me repeatedly during UWC process

5   and oral hearings that all information, material and

6   documents will be held in strict confidence.

7               MR. PATTIS:  Off the record.

8               (Discussion off the record)

9      Q.    Back to Exhibit 2 your Responses to our

10  Interrogatories.  I'd like to draw your attention to

11  Interrogatory Number 12 which refers to your allegation in

12  the Complaint that Yale provided financial support in lieu

13  of the Von Zedtwitz Chair in the year following the removal

14  of the chair but it's not contractually obligated to do so

15  in the future, and you allege that it caused you to suffer

16  lost wages, and we asked you to state the facts on which

17  you base that allegation including the amount of the lost

18  wages, the circumstances of the financial support -- I'm

19  sorry, the amount of your wages, the circumstances of the

20  financial support, and again this is what we covered

21  before.  A and B you have not responded to, but I want to

22  focus your attention on C for the purposes of this

23  question.  Okay?  Do you see your response C there?

24      A.    Yes.  This is what I was explaining before that

25  the endowment grows.  The chair endowment grows at least 5

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1   or 10 percent every year, and if you substitute a chair
2   payout with a fixed payout you're losing any increases that
3   occur.  First of all, a chair is a permanent thing, and
4   what they have built instead is a mishmash that can easily
5   be taken away.  This is saying they're not contractually
6   obligated to continue.
7       Q.   As you sit here today, am I correct to
8   understand that your only allegation recording the change
9   in your annual wages as a result of the loss of the Von
10  Zedtwitz Chair is that the wages and benefits you were
11  receiving as the Von Zedtwitz Chair were permanent in
12  nature while the financial support you've received in lieu
13  of those wages is discretionary?
14      A.   No.  In part that is correct.  It is a
15  discretionary support versus a permanent, that's true, but
16  also as the chair endowment goes up the support that I'm
17  getting does not.  My salary has not changed in years.  I
18  don't think I've had a single salary raise since 2015.  I
19  consider that discriminatory by the way, and the publicity
20  associated with the Von Zedtwitz chair cost me several jobs
21  that are listed.  That was brought out because of
22  everything that happened before.  I was already lying down.
23  This was highly adverse publicity that was incredibly
24  detrimental to many of my activities, my ability to get a
25  new job, my ability to get research funding and many other

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1   things.

2        Q.    Okay.  I want to take these one at a time.  With

3   respect to the income you received through your employment

4   at Yale, am I correct to understand that since the Von

5   Zedtwitz Chair was removed the income you received from

6   your employment with Yale has not been reduced?

7        A.    My salary has not been reduced, but the amount

8   of support that goes with it is less than it would have

9   been if the chair was mine.  That's because it goes up 10

10  percent every year.  That means I have to get additional

11  funds somehow to support the salary, and first of all --

12       Q.    Doctor, you have to stop.  Norm's not here

13  anymore.  You have to stop.  I'm sorry.

14                  (Discussion off the record)

15                  (Recess taken)

16       Q.    Doctor, I know we're having technical

17  difficulties that have slowed us down today, and I know

18  we're going to suspend and come back to continue another

19  day, but I want to make sure we try and use the rest of the

20  time that we have here today officially so that next time

21  we can hopefully go a little more smoothly and that we

22  don't have the technical thing, but also I just want to try

23  and understanding some things about the rest of your claim.

24  Okay?

25       A.    Yes.

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

1      Q.    So the first claim that you brought in this

2  lawsuit is a breach of contract claim, and that's coupled

3  with a claim for a breach of the covenant of good faith and

4  fair dealing which was also based on the contract.  Do you

5  understand that?

6      A.    Yes, I do.

7      Q.    And when we asked you to identify the contracts,

8  let's see here, you identified the document I'm showing you

9  now which we're going to mark as Defendants' 14, and it is

10 a letter to you dated May 15th, 2008.  Do you recognize

11 this?

