UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL SIMONS, | : | CIVIL ACTION NO. |
|     Plaintiff, | : | 3:19-CV-01547 (OAW) |
| v. | : | |
| | : | |
| YALE UNIVERSITY, | : | |
| PETER SALOVEY, | : | |
| ROBERT ALPERN, M.D., | : | |
|     Defendants. | : | MAY 20, 2022 |

**REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Pursuant to L. Civ. R. 7(d) and Fed. R. Civ. P. Rule 56, the defendants, Yale University, Peter Salovey, and Robert Alpern, M.D., hereby reply briefly to the Plaintiff's Memorandum of Law in Opposition to Summary Judgment. ("Opp."), Doc. # 98. The Opposition: (1) misreads the University's sexual harassment policy in a failed attempt to find a contractual promise that does not exist; (2) improperly relies on a footnote in *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016), in a similarly unsuccessful effort to conjure evidence of discrimination—of which there remains none; (3) confirms his inability either to establish an adverse employment action, or to identify any disparately treated, similarly-situated individuals, as required to support his Title VII claim in any event; and (4) fails to provide factual or legal support for his Title IX claim.

1. ***The plaintiff's <u>breach of contract</u> claim relies on an erroneous reading of the University's sexual harassment policy; and he was at-will for the titles he alleges were wrongly removed.***

The plaintiff's breach of contract claim is based on the May 22, 2008 Offer Letter, which incorporated the University's policies and procedures. Opp. at 5. The plaintiff now asserts that the defendants breached the contract only because they failed to abide by their "own procedures prohibiting successive punishment." *Id*. Based on a strained reading of the UWC policy, he asserts that the defendants were barred from "revisiting the plaintiff's matter and continuing to punish him for the same incidents." *Id*. A plain reading of the UWC policy, however, belies the plaintiff's claim because it simply does not say or imply what he purports.

The UWC policy is silent about successive punishment and explicitly states that "the UWC's authority is *not* exclusive." (Emphasis added.) Defendants' Responses to Plaintiff's

Local Rule 56(a)2 Statement of Additional Material Facts ("Def.'s Resp.") ¶ 4; *see also* Pl.'s Ex. J at 2, 14. The plaintiff's misreading of the policy also tellingly overlooks that this provision pertains only to a complaining party's rights and limitations to seek redress, and is silent as to both a respondent's rights and limitations vis-à-vis the UWC, or anyone else's ability to take further actions once the UWC has made its recommendation. *See* Pl.'s Ex. J at. 2, 14; *see also* Def.'s Resp. ¶ 4.[1] It also bears emphasis that the UWC only has the power to recommend a penalty; it does not impose discipline. *See* Pl.'s Ex. J at 2; Def.'s Resp. ¶ 4. Accordingly, the UWC policy fails to provide any support whatsoever for the plaintiff's breach of contract claim.

The plaintiff also contends incorrectly that the defendants should have "haul[ed] Dr. Simons back before the UWC for reconsideration of his punishment...." Opp. at 9. Yet the policy expressly prohibits the UWC from hearing a new complaint if it has already decided a formal complaint under the same set of circumstances. *See* Pl.'s Ex. J at 2, 14. The UWC policy does not contain—and the plaintiff fails to identify—any provision that prevented the defendants from lawfully removing the plaintiff as Section Chief of Cardiology, Director of the Cardiovascular Research Center, or from his endowed chair, which were at-will and removable at any time. Def.'s Facts, ¶¶ 1-12; Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Mem."), at 16-18. The plaintiff has failed to address this argument, apparently conceding the point. The fact that these titles were at-will, combined with his misreading of the UWC policy on which he relies, defeats this claim entirely. *Id.*

---

[1] Specifically, the policy prevents the *complainant* from first bringing a complaint in one forum and then seeking a formal hearing in another forum, or from subsequently moving their claim to another forum once a governing body agrees to hear a complaint. *See* Pl.'s Ex J, at 2, 14. Even if the plaintiff's reading of the policy were accurate—which it is not—his claim still fails because an alternate governing body did not remove these titles from him after the initial UWC decision; Dr. Desir and the Yale Corporation did. *See* Defendants' Local Rule 56(a)1 Statement of Facts ("Def.'s Facts"), ¶¶ 30, 32, 38.

