**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL SIMONS, Plaintiff, | : | CIVIL ACTION NO. 3:19-CV-01547 (OAW) |
| v. | : | |
| YALE UNIVERSITY , PETER SALOVEY, ROBERT ALPERN, M.D., Defendants. | : | MAY 20, 2022 |

**DEFENDANTS' RESPONSES TO PLAINTIFF'S LOCAL RULE 56(a)2 ADDITIONAL MATERIAL FACTS IN OPPOSITION TO SUMMARY JUDGMENT**

1. Since 2008, Yale University has investigated and/or disciplined female employees based on accusations of sexual harassment, sexual assault, or other sexual misconduct. *See* Exhibit A., p. 36. It has never disciplined a female employee or female student twice for the same instance of sexual harassment, sexual assault, or other sexual misconduct. *Id.* at pp. 37-38.

**RESPONSE: Admitted in part, denied in part. The defendants admit that, since 2008, Yale University investigated and/or disciplined a female employee based on accusations of sexual harassment, sexual assault, or other sexual misconduct. *See id.* at 36. Denied that the defendants have never disciplined a female employee or female student twice for the same instance of sexual harassment, sexual assault, or other sexual misconduct. The University admits only that it is not "*aware* of any female student or employee disciplined who was disciplined *under the UWC* and was subsequently subject to formal discipline again for the same initial conduct that was the subject of the matter brought before the UWC." (Emphasis added.) *Id.* at 37-38. The defendants' interrogatory responses merely clarify that female students and female employees have been disciplined and/or investigated and referred the plaintiff to a university report on sexual misconduct— https://smr.yale.edu/title-ix/reports. *See id.* at 36. A review of these reports reveals that**

**there has only been one instance since the UWC's inception in 2011 where a female *faculty member* was a respondent in a UWC proceeding. *See* Affidavit of Stephanie S. Spangler, M.D. in Support of Defendants' Summary Judgment Reply Brief ("Spangler Aff."), at ¶ 4; Exhibit A to Spangler Aff. In this instance, however, the female faculty respondent was a junior faculty member, and there was no finding of sexual misconduct. Spangler Aff. at ¶ 6. Accordingly, the defendants have never taken subsequent action based on the same conduct following a UWC procedure because the opportunity has never presented itself. *Id.***

2. Yale University handles complaints of sexual harassment in accordance with Title IX's requirements under its University-Wide Committee on Sexual Misconduct ("UWC") and it requires that information about UWC proceedings be kept confidential. *See* Exhibit A, pp. 40-41.

**RESPONSE: Admitted, except to deny that complaints of sexual harassment are handled *exclusively* under the UWC. *See* Pl.'s Ex. J, pg. 2, 14; *see also* Pl.'s Ex. O, pg. 5:3-5:14.**

3. Yale University formed a contract with Dr. Simons through an offer letter that required him to abide by Yale University Sexual Harassment policies and procedures as articulated in the faculty handbook. *See* Exhibit I, p. 13.

**RESPONSE: Admitted in part, denied in part. Denied insofar as the plaintiff's citation to the record does not accurately reflect the above statement of fact. Admitted that the plaintiff and the University signed a contract that required him to abide by all University policies and procedures. *See* Defendant's Local Rule 56(a)1 Statement of Facts ("Def.'s Facts"), at ¶¶ 1-3, 12.**

4. These policies and procedures vested exclusive jurisdiction over sexual harassment matters in either the UWC or a specific school at Yale University that maintained its own body to resolve sexual harassment matters. The invocation of one body's jurisdiction precluded the other body from hearing it if it arose from the same set of circumstances. *See* Exhibit J, pp. 2, 14; *see also* Exhibit O, p. 5.

