**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MICHAEL SIMONS,                                    )
     *Plaintiff,*                                   )
                                                   )
v.                                                 )
                                                   )       3:19-CV-1547 (OAW)
YALE UNIVERSITY, et al,                            )
     *Defendants.*                                  )
                                                   )
                                                   )
                                                   )
                                                   )

## ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

**THIS ACTION** is before the court upon Defendants' Motion for Summary Judgment and memorandum in support thereof (together, "Motion").  *See* ECF Nos. 90–91.  The court has reviewed the Motion, Defendants' Statement of Facts ("Defendants' SOF") and all appurtenant exhibits, *see* ECF Nos. 92–93, Plaintiff's opposition brief, *see* ECF No. 98, Plaintiff's Statement of Facts ("Plaintiff's SOF") and all exhibits thereto, *see* ECF No. 99,[1] Defendants' reply brief, *see* ECF No. 103, Defendants' response to Plaintiff's SOF, *see* ECF No. 104, all other supporting exhibits, and the record in this matter, and is thoroughly advised in the premises.[2]

After careful review, the court finds that the Motion must be **GRANTED in part** and **DENIED in part**.

---

[1] To protect the identity and personal information of a non-party, certain of Plaintiff's filings are redacted; the court will cite to those redacted filings.  Plaintiff also has filed the opposition brief, Plaintiff's SOF, and certain exhibits in unredacted form.  *See* ECF Nos. 100–01.

[2] The court finds that the briefs are thorough and complete and that there is no need for oral argument on the Motion.  Therefore, the request for oral argument is denied.  *See* D. Conn. L. Civ. R. 7(a)(3) ("Notwithstanding that a request for oral argument has been made, the [c]ourt may, in its discretion, rule on any motion without oral argument.").

I.    **BACKGROUND**[3]

   A. **2008: Offer Letter and Acceptance.**

In a letter dated May 22, 2008, Yale University made Plaintiff an offer of employment.   ECF No. 93-1.   Per the letter, Plaintiff was to be installed, upon the satisfaction of certain contingencies, in several concurrent positions: Chief of the Section of Cardiovascular Medicine and Chief of Cardiovascular Medicine at Yale-New Haven Hospital (together, "Chief")[4], Professor of Internal Medicine at Yale University School of Medicine, and Director of the Yale Cardiovascular Research Center ("YCRC" and "Director").   ECF 93 No. at ¶¶ 1 and 8; ECF No. 93-1.

The professorship was unequivocally a tenured position, ECF No. 93 at ¶ 4; ECF No. 92-2 at 38, 23–25, though the offer letter does not state that the other positions are tenured.   It clarifies that the professorship is contingent upon "completion of the normal Yale University review process . . . ."   ECF No. 93-1 at 1.

The offer letter also promises to nominate Plaintiff to a Robert Berliner Professorship ("Berliner Professorship"), which is an honorific—not a position—tied to an endowed chair at the Yale School of Medicine sponsored by the Berliner family.   ECF No. 99 at ¶ 5 and response.   Endowed chairs come with additional income support from the endowment, which income may increase over time.   ECF No. 93-1 at 1–2.   It is undisputed that the actual ability to offer or to rescind the professorship rests only with the Yale Corporation, not the signatories of the employment letter.   ECF No. 99 at ¶ 5 and

---

[3] All factual assertions are taken from Defendants' SOF and Plaintiff's SOF and the exhibits incorporated therein.   The court cites to the internal pagination of these documents; where there is no such pagination, the court refers to the pages assigned by the court's electronic filing system).

[4] The parties do not differentiate between the two Chief roles, and there was deposition testimony that one necessarily follows the other, so the court will simply refer to both positions together.   ECF No. 92-2 at 45.

response.  Thus, the offer letter did not guarantee the Berliner Professorship, nor did it establish a term of years that Plaintiff would hold it.  ECF No. 99 at ¶¶ 6–7.

The offer letter set forth the material terms of the agreement, including compensation.  ECF No. 93-1 at 1–2.  Plaintiff was offered a base salary of $500,000 per year "comprised of a base of $85,000 and a supplement of $415,000" with annual potential for performance-based adjustments.  *Id.*; ECF No. 99 at ¶ 9 and response.  The offer letter stated that Plaintiff's salary would come from several sources.  Notably, about 17% would be derived from his role as Section Chief, and the Berliner Professorship was estimated to generate approximately $107,000 per year, which amount could "be expected to grow over time."  ECF No. 93-1 at 1.

The offer letter expressly incorporated, and required Plaintiff to adhere to, "all other University policies and procedures."  ECF No. 93-1 at 13.

On June 10, 2008, Plaintiff signed and returned the offer letter, thereby formally accepting the terms and conditions stated therein.  ECF No. 99 at ¶ 10 and response. Plaintiff was made Chief and Professor.  *Id.* at ¶ 12 and response.  Plaintiff also was named the inaugural Director of the newly-created YCRC, and he was given a Berliner Professorship.  *Id.* at ¶¶ 11–12 and response.

### B.  2013: Sexual Misconduct and UWC Report

In or around 2013, accusations of sexual harassment were formally lodged against Plaintiff to Yale's University Wide Committee on Sexual Misconduct ("UWC").  ECF No. 99 at ¶¶ 13–14.  The UWC is an internal review board consisting of members of the Yale community that reviews allegations of sexual harassment, including by conducting fact-finding and by holding hearings. ECF No. 99-10 at 2–3.  If the UWC concludes that sexual

harassment has been committed by a faculty member, it issues a recommended course of action to the Yale Provost, who issues a penalty.  *Id.* at 9.  UWC policies make clear that the extent of its authority is to recommend penalties, not to impose them.  ECF No. 99-10 at 9 ("The final decision to impose a penalty belongs to the Provost, in the case of a faculty member. . . .").