12     A.    Yes, I do.

13     Q.    And this is a 14-page document that is Bates

14 stamped D-1 through D-14, and am I correct to understand

15 that this is the document you were referring to earlier

16 when you said this was the contract that contains the terms

17 that you challenge in this lawsuit?

18     A.    Yes.

19     Q.    And do you -- question withdrawn.

20           So with respect to your claim for breach of

21 contract and your claim for the breach of the covenant of

22 good faith and fair dealing, am I correct to understand

23 that the document I'm showing you now that we've marked as

24 Defendants' Exhibit 14 is the contract on which those

25 claims are based?

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 109

```
 1       A.    Yes.
 2       Q.    And are you aware of any amendment to this
 3   contract?
 4       A.    No.
 5       Q.    So there's no other contract that you claim you
 6   have with Yale with respect to your claims in this lawsuit
 7   other than the one that I'm showing you right now and
 8   that's been marked as Defendants' Exhibit 14; is that
 9   correct?
10       A.    Correct.
11       Q.    Can you tell me -- question withdrawn.
12             In this document paragraph number 2 on the first
13   page of Exhibit 11 says that "The Department and the Dean
14   will nominate you to President Levin and the Yale
15   Corporation for a Robert Berliner Professorship;" correct?
16       A.    Yes.
17       Q.    Are you aware of any other term of this contract
18   relevant to the Berliner professorship?
19       A.    No.
20       Q.    And the contract merely provides that they will
21   nominate you for the professorship; correct?
22       A.    No.  It is understood in this context that this
23   is a formality and that the endowed professorship is a
24   given.  I did not accept the position and move to Yale
25   until the endowed professorship was actually approved by
```

Electronically signed by Frances Doran (301-157-500-4888)                                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 110

1    Yale, by Yale Corporation.

2        Q.    So you were nominated, and the nomination was

3    approved; correct?

4        A.    I was nominated, it was approved, and when it

5    was approved I moved to Yale.

6        Q.    And on what basis do you claim that the holding

7    of the Berliner professorship was intended to be a

8    permanent term of your contract?

9        A.    Because all the -- because all of the endowed

10   professorships are.  They are permanent.  They are not

11   given for a fixed period of time.  They are a lifelong

12   appointment.

13       Q.    Where does it say that?

14       A.    In the Yale Faculty Handbook.

15       Q.    It says that they are lifelong appointments?

16       A.    Yes, that is a common understanding.

17       Q.    And you believe that that's in the handbook?

18       A.    I believe that that's in Yale's policies.  I

19   cannot site you chapter and verse, but that's the universal

20   understanding of what the endowed professorship is.

21       Q.    But you testified earlier that the Berliner

22   professorship usually goes with the Chief of Cardiology;

23   correct?

24       A.    Right, but it's still a permanent appointment.

25   Dr. Zarad who was the head of cardiology before me is still

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59

Page 134

1                    C E R T I F I C A T E

2          I hereby certify that I am a Notary Public, in and for

3     the State of Connecticut, duly commissioned and qualified

4     to administer oaths.

5          I further certify that the deponent named in the

6     foregoing deposition was by me duly sworn, and thereupon

7     testified as appears in the foregoing deposition; that said

8     deposition was taken by me stenographically in the presence

9     of counsel and reduced to typewriting under my direction,

10    and the foregoing is a true and accurate transcript of the

11    testimony.

12         I further certify that I am neither of counsel nor

13    attorney to either of the parties to said suit, nor am I an

14    employee of either party to said suit, nor of either

15    counsel in said suit, nor am I interested in the outcome of

16    said cause.

17         Witness my hand and seal as Notary Public

18    this 28th day of June, 2021.

19

20                    _____
                      Frances L. Van Tienen
                      Notary Public
21                    CSR License No. 00192

22    My Commission expires:
      October 31, 2024
23

24

25

Electronically signed by Frances Doran (301-157-500-4888)                    e1cfd8ae-ef20-4fa0-923e-8070b81a5a59