2. ***The plaintiff's claim for <u>breach of implied warranty of fair dealing</u> fails for the same reasons as his breach of contract claim, and is still precluded by his available statutory remedies.***

The plaintiff bases his breach of implied warranty of fair dealing claim on the same UWC policy that fails to support his breach of contract claim. Opp. at 7-11. For the reasons demonstrated *supra* at 1-3, it also fails to support this claim, because the duty he seeks to impose on the defendants simply does not exist. Opp. at 8; *see Rudeen v. Allstate Ins. Co.*, 2018 WL 1401978 (D. Conn. 2018) ("the implied covenant of good faith and fair dealing is not implicated by conduct that does not impair contractual rights" [Internal quotations omitted]).

The plaintiff also claims that the implied warranty of fair dealing was breached because the defendants failed to provide him an opportunity to contest the removal of his at-will titles after the UWC made its recommendation. Opp. at 9. Again, the plaintiff's proposed course of action—a re-adjudication of his case based on the same circumstances—directly contravenes the express language of the UWC policy. *See* Pl.'s Ex. J at 2, 14 ("The UWC will not entertain a new complaint if it has already adjudicated a formal complaint based on the same set of circumstances."). Accordingly, the defendants' alleged failure to follow a policy that does not exist, and which would have contravened the policy already in place, cannot save the plaintiff's defunct breach of implied warranty claim.

Finally, absent any contractual basis for the plaintiff's breach of implied warranty claim, Title VII is the *sole* predicate.[2] *See Bagely v. Yale Univ.*, 42 F. Supp. 3d 332, 359 (D. Conn. 2014); Opp. at 11. The plaintiff rejects the cases the defendants cite as failing to establish a "categorical rule" that a breach of implied warranty claim is precluded when the plaintiff has available statutory remedies for relief. *See* Opp. at 10-11. Yet the plaintiff fails to offer any compelling reason at all—much less any authority—why this Court should deviate from these prior decisions. *Id.*; *see also* Def.'s Mem. at 21. Ironically, the one case the plaintiff does cite,

---

[2] The plaintiff concedes that his breach of implied warranty claim is based, at least in part, on the alleged discriminatory motivations that are central to every claim in this lawsuit. *See* Opp. at 8, 11.

*Bagley*, held that the plaintiff's breach of implied warranty claim *was* precluded by his available remedies under Title VII, the ADA, and CFEPA. *Bagley, supra*, 42 F. Supp. at 361; Opp. at 11.

Accordingly, the plaintiff's claim for breach of implied warranty of fair dealing is both lacking any contractual support and precluded, and the defendants are entitled to judgment as a matter of law on this claim as well.

3. ***The plaintiff's claim of <u>gender discrimination under Title VII</u> still fails because he has not suffered any adverse employment actions, nor can he identify any similarly situated employees who were treated disparately.***

*First*, the plaintiff now attempts to advance his Title VII claim under an actual discrimination theory. *See* Opp. at 13. It therefore bears repeating at the outset that the plaintiff admitted that neither the defendants, nor any employee, agent, or representative of the University, has directly made any oral or written comments—discriminatory or otherwise—about the plaintiff's gender, race, or ethnicity. *See* Def.'s Mem. at 28; Def.'s Facts, at ¶ 45.