**RESPONSE: Denied. The plaintiff misreads the defendants' UWC policies and procedures. The relied-upon policies and procedures state that "[t]he UWC's authority is *not* exclusive." (Emphasis added.) *See* Pl.'s Ex. J, pg. 2, 14. Further, the limitations referenced refer only to the complaining party's rights and limitations to seek redress. *See id.* ("*An individual may bring an informal complaint* to a school body or the UWC and then seek a formal hearing, but, once a school body or the UWC has agreed to hear a formal complaint, *the individual may not seek a formal hearing before the other body.*" [Emphasis added].). The policies and procedures that the plaintiff cites are silent as to both a respondent's rights and limitations vis-à-vis the UWC, or anyone else's ability to take further actions once the UWC has made an initial determination. Notably, the UWC only retains the power to *recommend* a penalty; it does not impose discipline. *See id.* at 21.**

5. The Yale University University-Wide Committee (UWC) had the power to recommend the recission of an endowed chair. *See* Yale University's Objections and Responses to Contention Interrogatories, Ex. 6 to Shea Aff., at 1.

**RESPONSE: Admitted in part, denied in part. The defendants' response states that "the UWC only had the power to recommend discipline, not to impose it independently or to strip University faculty members of titles. It is and has been the policy of the University that the Yale Corporation has the authority to appoint faculty members to endowed**

**professorships and to rescind such appointments upon the recommendation of the president. Dr. Simons was the one of the first Yale University faculty members brought before the then newly-established UWC. Although there was nothing prohibiting the UWC from recommending the recission of his endowed professorship, it was focused on his leadership position as Chief of Cardiology, as that is the context in which the charges were made against him."** ***See id.***

6. Between February 2010 and May 2010, Dr. Simons wrote a love letter to a colleague who was not a subordinate and continued to email her in an attempt to woo her even after she told him that she was in a relationship with one of his subordinates. *See* Exhibit K, pp. 25-26.

**RESPONSE: Admitted in part, denied in part. The defendants admit all of the facts stated herein, but deny that the colleague to whom the plaintiff wrote the love letter was not the plaintiff's subordinate. Although the colleague to whom the plaintiff wrote love letters did not report to him, he held a powerful position as head of the lab closely associated with the lab of which she was a member.** ***See*** **UWC Panel Recommendation, Exhibit B to Defendant's Local Rule 56(a)1 Statement of Material Facts, pg. 2. The plaintiff was also a prominent figure in the colleague's field of scientific research and was thus able to interfere with her ability to secure professional positions.** ***Id.*** **The plaintiff confirmed his apparent authority over the colleague at his UWC hearing, stating that he could have "killed" the colleague's candidacy for positions and she "would never know."** ***Id.*** **Further, this statement of fact is controverted by the plaintiff's prior admission. The plaintiff admitted that because of the conflict of interest stemming from the colleague's rejection of the plaintiff's romantic interest, his continued** ***decision-making authority*** **over the**

**colleague's career was a failure of proper leadership and was unprofessional. *See* Plaintiff's Response to Defendant's Local Rule 56(a)1 Statement of Facts ("Pl.'s Resp."), at ¶ 16.**

7. Under Dr. Simons' leadership, the Defendants' Cardiology division was very successful. *See* Exhibit C, pp. 67-69. Additionally, Dr. Simons elevated the Defendants' Cardiovascular Research Institute to become one of the best units in the country. *Id.* at pp. 68-89.

**<u>RESPONSE</u>: Admitted in part, denied in part. Admitted that the defendants' Cardiology division saw success under the plaintiff's leadership. As to the statement that the defendants' Cardiovascular Research Institute became "one of the best units in the country," this fact rests not on objective proof or criteria but on Dr. Alpern's subjective belief. *See id.* at 68:24-69:1 ("And so the cardiovascular research institute *I think* became one of the best units in vascular biology research that -- in the country." [Emphasis added]).**

8. The Defendants forced the Plaintiff to resign in 2014 as Section Chief of Cardiology after public reaction to *New York Times* stories regarding the UWC proceedings against him. *See* Exhibit D, pp. 106-07.