In August 2013, the UWC conducted an investigation into the accusations against Plaintiff and concluded that Plaintiff's actions did amount to sexual harassment in violation of University policy.  ECF No. 99 at ¶¶ at 15–16 and responses.  Based on its findings, the UWC formally recommended to Yale Provost Benjamin Polak that the plaintiff "be removed as section chief of Cardiology permanently and that he hold no comparable or higher leadership position in the University for a period of five years. . . .".  *Id.* at ¶ 17 and response.

On October 14, 2013, Provost Polak sent a letter to Plaintiff agreeing with the UWC's finding of sexual harassment.  *Id.* at ¶ 19 and response; ECF No. 93-3 at 1.  However, Provost Polak deviated from the UWC's recommended penalty, instead suspending Plaintiff from "serving as Section Chief of Cardiology until June 30, 2015," and reducing Plaintiff's salary to reflect the change in title.  *Id.* at 1.

### C.  2014: "360 Review;" Departure as Cardiology Chief and YCRC Director

After Provost Polak's determination, the University hired a third-party consultant to survey Plaintiff's coworkers in the Yale School of Medicine ("YSM") community and to conduct a comprehensive internal review ("360 Review") of his job performance.  ECF No. 99 at ¶ 21.  On June 21, 2014, the 360 Review was returned with primarily negative reports of Plaintiff's leadership capabilities.  *Id.* at ¶ 22; ECF No. 93-5.  For example, when

asked if Plaintiff was "suitable to lead the Section [of Cardiovascular Medicine] in the future," only 8% of respondents answered "yes" while 72% of respondents answered "no" and 19% answered "unsure."  *Id.*  Eighty-one percent of interviewees did not believe Plaintiff "met the educational and career development needs of the medical students, graduate students, residents, and fellows," and 72% stated plaintiff did not "create a positive work environment characterized by professionalism, honesty, integrity, diversity, respect, collaboration, open communication, and the sensitive management of conflict." *Id.*

It is undisputed that in or around October 2014, Plaintiff's departure from the Chief position was made permanent, though the parties dispute the specific nature of that change; the University asserts that it asked Plaintiff not to return to the position, and Plaintiff agreed, but Plaintiff contends that the University, responding to pressure from the media, forced him to resign permanently as Chief.  ECF No. 99 at ¶ 26 and response; ECF No. 104 at ¶ 8 and response.

By this point, Plaintiff's sexual harassment case had created a stir in the YSM community and beyond, to the extent that it was the subject of several news reports, including an article in the New York Times on November 1, 2014.  ECF No. 99 at ¶ 27 and response.[5]

On November 13, 2014, the chair of the Department of Medicine, Gary Désir, sent another announcement that Plaintiff would no longer serve as Director.  ECF No. 93-7. Again, the parties dispute the reason for Plaintiff's termination as Director: Defendants

---

[5] *See also* Tamar Lewin, *Handling of Sexual Harassment Case Poses Larger Questions at Yale*, N.Y. TIMES, Nov. 1. 2014, available at https://www.nytimes.com/2014/11/02/us/handling-of-sexual-harassment-case-poses-larger-questions-at-yale.html [https://perma.cc/7PSR-AUNB] (last visited Jan. 16, 2024).

contend that the removal was another result of the 360 Review, but Plaintiff asserts the removal was a response to another round of negative publicity.  ECF No. 99 at ¶ 30.

### D.  April 2018: Removal from Berliner Professorship

No alterations to Plaintiff's faculty position or his occupancy of the Berliner Professorship were made until April 2018, when Defendant Alpern asked if Plaintiff would switch to another endowed chair, the Waldemer Von Zedtwitz Professorship ("WVZ Professorship"), in an apparent effort to avoid a dispute with the Berliner family.  ECF No. 93-8 at 4.  Plaintiff expressed concern about losing the income from the endowed chair and Defendant Alpern assured him that the WVZ Professorship would have an equal payout and that there would be no issues with awarding the new chair.  *Id.* at 3; ECF No. 93-8.  Plaintiff agreed to exchange his professorship and suffered no loss of salary due to his move to the WVZ Professorship.  ECF No. 93 at ¶¶ 34–36.

### E.  September 2018: Removal from WVZ Professorship

The YSM community reacted negatively to Plaintiff's appointment to the WVZ Professorship.  ECF No. 99 ¶ 37.  The parties agree that the community viewed the appointment to the WVZ as bestowing an additional honor to the Plaintiff.  *Id.*; ECF No. 92-5 at 59:12–16; ECF No. 99-6 at 166:3–18.  At some point in the summer of 2018, a petition began circulating among YSM alumni, faculty, and students calling to remove Plaintiff's WVZ endowment.  ECF No. 99 ¶ 37; *see* ECF No. 99-6 at 186:14–25.

Defendant Alpern met with different University organizations to address the negative response to Plaintiff's appointment.  ECF No. 93 at ¶ 38.  One such organization was the Committee on the Status of Women in Medicine (SWIM), a committee under the

dean's office which advocates to reduce gender inequity in the field of medicine, with which Defendant Alpern met in September 2018.  ECF No. 99-7 at 15:11–18:5.

On September 20, 2018, Defendant Alpern contacted Plaintiff while he was abroad in England and told him to resign from the WVZ Professorship by noon the following day, or he would be removed from it.  ECF No. 104 ¶ 12 and response; *see* ECF No. 99-12 at 204:7–19.  Plaintiff did not resign the chair and was removed from the WVZ Professorship effective September 21, 2018.  ECF No. 99 at ¶ 38 and response; ECF No. 104 at ¶¶ 12–13 and responses.

Plaintiff suffered no loss of benefit or changes to his work environment due to his removal from the WVZ Professorship, and he remains a tenured professor of medicine.  ECF No. 99 ¶¶ 39–43 and responses.  Plaintiff did lose the income associated with the endowed chair, but Defendants have compensated for the loss by increasing his pay.  ECF No. 92-4 at 233:1–7.  Plaintiff continues to work for the University as a tenured professor.  ECF No. 99 at ¶ 43 and response.