Undeterred by this concession, the plaintiff relies exclusively on a footnote from *Doe v. Columbia Univ.*, 831 F.3d 46 (2d. Cir. 2016) for the proposition that a university engages in direct discrimination based on sex when it adopts a policy of favoring one sex over the other in a disputed disciplinary proceeding to avoid bad publicity. *See id.* at 58 n. 11; Opp. at 14, 17. The plaintiff's heavy reliance on *Doe* is misplaced. For starters, *Doe* is procedurally inapposite, given that the Court was deciding a motion to dismiss and thus applied the reduced "plausibility" pleading standard. *See Doe*, 831 F.3d at 54 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Indeed, the Court in *Doe* expressly stated that a *complaint* states a discrimination claim if "it pleads specific facts that support a *minimal plausible* inference of such discrimination." [3] (Emphasis added.) *Doe, supra*, 831 F.3d at 56. Unlike in *Doe*, Dr. Simons is held to a higher standard here and must "point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing Fed. R. Civ. P. 56(e)). Thus, *Doe* stands on a different procedural footing and has no application here for that reason alone.

---

[3] The *Doe* Court also emphasized that, at this stage of the proceedings, its role was not "in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *See Doe*, 831 F.3d, at 59.

But *Doe* is also materially distinguishable on its facts and merits. The Court in *Doe* first determined that the procedural irregularities alleged by the plaintiff in the hearing process, standing alone, supported an inference of bias, but did not necessarily relate to bias on account of sex.[4] *See Doe*, 831 F.3d at 57. In order to discern a plausible inference of discrimination, the Court was required to rely on the criticism of the university, both in the student body and in the public media, accusing the university of not taking seriously female students' complaints alleging sexual assault by male students to support its ultimate conclusion that the plaintiff had sufficiently alleged a discrimination claim. *See id.* at 57-58. In other words, *Doe* stands for the proposition that "[p]ress coverage of sexual assault at a university *does not* automatically give rise to an inference that a male who is terminated because of allegations of inappropriate or unprofessional conduct is the victim of [sex] discrimination." (Emphasis added.) *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019). Instead, only when media coverage and public pressure are combined "with *clear procedural irregularities* in a university's response to allegations of sexual misconduct" will the Court find a university to act based on invidious stereotypes to permit a *plausible* inference of sex discrimination. (Emphasis added.) *Id.* at 33.

Here, the plaintiff has not alleged a single procedural irregularity in the UWC hearing or otherwise, nor does his complaint relate to a disputed matter in which an evaluator has weighed the evidence in favor of one side's version of events, such that it suggests bias favoring one sex over the other. Unlike in *Doe*, there are no competing male and female versions of the story here. Instead, the plaintiff's direct evidence of discrimination relies solely on the defendants' alleged "undisguised pandering to public pressure." *See* Opp. at 14. But as *Doe* and *Menaker* make clear, media coverage and public pressure surrounding sexual assault at a university, standing alone, does not give rise to sex discrimination. *See Menaker*, 935 F.3d at 33; *Doe*, 831 F.3d at 57-58. The plaintiff's misreading of *Doe* fails to recognize that a plaintiff must demonstrate more than a

---

[4] Specifically, the plaintiff alleged that the investigator, the panel, and the reviewing Dean reached conclusions that were incorrect and contrary to the weight of the evidence. *See id.* at 57. The Court stated that "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias." *Id.*

university's reaction to media coverage and public pressure surrounding sexual assault to establish a finding of discrimination based on sex. *See Menaker*, 935 F.3d at 33; *see, e.g., Roe v. St. John's Univ.*, 2021 WL 1224895, at *17 (E.D.N.Y. Mar. 31, 2021) (holding plaintiff's failure to show any procedural irregularities—coupled with media coverage and public pressure—to be fatal in claim based upon *Doe* and *Menaker*). Read properly, *Doe* provides no support for the plaintiff's claim of direct evidence of discrimination.