**<u>RESPONSE</u>: Denied. The plaintiff plainly misreads Dr. Alpern's testimony. Dr. Alpern was asked two questions: (1) Whether, as a result of public reaction to the stories in *The New York Times*, Yale forced the plaintiff to resign as Chief of Cardiology, and (2) Whether Dr. Alpern agreed that the plaintiff was forced to resign as Chief of Cardiology after the UWC decision. *See id.* at 107:3-9. In his answer, Dr. Alpern explicitly stated that he agreed with the "*last statement* [Attorney Pattis] made, that he was forced to resign after the UWC decision." (Emphasis added.) *See id.* at 107:12-15. Contrary to what the plaintiff claims, Dr. Alpern's testimony does not state or suggest that the public reaction to *The New***

**_York Times_ articles was a factor in the forced resignation of the plaintiff. Further, Dr. Alpern flatly rejected the contention that the University removed the plaintiff from his position as Section Chief because of the public criticism stemming from _The New York Times_ articles; instead, he expressly stated that the University would have removed the plaintiff from that position even without the media criticism. _See_ Exhibit 2 to Shea Aff., pg. 113:24-114:12. Dr. Alpern testified that the negative results from the plaintiff's "360 Review" "made it clear that there was no future for [the plaintiff] as Chief of Cardiology." _See id._ at 110:13-111:6. Dr. Gary Desir also testified that, based on the results of the "360 Review," he consulted Dean Alpern to ultimately conclude that the best course of action was to remove the plaintiff from the Section Chief position. _See_ Def.'s Facts, at ¶ 26.**

9. The Defendants removed Dr. Simons from being Director of the Cardiovascular Research Center in 2014 because of another round of negative publicity against him. *See* Plaintiff's Exhibit E, pp. 118-26.

**RESPONSE: Denied. The plaintiff was removed as the Director of the Cardiovascular Research Center because of the culture the plaintiff had cultivated within the Department and the plaintiff's leadership skills, which were reflected in the results of the "360 Review." _See_ Def.'s Facts, at ¶ 30.**

10. After the Defendants became aware that information pertaining to Dr. Simons' UWC proceedings had been leaked to the Robert W. Berliner family, Yale University alumni, and the New York Times, they failed to conduct any investigation into how the confidentiality of the UWC proceedings had been leaked. *See* Exhibit A, pp. 42-46.

**RESPONSE: Admitted in part, denied in part. The plaintiff misrepresents the defendants' responses to suggest that they became aware that confidential information has**

**been leaked as alleged, which is denied. The defendants admit that they did not "open an investigation into how they learned of the plaintiff's sexual misconduct and past discipline by Yale University."** ***See*** **Pl.'s Ex. A, pg. 42-43.**

11. Dr. Simons completed the punishment and probation imposed upon him by the Defendants and has had no further instances of misconduct. *See* Exhibit B, pp. 20-21.

**<u>RESPONSE</u>: Admitted only that the defendants are aware of no further instances of misconduct since Dr. Simons completed his probation.** ***Id.***

12. On September 20, 2018, Defendant Alpern knew that Dr. Simons was in London, United Kingdom late in the day. *See* Exhibit L, p. 204. He arranged to have a conversation with him. *Id.* In that conversation, Dr. Alpern gave Dr. Simons an ultimatum: resign the Waldemar Von Zedtwitz Professorship by noon, September 21, 2018 or be forcibly removed from it. *Id.*

**<u>RESPONSE</u>: Admitted in part, denied in part. The Defendants admit that Dr. Alpern communicated in that conversation words to the effect that the plaintiff needed to resign the chair or it would be removed, but deny that Dr. Alpern gave the plaintiff an "ultimatum" or that the removal was done "forcibly."** ***See*** **Def.'s Facts, at ¶ 38. Dr. Alpern never used the words "ultimatum" or "forcibly" (or any variation thereof).** ***See*** **Pl.'s Ex. L, pg. 204.**

13. Defendant Alpern then forcibly removed Dr. Simons from the Waldemar Von Zedtwitz Professorship on September 21, 2018. *See* Exhibit L, pp. 201-202.

**<u>RESPONSE</u>: Admitted in part, denied in part. Admitted that, after consulting with various groups within the University, and based on concern for the welfare of the Medical School community, Dr. Alpern (and ultimately the Yale Corporation) removed the plaintiff**

**from the Waldemar Von Zedwitz chair on September 21, 2018; denied that it was done "forcibly."** ***See*** **Def.'s Facts, at ¶ 38.**

14. The underlying motivation behind the Defendants' repeated punishment of Dr. Simons was to demonstrate, in the face of intense public pressure, that Yale University took sexual harassment seriously. See Exhibit M, pp. 130, 141-42, 154, 158-59.