### F.  CHRO & EEOC Complaints; Sex Discrimination; Disparate Treatment

On February 28, 2019, Plaintiff filed a gender discrimination complaint with the Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC"), and on August 6, 2019, they released jurisdiction for failure to state a claim.  ECF No. 99 at ¶ 44 and response; ECF No. 104 at ¶ 24 and response; *see also* ECF No. 99-16; ECF No. 93-13.  Plaintiff timely filed this action alleging disparate treatment on the basis of gender.  ECF No. 99 at ¶ 51.  He seeks compensatory damages for his lost wages, reputational harm, loss of professional

opportunities; an order reinstating the WVZ Professorship or a similar endowment; punitive damages; and attorneys' fees.  ECF No. 1. At 16.

In his complaint, Plaintiff alleged the following claims: (1) Breach of Contract; (2) Breach of the Implied Warranty of Good Faith and Fair Dealing; (3) Wrongful Discharge; (4) Negligent Infliction of Emotional Distress; (5) Gender Discrimination in Violation of Title IX; Gender Discrimination in Violation of Title VII; and (7) Breach of Privacy.  *See generally* ECF No. 1. Counts Three and Four were dismissed by this court and Count Seven, which was addressed to "unknown defendants," was withdrawn and dismissed. ECF Nos. 44, 83.  Defendants have moved for summary judgment on all remaining counts.

## II.    <u>LEGAL STANDARD</u>

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  The movant bears the burden of demonstrating that there is no genuine issue of material fact. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1535 (2d Cir.1997)).  If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Id.*

To defeat a summary judgment motion, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998).  Rather, the nonmoving party must point to "specific facts in dispute to show that there is a *genuine issue for trial.*" *Matsushita,* 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).  If the nonmoving party submits evidence that is "merely colorable," or that is not "significantly probative," then summary judgment still may be granted.  *Horror Inc. v. Miller*, 15 F.4th 232, 240–41 (2d Cir. 2021).

When reviewing a summary judgment motion, the court construes the cited evidence in the light most favorable to the nonmoving party and "resolves all ambiguities and draws all reasonable inferences against the moving party."  *Horror*, 15 F.4th at 240.

### III.   **DISCUSSION**

#### A. **Count One: Breach of Contract**

"Under Connecticut law, a breach of contract claim has four elements: (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages." *Prysmian Cables & Sys. USA LLC v. ADT Com. LLC*, No. 3:22-CV-836 (VAB), 2023 WL 2712613, at *4 (D. Conn. Mar. 30, 2023) (citing *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014)).  There is no dispute here that a valid employment contract was formed.  But Plaintiff asserts that despite his performance, Defendants breached the terms of the employment agreement, as laid out in the offer letter, in several respects: first, by punishing Plaintiff multiple times

for the same offense (i.e., by making Plaintiff's removal as Chief permanent, by permanently removing Plaintiff as Director, and by exchanging the Berliner Professorship for the WVZ Professorship); second, by rescinding the WVZ Professorship entirely; and third, by violating its own policies insofar as Plaintiff was not provided an opportunity to contest the removal of the WVZ Professorship.

Defendants argue that they are entitled to summary judgment on Count One because Plaintiff has failed to identify any clause of the offer letter that they did not honor and because he cannot show damages.  Defendants assert that Plaintiff's initial suspension was a lawful response to Plaintiff's violation of the University's sexual harassment policy (which Plaintiff does not dispute), and that the subsequent permanent revocation of Plaintiff's roles as Chief and Director were a response to the 360 Review, which response was entirely lawful given that Plaintiff's employment in these positions, unlike his professorship, was at-will.  Consequently, Defendants contend that Plaintiff could have been terminated from these roles for any reason or for no reason at all. Furthermore, Defendants assert that Plaintiff agreed to the exchange of the Berliner Professorship for the WVZ Professorship, that his occupation of any endowed chair was also at-will, and that he has suffered no financial loss due to either the exchange of professorships or the loss of the WVZ Professorship.  Finally, Defendants argue that Plaintiff was first to breach the terms of the Offer Letter, and therefore even if they did so thereafter, any subsequent breach is not actionable.

Plaintiff counters that Defendants breached the University's sexual harassment policy (which vests exclusive disciplinary authority to the UWC), by punishing Plaintiff several times over, and by not following its own UWC procedures.  Plaintiff further

10

contends that his removal from all leadership positions was a response to negative publicity, not the 360 Review.

It is undisputed that the offer letter only specifies that Plaintiff's position as a *professor* is protected by tenure; a contract that is silent as to the term of employment is, by default, terminable at will.  *Torosyan v. Boehringer Ingelheim Pharms., Inc.*, 234 Conn. 1, 14 (1995); *see also Leichter v. Lebanon Bd. of Educ.*, 917 F. Supp. 2d 177, 186 (D. Conn. 2013) (noting the "default rule that contracts for indefinite employment are terminable at will.").  Plaintiff does not respond directly to Defendants' argument that his endowed chair and his Chief and Director positions were at-will, and so the court considers the point to be conceded.  *See Cafasso v. Nappe*, No. 3:15-CV-920 (MPS), 2017 WL 4167746, at *5 (D. Conn. Sept. 20, 2017) (finding litigant had abandoned an argument by not making it); *Henley v. City of Buffalo*, No. 122CV00065LJVJJM, 2023 WL 2975560, at *1 (W.D.N.Y. Mar. 27, 2023), report and recommendation adopted, No. 22-CV-65-LJV-JJM, 2023 WL 2974633 (W.D.N.Y. Apr. 17, 2023) ("By failing to respond to defendants' arguments, plaintiff concedes their validity.").  Plaintiff has provided several versions of the University's sexual harassment policy and the UWC process, but none of these contains any language tending to abrogate the Plaintiff's at-will status.  Therefore, even accepting as true his position that successive punishment is improper under University policy (a point Defendants contest), and even viewing the facts in the light most favorable to Plaintiff, he has failed to show that any of the actions of which he complains constitute a breach of the terms of his employment agreement.