*Second*, the plaintiff attempts to show direct discrimination by contrasting his treatment with that of Dr. X.[5] Opp. at 15-18. This argument, however, fails to recognize—and the plaintiff presents no evidence to show otherwise—that Dr. X and the plaintiff are *not* similarly-situated employees. Tellingly, the plaintiff's Opposition is devoid of *any* discussion of the similarly-situated analysis. Despite the plaintiff's burden to show that he was similarly situated to the other employees he claims were treated disparately, the defendants can readily show that none exist. *See* Def.'s Mem. at 24-25 (legal standard for similarly situated employee).

Even though it is the *plaintiff's burden* to show otherwise, the record is clear that he and Dr. X are not similarly-situated employees.[6] Fatal to the plaintiff's argument, Dr. X is a Caucasian male and thus within the same protected class as the plaintiff. *See* Affidavit of Gary Desir, M.D., in Support of Defendants' Summary Judgment Reply Brief ("Desir Aff."), at ¶ 4. Moreover, Dr. X and the plaintiff worked in different sections of the University. *Id.* Unlike the plaintiff, Dr. X was not a Section Chief, did not hold an endowed chair, and had no administrative role at the University. *Id.* at ¶¶ 4-5. Dr. X and the plaintiff also reported to different supervisors. *Id.* at ¶ 6. Thus, Dr. X and the plaintiff necessarily could not have had their punishments imposed by the same supervisor. *Id.* at ¶¶ 7-8. Further, despite the glaring differences mentioned above, the plaintiff was subject to the procedures of the UWC, whereas no

---

[5] The defendants hereinafter refer to the individual whose name the plaintiff has redacted in his Opposition and who is the subject of the Motion to Seal filed with this Court as "Dr. X" to preserve confidentiality and avoid the necessity of further filings under seal.

[6] *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment ... the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.").

complaint was ever made to the UWC for Dr. X's conduct. *Id.* at ¶ 8. Dr. X simply is not a valid comparator to the plaintiff, thereby rendering irrelevant any comparison of their circumstances, and the plaintiff's direct evidence theory fails for this reason as well.

***Third***, the plaintiff also advances his Title VII claim under a disparate treatment theory, using the *McDonnell Douglas* framework. Opp. at 16. The plaintiff makes a last-ditch attempt to establish his prima facie case by arguing that he has suffered an adverse employment action as a result of the removal of the Von Zedtwitz chair because "he now has greater uncertainty in his compensation because he is now responsible for supporting a greater portion of his salary that the Defendants are temporarily assisting him with." Opp. at 18. Notably, the plaintiff acknowledged that the defendants agreed to cover—and continue to cover—the amount "over-the-cap" in order to continue to pay the plaintiff the same, or even a slightly higher, salary. Def.'s Resp. ¶ 23. In any event, this argument is purely conjecture and is not ripe for adjudication.[7] The plaintiff's impermissible speculation notwithstanding, it also bears noting that the alleged 5% to 10% increase he references involves the endowment that funds the salary, and not the salary itself. Def.'s Resp. at ¶ 23; Opp. at 18. It remains the case that the plaintiff has suffered no loss of salary or benefits as a result of his removal from the WVZ professorship. *See* Def.'s Resp. at ¶ 23.

In addition to these deficiencies, the Fifth Circuit, in *Oller v. Roussel*, 609 F App'x 770 (5th Cir. 2015), held that "the decision not to renew the professorship is not an adverse employment action." *Id.* at 774; *see also* Def.'s Mem. at 29-30. The *Oller* court held that the position was "a discretionary, merit-based award based in part" on the university's "assessment of the quality of a professor's work and his value to the department." *Id.* The plaintiff had no entitlement to the professorship, and the Fifth Circuit observed that "[c]ourts are not the