**RESPONSE: Admitted in part, denied in part. Admitted that Yale took sexual harassment seriously. Denied that the defendants punished the plaintiff repeatedly, or that Yale's demonstration of its commitment to taking sexual harassment seriously was the underlying motivation behind any of its subsequent actions towards him. Dr. Alpern was explicitly asked in his deposition whether the plaintiff was "removed from the research institution to placate an angry mob," to which he responded, "I would say no." Dr. Alpern elaborated that the plaintiff's removal from the Von Zedtwitz Chair was in an effort to "[t]o pay attention to its other missions of clinical care, research, education."** ***See id.*** **at 141:3-15;** ***see also*** **Def.'s Facts, at ¶¶ 37-38 (emphasizing concern for the welfare of the Medical School community).**

15. The Defendants punished similarly situated professors who committed far worse sexual harassment offenses than Dr. Simons less severely because they were not the subject of intense public scrutiny. Dr. X was found to have been "[o]verly touching staff and fellows and those sorts of things." *See generally* Exhibit N; Exhibit O, p. 5. Instead of being stripped of any positions or terminated even though the Defendants concluded that he had committed an actual crime (sexual assault), Dr. X was banned from meetings and from meeting with faculty, students, or staff at Yale University, but allowed to keep his position. *See* Exhibit O, pp. 4-5.

**<u>RESPONSE</u>: Admitted in part, denied in part. The Defendants admit that Dr. Desir testified that Dr. X was found to have been "[o]verly touching staff and fellows and those sorts of things," and that he was investigated and confined to working from home and not being allowed to come to the university as his punishment. *See id.* The defendants deny the comparison of the offenses and punishment and any determination of criminal activity.[1] The University also defendants deny—and the plaintiff has failed to provide any factual basis to support—that Dr. X was similarly situated to the plaintiff in any material respects. *See* Affidavit of Gary Desir, M.D., in Support of Defendants' Summary Judgment Reply Brief ("Desir Aff."), at ¶ 4. Dr. X is a Caucasian male and thus within the same protected class as the plaintiff. *See id.* Moreover, Dr. X and the plaintiff worked in different sections of the University. *Id.* Unlike the plaintiff, Dr. X was not a Section Chief, did not hold an endowed chair, and had no administrative role at the University. *Id.* at ¶¶ 4-5. Dr. X and the plaintiff also reported to different supervisors. *Id.* at ¶ 6. Thus, Dr. X and the plaintiff fundamentally could not have had their punishments imposed by the same supervisor. *Id.* at ¶¶ 7-8.**

16. The primary voice advocating for Dr. Simons' repeated discipline and ultimate removal from the Waldemar Von Zedtwitz Professorship was Yale University's Committee on the Status of Women In Medicine (SWIM). *See* Exhibit M, pp. 130-160; *see also*, Exhibit G, p. 32-34.

**<u>OBJECTION AND MOTION TO STRIKE</u>: The defendants object and move to strike on the grounds that the plaintiff has failed to comply with the "specific citation" requirement as required by D. Conn. L. Civ. R. 56(a)3 insofar as he has broadly cited 30**

[1] The defendants hereinafter refer to the individual whose name the plaintiff has redacted in his Opposition and who is the subject of the Motion to Seal filed with this Court as "Dr. X" to preserve confidentiality and avoid the necessity of further filings under seal.

**pages of Dr. Alpern's deposition transcript. *See, e.g., Nodoushani v. S. Connecticut State Univ.*, No. 3:08CV00561 AWT, 2011 WL 4537978, at *4-6, *aff'd in part, vacated in part sub nom. Nodoushani v. S. Conn. State Univ.*, 507 Fed. Appx. 79 (2d Cir. 2013) (granting defendant's motion to strike portions of plaintiff's Local Rule 56(a)2 Statement containing broad page citation range and limiting plaintiff to a page citation range of five deposition transcript pages).**