Accordingly, the court grants the Motion with respect to Count One.

### B.  Count Two: Breach of Implied Warranty of Good Faith and Fair Dealing

Plaintiff next asserts that Defendants breached the implied warranty of good faith and fair dealing when they induced Plaintiff to come to the University with the terms laid out in the offer letter and led him to believe that the termination of these positions could only result from renegotiation of the contract or the proper execution of University policies. More specifically, Plaintiff's complaint points to his removal from the WVZ Professorship as the basis for Count Two.  He also asserts in his brief, though, that this count is predicated upon Defendants' failure to follow their own published policies with respect to the UWC proceedings.

There are three things Plaintiff must show with respect to this claim: "first, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits it reasonably expected to receive under the contract, the defendant was acting in bad faith."  *Jones v. H.N.S. Mgmt. Co.*, No. CV020471419S, 2003 WL 22332837, at *4 (Conn. Super. Ct. Sept. 25, 2003) (quoting *Pine Creek Partners, LLC v. Seaman*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 99 0364880 (Dec. 20, 2000, Skolnick, J.)).

Defendants assert that they are entitled to summary judgment on this count because Plaintiff has failed to show that he was denied any benefit promised in the offer letter, and because he has failed to show sufficient evidence of bad faith.  Defendants

further argue that this claim is precluded because there is an adequate statutory remedy available to redress Plaintiff's alleged wrongs.[6]

Plaintiff responds that there are too many disputed material facts to grant summary judgment.  Specifically, he asserts that Defendants' motivation for taking successive punitive action is in question.  He also asserts that this count is distinct from his Title VII and Title X claims such that there is no statutory preemption of this contractual claim.

Here again, though, Plaintiff fails to dispute the fact that his positions as Chief, Director, and occupier of the Berliner and WVZ Professorships were at-will.  And "[w]here an employment contract is clearly terminable at will, . . . a party cannot ordinarily be deemed to lack good faith in exercising this right."  *Carbone v. Atl. Richfield Co.*, 204 Conn. 460, 470 (1987).  Thus, the court need not determine whether an adequate statutory remedy exists, or even whether Plaintiff has adduced any evidence of bad faith. It was not reasonable for Plaintiff to expect to hold these positions indefinitely or absent good cause for removal, and thus the first essential element of this claim is lacking.

Accordingly, the court grants the Motion with respect to Count Two.

### C.  Count Six: Gender Discrimination in Violation of Title VII[7]

In Count Six, Plaintiff alleges sex-based discrimination in violation of Title VII. Specifically, he asserts that Defendants punished him multiple times for the same conduct when they have never done so as to a non-male employee.  Defendants assert that

---

[6] Under Connecticut law, "neither a wrongful discharge nor a breach of implied covenant claim is available where the plaintiff has adequate statutory remedies through which the alleged public policy violations can be enforced."  *Leichter v. Lebanon Bd. of Educ.*, 917 F. Supp. 2d 177, 194 (D. Conn. 2013).

[7] The court addresses Count Six before Count Five because the analysis of the Title VII claim in Count Six is a helpful predicate to the analysis of the Title IX claim in Count Five.

summary judgment should enter on this count because (1) the claim is procedurally barred, and (2) the claim is unsupported by direct or circumstantial evidence.

With respect to the procedural bar, it is undisputed that exhaustion of administrative remedies is required before a party may sue for employment discrimination, and also that an employment discrimination action must be initiated within 90 days of such exhaustion.  Plaintiff agrees that he did not seek review from the Equal Employment Opportunity Commission ("EEOC") regarding any of the sanctions against him except the rescission of the WVZ Professorship.  But he asserts that he has never claimed any other action as the basis for his Title VII claim, and as the EEOC (on August 6, 2019)[8] gave him the right to sue for the rescission of the WVZ Professorship, his initiation of this action was well within the requisite 90 days.  Defendants do not refute either assertion, and so the court accepts that Count Six is predicated solely upon the rescission of the WVZ Professorship, and that the claim is not procedurally barred.

The court now turns to the substantive arguments.  Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer to discriminate against an employee because of that employee's race, color, or sex.  42 U.S.C.A. § 2000e-2.  The statute is intended "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973), holding modified by *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).  "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but

---

[8] Plaintiff actually asserts that the right-to-sue letter came on August 6, 2018, but this is clearly a typographical error, as the letter is dated August 8, 2019.  *See* ECF No. 99-16.

in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577, 129 S. Ct. 2658, 2672, 174 L. Ed. 2d 490 (2009).  Recognizing that "most discrimination and retaliation is not carried out so openly as to provide direct proof of it," *Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004), plaintiffs asserting disparate treatment claims may show discriminatory intent by either direct or circumstantial evidence of animus, *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022).

Plaintiff purports to bring his claim of sex discrimination under both a disparate impact and a disparate treatment theory,[9] but he makes no argument with respect to disparate impact.  His argument with respect to disparate impact follows the *McDonnell Douglas* framework, but that test is used in analyzing disparate *treatment* claims. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003) ("The Court in *McDonnell Douglas* set forth a burden-shifting scheme for discriminatory-treatment cases.").  Accordingly, the court construes the claim as proceeding under a disparate treatment theory, but by using both direct and circumstantial evidence to show discriminatory animus.