---

[7] *See Charlton-Perkins v. Univ. of Cincinnati*, 2021 WL 3737910, at *5 (S.D. Ohio Aug. 24, 2021) (finding plaintiff's Title VII claims resting on future unknown events un-ripe and stating that "an employment case is not ripe until the employment action is complete."); *see also Opals on Ice Lingerie v. Body Lines, Inc.*, 320 F.3d 362, 370 n. 3 (2d Cir.2003) (noting that the law is "well established that conclusory statements, conjecture, or speculation" are inadequate to defeat a motion for summary judgment. [Internal quotation marks omitted]).

appropriate forum for evaluating education and faculty appointments." *Id*. Recently, in *Champion v. Texas S. Univ.*, 2022 WL 1046154 (S.D. Tex. Apr. 7, 2022), a Texas district court relying on *Oller, supra*, held that a university's decision to remove the plaintiff's professorship did not constitute an adverse employment action under Title VII. *See Champion*, 2022 WL 1046154, at *2. Thus, summary judgment should enter on the plaintiff's Title VII claim on this basis alone. *See also* Def.'s Mem. at 29-30.

*Fourth*, the plaintiff argues erroneously that the defendants "ignore[] their own discovery responses," which he purports show that the defendants have treated female employees differently than they treated the plaintiff. Opp. at 17. Once again, the plaintiff's Opposition fails to even address the legal standard for employees to be similarly-situated. *See supra* at 6-7. Instead, the plaintiff mistakenly relies on an inference that does not exist: the University's interrogatory responses merely stated that female students and/or female employees have been investigated and/or disciplined, and referred the plaintiff to a university report on sexual misconduct—https://smr.yale.edu/title-ix/reports. *See* Plaintiff's Local Rule 56(a)2 Additional Material Facts ("Pl.'s Facts"), at ¶ 1; Def.'s Resp., at ¶ 1.

If the plaintiff had reviewed the referenced reports, he would have discovered that there has only been one instance since the UWC's inception in 2011 where a female faculty member was a respondent in a UWC proceeding. *See* Affidavit of Stephanie S. Spangler, M.D. in Support of Defendants' Summary Judgment Reply Brief ("Spangler Aff."), at ¶ 4; Ex. A to Spangler Aff. In this instance, however, the female faculty respondent was a *junior faculty member*, and there was *no finding of sexual misconduct*. Spangler Aff., at ¶ 6. These facts critically reveal that this female respondent cannot be used as a valid comparator to the plaintiff, who, unlike the female respondent, was a Section Chief and was found to have engaged in sexual misconduct concerning a junior colleague. Def.'s Facts ¶ 12, 15-17. Once this lone female faculty respondent is ruled out, which she must be, no other female faculty members remain, and the plaintiff cannot establish disparate treatment. Thus, the opportunity to punish a female faculty member similarly-situated to the plaintiff twice for the same conduct has never presented itself, and the defendants

cannot be found to have engaged in the discriminatory conduct alleged by the plaintiff on a disparate treatment theory, either. Again, although it remains the plaintiff's burden to establish such a comparator, Dr. Spangler's affidavit and the reports referenced in the University's interrogatory response have conclusively put the lie to this theory, too.

*Fifth*, and finally, the plaintiff's heavy reliance on Dr. Stachenfeld's and SWIM's involvement is similarly misplaced and unpersuasive. *See* Opp. at 14-15. In the absence of any competent direct or indirect evidence of discrimination, the plaintiff attempts to graft Dr. Stachenfeld's motivations on to the defendants, claiming that she was "emblematic of SWIM's views and the pressure that they exerted on the Defendants." *Id*. at 15. Because the plaintiff cannot put forth any evidence that Dr. Stachenfeld was a decision-maker vis-à-vis him in any capacity, however, this theory likewise fails.[8] Indeed, the record shows that Dr. Stachenfeld's (and SWIM's) role in the removal of the plaintiff's endowed chair was dubious; she even conceded that, as SWIM's co-chair, she did not know whether SWIM played a "critical role" in the plaintiff's removal from the Von Zedtwiz professorship. *See* Def.'s Resp. ¶ 16; *see also* Def.'s Facts, at ¶ 38 (noting that Dr. Alpern—and ultimately the Yale Corporation—removed the plaintiff from the Von Zedtwitz chair based on concern for the welfare of the Medical School community). The plaintiff's efforts to associate Dr. Stachenfeld and SWIM directly with Dean Alpern are also improper; Dr. Stachenfeld testified that, as one of many committees of the dean's office, SWIM worked to advance and improve the culture and climate at the medical school for women, but she explicitly stated that SWIM *was not* a specialized committee of faculty that worked "on behalf" of the dean or his office. *See* Def.'s Resp., at ¶ 17.