**RESPONSE: Denied that SWIM was the "primary voice" advocating for the plaintiff's removal of the Waldemar Von Zedwitz Professorship. In fact, Dr. Stachenfled testified that when she became the co-chair of SWIM in 2016, she could not remember whether the plaintiff was even on SWIM's agenda. *See* Pl.'s Ex. G, at pg. 32-34. Further, Dr. Stachenfeld, in her capacity as co-chair of SWIM, did not know whether SWIM played a "critical role" in the plaintiff's removal from the Waldemar Von Zedtwitz professorship. *See id.* at 72:16-20.**

17. SWIM is considered "a committee of the dean's office" at Yale School of Medicine, specifically Defendant Alpern's office. *See* Exhibit G, pp. 13-16. It also received administrative assistance from Dean Latimore's office. *Id.* at pp. 11-12. SWIM's co-chairs also receive a $30,000 per year salary from Defendant Alpern's office in addition to their normal salaries. *Id.* at pp. 14-15, 18-19. Defendant Alpern met quarterly with SWIM to discuss climate and culture at Yale School of Medicine. *Id.* at pp. 37-38

**RESPONSE: Admitted in part, denied in part. The defendants admit that SWIM is one of the "many committees as part of the deanery," but deny that Dr. Stachenfeld testified that the $30,000 salary per year given to SWIM co-chairs came from Dr. Alpern's office; Dr. Stachenfeld testified that she was "not sure where the money came from." *See id.***

**at 14:20-15:2, 15:24-16-17:2. Dr. Stachenfeld also testified that SWIM received "a *small* amount of time of one of the admins in Dean Latimore's office." (Emphasis added.) *See id.* at 11:14-24. Further, Dr. Stachenfeld testified that SWIM worked to advance and improve the culture and climate at the medical school for women, *id.* at 17:5-10, but she clarified that SWIM was not a specialized committee of faculty that worked "on behalf" of the dean or his office. *Id.* at 16:20-18:8.**

18. Dr. Nina Stachenfeld is a co-chair of SWIM. Exhibit G, p. 19. Her knowledge of Dr. Simons and his UWC matter came entirely from what she read in the New York Times and other news sources. *Id.* at pp. 19-21. Neither Dr. Stachenfeld nor any member of SWIM made any effort to personally verify the allegations against Dr. Simons before advocating for his further punishment. *Id.* at pp, 25-26, 38-39.

**OBJECTION: Lack of Personal Knowledge (FRE 602). Dr. Stachenfeld is not capable of speaking on behalf of other SWIM members' efforts to verify the allegations against the plaintiff.**

**RESPONSE: Admitted in part, denied in part. The defendants admit that Dr. Stachenfled is a co-chair of SWIM and that she did not personally verify the allegations against the plaintiff. The defendants deny that other members of SWIM failed to make similar efforts to verify the allegations against the plaintiff, and Dr. Stachenfeld testified that she did not know of any such efforts. *See id.* at pg. 38:24-39:5. The defendants also deny that Dr. Stachenfeld's knowledge of the plaintiff came entirely from *The New York Times* articles and other news sources. *See id.* at 19-21.**

19. Despite admitting that there was nothing wrong about Dr. Simons writing unsolicited love letters and conceding that it would have made a difference if Dr. Simons could

not have retaliated against anyone for having his romantic advances spurned and actually helped the people he had been accused of retaliating against, Dr. Stachenfeld would not answer whether she would advocate for Dr. Simons to be restored to his endowed professorships if she could verify as true what she conceded would have made a difference. *See* Exhibit G, pp. 27-31.

**RESPONSE: Denied. Dr. Stachenfeld did not answer the referenced line of questioning because it was compound, confusingly phrased and based on hypothetical conjecture, to which counsel for the defendants objected many times, after which plaintiff's counsel withdrew the question. *See id.* Admitted that Dr. Stachenfeld testified that there is nothing inherently wrong with a man writing an unsolicited love letter to someone he admires; and that it might have made a difference in her opinion of Dr. Simon's actions if Dr. Simon could not have retaliated against Dr. Giordano (which is contrary to what the UWC found.) *See id.***

20. Dr. Stachenfeld also conceded that it was inherently unfair to punish someone twice for the same offense without additional misconduct, but contended that her concession did not apply to Dr. Simons. See Exhibit G, pp. 53-54.