With respect to direct evidence, Plaintiff argues that the rescission of the WVZ Professorship was a reaction to negative publicity against the University, and he argues that this reaction exhibited a policy of favoring one sex over another.  More particularly, he contends that the rescission was an attempt by Defendant Alpern to retain his office

---

[9] Plaintiff actually purports to bring this claim under both a disparate impact and an "actual discrimination" legal theory.  The latter, however, does not appear to be a recognized legal theory.  The only case from the Supreme Court of the United States cited by Plaintiff in relation to this legal theory clearly deals with disparate treatment, *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212 (2015), which the Supreme Court has referred to as "intentional discrimination," *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Indeed, the express purpose of Title VII is to forbid all actual discrimination (and not merely potential discrimination) whether it happens by disparate treatment or by disparate impact.  The balance of Plaintiff's argument indicates that by "actual discrimination" he means "disparate treatment," and so the court will analyze the argument as such.

by securing the support of an allegedly sexist faculty committee (SWIM).  With respect to circumstantial evidence, he argues that he has carried his burden under the familiar *McDonnell Douglas* burden-shifting framework. Defendants disagree on both points.

### 1. Direct Evidence

Direct evidence of discriminatory animus includes employer policies, practices, or decisions that expressly rely upon a protected characteristic.  *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015).  Plaintiff asserts that Defendants exhibited a policy of favoring one sex over the other when it removed Plaintiff from the WVZ Professorship in order to assuage negative sentiment within the YSM community.   He points to testimony from Defendant Alpern that he asserts clearly shows that the WVZ Professorship was rescinded in response to backlash on campus.

None of Defendant Alpern's deposition testimony cited by Plaintiff specifically deals with the rescinded WVZ Professorship, and the court finds that Plaintiff's proffered support is not direct evidence of his claims.  In claiming that a response to negative publicity can be direct evidence of sex discrimination, Plaintiff cites only *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).  In that case, the United States Court of Appeals for the Second Circuit found (by analogizing Title VII and Title IX claims) that a student carried his pleading burden on a Title IX claim by pointing to several procedural flaws in his disciplinary proceedings (from which the Second Circuit found bias), and by then pointing to the "substantial criticism" that Columbia received in the media for its response to female students' accusations of sexual assault (from which the Second Circuit found it reasonable to infer bias based on sex, more specifically).  *Doe*, 831 F.3d at 57.  But *Doe*

clearly dealt with a claim proceeding on *circumstantial* evidence. *Id.* at 54 (discussing the burden-shifting framework for claims based on circumstantial evidence).

The Second Circuit did footnote that discriminatory action precipitated by "a desire to avoid practical disadvantages that might result from unbiased action" is no more lawful than action resulting from "a discriminatory heart," but this commentary addresses an issue distinct from the question of what constitutes direct evidence. *Id.* at 58 n.11. The Second Circuit was responding to the lower court's finding that fear of negative publicity was a more likely motivation for the student's discipline than sex discrimination, pointing out that *if* an institution were to implement a policy of favoring one sex over another, that policy would be discriminatory regardless of why the institution implemented the policy. The Second Circuit did not state that any institution's action in response to public outcry necessarily is direct evidence of discrimination. There still must be direct evidence that the institution's response favored one sex over another, which is lacking here.

Although Defendant Alpern did testify that the University's treatment of Plaintiff stemmed from a desire to address negative sentiment within the YSM community, he did not testify that the University adopted a clear policy of dealing with men more severely than others. Nor did he testify that community sentiment was sexist against men.[10]

---

[10] Plaintiff alleges overt sexism against men by SWIM, and more particularly by SWIM's co-chair, *see* ECF No. 98 at 14–15, but he fails to offer testimony or other direct evidence of such alleged bias. SWIM aims "to improve the culture and climate . . . for women" at YSM, ECF No. 99-7 at 17:8–9; *see also id.* at 18:2–3. Its co-chair was interested in doing the same for "underrepresented minorities." *See id* at 70:25. The co-chair conceded that there is nothing inherently wrong with a man writing an unsolicited love letter to someone else, *id.* at 27, and she suggested that it would have affected her reaction to the situation had Dr. Simons been unable to retaliate against the fiancé of the source of his unrequited affection, *id.* at 28. In fact, the co-chair noted that "it <u>would</u> make a difference if he truly [had] not retaliate[d]," *id.* at 30:17–18 (emphasis added). As co-chair of SWIM, she spoke with a Yale trustee, *id.* at 64–65, who explained that "families should not be involved" in the University's decision to remove someone from an endowed chair, *id.* at 68:17–18, which she found to be "a very good argument," *id.* at 69:9, one that "was a better argument than [SWIM] had been given in the past," *id.* at 69:17–18. She identified "a difference between . . . a family pulling a chair because of a point of view versus . . . because of an individual's behavior." *Id.* at 69:12–16. This is distinguishable from animus based solely and unjustifiably on Plaintiff's sex. Finally,

Instead, he testified that the University responded to community concern that YSM had "taken a faculty member who was guilty of sexual harassment and was leaving him in a leadership position . . . ." ECF No. 99-13 at 142:5–12. This was distinguished from acting upon pressures from the "Me Too" movement. *Id.* at 158:12–13. Dr. Alpern recognized (over the previous decade) a justified increase in the awareness of sexual harassment, and in public attention to the official responses thereto. *Id.* at 158–59. He believed that people wanted to know that YSM and its dean were taking such issues "very seriously." *Id.* at 159:14. There is no direct evidence of discrimination actionable under Title VII.