As such, the plaintiff cannot show any similarly situated employees to prove his actual discrimination or disparate treatment theories of liability. *See* Opp. at 13, 16. Removing the plaintiff's endowed chair is not an adverse employment action, which is fatal to his prima facie

---

[8] *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 89 (2d Cir. 2005) ("an employer's intent to discriminate must be evaluated by reference to the decision-maker actually ordering the adverse employment action, not to other persons in the company.").

case in any event. Lastly, Dr. Stachenfeld was not a decision-maker vis-à-vis the plaintiff, and any reliance on her motivations is misplaced. For these reasons and those set forth in the moving papers, this Court should enter summary judgment on the plaintiff's Title VII claim.

4..   **The plaintiff's *Title IX claim* fails for the same reason as his Title VII claim, and it is preempted by his Title VII claim in any event.**

The weaknesses in the plaintiff's Title IX claim are underscored by the fact that he has abandoned the Double Jeopardy and Due Process claims that he alleged in his Complaint. Complaint (Doc # 1), at ¶¶ 58-63; Def.'s Mem. at 32, 37-40. The plaintiff now contends that his Title IX claim is based on actual discrimination and disparate impact, Opp. at 22, but disparate impact is not cognizable under Title IX.[9] Even more revealing, the plaintiff's Title IX section is a carbon copy of his Title VII analysis. *Compare* Opp. at 13-19 *with* 21-26. Such copy-and-paste claims are precisely what the majority of district courts in this Circuit have precluded. *See* Def.'s Mem. at 33-34. As merely duplicative of his Title VII claim, the plaintiff's Title IX claim should fail for the same reasons, and summary judgment should enter on this Count for the reasons stated *supra* at 4-10.

Notwithstanding the weight of authority that holds to the contrary, the plaintiff's Opposition attempts to piecemeal together three United States Supreme Court cases to argue that an *implied* cause of action for employment discrimination under Title IX exists. *See* Opp. at 19-21. Instead, this Court should follow the well-reasoned majority of district courts in this Circuit that have found reliance on these cases both misguided and misplaced. Def.'s Mem. at 33-37.

WHEREFORE, for all the reasons herein and in the defendants' moving papers, and in the interest of justice, this Court should grant the defendants' Motion for Summary Judgment. The plaintiff has failed to demonstrate genuine issues of material fact to support his remaining claims, and the defendants' are entitled to judgment as a matter of law.

---

[9] *See Alexander v. Sandoval*, 532 U.S. 275, 281, 293 (2001); *see, e.g., Weser v. Glen*, 190 F.Supp.2d 384, 395 (E.D.N.Y.2002) (dismissing Title IX disparate impact claims in light of *Alexander*).

THE DEFENDANTS

BY: /s/ Kevin C. Shea
KEVIN C. SHEA (CT13781)
CLENDENEN & SHEA, LLC
400 Orange Street
New Haven, CT  06511
Telephone:  203-787-1183
Fax: 203-787-2847
kcs@clenlaw.com

CERTIFICATION:

This is to certify that a copy of the foregoing has been sent to all required notification parties either via operation of the Court's electronic notification system or by first-class mail, postage pre-paid to anyone unable to accept such notification on May 20, 2022.

/s/ Kevin C. Shea
CLENDENEN & SHEA, LLC