**RESPONSE: Denied. The plaintiff fails to represent Dr. Stachenfeld's testimony and opinions accurately. Dr. Stachenfeld testified that she believed that removing an honorific—such as an endowed chair—is not a punishment, but is instead an indication that the person no longer deserves the honorific. *See id.* at 54:16-55-7; *see also* Def.'s Facts, at ¶ 6. ("The May 22, 2008 Offer Letter does not guarantee the plaintiff's appointment to a Robert Berliner Professorship").**

21. Dr. Stachenfeld's position and complete disregard for fundamental fairness was emblematic of SWIM. After Dr. Simons had been removed from the Waldemar Von Zedtwitz

Professorship, Dr. Stachenfeld wrote a letter to SWIM celebrating his removal and called for action to increase the percentage of women in leadership roles, implying that its goal was to replace men like Dr. Simons with women. *See* Exhibit Q, p. 1.

**RESPONSE: The defendants admit that Dr. Stachenfeld wrote a letter to SWIM detailing the removal of the plaintiff's titles and that the letter contained a statement calling for more gender diversity in leadership roles. *See id.* Denied that Dr. Stachenfeld held disregard for fundamental fairness or that such a position was representative of SWIM as an organization; and denied that Dr. Stachenfeld's proposal to see more women in leadership roles implied that her ultimate goal was to replace men like the plaintiff with a women. *See id.***

22. Dr. Stachenfeld also testified that she opposed Defendant Alpern's reappointment as dean of Yale Medical School and used Dr. Simons' matter as an example on why he should not be reappointed in conversations with a member of the Yale Corporation's Board of Trustees. *See* Exhibit G, pp. 70-71.

**RESPONSE: Admitted that Dr. Stachenfeld testified that Dr. Simons's case was not a major point, but merely an example of why she believed that Dr. Alpern was unable to move forward in improving the environment for women at the School of Medicine. *Id.***

23. As the result of the Defendants' removal of Dr. Simons from the Waldemar Von Zedtwitz Professorship, Dr. Simons lost the annual increases in compensation that accompany endowed professorships at Yale in addition to certainty as to his total compensation. *See* Exhibit R, pp. 81-83, 105-06. The minimum increase to the annual increases in compensation ranges between 5 to 10% per year. *Id.* at pp. 105-07.

**<u>RESPONSE</u>: Denied. The referenced 5% to 10% increases alleged—even if true, which the defendants do not concede—involves the endowment that funds the chair and the salary, not the salary itself. *Id*. Although the plaintiff alleges that both his responsibility for maintaining portions of his salary and overall uncertainty surrounding his compensation has increased since he was removed from the Waldemar Von Zedwitz Chair, he acknowledged that, despite any written agreement, Yale has agreed to cover—and continues to cover—the amount over-the-cap in order to continue to pay the plaintiff the same, or even a slightly higher, salary. *See* Exhibit 4 to Shea Aff., pg. 185:14-186:10. Nor did the plaintiff suffer any loss of salary or benefits as a result of his removal from the Waldemar Von Zedtwitz Professorship. Def.'s Facts, at ¶¶ 39-40.**

24. Dr. Simons filed an EEOC complaint against the Defendants for removing him from the Waldemar Von Zedtwitz Professorship. The EEOC released its jurisdiction over the matter on August 6, 2018, giving Dr. Simons the right to sue under Title VII for the first time. *See* Exhibit P.

**<u>RESPONSE</u>: To the extent that this statement calls for legal conclusions, the defendants submit that no response is required and object on that basis. Admitted that the EEOC issued its Dismissal and Notice of Rights to the plaintiff on August 6, 2019.**

THE DEFENDANTS

BY: ______________________________

KEVIN C. SHEA (CT13781)
CLENDENEN & SHEA, LLC
400 Orange Street
New Haven, CT 06511
Telephone: 203-787-1183
Fax: 203-787-2847
kcs@clenlaw.com

CERTIFICATION:

This is to certify that a copy of the foregoing has been sent to all required notification parties either via operation of the Court's electronic notification system or by first-class mail, postage pre-paid to anyone unable to accept such notification on May 20, 2022.

______________________________
CLENDENEN & SHEA, LLC