### 2. *Circumstantial Evidence*

The absence of direct evidence is not fatal to Plaintiff's Title VII claim. Circumstantial evidence of discriminatory animus can be enough to survive summary judgment using the *McDonnell Douglas* burden-shifting framework. First, Plaintiff would have to make a prima facie case by showing that he is a member of a protected class, that he is qualified for the WVZ Professorship, that he suffered an adverse action, and that the facts imply a discriminatory intent. *Radwan*, 55 F.4th at 130. If he were able to do so, the burden would shift to Defendants to proffer a legitimate, non-discriminatory reason for the adverse action. *Id.* Then the burden would shift back to Plaintiff to show that the proffered reason is pretextual. *Id.*

---

the SWIM co-chair testified that generally it would be unfair for an offender to face a second round of punishment after completing a sanction, but she noted that the endowed chair bestowed upon Dr. Simons was "a signal of respect and honor by the university," *id.* at 54:22–23, such that its removal would be less a form of punishment than "an indication that honorific is no longer deserved by that person," *id.* at 55:5–7, even if such person had not committed any further incidents of sexual misconduct, *id.* at 53:12–13. No direct evidence suggests that Defendant Alpern acted specifically to appease SWIM, *see, e.g.,* ECF No. 99-13 at 141:7–15. And while SWIM suggested guidelines that it thought YSM should adopt in addressing sexual harassment; 150:12–13, 151:5–7; such guidelines included a proposed "rule that when someone is found guilty of sexual harassment, they would lose all honorifics, [including] endowed chairs," *id.* at 151:8–12. Plaintiff's cited evidence does not support his argument of overt sexism by SWIM, nor of Defendant's actions to appease such sexism, thus the court will not address it any further.

There is no dispute that Plaintiff has satisfied the first and second elements of the prima facie test.  Defendants argue, however, that because the University has supplemented Plaintiff's salary so that the loss of the WVZ Professorship has had no financial repercussion, there has been no adverse employment action.  They further argue that there is no evidence from which a reasonable juror could infer discriminatory animus.  And even if Plaintiff has stated his prima facie case, Defendants contend that they have proffered a legitimate, non-discriminatory reason for his removal from the WVZ Professorship, which Plaintiff cannot show to have been pretextual.

### a)  Adverse Action

 For purposes of Title VII claims, an adverse action is defined as a materially adverse change in the terms and conditions of employment.  *Sanders*, 361 F.3d at 755. It must be more than an inconvenience or a change in an employee's responsibilities.  *Id.*

Defendants' position that rescinding the WVZ Professorship was not adverse is supported only by non-controlling district court rulings addressing whether a change in job title, absent a reduction in compensation, constitutes an adverse action.  The court finds these cases inapplicable here.  In the first instance, the Second Circuit unequivocally has stated that giving an employee a "less distinguished title" *can* qualify as an adverse employment action.  *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138, 141 (2d Cir.2003)). Moreover, it also has stated that an adverse employment action can be found in "other indices . . . unique to a particular situation."  *Id.*

Here, it is undisputed that endowed chairs are not titles, but honorifics, and Plaintiff testified that endowed chairs have particular importance within the academic community even beyond the funds they generate.  ECF No. 92-2 at 40:6–9, 42:11–13; ECF No. 92-

4 at 188:1–5.  An endowed chair signals that the holder is especially accomplished in a particular field and generally is bestowed only upon an individual who has exemplified some sort of academic excellence.  ECF No. 92-4 at 188:1–5.  While perhaps analogous to a job title, the endowed chair is yet distinct from a job title, as further shown by the fact that Plaintiff's job title as a professor did not change when his endowed chair was rescinded.  Furthermore, Plaintiff testified that his search for a new position has been hampered by the rescission.  ECF No. 92-4 at 188:6–10.  Construing the evidence most favorably to the nonmovant, these facts are sufficient to show a materially adverse change to Plaintiff's conditions of employment.  The court also notes that the rescission of the WVZ Professorship seems analogous to a poor (and public) performance review, which the Second Circuit also might qualify as an adverse action.  *Sanders*, 361 F.3d at 756 ("[A] negative job evaluation may constitute adverse employment action in certain circumstances . . . .").

Thus, the court finds that there is a genuine issue of fact as to whether Plaintiff experienced an adverse employment action, rending it a question best left to a jury.

*b) Discriminatory Animus*

There are several ways in which a Title VII plaintiff can show circumstances which might lead a reasonable juror to infer discriminatory animus.  One is by pointing to those similarly situated to the plaintiff, but who are not of the protected class, and who were not treated as harshly.  "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury."  *Radwan*, 55 F.4th at 132 (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  However, in rare cases, "the issue can be

resolved as a matter of law." *Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760 (2d Cir. 2008). This is one of those rare cases.

Although Plaintiff does point to some deposition testimony showing that no female faculty members have been punished twice for a violation of the University's sexual harassment policy, the record evidence shows that the reason for this is that no female faculty members ever have been found in violation of that policy. ECF No. 103-2 at ¶¶ 4–6; *see generally* ECF No. 99-1. Thus, there is no possible female comparator. And while Plaintiff points to a specific faculty member as a potential comparator[11], that individual also is a white male.[12] So, even if the comparator was given more lenient treatment than was Plaintiff, the difference cannot be attributed to sex discrimination.

Here, though, the court finds that *Doe* is applicable and saves Plaintiff's Title VII claim from summary judgment. Accordingly, although the parties presented their arguments with respect to *Doe* in the context of the direct evidence inquiry, the court instead will analyze them here.

As discussed supra, the Second Circuit in *Doe* found indicia of discriminatory animus adequate to satisfy the plaintiff's prima facie case because (1) there were procedural anomalies in the plaintiff's disciplinary proceedings, indicating bias, and (2) Columbia had been the subject of media reports accusing the school of not taking seriously its female students' allegations of sexual violence, indicating a bias specifically

---

[11] Defendants argue that certain other individuals, based upon discovery, appeared likely to be used as comparators, but Plaintiff makes no argument with respect to those people and so the court will not apply this analysis to them.

[12] Plaintiff moves to conceal the identity of this individual, who is a non-party. Defendants do not oppose the motion. The court finds good cause to redact this individual's name because of the strong privacy interests at issue, and the relatively weak public interest in identifying the individual. *See generally* D. Conn. L. Civ. R. 5(e). Accordingly, the motion to seal is granted.

in favor of women.  *Doe*, 831 F.3d at 57.  The circuit court found that, from these two facts, a reasonable juror could infer discriminatory animus.

Defendants argue that *Doe* is distinguishable because (1) it dealt with a motion to dismiss, where the plaintiff only had to meet a pleading burden, and (2) there are no procedural anomalies in the instant action such that *Doe* could be applicable.

 With respect to the latter argument, the court disagrees.  The University's sexual harassment policy does not explicitly prohibit successive discipline for a single offense, but it strongly implies that such action is discouraged, particularly in asserting that the entire disciplinary process generally should take about 60 days.  ECF No. 99-10 at 10.  Further, the policy's plain language states that an accused who is found in violation thereof has an opportunity to object to proposed sanctions.  *Id.* at 9–10.  Not only was rescinding the WVZ Professorship outside the UWC recommendations, but Plaintiff was not given an opportunity to present any argument in opposition to the sanction.  Also, it is undisputed that Defendant Alpern assured Plaintiff there would be no attempt to "sabotage" his assumption of the WVZ Professorship.  *See generally* ECF No. 93-8.  In these facts, the court finds that there were procedural anomalies in the present case.

Defendants' former argument is well-taken, though still unpersuasive in the end.  There is, of course, a difference between a plaintiff's relative burdens in opposing a motion to dismiss and opposing a motion for summary judgment.  That does not necessarily mean, though, that *Doe* is wholly inapplicable.  To the contrary, it simply means that those facts which would be sufficient to lead to an inference of discrimination must not only be well pled, but must be shown to have a basis in the evidentiary record such that the court can find that those facts might be proved to a jury.  *See Reeves v.*

*Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000) (holding in their review of a grant of judgment as a matter of law that, within the *McDonnell Douglas* framework, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

Here, there is no dispute as to the facts themselves. Those things which Plaintiff would have needed to plead in response to a motion to dismiss have been conceded in this summary judgment phase of litigation. Plaintiff was adjudged guilty of committing sexual harassment, he was punished, he executed his punishment without further violations, and then years after the completion of his punishment, he was again sanctioned for the same behavior, but this time without any process at all. There is also no dispute that the University was the subject of news reports criticizing its decision to reward a sexual harasser with an endowed chair. Thus, neither the procedural flaws nor the negative media coverage is disputed. According to *Doe*, these facts are sufficient for a jury to find gender bias, and thus, Plaintiff has made his prima facie case.

### 3. Pretext

Defendant next argues that even if Plaintiff has stated his prima facie case, there is a legitimate, non-discriminatory reason for the rescission of the WVZ Professorship: adequately responding to the negative sentiment within the YSM community. Plaintiff counters that he has adduced sufficient evidence from which a reasonable juror could find this proffered reason pretextual.

The court agrees with Plaintiff. First, as the Second Circuit noted in *Doe,* it is not clear that Defendants' proffered reason could not itself suggest discriminatory animus.

As previously discussed, if the University treated Plaintiff differently because of his sex, even if such treatment resulted from a desire to avoid unpleasantries which would have followed unbiased treatment, that treatment still is discrimination. *Doe,* 831 F.3d at 58 n.11. Moreover, the fact that this sanction so far postdated the predicate behavior that Plaintiff already had completed the original sanction, and that the University and the relevant decision-makers found themselves cast in poor light (locally and nationally) for their purported weakness in responding to sexual harassment on campus, all suggest circumstances from which a jury could infer that the rescission of the WVZ Professorship was substantially motivated by discriminatory animus against men, specifically, those who had violated the University's sexual harassment policy.

Accordingly, and for substantially the same reasons as already discussed *supra* in relation to the fourth element of the prima facie case, the court finds that Plaintiff has presented genuine issues of material facts such that he survives summary judgment on his Title VII claim. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89 (2d Cir. 2019) (stating that under the *McDonnell Douglas* framework, a plaintiff may show pretext "by reference to the same evidence used to establish a prima facie case . . . .").

### D. Count Five: Gender Discrimination in Violation of Title IX

Title IX states, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Plaintiff asserts that Defendants violated this statute by failing to provide required procedural protections in their handling of the sexual harassment accusations against him. More specifically, he points to the University's

successive punishment without additional process.  Defendants argue that this claim fails as a matter of law for several reasons.  First, they argue that the Title IX claim is duplicative of the Title VII claim alleged in Count Six.  Second, they contend that the claim is time-barred insofar as it seeks redress for Plaintiff's initial suspension in 2013.  Third, they assert that there is no factual support for Plaintiff's Title IX claim.[13]

### 1. Duplicative Claims

With respect to the first argument, analysis of Title VII claims often mirrors analysis of those brought under Title IX, but that does not necessarily render the claims duplicative of each other.  Notably, "the enforcement mechanisms of each statute apply to different categories of employers and serve independent ends: Title VII provides redress to individual employees for the discriminatory actions of their employers, while Title IX encompasses both individual redress and systemwide compliance by recipients of federal funds."  *Castro v. Yale Univ.*, 518 F.Supp. 3d 593, 606 (D. Conn. 2021).  Further, each Title provides for different remedies, and Title VII has a statutory cap on punitive and compensatory damages which is absent from Title IX.  42 U.S.C.A. § 1981a(b)(3).  For these reasons, the court finds that Count Five and Count Six are not duplicative of each other.  *See Castro*, 518 F.Supp. at 607 (concluding that "employees of educational programs may bring suit against their federally-funded employers for sex-based

---

[13] Defendants initially made several arguments that need not be addressed here.  First, they argued that there is no private right of action under Title IX, but they since have provided notice, *see* ECF No. 105, that the Second Circuit definitively has held that a private cause of action exists.  *Vengalattore v. Cornell University*, 2022 WL 1788705 (2nd Cir., June 2, 2022).  Thus, the court will not address this argument, but it thanks Defendants for their candor.  Second, they argued that Yale University is a private institution, and that constitutional due process claims only can be stated against state actors.  This, of course, is true, but the court does not interpret the complaint to assert constitutional deprivations; rather, the complaint only asserts violations of statutory due process requirements which are applicable to private actors.  Therefore, the court will not address this argument, either.  Finally, they argued that there is no actionable disparate impact claim under Title IX, but since the court already has found that there is no basis for a disparate impact claim in any case, this argument need not be addressed.

discrimination, including retaliation, even if they could also seek remedy by suit under Title VII."); *Doe v. Cent. Connecticut State Univ.*, No. 3:19CV418 (MPS), 2020 WL 1169296, at *7 (D. Conn. Mar. 11, 2020) (declining to dismiss a Title IX claim based on employment discrimination as duplicative of a Title VII claim).

### 2.  *Statute of Limitations*

The court turns next to the statute of limitations.  It is undisputed that the statute of limitations for Title IX claims is three years (based upon Connecticut's statute of limitations for tort claims).  *See Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir.2004) (applying the state statute of limitations for personal injury actions to a Title IX claim); Conn. Gen. Stat. Ann. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of.").  Plaintiff argues that a continuing course of conduct tolls the limitations period in the present case.

The continuing course of conduct doctrine holds that "[w]hen [a] wrong sued upon consists of a continuing course of conduct, the statute [of limitations] does not begin to run until that course of conduct is completed."  *Slainte Invs. Ltd. P'ship v. Jeffrey*, 142 F. Supp. 3d 239, 258 (D. Conn. 2015) (quoting *Giulietti v. Giulietti*, 65 Conn.App. 813, 833, 784 A.2d 905 (Conn.App.2001)) (alterations in original).  "The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied."  *Bartold v. Wells Fargo Bank, N.A.*, No. 14-CV-00865 (VAB), 2015 WL 7458504, at *4 (D. Conn. Nov. 24, 2015).  It is designed to address those cases where "it would be unreasonable to require or even permit [the plaintiff] to sue separately over every incident of the defendant's unlawful conduct" because "[t]he injuries about which

26

the plaintiff is complaining . . . are the consequence of a numerous and continuous series of events." *Gibson v. Metropolis of CT LLC*, No. 19-CV-00544 (KAD), 2020 WL 956981, at *6 (D. Conn. Feb. 27, 2020) (quoting *Watts v. Chittenden*, 301 Conn. 575, 587–88, 22 A.3d 1214 (2011)) (alterations in original).  It does not apply, though, where repeated events give rise to discrete injuries.  *Id.*

Here, the predicate actions for Count Five clearly were discrete events which gave rise to discrete injuries.  Particularly given the amount of time that passed between each event, the court finds that the successive sanctions were not difficult to identify and clearly were not going to be remedied by Defendants, and thus Plaintiff could have filed suit pursuant to any of these sanctions.  Accordingly, he may only bring claims associated with actions taken in the three years preceding the initiation of this case.  Thus, his initial suspension and his removal from the roles of Chief and Director are not actionable predicates for this Title IX claim.  This leaves the rescission of the WVZ Professorship.

In this circuit, Title IX claims based on discipline usually fall within two categories: "(1) claims of an erroneous outcome from a flawed proceeding, and (2) claims of selective enforcement."  *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015); *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  This case falls in the latter category, with Plaintiff arguing that "regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by [his] gender."  *Yusuf*, 35 F.3d at 715.  In the analogous Title VII context, courts disposing of a summary judgment motion must determine "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive."  *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997).  The

question, then, is whether there is sufficient evidence in the record from which a jury reasonably could conclude that rescinding the WVZ Professorship resulted from impermissible gender bias.   In answering this question, a plaintiff may rely upon circumstantial evidence by application of the *McDonnell Douglas* framework in the same way as for Title VII claims.   *Doe,* 831 F.3d at 55–56 ("Title VII cases provide the proper framework for analyzing Title IX discrimination claims.").

Plaintiff again argues that he has presented sufficient direct and circumstantial evidence for his Title IX claim to survive summary judgment, pointing to the evidence cited in his Title VII claim.   Defendants also present the same arguments in opposition.

As discussed *supra*, there is no direct evidence of discriminatory animus. However, given that the court already has found that Plaintiff has identified genuine issues of fact using the *McDonnell Douglas* framework, it need not do so again.   For the same reasons as stated supra, Plaintiff's Title IX claim survives summary judgment.

## IV.   **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment, ECF No. 90, is **DENIED in part** and **GRANTED in part.**

    a.   The Motion is granted with respect to Count One and Count Two.

    b.   The Motion is denied with respect to Count Five and Count Six.

2. Plaintiff's Motion to Seal, ECF No. 97, is **GRANTED.**

3. The parties are instructed to confer and to file a joint status report on or before **January 31, 2024,** that addresses:

   a.  How long trial is anticipated to run, and

   b.  Whether the parties seek referral to a United States Magistrate Judge for the scheduling of a settlement conference.

Thereafter, the court will reset all remaining deadlines in this action.

4.  Rule 73 of the Local Rules for Magistrate Judges provides that "[e]ach Magistrate Judge may exercise case-dispositive authority in a civil case on the specific written request of all parties, as permitted by 28 U.S.C. § 636(c)(1), provided the District Judge assigned to the case approves."  D. Conn. L. Mag. R. 73(A)(1); *see also* 28 U.S.C. § 636(c)(1).  If all parties consent to the jurisdiction of a United States Magistrate Judge over this case (for trial to such court, or to a jury), they shall jointly file a consent form on or before **January 31, 2024**.  The consent form can be found at https://www.uscourts.gov/forms/civil-forms/notice-consent-and-reference-civil-action-magistrate-judge.  Such consent may result in the jury trial being scheduled earlier than would otherwise be set withs a United States District Judge.  If either party does not consent, no action is needed.

**IT IS SO ORDERED** at Hartford, Connecticut, this 17th day of January, 2024.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE